In the Matter of the Estate of ABRAHAM L. ERLANGER, Deceased.

Surrogate's Court, New York County, August 1, 1932.

*Samuel Untermeyer* and *Isidor J. Kresel*, for the proponents.

*Aaron Lipper*, for certain legatees.

*Max D. Steuer* [*Max D. Steuer* and *Irving J. Levy* of counsel], for the contestant.

O'BRIEN, S. This trial of the issue of the status of a contestant in the pending probate proceeding began on October 19, 1931, and with the exception of a recess of one day in November, and of three and a half days in Christmas week occasioned by the death of decedent's sister, continued without interruption until Monday, January 11, 1932, at two P. M.; 149 witnesses were called in the trial, 834 exhibits were marked in evidence and the record fills 6,965 pages. *The period of the cohabitation of the parties runs from*

*early in 1920 down to the date of* decedent's death on March 7, 1930. Practically every part of this period, and in the years 1927–1928–1929 practically every day up to March 7, 1930, when decedent died, is covered by the proofs. It seems not only logical but helpful to present in the first instance some of the landmarks of the law relating to common-law marriages. Parenthetically, it may be stated that while the trial developed many unique situations and individual features, it also disclosed many of the common characteristics of leading common-law marriage cases. With the following authorities before us, when we come to analyze the evidences adduced we will have a truer perspective of the proofs.

Chancellor KENT in his Commentaries (12th ed., edited by O. W. Holmes, Jr., part IV, lect. XXVI, pp. 87, 92, 93) declares: " No peculiar ceremonies are requisite by the common law to the valid celebration of the marriage. The consent of the parties is all that is required; and as marriage is said to be a contract *jure gentium,* that consent is all that is required by natural or public law. The Roman lawyers strongly inculcated the doctrine, that the very foundation and essence of the contract consisted in consent freely given, by parties competent to contract. *Nihil proderit signasse tabulas, si mentem matrimonii non fuisse constabit. Nuptias non concubitus, sed consensus facit.* This is the language equally of the common and canon law and of common reason. If the contract be made *per verba de præsenti,* and remains without cohabitation, or if made *per verba de futuro,* and be followed by consummation, it amounts to a valid marriage in the absence of all civil regulations to the contrary, and which the parties (being competent as to age and consent) cannot dissolve, and it is equally binding as if made in *facie ecclesiæ.* * * * As the law of marriage is a part of the *jus gentium,* the general rule undoubtedly is that a marriage, valid or void by the law of the place where it is celebrated, is valid or void everywhere."

Chancellor WALWORTH declared in *Rose* v. *Clark* (8 Paige, 574, 579): " For it is now a settled rule of the common law which was brought into this State by its first English settlers, and which was probably the same among the ancient Protestant Dutch inhabitants, that any mutual agreement between the parties to be husband and wife *in praesenti, especially where it is followed by cohabitation,* constitutes a valid and binding marriage; if there is no legal disability on the part of either to contract matrimony (2 Kent Com. 87). * * * That an actual marriage may be inferred in ordinary cases, from cohabitation, acknowledgments of the parties, etc., as well as by positive proof of the fact, there can be no room to doubt (see Math. on Pres. Evid. 283, and cases there cited). And the only

doubt in this case arises from the proof of the fact that the matrimonial cohabitation between these parties commenced, previous to the death of the first husband under a contract of marriage which was absolutely void previous to the revised statutes; although neither of them may have known at the time that Frink was still living (*Valleau* v. *Valleau*, 6 Paige's Rep. 210). It appears, however, from decisions in our own courts, as well as in England, that a subsequent marriage may be inferred from acts of recognition, continued matrimonial cohabitation and general reputation; even where the parties originally came together under a void contract of marriage. The case of *Wilkinson* v. *Payne* (4 Durn. & East's Rep. 468) *carried the doctrine of presumption to a very great length on the subject.* There the marriage was absolutely void under the English marriage acts, for the husband, whose parents were dead, was under age at the time the ceremony was performed and had no legal guardian to consent to the marriage. And when he afterwards became of age his wife was upon her deathbed and actually died in three weeks from that time. But upon proof that the father of the wife, who was the defendant in that suit, and the rest of his family, had always treated them as husband and wife, Justice Grose, before whom the cause was tried, left it to the jury to presume a legal marriage after the husband was of age; which they did. And the court of king's bench refused to disturb their verdict." (Citing *Fenton* v. *Reed*, 4 Johns. 52, and *Jackson* v. *Claw*, 18 id. 346.)

Bishop, an authority quoted in practically every State in the Union, declares (1 Bish. Mar. & Div. [6th ed.] § 457): " Every intendment of the law is in favor of matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of the proofs, the law raises a strong presumption of its legality; not only casting the burden of proof on the party objecting, but requiring him throughout, and in every particular, plainly to make the fact appear, against the constant pressure of this presumption, that it is illegal and void. * * * *And the strength of the presumption increases with the lapse of time through which the parties are cohabiting as husband and wife.*"

The United States Supreme Court, 1907 (*Travers* v. *Reinhardt*, 205 U. S. 423, 440), in a case where the parties had lived a few months in the State of New Jersey, held: " We are of the opinion that even if the alleged marriage would have been regarded as invalid in Virginia for want of a license, had the parties remained there, and invalid in Maryland for want of a religious ceremony, had they remained in that State, it was to be deemed a valid marriage in New Jersey after James Travers and the woman Sophia, as husband

and wife, took up their permanent residence there and *lived together in that relationship continuously, in good faith and openly,* up to the death of Travers — being regarded by themselves and in the community as husband and wife. *Their conduct towards each other in the eye of the public, while in New Jersey, taken in connection with their previous association, was equivalent in law to a declaration by each that they did and during their lives were to occupy the relation of husband and wife. Such a declaration was as effective to establish the status of marriage in New Jersey as if it had been made in words of the present tense after they became domiciled in that State."* (Italics are writer's.) (See also, *Meister* v. *Moore,* 96 U. S. 76.)

Judge KELLOGG, in a recent decision, in which all concurred (*Fisher* v. *Fisher,* 250 N. Y. 313, 316, 317), succinctly states historical aspects of the law of common-law marriages: " It is elementary that marriage is a civil contract; that the law deals with it as it does with all other contracts; that it pronounces a marriage to be valid wherever a man and woman, able and willing to contract do, *per verba de præsenti* promise to become husband and wife. (Black Com. Sharswood, vol. 1, pp. 432–441; Kent's Com., vol. 2, p. 57; *Clayton* v. *Wardell,* 4 N. Y. 230; *Matter of Ziegler* v. *Cassidy's Sons,* 220 N. Y. 98; *Meister* v. *Moore,* 96 U. S. 76.) A formal ceremony of marriage, whether in due form or not, must be assumed to be by consent, and, therefore, *prima facie* a contract of marriage *per verba de præsenti.* (*Fleming* v. *People,* 27 N. Y. 329.) According to the common law of all Christendom, consensual marriages — *i. e.,* marriages resting simply on consent *per verba de præsenti* — between competent parties, are valid marriages. (Wharton's Conflict of Laws, secs. 171–173.) ' This view prevailed, and may be said to have been *the common law of Christendom, as it had been of the old Roman Empire, down till the Council of Trent.'* (Maitland Select Essays in Anglo-American Legal History, vol. 3, p. 810.) The canon law declared a valid marriage existed where competent parties should covenant, ' *ego te accipio in meam,'* and ' *ego te accipio in meum.'* (Wharton, sec. 171.) Consensual marriages were valid in England, Scotland, The Netherlands, Spain, Portugal, Germany and the United States. (Wharton, secs. 172, 183.) ' Marriage is a thing of right, recognized in all countries, in all ages, among all people, all religions, all philosophies. It pertains, therefore, in the highest sense, to the law of nations, in distinction from the law of any particular state or country.' (Bishop Marr. & Div. vol. 1, sec. 351.) Marriage between parties capable of contracting is ' of common right, and valid by a common law prevailing throughout Christendom.' (*Hutchins* v. *Kimmell,* 31 Mich. 126.) * * * ' *Prima facie* a good marriage is shown when the con-

tract is proved with cohabitation following it, and we cannot assume that there are regulations restrictive of the common right until they are shown.' (Per COOLEY, J., in *Hutchins* v. *Kimmell, supra.*) Every presumption lies in favor of the validity of a marriage. (1 Bishop, § 13; *Piers* v. *Piers,* 2 H. L. Cas. 331; *Hynes* v. *McDermott,* 91 N. Y. 451.) Marriage between the parties to this action was not subject to any bar imposed by the common voice of Christendom. Consequently, although no law of any State, territory or district of the United States, sanctioning the marriage of the parties to this action, may have followed the ship *Leviathan* upon the high seas, in the absence of any such law, which condemned the marriage, we think that they were lawfully married."

The erudite ROBERT LUDLOW FOWLER, who for many years adorned this court, in *Matter of Spondre* (98 Misc. 524, 531) held: " The necessary declarations of Henry and Rachel Spondre to the commissioners of immigration at the Port of New York, of themselves constituted, at common law, a perfectly good contract of marriage *per verba de præsenti.* Their cohabitation and union is not denied, and, indeed, is established beyond all peradventure. * * * If we inquire what other evidence besides that denoted above there may be of such marriage, let me say *that evidence,* which I had always believed until lately was universally regarded as the highest kind of evidence known to the law of civilized peoples — I refer to *reputation and cohabitation.* (*People* v. *Humphrey,* 7 Johns. 314; *Hynes* v. *McDermott,* 91 N. Y. at page 463, 43 Am. Rep. 677, where all the authorities are reviewed.) " After citing *Blanchard* v. *Lambert* (43 Iowa, 228), the court said that Henry and Rachel Spondre were married under the old law of this State, *their arrival in this port as husband and wife,* followed by their long cohabitation in this city and by the established general repute of their marriage, sufficiently demonstrates for this matter.

In *O'Gara* v. *Eisenlohr* (38 N. Y. 298), a New York decision cited in *Travers* v. *Reinhardt* (205 U. S. 438), our Court of Appeals held: " It was entirely competent to prove the marriage by cohabitation, acknowledgment of the marriage by the parties themselves, reception of them as man and wife by their relatives and friends, and common reputation. (Matthews Pres. Ev. 283; 4 Johns. 52; 18 id. 346; 4 Comst. 230; 5 Day, 290; 9 May, 114; 8 Serg. & Rawle, 159.) Marriage with us is but a civil contract, and no ceremonial is necessary to create this relation. A contract of marriage made ' *per verba de præsenti* ' amounts to an actual marriage and is valid, and *marriage is inferred* when the parties live and cohabit together with all the concomitants of this case. * * * The presumption of law, also, is in favor of innocence, and against the commission of crime and immorality " (p. 301).

Another Court of Appeals decision cited throughout the land is *Badger* v. *Badger* (88 N. Y. 547), which ought to be read and studied by all who are interested in the law of common-law marriages, particularly because it presents a masterly analysis of the facts and a deep insight into everyday life and human affairs. The court held: " The reputation attending this cohabitation in the neighborhood where it existed and was known among those brought into its presence by relationship, business, or society, was that which ordinarily attends the dwelling together of husband and wife. It has been well described as the shadow cast by their daily lives (1 Bishop on Marriage and Divorce, § 438). *In the general repute surrounding them*, the slow growth of months and years, the resultant picture of forgotten incidents, passing events, habitual and daily conduct, presumably honest because disinterested, and safer to be trusted because prone to suspect we are enabled to see the character of the cohabitation, and discern its distinctive features. It is for that reason that such general repute is permitted to be proven. It sums up a multitude of trivial details."

The same court in a later decision (*Wilcox* v. *Wilcox*, 46 Hun, 32) held: " The general definition of ' matrimonial cohabitation is the living together of a man and woman ostensibly as husband and wife ' (1 Bish. on Mar. and Div. § 777; *Yardley's Estate*, 75 Penn. St. 207; *Pollock* v. *Pollock*, 71 N. Y. 137). This does not necessarily require the announcement further than it is given by the appearances of the purpose of the parties. There must be sufficient to fairly represent such relation by the manner in which the parties are living together. The fact that Wilcox kept rooms in his own house which he occupied a portion of the time at least, is a circumstance bearing upon the question of cohabitation, but is not necessarily inconsistent with it. (*Badger* v. *Badger*, 88 N. Y. 547.) "

Another decision of this State quoted far and near and cited by all writers on common-law marriages is *Hynes* v. *McDermott* (91 N. Y. 451), which should be examined as should *Gall* v. *Gall* (114 N. Y. 109) and *Badger* v. *Badger* (88 id. 547), particularly for the benefit of observing the court's treatment of the facts in the case. In some aspects this authority is especially applicable to the instant case: " *There is no direct evidence of the interchange of consents during their stay in Paris. There was evidence that they lived together there in the apparent relation of marriage, and assuming that what occurred between them in Cleveland street, did not constitute a valid marriage by the law of this State,* for the reason that the law of England can only be resorted to, to determine the effect of that transaction, we are, nevertheless, of opinion that the jury were authorized to find that in France the requisite consents were interchanged, and

that the parties, then and there, became husband and wife. The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence." (Citing *Morris* v. *Davies*, 5 Cl. & Fin. 163, and *Piers* v. *Piers*, 2 H. L. Cas. 331.) Adhering to the principles previously laid down, the Court of Appeals in *Gall* v. *Gall* (114 N. Y. 109, 117), which may be justly entitled as a generally accepted authority upon common-law marriage status, held: " The cohabitation, apparently decent and orderly, of two persons opposite in sex, raises a presumption of more or less strength that they have been duly married. While such cohabitation does not constitute marriage, it tends to prove that a marriage contract has been entered into by the parties. Where, however, the cohabitation is illicit in its origin, the presumption is that it so continues until a change in its character is shown by acts and circumstances strongly indicating that the connection has become matrimonial. It is sufficient if the acts and declarations of the parties, their reputation as married people and the circumstances surrounding them in their daily lives, naturally lead to the conclusion that, although they began to live together as man and mistress, they finally agreed to live together as husband and wife. (*Caujolle* v. *Ferrie*, 23 N. Y. 90; *O'Gara* v. *Eisenlohr*, 38 id. 296; *Badger* v. *Badger*, 83 id. 546, 554; *Hynes* v. *McDermott*, 91 id. 451, 457.) "

Surrogate SLATER in an exhaustive opinion in a case in which it appeared that the parties, residents of Westchester county in the period (1902–1908) when common-law marriage was not valid in this State, went to Philadelphia and sent a card through the mails announcing their marriage — a brief statement of two lines, and the next day returned to Westchester county, where they afterward lived. The surrogate held: "*After the impediment had been removed, the law will presume that the decedent and the petitioner consented and agreed to continue their relations as husband and wife.* The evidence shows that they acted accordingly. At all times they had acted in good faith. Duration of cohabitation must be taken in consideration. Immediately on January 1, 1908, a contract of marriage will be presumed to have been entered into. Their conduct established the contract. The presumption of marriage, when it once arises, is a strong one, there can be no doubt, but it is certainly rebuttable. (*Caujolle* v. *Ferrie*, 23 N. Y. 90;

*Hynes* v. *McDermott*, 91 id. 451.) '' There was a good common-law marriage in this State between the petitioner and the decedent, *and the relations established and recognized for so long a time ought not to be set aside.* The common-law marriage has been established very clearly by actual cohabitation as husband and wife, acknowledgment, declarations, conduct, repute and reception among friends and neighbors. *The facts presented justify holding that the parties were twofold married. They did in truth and in fact agree to enter into and sustain the marriage relation contracted at Philadelphia, Pa., on January 18, 1903, and likewise under our law on January 1, 1908.* (*Matter of Seymour,* 113 Misc. 421.) *Maryland has laid down the same principle* (*Richardson* v. *Smith,* 80 Md. 89, 93), holding: '' The law has wisely provided that marriage may be proved by *general reputation, cohabitation* and acknowledgment; when these exist, it will be inferred that a religious ceremony has taken place; and this proof will not be invalidated because evidence cannot be obtained of the time, place and manner of the celebration of the marriage. On this point we think it unnecessary to do more than quote from *Redgrave* v. *Redgrave* (38 Md. 93, 97): ' Where parties live together ostensibly as man and wife, demeaning themselves toward each other as such and are received into society and treated by their friends and relations as having and being entitled to that status, the law will, in favor of *morality and decency,* presume that they have been legally married. (1 Taylor, Evidence, §§ 140, 517; *Hervey* v. *Hervey,* 2 W. Bl. 877; *Goodman* v. *Goodman,* 28 L. J. Ch. 1; *Jewell* v. *Jewell,* 1 How. 219, 232.) ' ''

Justice COOLEY in *Hutchins* v. *Kimmell* (31 Mich. 126; 18 Am. Rep. 164), speaking for the court in discussing common-law marriage, said in part: '' Whatever the form of ceremony, *or even if all ceremony was dispensed with,* if the parties agreed presently to take each other for husband and wife, and from that time lived together professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties and which would subject them and others to legal penalties for a disregard of its obligations. *This has become the settled doctrine of the American courts; the few cases of dissent or apparent dissent being borne down by a great weight of authority in favor of the rule as we have stated it,* citing *Fenton* v. *Reed,* 4 Johns. 52 (4 Am. Dec. 244); *Jackson* v. *Winne,* 7 Wend. 47 (22 Am. Dec. 563); *Starr* v. *Peck,* 1 Hill, 270; *Rose* v. *Clark,* 8 Paige, 574; *Matter of Taylor,* 9 Paige, 611; *Clayton* v. *Wardell,* 4 N. Y. 230; *Cheney* v. *Arnold,* 15 N. Y. 345 (69 Am. Dec. 609); *O'Gara* v. *Eisenlohr,* 38 N. Y. 296; *Pearson* v. *Howey,* 11 N. J. Law, 12; *Hantz* v. *Sealy,* 6 Binn. 405; *Commonwealth* v. *Stump,* 53 Pa. St. 132 (91 Am. Dec. 198);

*Newbury* v. *Brunswick*, 2 Vt. 151 (19 Am. Dec. 703); *State* v. *Rood*, 12 Vt. 396; *Northfield* v. *Vershire*, 33 Vt. 110; *Duncan* v. *Duncan*, 10 Ohio St. 181; *Carmichael* v. *State*, 12 Ohio St. 553; *State* v. *Patterson*, 2 Ired. 346 (38 Am. Dec. 699); *Londonderry* v. *Chester*, 2 N. H. 263 (9 Am. Dec. 61); *Keyes* v. *Keyes*, 2 Fost. (N. H.) 553; *Bashaw* v. *State*, 1 Yerg. 177; *Grisham* v. *State*, 2 Yerg. 589; *Cheseldine's Lessee* v. *Brewer*, 1 H. & McH. 152; *State* v. *Murphy*, 6 Ala. 765 (41 Am. Dec. 79); *Potier* v. *Barclay*, 15 Ala. 439. *Dumaresly* v. *Fishly*, 3 A. K. Marsh. 368; *Graham* v. *Bennet*, 2 Cal. 503; *Case* v. *Case*, 17 Cal. 598; *Patton* v. *Philadelphia*, 1 La. Ann. 98; *Holmes* v. *Holmes*, 6 La. R. 463; *Hallett* v. *Collins*, 10 How. 174." On the subject generally of common-law marriage the following may profitably be considered: *Dalrymple* v. *Dalrymple* (2 Hagg. Consist. 54–137), a most scholarly and comprehensive opinion which every student of this branch of the law should read and analyze, the report of decision and exhibits covers 249 pages); *Lindo* v. *Belisario* (1 Hagg. Consist. 216; id. appendix, p. 217, in which the Jewish law is discussed with much detail and opinions of experts examined and works of the learned Maimonides and Beth Joseph consulted); *The Queen* v. *Millis* (10 Cl. & Fin. 534, a most exhaustive opinion of 373 pages on marriage *per verba de præsenti*); *Hallett* v. *Collins* (10 How. 181); *Meister* v. *Moore* (96 U. S. 82); *Jewell's Lessee* v. *Jewell* (1 How. 218); *Maryland* v. *Baldwin* (112 U. S. 490); *Adger* v. *Ackerman* (115 Fed. 124); *Hamlin* v. *Grogan* (257 id. 59); *Hutchinson* v. *Hutchinson* (63 N. E. 1023); *Medway* v. *Needham* (16 Mass. 157); L. R. A. 1915 E; note to *Grigsby* v. *Reib* (105 Tex. 597; 153 S. W. 1124); note to *Becker* v. *Becker* (153 Wis. 226; 140 N. W. 1092); note to *People* v. *Shaw* (259 Ill. 544; 102 N. E. 1031); these notes appended to said three decisions in Texas, Wisconsin and Illinois cases respectively and published in L. R. A., *supra*, present a most exhaustive study of common-law marriages as recognized in the several States of the Union; 18 R. C. L. § 10, chapter on common-law marriage; R. C. L., Permanent Supplement, 6; " *Marriage and the State*," (Richmond & Hill, Russell Sage Foundation); " *Marriage Laws and Decisions in the United States* " (Geoffry May, Russell Sage Foundation); " Getting a Divorce " (by Isabel Drummond, publ. Alfred Knopf). Consult, also, " *Common Law Marriage* " by Koegel, especially the chapter on the Council of Trent; *Matter of Taylor* (9 Paige, 611); *Fenton* v. *Reed* (4 Johns. 52); *Rose* v. *Clark* (8 Paige, 573); *Bissell* v. *Bissell* (55 Barb. 325, 327); *Cheney* v. *Arnold* (15 N. Y. 345, 347); *Chamberlain* v. *Chamberlain* (71 id. 423, 427); *Ziegler* v. *Cassidy's Sons* (220 id. 98); *Matter of Hinman* (147 App. Div. 452; affd., 206 N. Y. 653); *Boyd* v. *Boyd* (252 id. 422); *Miller* v. *Amalgamated Laundries* (257 id. 588): *Chamberlain* v. *Chamber-*

*lain* (68 N. J. Eq. 414; affd., Id. 736); *Clark* v. *Clark* (52 id. 650); *Smith* v. *Smith* (52 N. J. Law, 207); *Schaffer* v. *Schaffer* (88 N. J. Eq. 19); *Burger* v. *Burger* (105 id. 403, 409); *People* v. *Pizzura* (211 Mich. 71, opinion by MOORE, C. J., concurred in by his eight colleagues); *Askew* v. *Dupree* (30 Ga. 173); *Matter of Schroeder* (205 App. Div. 883); *Matter of Cofer* (119 Misc. 587; affd., 206 App. Div. 657; affd., 237 N. Y. 512, in both of which cases Surrogate FOLEY's decisions were affirmed); *Matter of Maggio* (FOLEY, S., N. Y. L. J. July 5, 1931); *Matter of Briggs* (138 Misc. 136; affd., 232 App. Div. 666); *Matter of Biersack* (96 Misc. 161, 173, 174); *Applegate* v. *Applegate* (118 id. 359–362, opinion by LAZANSKY, J.); *Matter of Meyers* (129 id. 760, FOLEY, S.); *Matter of Murtha* (136 id. 424; revd., 232 App. Div. 285; latter decision reversed in Court of Appeals, 259 N. Y. 456); *Matter of Smith* (WINGATE, S., 136 Misc. 863).

The foregoing authorities clear the way for a statement of the evidence, but still further clarity and better understanding of the proofs presented and the weight to be allotted to this or that item of evidence if these proofs be considered in the light of the following: (1) One of the parties to the alleged marriage is dead and the other party, the contestant, upon taking the witness stand, was in the very first instant barred from testifying concerning her relations, conversations, etc., with decedent by the proponents' objection raised under section 347 of the Civil Practice Act, so that both are mute so far as oral testimony is concerned. (2) One of the proponents, Baron, renounced his executorship before taking the witness stand so that he might testify as to acts and conversations with decedent without opening the door to the testimony of contestant concerning the decedent, but he did not resign his temporary administratorship, which he continues to hold. (3) Proponents as temporary administrators have been in possession of the books, records, files, letters, telegrams and personal effects of decedent and have continued the theatrical business of decedent. (4) Testimony was elicited by proponents from Pratt, the auditor, still employed in the Erlanger offices, which indicates a purpose to claim as a gift to them all of the stock of two of the principal corporations of decedent's enterprises, viz., the Erlanger Amusement Enterprises, Inc., and the Erlanger Real Estate Corporations (5684). (5) By a decree of divorce made in 1912 in favor of Adelaide Louise Erlanger decedent was prohibited from marrying in the State of New York during the lifetime of the plaintiff, who is still alive. A violation of the terms of this decree would constitute bigamy under the statutes of this State. The Penal Law, section 340, defines bigamy and fixes the punishment in a penitentiary or

State prison at not more than five years, and section 8 of the Domestic Relations Law (as amd. by Laws of 1919, chap. 265) declares: "Marriage after divorce for adultery. Whenever a marriage has been or shall be dissolved, the complainant may marry again during the lifetime of the defendant. But a defendant for whose adultery the judgment of divorce has been granted in this State may not marry again during the lifetime of the complainant, unless the court in which the judgment of divorce was rendered shall in that respect modify such judgment, which modification shall be made only upon satisfactory proof that three years have elapsed since the decree of divorce was rendered, and that the conduct of the defendant since the dissolution of said marriage has been uniformly good; * * *."

In McKinney's Consolidated Laws of New York, book 14, page 30, section 8 of the Domestic Relations Law is annotated as follows: " Re-marriage of one divorced for adultery as bigamous. For the purpose of enforcing a statute which declares that every person having a husband or wife living who shall marry again, shall, except in specified cases, be adjudged guilty of bigamy, a person against whom a divorce has been obtained because of adultery and who has not received a judicial permit to remarry, is regarded as having a husband or wife living. A person, therefore, so divorced and so under a disability, who marries, is guilty of bigamy. (*People* v. *Faber*, [1883] 92 N. Y. 146; 44 Am. Rep. 357; reversing 29 Hun, 320, and over-ruling *People* v. *Hovey*, 5 Barb. 117; compare *Moore* v. *Moore*, [1877] 8 Abb. N. Cas. 171.) " (6) The United States Code, title 18, section 398, provides as follows: " Any person who shall knowingly transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, or in any territory or in the District of Columbia, any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl to become a prostitute or to give herself up to debauchery, or to engage in any other immoral practice; or who shall knowingly procure or obtain, or cause to be procured or obtained, or aid or assist in procuring or obtaining, any ticket or tickets, or any form of transportation or evidence of the right thereto, to be used by any woman or girl in interstate or foreign commerce, or in any territory or the District of Columbia, in going to any place for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent or purpose on the part of such person to induce, entice, or compel her to give herself up to the practice of prostitution, or to give herself up to debauchery,

or any other immoral practice, whereby any such woman or girl shall be transported in interstate or foreign commerce, or in any territory or the District of Columbia, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $5,000, or by imprisonment of not more than five years, or by both such fine and imprisonment, in the discretion of the court. (June 25, 1910, c. 395, § 2, 36 Stat. 825.) " (7) Decedent was a dominant character who had reached the pinnacle of far-reaching power and prominence in the theatrical world, his properties and business being located in many of the populous cities in this country. His brother, one of the proponents, was, until recently retired, a Supreme Court judge; until recently he was a bachelor and lived during the period of the relationship of the parties with his unmarried sister, Ray, who died during the trial of this issue. Contestant was a daughter of Rudolph Fixel and Delia Ferdelin, and a cousin of Olivia Leventritt and a niece of the late Supreme Court Judge David Leventritt. She took up voice culture with Clara Kalisher in 1902 and later went on the stage, appearing in many well-known productions. "In cases of this kind the character of the parties to the alleged marriage is of much importance." (Surrogate Fowler in *Matter of Eichler*, 84 Misc. 672, 673, citing *Chamberlain* v. *Chamberlain*, 71 N. Y. 423; *Matter of Brush*, 25 App. Div. 610.)

The contestant called the following witnesses:

*Walter S. Thompson*, bank teller in the Union Dime Savings Bank, with which he has been connected for forty years; knew the contestant, could not recall exactly how long, but he should say twenty years about. He first became acquainted with her under the name of Charlotte Fixel; she was a depositor in his bank; her account was changed to Charlotte Lesley, her occupation was given as that of an actress. Later on he got to know her as Mrs. Erlanger, and fixes the date as possibly 1920 or 1921. He was unable to fix the date upon being told at what time the play " Mary " was being presented at the Knickerbocker Theatre, having received through the contestant tickets for that play. It was conceded by counsel that the play ran from October 18, 1920, to April 23, 1921. He recognizes his handwriting on plaintiff's Exhibit 259; the number of the account and " Fifty shares of Bethlehem Steel " being in his handwriting. He received this order for the purchase of the fifty shares of Bethlehem Steel from Mrs. Erlanger, and the account in the bank at that time was in the name of Charlotte Lesley. He passed it along to the assistant treasurer, Mr. Miller; he recognized Mr. Miller's signature on plaintiff's Exhibit 261;

plaintiff's Exhibit 259 had already been shown him; he identifies three sheets which compose plaintiff's Exhibit 257; the date on one is January 27, 1922; the second, October 4, 1923, and the third, October 9, 1924. In each instance Mr. Thompson wrote the words, " Charlotte Lesley," and on two of them, " 232 West End Avenue," and at the time he wrote the name Charlotte Lesley on these he knew that Charlotte Lesley and Mrs. Erlanger were the same person.

*Miss Clara Kalisher,* who first taught singing lessons to the contestant in 1902, contestant having been brought to her studio by *Miss Olivia Leventritt, a daughter of Judge Leventritt and Mrs. Erlanger's cousin,* testified that Miss Leventritt introduced her as her cousin. She first met the decedent in 1920 or 1921; went with Mr. and Mrs. Erlanger to see the " Yankee Princess " at the Knickerbocker Theatre. Contestant introduced her when they got into the car, stating, " This is my vocal teacher, Miss Clara Kalisher," and she said, " Clara, I would like you to know my dearly beloved husband." From that time on she continued to visit her at the West End avenue home. When she called up the West End avenue home, she asked for Mrs. Erlanger, and was always connected with Mrs. Erlanger.

*Charles J. Keeley,* in the fish business at No. 227 Columbus avenue, testified that he knew Mrs. Erlanger and served her fish at the West End avenue address; that she generally went over herself; that he always marked on the ticket " Mrs. Erlanger; " that she would say, " Send this to Mrs. Erlanger at my house; " that he addressed her as Mrs. Erlanger; that is all he knew her by; that he judges the time to about thirteen years ago. Later he said that he would not say positively about thirteen years, he could not say for sure — it might be only ten years, he could not say really. He has no books to show when she started to trade there. He served her also at No. 175 Riverside drive. He insists that he testified " about thirteen years ago," and says that it may be only ten.

*Hugh C. Reilly,* a butcher at No. 235 Columbus avenue, formerly at Amsterdam avenue, corner of Seventieth street, testified that he knew Mrs. Erlanger, he guesses, for the last ten years; that she came to the store; that he knew her as Mrs. Erlanger and sold her meat and delivered it at the West End avenue home and also at the Riverside drive apartment, he thinks, for over a period of nine or ten years. He said that he served Mr. Erlanger before when he had a housekeeper.

*Henry W. Noll,* a retail grocer in Columbus avenue, knew the contestant as Mrs. Erlanger. She marketed at his place of business,

beginning to market with him some time after December, 1919, and continued to market with him for eight years or more, deliveries being made to the West End avenue house and to the No. 175 Riverside drive apartment; that everybody in his place knew her by the name of Mrs. Erlanger.

*Alphonso Russo*, a fruit and produce dealer with a store on Amsterdam avenue, between Sixty-seventh and Sixty-eighth streets, testified that he knew Mrs. Erlanger for about four or five years; that she did her own marketing and that he delivered produce and fruit at her home at No. 175 Riverside drive; that that is the only address of hers that he knew.

*Pierre V. Senegas*, hairdresser, knew contestant first as Charlotte Lesley and later as Mrs. Erlanger. He knew her as Charlotte Lesley since 1905, met her at the West End avenue house, where he went to dress her hair, also saw her at Riverside drive. Visited the apartment at Riverside drive; dined there with Mr. and Mrs. Erlanger. Witness addressed her as Mrs. Erlanger; decedent addressed her as "Darling," "Charlotte," "Dearest," or as Mrs. Erlanger. He dressed her hair before he met Mr. Erlanger; had records in his books of appointments made for Mrs. Erlanger; books from 1922 to 1929; said he always did her hair; dressed it himself; he brought the books for each year running from 1922 to 1929; said she had been his customer since 1905. His place is located in the theatrical district; said he did not keep any books before 1922; prior to that time kept his appointments on slips of paper.

*Ulysses G. Brown*, the private telegrapher and telephone switchboard operator at decedent's office from 1921 to May, 1926, testified that he delivered packages and letters to Mrs. Erlanger at No. 232 West End avenue, decedent directing him to report to Miss Donnelly and get the package and take it to Mrs. Erlanger at No. 232 West End avenue. At the house he asked for Mrs. Erlanger and delivered the package; *that every day for five years*, except Sundays, he telephoned to Mrs. Erlanger at the West End avenue home for Mr. Erlanger; that it was a custom when the latter was going to lunch for him to say, "Call up Mrs. Erlanger and tell her that I am going to lunch downtown and I won't be home for lunch," or "I will be home for lunch," and that he would designate the hour and that it was a further custom for him, Brown, to call up Mrs. Erlanger and tell her that Mr. Erlanger was on the way; that upon leaving decedent's employ he was given a written recommendation by the general manager, Bergman (this is decedent's nephew). On cross-examination he adheres to his statement that *every day for five years, except Sundays, when decedent was in town,*

*at his personal request he called Mrs. Erlanger once a day and mostly twice a day.*

*Lars Jorgensen,* in decedent's employ for over seven years — from about 1923 to May 31, 1930 — as an office assistant; carried messages and parcels to the West End avenue home and to the Riverside drive apartment, the messages and parcels being for Mrs. Erlanger, and that he met her at both of these homes. He further testified that he went to the West End avenue home *200 times or more and to the Riverside drive home 50 to 100 times;* that he went there on occasions when decedent was there, in both of these homes, and *that he never knew contestant by any other name than Mrs. Erlanger.* Recalled, he testified that the messages he took to 232 West End avenue and the Riverside drive apartment were not oral, they were letters inclosed in envelopes and addressed *"Mrs. A. L. Erlanger,"* and the parcels that he took to West End avenue and to No. 175 Riverside drive, given him to deliver by Miss Donnelly or by Tommy Tucker, were *the majority of them or a great number of them addressed "Mrs. A. L. Erlanger,"* and some were addressed " Mr. A. L. Erlanger."

*Edward Fitzgerald,* who worked in the financial department of the Erlanger Enterprises *from June, 1925, to October, 1931,* testified as to personal bills of Mr. and Mrs. Erlanger passing through his hands. He described the *modus operandi* for handling bills and various approvals put upon them (2169–2191); that there were bills that bore Mrs. Erlanger's " O K; " that he went to West End avenue when decedent was sick to get him to sign checks and saw Mrs. Erlanger there; that he did relief work on the telephone; that he addressed her as Mrs. Erlanger; that he heard Mr. Pratt call her Mrs. Erlanger. He referred to an insurance bill where the name of the car was mentioned and " Mrs. A. L. Erlanger " was on the bill. It was in 1925 and the car was a Flint car; that Mr. Golding, his superior at that time, referred to her as Mrs. Erlanger; that the only persons who referred to her as Mrs. Erlanger were Mr. Dillon, Miss Donnelly, his wife, and Mr. Golding, in 1925. He testified that the Dillons and Miss Donnelly's sister and he himself and Mr. Jorgensen always referred to her as Mrs. Erlanger, also the other operators on the board and Tommy Tucker. The witness was examined by Judge Erlanger on October 17, 1930, and the next day he was discharged. He testified that after his discharge he met George W. Lederer; Lederer said, " Hello, Eddie," whereupon Mr. Warner, a theatrical manager, told him that Eddie had been discharged, and Fitzgerald said that there was no reason given, but he believed that it was because he stated that he knew this lady as *Mrs. Erlanger.* Then " Mr. Lederer said

to me, ' *That is all anybody in the building knew her as.*' " He was asked about Lederer's testimony of having rung up on the day Erlanger died the Erlanger offices, and having talked with Eddie Fitzgerald and getting the address. of Mrs. A. L. Erlanger from him, and Fitzgerald said he does not remember; he is sure that he did not speak to Lederer on March seventh; when he says he did not remember, he is sure that he did not talk to him. Fitzgerald said that he did know there was a Mrs. A. L. Erlanger at No. 175 Riverside drive (6770).

*Madeline Dillon, known in the Erlanger offices as Miss Donnelly,* though she was married in 1926 to John J. Dillon, was Erlanger's private secretary from February, 1918, up to the time of his death, shortly after which she was discharged by Judge Erlanger, one of the proponents; first met Mrs. Erlanger in 1921, in decedent's home in West End avenue; he then was ill and directed her visit, to take some dictation; she recollected his saying, " Miss Donnelly, this is Mrs. Erlanger." She next saw Mrs. Erlanger at the " Ben Hur " opening, a screen production in the George M. Cohan Theatre; Mr. Erlanger was interested in the picture, which was a picturization of the Erlanger legitimate production of " Ben Hur; " she saw *contestant with Mr. Erlanger on the left-hand side of the theatre about four rows from the rear;* among the persons at the place where Mr. and Mrs. Erlanger sat, she remembers Vincent Astor and Henry L. Wallace. She next saw Mrs. Erlanger at the Knicker- bocker Theatre in August of 1926, at a rehearsal of " Honeymoon Lane." Mr. Erlanger always rehearsed his own performances; this was before the try out of " Honeymoon Lane " at Atlantic City, at which performance several witnesses testified to having seen Mr. and Mrs. Erlanger. She next saw her at the opening of " Happy- Go-Lucky " in September, 1926; witness, who had just been married, was present with her husband; she greeted Mrs. Erlanger on that occasion; next saw her in June, 1927, in the West End avenue home. She had been in the hospital where she gave birth to a baby and the baby had died; at the hospital she received a telegram from decedent, who, as the testimony already showed, had suffered a stroke on *May 4, 1927,* and was confined to his home from that time on until the latter part of July, when contestant took him to Atlantic City. Decedent's telegram read, " *I mourn with you in your mishap, but thank God you are here and I pray for your early recovery. A. L. Erlanger.*" On her call, Erlanger was in his bed and he got up while she was there; her husband was with her; he talked with her husband about going into the office (in his employ). *He told her how very wonderful Mrs. Erlanger had been to him.* She returned to

work on July fifth, but saw Erlanger again on July third. Mrs. Erlanger and Dillon were there; Erlanger addressed Mrs. Erlanger as " Charlotte, darling," and his " Little Blue Angel." She next saw Erlanger in the Shelburne Hotel at Atlantic City in August, 1927; this was the only time she saw him in August; she is positive she did not see Mr. Baron at Atlantic City in August of 1927. Erlanger had not been at his office at any time in August, 1927; she is a notary public; she stated she did not take any acknowledgments of Mr. Erlanger to any document in Atlantic City in August, 1927, nor did she see him sign any document in August of 1927. She was shown a paper purporting to have been acknowledged by her on the 15th of August, 1927, at the city of New York by Mr. Abraham L. Erlanger, but she denied that she saw him on the fifteenth. of August in the city of New York. She recognized her signature, " M. C. Donnelly," with the words " notary public," and stated that Baron brought that paper to her, and that it was for Baron that she acknowledged the paper; the paper which is dated August 15, 1927, and is a deed, " Abraham L. Erlanger to Charlotte M. Fixel," was received in evidence (Contestant's Exhibit H-7). Her attention being called to the typewriting, " *Abraham L. Erlanger, unmarried, of 214 West 42nd Street,*" she declared that when she acknowledged the paper, the words, "*unmarried, of 214 West 42nd Street* " *were not in that paper*, but that where the words, " *unmarried, of 214 West 42nd Street*," now are were the words, " *232 West End Avenue.*" Her attention was called to the name of grantee at the beginning of the instrument, viz., " and Charlotte M. Fixel, of Hotel Shelburne, Atlantic City, New Jersey," and she was asked whether any part of that was written in there at that time (the time of her acknowledgment), and she replied " Absolutely not; it was a blank space." It was conceded that this handwriting of the name and address of the grantee is Mr. Baron's; the rest of the face of the paper is in typewriting. She said that Mrs. Erlanger at the time of the acknowledgment on the fifteenth was living with Mr. Erlanger at No. 232 West End avenue; they were both at that time stopping at the Hotel Shelburne at Atlantic City, and Mrs. Erlanger did not have a residence at the Hotel Shelburne, Atlantic City. The Dillons were guests of Mr. and Mrs. Erlanger on their visit at the Shelburne; dined in their suite. When they arrived at the hotel, they had asked to be announced at the desk to Mr. and Mrs. Erlanger; on going to the suite they had luncheon there. Dillon remained with Mr. Erlanger, and Mrs. Erlanger and herself went on to the boardwalk; saw them again on Sunday; saw Erlanger when he returned to the office; in September *she saw Mrs. Erlanger at the opening of the Erlanger Theatre.* From

the New York office, she spoke to Mrs. Erlanger every morning at Atlantic City. Erlanger had told Dillon to call him every morning at ten o'clock and *give Mrs. Erlanger all the receipts of the various theatres and any business of importance.* Direction for the telephonic connection for these messages was given by Dillon, who would say to Tommy Farrell, " Get me Mrs. Erlanger in Atlantic City;" or " Get me Mrs. Erlanger at the Shelburne."

*Mrs. Caroline D. Barnett,* a daughter of the late Charles Frederick Daly, vice-president, Durant Motors Company in 1923, identified her father's signature and his handwriting in a certain letter (Contestant's Exhibit P-7). An operator's license card (Contestant's Exhibit Q-7) and his check (Contestant's Exhibit R-7) were marked in evidence. The Daly letter, dated *April 5, 1923,* is addressed to " My dear Mrs. Erlanger " and refers to the inclosing of an operator's certificate of registration which reads, among other things, " *1923–1924* " and certifies that the " person named below has been licensed to *operate motor vehicles," etc., and the name is given,* " *Charlotte Erlanger, 232 West End Ave.;"* the envelope is addressed to " *Mrs. A. L. Erlanger." Mrs.* Barnett visited at the West End avenue home with her mother and her father, the latter introducing her to Mr. Erlanger, and Mr. Erlanger introducing her and her mother to Mrs. Erlanger. This was six or seven years ago, which would make it *1924 or 1925.*

*Mrs. Mary Stoy,* and her daughters, *Mrs. Elizabeth S. Conger, Mrs. Caroline S. Stehle, and Mrs. Dorothy McCulloch,* together with their husbands *William H. Conger, Jr., Dr. Frederick Stehle, and Frank McCulloch,* gave testimony showing that the parties held themselves out as husband and wife and as Mr. and Mrs. Erlanger during the years which we have styled the earlier period of this record. Their testimony is important for several reasons, particularly because they proved to be highly credible and dependable witnesses, and some of them participated in important episodes. The Congers and the Stehles together with Mrs. Stoy, have been for a number of years residents in Atlantic City, while Mr. and Mrs. McCulloch have lived in New York city. The acquaintanceship between the contestant and Mrs. Stoy and her daughters runs back to 1906; her daughter Dorothy (Mrs. McCulloch) was an actress and participated in various plays with contestant. Through this contact contestant met and visited with Mrs. Stoy and her family, and the friendship between them all ran over a term of years. All of these seven witnesses testified as to their meeting Mr. and Mrs. Erlanger in *1920* at the Apollo Theatre, Atlantic City, where " Two Little Girls in Blue " was being given the initial performance. The first of this group called to the stand was Mrs. Elizabeth S. Conger.

She proved to be a very impressive and dependable witness, in her testimony both direct and cross, the latter being very exhaustive; it was about the year *1920* that Mrs. Conger first knew the contestant as Mrs. Erlanger; she had previously known contestant by the name of Charlotte Lesley; heard people speak to Mrs. Erlanger at the Shelburne at the desk of the hotel and in the dining room; she was always addressed in the hotel as Mrs. Erlanger. She and her husband and her son visited Mr. and Mrs. Erlanger at their home in West End avenue; the witness' mother had already been visiting there. She, her husband and son remained there with Mr. and Mrs. Erlanger from Saturday until Monday. *This was the winter of 1922 or 1923.* The housekeeper addressed the contestant as Mrs. Erlanger or " Madam." They took meals at the house, and Mr. Erlanger was present at the meals; sat at the head of the table; witness and Mr. Conger sat on one side; her mother and her son sat on the other, and Mrs. Erlanger at the other end of the table. Mr. Erlanger called her " Darling," sometimes " Charlotte " or " Lottie." She always called him " Darling," once in a while " Bunny." The Congers, their son and Mrs. Conger's mother slept there. When the witness left, she left with her husband and her son; her mother remained. In reference to the first meeting at the Apollo Theatre she said she with Mrs. Erlanger and her mother, Mrs. Stoy and her sister, Mrs. Stehle, dropped in at the Apollo Theatre in the afternoon; Mrs. Erlanger wanted to know if Mr. Erlanger was coming back to the hotel for dinner. A dress rehearsal of " Two Little Girls in Blue " was on; Mrs. Erlanger sent word that she was at the back of the theatre, and Mr. Erlanger came back; she introduced him, saying, " Darling, I want you to meet my family; you have often heard me speak of them;" and she said, " This is my husband," introducing her mother, Mrs. Stoy. Erlanger invited them to attend the opening of the show in the evening, and they did; the party being made up of Mrs. Stoy, the Congers, the Stehles and Mr. and Mrs. Erlanger. Mr. Erlanger conducted them to a box, and then went back stage, coming out between the acts to visit with them. Mr. and Mrs. Erlanger had visited Atlantic City six or eight times from the time she first met them; contestant was always addressed at the hotel as Mrs. Erlanger; next meeting was at a performance by Ed Wynn in " The Perfect Fool," and the third meeting was still two years later, at the same theatre, at the presentation of Eddie Dowling in " Honeymoon Lane." The rest of her direct and cross-examination will be referred to further on, particularly the part bearing upon events in *the latter part of 1927*.

Her husband, William H. Conger, Jr., confirmed her testimony, especially the meeting of the Erlangers in the Apollo Theatre in

1920, at the opening of " Two Little Girls in Blue " and the visit subsequently in the *winter of 1922 and 1923* with the Erlangers at their West End avenue home; the incident of the party attending the performance of Ed Wynn two years later and the attendance at the performance of " Honeymoon Lane " two years afterwards. *Mr. Conger has been practicing the profession of law* in the city of Philadelphia since *1905;* he is vice-president of Integrity Trust Company of Philadelphia, and lives in Atlantic City; first met contestant at the home of his wife, just prior to their marriage in *1913;* first met Erlanger in Atlantic City, in the lobby of the Apollo Theatre, at the opening of " Two Little Girls in Blue;" his wife, his mother-in-law, his brother-in-law, Dr. Stehle, and his wife, Caroline Stehle, were with him. Mrs. Erlanger came in and she introduced the party to Mr. Erlanger, using the words: " ' I want you to meet my husband,' words to that effect." The next meeting he placed about a year or two later at the Apollo Theatre, where he and his family were guests of Mr. and Mrs. Erlanger at the Ed Wynn show, " The Perfect Fool." The party all sat together and Mr. Erlanger sat with them. Conger described the visit of himself and his family at the Erlanger home in the *winter of 1922 and 1923.* He was not sure whether this visit antedated the meeting at the Apollo Theatre at the opening of " Honeymoon Lane " or was subsequent to that event; described his driving with his wife to the Shelburne Hotel and taking Mr. and Mrs. Erlanger in his car to the theatre. During the party he addressed Erlanger as Mr. Erlanger, and the contestant as Mrs. Erlanger. At the end of the performance Erlanger asked him if he would see that Mrs. Erlanger was taken to her hotel, and he drove her to the hotel, saw her in, witness' wife and mother-in-law being with them. On the visit in *1922–1923,* witness, his wife and son, arrived at the Erlanger home on Saturday and remained until Monday, his mother-in-law, Mrs. Stoy, had been visiting there. During the visit, in the course of conversation, witness addressed contestant as Mrs. Erlanger and " Charlotte," it all depended to whom he was talking. He thus addressed her in the presence of Erlanger, and Erlanger, to the servants who served at the table, spoke of contestant as " Mrs. Erlanger " and " Darling " and things of that sort. Contestant addressed Erlanger as " Bunny " and as " Darling." He described their attitude, demeanor, method of address, and so on, toward each other as that of husband and wife who thought a great deal of each other (176) and were very devoted to each other, the witness stating: " It was rather a devoted attitude and I should say, in fact, very much so." He detailed the conversation with Erlanger in the library of his home, *where wills and deeds of trust were discussed,* the witness

stating: " He had been informed, it seemed, I was supposed to know something about those things, and he talked to me rather freely about estate settlements, about the demerits and merits of deeds of trust over wills, and so on, and we had quite a conversation that evening * * *." He did not recall the exact words, but stated: " He said in these *words that he feared that if he did not make some provision in his lifetime in addition to his will, his brother might make trouble for her after his death."* The four meetings described by the witness were the only times when he met Erlanger. In cross-examination he told how contestant's stage name was Charlotte Lesley, that she appeared in David Warfield's " The Auctioneer," that he met her through his wife, that his wife received a letter from contestant in *1918, 1919, or 1920.* He stated the first time he heard her called by the name of Erlanger was at the Apollo Theatre (the letter which was received, in which she was described as married, was probably about *1919,* but he does not know). He is not so sure of the time (202). " He would say so, *1919,* for want of better * * *;" she had never mentioned the name to witness, that is, not prior to the meeting at Atlantic City. He did not know then, nor did his family; so far as he knew, Miss Fixel did not know him. Interrogated about the friendship of his wife and her family with the contestant, the witness described having met her father and her mother (206). He did not know her near relatives, *but had heard her speak of them and of an uncle, Judge Levintritt.* He heard contestant speak of him many times. He reiterated his description (212) of the introduction to Erlanger by Mrs. Erlanger of his wife's mother, his wife, himself, Dr. Stehle and his wife, and declared that she presented them to Mr. Erlanger, to her husband, saying, " Meet my husband," or some words to that effect. In cross-examination he could not recall the exact words, but gave his impression of the conversation with Erlanger about wills and trusts, and declared it was along the lines that he wanted to make adequate preparations for his wife. He said that Erlanger had several ideas: *" He knew that I knew something about wills and deeds of trust, and I suppose that he was trying to get any information from me that he could; I was not his lawyer or counsel; he just opened up and asked me. That was all, and I suppose that was on his mind; that was all. * * * He wanted to make provision for Mrs. Erlanger and then he felt he ought to make some provision in his lifetime,"* in addition, *" by a deed of trust, something that could not be affected by any squabble or fight."* Erlanger, he said, did not say that he expected a squabble or a fight, " but he feared one." Erlanger did not say what he had done, as the witness recalled it, but he wanted to provide for her. Questioned as to what Erlanger asked him in the nature of advice,

and the witness replied: " For example, by a deed of trust you can make an estate settlement which cannot be well attacked." He told Erlanger in substance that if he wanted to provide for the contestant he could do so either by a will or by a deed of trust or by both, and this seemed to please Erlanger. Outside these four occasions that the witness described when he met Erlanger, he saw them together on the boardwalk many times.

*Mrs. Carrie Stoy,* mother of Mrs. Conger, Mrs. Stehle and Mrs. McCulloch, a lady of seventy years of age, who had been married to her husband nearly fifty years when he died, knew contestant as Charlotte Lesley, her stage name. The friendship came about through her daughter, Dorothy McCulloch, having been in the same plays with contestant as an actress. She remembered going to the Apollo Theatre with Mrs. Conger and Mrs. Stehle and Mrs. Erlanger; she recalled the latter sending word back to Mr. Erlanger, and he came out, and contestant said, " Dear, I want you to meet my family;" and contestant referred to him as her husband. Her testimony about the make-up of the party and where they sat at the performance, etc., confirmed Mr. and Mrs. Conger's. She described the next meeting with Erlanger at the Ed Wynn show, meeting Mr. and Mrs. Erlanger in the lobby; also her visit at the Erlanger home in West End avenue; arrived at the house on Tuesday and went home Wednesday a week, staying at the house during all that time. Erlanger was away on a trip, but came home before she left; she and the Erlangers dined at the same table; Erlanger addressed contestant as " Darling, very affectionate," and she addressed him as " Dear " and " Dearest." When asked about the behavior of Mr. Erlanger towards Mrs. Erlanger, and Mrs. Erlanger towards him, she answered: " Very beautiful," and as being man and wife. The housekeeper addressed her as Mrs. Erlanger. She described meeting Mr. and Mrs. Erlanger on the boardwalk in *1927.* This testimony will be reviewed when that particular epoch is taken up.

*Caroline S. Stehle* knew contestant by the name of Mrs. Erlanger since *1920;* met Erlanger at the Apollo Theatre; she described the visit at the theatre and the meeting of Erlanger. Mrs. Erlanger introduced him. They attended the theatre in the evening, her husband, her sister's husband and her mother being in the party; Dr. Stehle and Mr. Conger were then presented to Mr. Erlanger. The next time she saw Mr. Erlanger was at the performance of " The Perfect Fool;" they met in the lobby of the theatre; saw them next when they were down at Atlantic City for a week-end; she again described the introduction at the Apollo Theatre and stated: " Mrs. Erlanger said to us, ' I want you to know my husband,' and she said to Mr.

Erlanger, 'I want you to meet my family.'" She described the theatre party at the Ed Wynn production, "The Perfect Fool." She had known that contestant was Mrs. Erlanger since she, the witness, first met Mrs. Erlanger in *1920*. The witness made it clear as to when she had been told by her sister of "Mrs. Erlanger;" it was a previous winter to the time of the performance in the theatre. That would be the winter of *1919–1920;* she could not give the month.

*Dr. Frederick Stehle,* husband of the former witness, first met contestant about 1906–1907; knew her as Charlotte Lesley then; first knew her as Mrs. Erlanger in Atlantic City in *1920;* described the Apollo Theatre meeting at the box party and the introduction; Mrs. Erlanger presented him (1597), saying: "*Meet Mr. Erlanger, my husband.*" He described the other meetings with the Erlangers, that is, at the opening of Ed Wynn's show and the opening of "Honeymoon Lane," and the members of his family who were present at these performances.

*Dorothy McCulloch* first met the contestant in *1906* at rehearsals of "Sergeant Brue," both being members of that piece, produced by Mr. Dillingham. She described her friendship and companionship with contestant over a number of years, which continued until 1912; the witness was married in 1914; met Mr. Erlanger in *1920* at the Alamac Hotel, Atlantic City; Mrs. Erlanger introduced her to him; saw her three or four times on that occasion of the Erlangers' visit to Atlantic City; when Mr. Erlanger came in to their suite at that hotel, came in from rehearsal to the suite, Mrs. Erlanger said, "Darling, meet Dorothy, Dorothy, this is my husband now." And Erlanger said, "Oh, yes, I recall you, Dorothy." That evening she went to the theatre with them and saw "Two Little Girls in Blue," meeting the other members of her family there; next saw Mr. Erlanger in New York at his residence, No. 232 West End avenue, a month after she came here, early in *1920;* used to call at the West End avenue house two or three times a week; always kept up this habit of calling at the residence of the Erlangers, up to the time of his demise; likewise she called on them at the Ambassador Hotel during the period they were there, and at No. 175 Riverside drive, possibly two or three times a week. When her husband was working for Erlanger they dined there once every two weeks. That was in *1923,* her husband having worked for Erlanger for about a year, and when dining with them Erlanger addressed contestant as "Darling," sometimes "Lottie," "Dear," and contestant addressed him in similar terms; no other lady was in the house; there was a housekeeper and a valet-butler. Witness would on occasions go there and ring the bell, and when someone answered the bell she would

ask for "Mrs. Erlanger." She heard the butler address Mrs. Erlanger. He addressed her as Mrs. Erlanger and Madam; and the housekeeper addressed her in the same manner. She and her husband called her Charlotte. Witness went to stores where she did her marketing, and to different department stores, and contestant was always addressed as Mrs. Erlanger. That has been continuously so when they were together since *1920*. She never heard her addressed in any other way except as "Mrs. Erlanger," or by people who called her "Charlotte" or "Lottie." During the period of Erlanger's last illness Mrs. McCulloch would go over there and stay for luncheon, getting there at possibly ten o'clock. On these occasions she spoke to Erlanger only once, in his bedroom when he had first taken to the bed. Witness said about Mrs. Erlanger: "*She waited on him constantly, she gave him his medicine, she made broth, she went into the kitchen and made the broth herself, she prepared little delicacies; she saw and held his hand, she was constantly being called for by him; on those occasions when he called her, he called 'Darling,' Mrs. Erlanger dropped whatever she was doing and ran;*" she was there in the apartment the night before Erlanger died, leaving about half-past ten or eleven o'clock; she came back the same night about half-past twelve or one, and was there when Erlanger actually passed away. "The nurse came to Mrs. Erlanger and said he thought it would be only a matter of minutes. It was about half-past five in the morning; and Charlotte hurried into his room, and sat on the edge of his bed; she put her arms around his shoulders, and she was crying very bitterly, and begged him to speak to her, and the nurse shook his head, said it was no use, he could not even hear her; she patted his shoulders and cheeks; she kept crying, asking him to speak to her, and the nurse came over and just laid him back on his pillows." When he passed away, the nurse was there and the housekeeper and the butler, Mrs. McCulloch and Mrs. Erlanger. The next thing she recalled was, "*Mrs. Erlanger telephoned his sisters, she called the number and someone answered and she said, 'Your brother has just passed away,' and then she dropped the telephone and called the nurse and said, 'You tell her,' and the nurse gave the message.*" Witness knew contestant's father and mother from the time that she knew her; identified the ring marked Exhibit V, and said she saw that ring on Mr. Erlanger's finger; he wore it on his finger; it belonged to Mrs. Erlanger's father; she went to Tiffany's with Mrs. Erlanger at the time she had the initials changed to the initials it now has on it, "A. L. E.," which initials replaced Mr. Fixel's. She identified Exhibit F and stated that she saw Mrs. Erlanger wear it. She knows E. G., the other ring; said she saw Mrs. Erlanger wear that

ring; about *1925 or 1926,* somewhere around there, she first saw her wear the ring Exhibit F, and the other ring, Exhibit G, she saw when they first moved into No. 175 Riverside drive; the ring was new then, and since the time that she first saw this ring, Exhibit G, she always saw Mrs. Erlanger with both of these rings on her finger. In cross-examination the witness reiterated that she met the contestant in *1906,* both being in the play, " Sergeant Brue." The cross-examination took the witness through the various plays in which they participated and into the various places where contestant lived during those years, her father's and her mother's home and other places. Among the plays in which they performed were " The White Chrysanthemum," " Lil 'Mose." Witness stated that during the rehearsals they always lived with Mr. and Mrs. Fixel, contestant's father and mother (3165). Other plays were " Pocahontas," " Stubborn Cinderella;" during the run of the latter play they lived right next door to contestant's mother and father, the latter living in a boarding house. " Modest Susan " was another play; witness married in *1914,* but remained on the stage for two years thereafter; she and her husband lived in Atlantic City from *1916 to 1920.* Correcting the former statement, the witness stated that she began visiting the contestant in West End avenue in the latter part of *1920;* they dined frequently at West End avenue; saw contestant in Garden City in the summer of *1922;* she and her husband dining there a few times; she visited the contestant at her summer home at Lawrence in the *summer of 1923;* a rented house; Erlanger spent week-ends at the home where contestant lived in Lawrence. During the summer of 1924 the witness said the contestant lived at Cedarhurst while Erlanger lived at Lawrence. She described the various domestics employed in the West End avenue house from *1920* on (3182, 3183, 3184); witness told how she returned to the Riverside drive apartment after she had left there, the night before Erlanger died; Mrs. Erlanger telephoned her and told her the doctors had just left; she was frightened and crying and begged her to come over. She placed the time of her going with contestant to Tiffany's to have the initials on her father's ring changed at *1921–1922,* being unable to state definitely which year. She described minutely what took place at Tiffany's (3195) and the colloquy between the contestant and the man at Tiffany's repair department, to whom she said that the ring in question was an engagement ring from her mother to her father. Both had died before *1920;* her mother died in *1919* and her father the year before. In redirect witness stated she and her husband were present when they dined with the Erlangers at Lawrence and at Cedarhurst; during those summers they took many drives with Mr. and Mrs.

Erlanger. Witness identified a photograph (3541) which was presented by Erlanger to her and her husband, which was received in *1923*, just before her husband left the employ of Erlanger. It was given to Mr. McCulloch, but as he went to inscribe it Mr. Erlanger said, " Well, I must include Dorothy, too."

*Frank McCulloch,* the husband of the last witness, had first met Erlanger in Cincinnati, Ohio, at the Grand Opera House, where he was employed as a box office boy. He next met him in *1920,* in the Apollo Theatre, at the opening of the show previously described. He met Mrs. Erlanger eighteen years ago, as Charlotte Lesley, but the meeting in the Apollo Theatre in 1920 was the first time that he met her as Mrs. Erlanger. He worked with Erlanger in the preparation of the production of " Ben Hur;" he dined with Erlanger at West End avenue house, sometimes once in a month. Mrs. McCulloch was always with him. Erlanger addressed Mrs. Erlanger as " Lottie " or " Dearest " or " Darling " and she addressed him as " Dearest " or " Bunny." Witness regarded the demeanor of each toward the other absolutely as that of husband and wife. The first time prior to the Apollo Theatre incident when he knew of the contestant as Mrs. Erlanger was in the early part of *1920;* during *1923,* when employed by Erlanger, he knew her as Mrs. Erlanger (3212).

*Albert H. Woods,* theatrical producer, knew Erlanger for thirty years, saw him frequently, had business relations with him; identified the contestant; he was introduced to her by Erlanger as Mrs. Erlanger; on the boardwalk in Atlantic City he saw Erlanger in a chair car, the latter called him over and they talked, and Erlanger introduced him to Mrs. Erlanger. He fixed the time as either *1926 or 1927.* In addition to meeting Mr. and Mrs. Erlanger in Atlantic City in *1926 or 1927* he met them in *1928* in the city of Paris. He had seen an ad. in the New York edition of the *Paris Herald* (Contestant's Exhibit H-3), a full page ad. of Mr. Erlanger's theatre, which let him know that he was in Paris; he rang up the Hotel George V and called at the hotel and saw Erlanger and Mrs. Erlanger; had announced himself at that hotel by a card sent up to " Mr. and Mrs. Erlanger " (Contestant's Exhibit G-3); on cross-examination he stated his relations with Erlanger *were wonderful, were very close, that they were never social, but only in business;* had only been up to see him once or twice; had had extensive and intimate business associations with Erlanger in joint productions and in the booking of Wood's attractions; he stated that he did not think he ever met contestant before meeting her at Atlantic City; that he knew nothing about her. Witness knew Erlanger's wife, having met her two or three times up to the time of the divorce in *1911.*

*Edward Cantor*, widely known in the musical and moving picture world as Eddie Cantor, knew Erlanger fifteen or sixteen years, and in the summer of *1925*, when he was abroad, he met Erlanger in front of a theatre in London. This was the first time he met Mrs. Erlanger; he and his wife were going to a theatre this particular night and in front of the Gaiety Theatre he ran into Erlanger coming out of an automobile, and the latter introduced him to Mrs. Erlanger, Erlanger saying, "Eddie, I want you to meet my wife, Mrs. Erlanger."

*Dr. Joseph C. Marshall*, of Atlantic City, met Mr. and Mrs. Erlanger in *July of 1927*. He is a graduate of the University of Pennsylvania and a practicing physician for thirty-one years in Atlantic City. He knew the contestant under the name of Mrs. Abraham L. Erlanger. When he met them Baron, Erlanger's attorney, and a valet in attendance on Erlanger were in the party. Of this party he stated Baron met him first; that Baron said Mr. Erlanger would be his patient, saying, "The details of the case I would be informed of by Mrs. Erlanger," who had entire charge of him and knew about the case. He had not met Mrs. Erlanger before. After inquiring at the office of the Shelburne Hotel he went to the Erlanger apartment, and there he was introduced to Mrs. Erlanger by Mr. Baron; then he was introduced to Erlanger; Mrs. Erlanger was present. He treated Erlanger on *July 27, 1927*, and saw him each day up to and including *September 20, 1927*, seeing him once each day during that period. He met them socially, dined with them in their apartment, and testified that decedent referred to Mrs. Erlanger always as "Darling" or "Mrs. Erlanger." When he addressed her he addressed her as "Darling." If he referred to her he referred to her as "Mrs. Erlanger." He said he and Erlanger became good friends, that the friendship continued up to his death; that at first he addressed the decedent as Mr. Erlanger, and when better acquainted decedent said, "I wish you would call me Pal, as we were pals after September 20th." He treated him personally on *November 1; 2, 3, 4 and 5 of that year*. Erlanger told him the next day (264) that Baron was his lawyer. Dr. Marshall further stated (266) he believed when he wrote the communications that she was Mr. Erlanger's wife; the food of the dinner was always ordered, that which he preferred, she always personally took the chair from the waiter and placed it under him, and fixed the cushions in it, cut up his meat for him and his food; he was incapacitated partly for performing that act, and she watched over him in such a careful manner that it could not help but be noticeable to a stranger, and that was continued throughout the period of the dates that he had already mentioned.

*Andre Fray,* a butler and valet, worked at the West End avenue house in September, 1923. From September, 1923, to April or May, 1924, packages and mail came to the house addressed to Mrs. Erlanger. Mrs. Erlanger gave the orders in the household. He took trips with Mr. and Mrs. Erlanger to French Lick, Columbus, Chicago and New Haven. At the hotels where they stopped she was addressed as Mrs. Erlanger, and she was so addressed in the presence of Mr. Erlanger. He heard others address her as Mrs. Erlanger. Decedent often inquired of him for Mrs. Erlanger. He saw letters addressed to her as Charlotte Lesley.

*Margaret M. Anderson,* a cook for Mr. and Mrs. Erlanger from April until October, 1925, at the West End avenue home, testified that Mrs. Erlanger engaged her; that she saw Mr. Erlanger going in the morning and coming in the evening; that he and she slept there; that he addressed her as Mrs. Erlanger; that other persons who came to the house addressed her as Mrs. Erlanger and that she addressed her as Mrs. Erlanger, and that if he asked for the contestant he asked for Mrs. Erlanger; that they ate together.

*Charlotte Heitmann,* the lady's maid, met Mr. and Mrs. Erlanger October 2, 1926; became the personal maid and was employed for about seven months; introduced to Mr. Erlanger by Mrs. Erlanger. He said, " Be very nice to Mrs. Erlanger so she will be very nice to you;" he addressed her as Mrs. Erlanger. Mr. Erlanger said, " Please tell my wife to hurry." On the telephone Mr. Erlanger said, " Call Mrs. Erlanger to the telephone."

*Albert Knipping,* a cook and a waiter, entered Erlanger's employ March 9, 1926, was there up to January 27, 1927; knew the contestant as Mrs. Erlanger; he did the cooking and served on the table. Remembered two parties there in 1926, the first on Thanksgiving Day, the other December 9, 1926, her birthday. He was not in their employ in 1925. Described Baron calling for the Thanksgiving Day party, bringing a package of candy; those present at the party were Mr. and Mrs. Erlanger, Mr. Baron and Mrs. Clarke. He described how he made a special cake with a white icing and chocolate letters; on the top of the cake was the inscription: " Western Union, to Mrs. A. L. Erlanger, 232 West End Avenue. Happy Birthday, Albert;" " Albert " being himself. He said the cake was cut after it was shown to everybody. Baron said to him, " *This package belongs to Mrs. Erlanger for her birthday.*" And he brought it up to the library himself. In cross-examination he described how he would call Lancy Johnson and tell him either Mrs. Erlanger does want the car or does not want the car; he described callers at the West End avenue house, he included Mr. Baron, Dr. Glass, Miss Glass, Dr. Glass' son, and wife and baby, Mr. and Mrs. Denni,

Mr. and Mrs. Evans, Miss Wells (Miss Bothwell), Mr. Mitchell Erlanger (on one occasion), Mr. Bergman and the chauffeur, also Mr. and Mr. McCulloch, and trades people. (*At the time of his testifying in this trial, he was employed by Mr. and Mrs. Dillon.*) They did not visit the West End avenue house while he was employed there. He recalled contestant's birthday, December ninth; it is the same date as the birthday of his own mother in Germany; at the birthday dinner, Mr. and Mrs. Erlanger were present, and Mr. Baron; he described how he showed the birthday cake to each of those present, and he remembered Mr. Erlanger reading it out loud, " Western Union Telegram to Mrs. A. L. Erlanger, 232 West End Avenue, Happy Birthday, From Albert." He had made this cake without the knowledge of the contestant. He described another dinner party in March of 1926, at which Mr. and Mrs. Denni, Mr. and Mrs. Evans and Miss Bothwell were present. He worked during the summer at the West End avenue house, during June and July and August; the contestant was there once a week.

*Nathan Jacobs*, in the hotel business at Lakewood, told of Mr. and Mrs. Erlanger coming to the hotel in *January of 1924* as guests. Mrs. Erlanger registered for both; Mr. Erlanger was standing right by her side as she registered. " Mr. Erlanger introduced me to her as Mrs. Erlanger;" and they were assigned to room 200 in this Lakewood Hotel; Mr. Erlanger was called to the telephone and was somewhat irritated; he had been paged for a phone call, came out of the booth a little angry and said, " That phone is for Mrs. Erlanger, connect it up to her room." During this period Mrs. Erlanger was referred to by no other name than Mrs. Erlanger.

*Irving Ulick*, a room clerk from 1920 to 1924 at the Lakewood Hotel, later known as the Carasaljo Hotel, stated that reservations at the hotel had been made for Mr. and Mrs. Erlanger and that Mrs. Erlanger stepped up to the desk and registered as Mr. and Mrs. Erlanger, and that he assigned them to a room, and that was the first time he met them, sometime in *February of the season of 1924*. They remained there about five or six days, and to some extent they commingled with other guests in the house. He noticed Mr. Erlanger sitting to the left of the registration desk, and *Mrs. Erlanger would assist him to that chair, prop him up and make him as comfortable as possible; he seemed to be ill at the time. He saw Mr. Erlanger introduce Mrs. Erlanger to the receiver, Arthur Gorman Gallagher. He saw Mr. and Mrs. Erlanger in conversation with all these people that he has mentioned.*

*Margaret M. Reid* (deposition) of Port Huron, Mich., visited the Shelburne Hotel, summer of 1927; family consisted of a son, niece and herself; she is a widow; first met Mr. A. L. Erlanger at

French Lick Springs Hotel in 1924, the year after her husband's death; met him with Mrs. Erlanger; became acquainted through Charles Dillingham; met Mr. Erlanger for four seasons with Mrs. Erlanger. She further testified: " Yes, Mrs. Erlanger was always with him. * * * Once every fall and once in the spring. They were there on both occasions during five different years." She was there at the hotel for three weeks on one visit, and not less than two weeks on the other visits; when Mr. and Mrs. Erlanger were there spent most of the afternoon each day with them, most of the afternoon; she addressed her as Mrs. Erlanger and she was addressed as Mrs. Reid; she stated: " I think he called her ' Charlotte ' most of the time, in very fond terms as ' Dearie ' and ' Honey.' She addressed him as ' Abe.' * * * There was a great deal of devotion between both parties, so much so that it was very remarkable. He often told me that he had known Mrs. Erlanger when she was a little girl with curls, and held her on his knee." He was ill the past two seasons, 1927 and 1928; in 1929 they were in Europe; during the period of his illness he was strictly confined to his room, " except at dinner time he was wheeled in his wheel chair to the dining room for dinner at four o'clock in the afternoon." About his coming downstairs and attending at the dining room, the witness said Mrs. Erlanger went in only with him for meals, and had her other meals in her room; " she was never seen in the dining room only with Mr. Erlanger." She knew Mr. and Mrs. Erlanger for five years; never heard her addressed by any other name than Mrs. Erlanger. Mr. Erlanger addressed her usually as " Sweetheart " or " My dear." As to writing to Mrs. Erlanger, she said, " always when they were in Europe and all the time they were at their old address in New York, before she moved into her new home. She described her new home to me while at French Lick," that Mr. Erlanger had made her a gift of. Asked if she received letters from the woman or a representative since March seventh, she said: " I received cards and letters, mostly cards from Europe, where Mr. Erlanger went for treatment, giving me the condition of his health, and their love; never met Mr. Erlanger at any other place than French Lick; met her in Chicago at the Blackstone Hotel and had luncheon with her. Mr. Erlanger was there with her; this had been arranged by Mr. Erlanger that we should have luncheon together."

*Mrs. Ethel Morganroth* knew the parties; made their acquaintance at the Carasaljo Hotel, Lakewood, N. J.; was introduced to them by her uncle, Dr. Glass; saw them once or twice a week at their home in West End avenue; visited there about seven years; dined there very frequently with Mr. and Mrs. Erlanger; dined there with others, such as Mr. Charles B. Dillingham, Mr. Saul Baron, Senator

and Mrs. Van Husen, Sir William Wiseman, and a few more people; recalled an occasion in December of 1924 when she dined with them, when reference was made to a ring, and the ring exhibited; remembered one person definitely who was there, and that was Mr. Dillingham, because he attended most of the dinner parties that she attended and was there on the occasion that she referred to; it was a birthday dinner party, Mrs. Erlanger's birthday; Mrs. Erlanger said that she had received a marriage band; it had come from Tiffany's; they were all sitting at the dinner table; Mr. Erlanger was present; the ring was shown and they were looking at it. It was a diamond marriage band. It was shown to the other guests. She identified Exhibit F as the ring in question. Erlanger mentioned the fact that he had purchased it at Tiffany's. She attended a dinner party that was given by Mr. Dillingham; Mr. and Mrs. Erlanger were present, and there were other guests there, and Mrs. Erlanger was addressed by the people present as " Charlotte " or " Mrs. Erlanger," or " Dear " or " Darling," Erlanger referred to her as " Dear " or " Darling." She attended the performance of " Ben Hur " in the George M. Cohan Theatre; Mr. and Mrs. Erlanger were there; she recalled the part of the house in which they sat, toward the back on the right side of the theatre. She spoke with them during the performance, and other people spoke to them; she heard Mr. Erlanger introduce her absolutely as Mrs. Erlanger; there were many people. On cross-examination she said that her uncle, Dr. Glass, was Mr. Erlanger's physician for years; Dr. Glass has a daughter, Ethel; the introduction by her uncle, Dr. Glass, at Lakewood was, " Meet Mr. and Mrs. Erlanger, my niece, Miss Kuhn." During the cross-examination she referred again to the ring; she said, " Well, I said that I should like to see the birthday gift." " Mrs. Erlanger showed us the ring, and those persons that were present at the party looked at it and said it was very beautiful; and Mr. Erlanger said that he had purchased it at Tiffany's and naturally there were various other comments made about its beauty." At the " Ben Hur " performance she remembered lots of people coming up to speak to them. (Note. Questions were addressed to Baron and Dillingham directly stating that this witness said that Erlanger had said to contestant at the birthday dinner, " Why don't you show them your wedding ring? " This witness did not so testify.)

*Edward M. Graffin,* of Tiffany's, with that firm over forty years, was shown Exhibit F, which he identified as a Tiffany ring from the name of Tiffany & Company on the ring and by what is called the *scratch number on the ring,* which he deciphered as number *19631.* He produced from Tiffany's files the original charge slip

for the ring, dated *"November 29, 1924,* diamond ring, $830.00,
number 19631" (Contestant's Exhibit R-2), and the receipt for
the ring dated *December 1, 1924* (Contestant's Exhibit S-2), the
signature "A. L. Erlanger" on the receipt being conceded by the
proponents to be that of the decedent; the original bill for the ring
dated *December 21, 1924* (Contestant's Exhibit T-2), and the check
"A. L. Erlanger" *March 15, 1925.* "A. L. Erlanger, special," by
which payment was made for the bill dated *December 31, 1924*
(Contestant's Exhibit U-2). He produced Erlanger's charge slips
from *October 22, 1920,* to *December 29, 1927;* the last charge slip
produced was *September 29, 1927,* stamped "Paid, January 15,
1928."

*Mrs. Amy Ashmore Clark,* the advertising director, *Junior
League Magazine,* first met the decedent either in 1921 or 1922 at
the opening of "The Wandering Jew" at the Knickerbocker
Theatre. Mr. and Mrs. Erlanger called for her at her house in a
car to take her to the theatre, and the chauffeur phoned upstairs
that Mr. and Mrs. Erlanger were waiting downstairs; that later
at No. 175 Riverside drive their demeanor was the same as it was
at West End avenue house. They addressed each other most
affectionately; visited at No. 232 West End avenue and dined with
them on one occasion of Mrs. Erlanger's birthday party; that Mr.
Baron was present; dinner was served by the butler; heard her
addressed as Mrs. Erlanger and Darling or Love. Addressed her
as Mrs. Erlanger one day at dinner when Charles Dillingham was
present; the housekeeper addressed her as Mrs. Erlanger; every
meal she was addressed by the butler as Mrs. Erlanger; he addressed
her as Darling or Love; she addressed him as Darling always;
throughout a meal at which Mr. Dillingham was present Mrs.
Erlanger was addressed by the butler as Mrs. Erlanger; heard the
housekeeper address her always as Mrs. Erlanger; visited them at
the Hotel Ambassador; asked for Mr. and Mrs. Erlanger; was
with them at their apartment; their demeanor and attitude toward
each other was the same there as it had been other places where
she had met them; they acted toward each other as husband and
wife. She thought it was in 1921 or 1922 when the contestant
called her up one day and said, "I am married to Mr. Erlanger."
Both he and she invited Mrs. Clark to the West End avenue home.
She described the birthday party of Mrs. Erlanger on December 9,
1926, there being present besides herself Mr. Baron, Mrs. and Mr.
Erlanger; recalled another dinner when Mr. Dillingham was pres-
ent; stated that she met Bergman, the decedent's nephew, at the
Erlanger suite in the Shelburne Hotel in the summer of 1927; visited

them at West End avenue home six or seven times, at Riverside drive six or seven times.

*Mary Bothwell,* who was a singer and known as Miss Wells, swore that she knew Mrs. Erlanger since 1926. She had been taken to the West End avenue home by Mr. and Mrs. Charles Evans and Mr. and Mrs. Lucien Denni, to sing a play which was afterwards produced by the decedent. She first met him and then Mrs. Erlanger came, and decedent said, *"Miss Bothwell, I guess you are the only one who has not met Mrs. Erlanger. This is Mrs. Erlanger."* Witness met them at least fifty times from 1926 to the date of his death, at Riverside drive, in his office, in the theatre and at the Garden City Hotel. The name of the play in question was " Happy-Go-Lucky." It opened in Boston and she played in it. Decedent assisted in the rehearsals and Mrs. Erlanger was present at the opening in Boston with Mr. Erlanger. She heard Mr. Evans on frequent occasions refer to Mrs. Erlanger, referring to her as Charlotte when talking to Mrs. Evans or Mrs. Denni. The servants addressed her as Mrs. Erlanger. She described how Mr. Charles Evans on the occasion of their visiting the West End avenue home said: " Oh, Mrs. Erlanger would be a perfect *prima donna* for this part;" how she said: " Oh, do you think so, Charley? " and he said: " Yes, what do you think about it? " and Mr. Erlanger sort of straightened himself up and said: *" I have given Charlotte the greatest honor any man can bestow upon any woman, to be my wife, to grace my table, the head of my house. Now tell me, darling, you don't want to go back on the stage;"* how she said, " Of course not. Whatever you want me to do you know I will do." Witness said she remembered that very distinctly. She further recalled that Mrs. Evans was sitting near Mrs. Erlanger and Mrs. Erlanger had a piece of jewelry on; Mrs. Erlanger had evidently remarked about it to her and then Mr. Denni asked, " What is it? " or something, and Mrs. Erlanger produced this — showed this bracelet that she had on, it was evidently a new bracelet or something, and they said how lovely it was. Mr. Erlanger said, " I gave it to her. I never go shopping but I had to go shopping for that." She said further that whenever she saw Mrs. Erlanger she wore a wedding ring, or what folks call a wedding ring. She identified Exhibit F as this ring that she saw her wear. She said that there came a time when she saw her wear an additional ring (Contestant's Exhibit G) which she identified. Upon cross-examination she told of meeting Mrs. Erlanger at Christmas, 1920, at a musicale where she was a guest; her visit at the West End avenue home was in 1926. She saw decedent in the Garden City Hotel in 1926, having been taken down there by Mr. and Mrs. Evans and Mr. and Mrs. Denni. She met Mrs. Erlanger there.

*Reine Davies*, of 321 Ocean Front, Santa Monica, Cal., knew Mrs. A. L. Erlanger from the year when she was sixteen; knew her as Mrs. Erlanger; before she knew her as Charlotte Erlanger she knew her as Charlotte Lesley, when she was playing in her company at the Victoria Theatre; met them together, 1923; met Mr. Erlanger in an elevator of the New Amsterdam Theatre and he introduced her to witness as Mrs. Erlanger; he referred to her as the child wife or the kid wife; she met them on four or five occasions; she met them in the first place in New York in the New York Theatre Building; in the second place in the New Amsterdam Theatre Building; the third place on the top of the Ziegfeld Roof; the fourth place in the Biltmore Hotel, Los Angeles. In the elevator of the New Amsterdam Theatre Building Erlanger said, " I want you to meet the child wife; " during the conversation at the Biltmore, Los Angeles, he referred to her as Mrs. Erlanger. As to relations, attitude of her toward him when she saw them together, it was the most lovable, the most sweet and the most devoted; and his attitude toward her when she saw them together was the most lovable. He called her the " kid wife " or the " child wife." Was present on occasions when Erlanger introduced her as Mrs. Erlanger to other people. She answered, " husband and wife," to the question, " What was generally regarded the relationship between the gentleman and the lady known to you as Mrs. Erlanger? " In cross-interrogatories she said she was not furnished with a copy of any questions; did not receive any instruction or advice from Mrs. Erlanger as to the nature of the evidence to be given by her; did receive letters since March seventh; did not receive one prior; did receive one after March seventh. As to being spoken to, she said she received a long distance from New York, from the Erlanger people, but did not know who it was that spoke to her. They told her that an attorney would call upon her. An attorney did call upon her. " He came out to the house and asked me what I knew about Charlotte Lesley. I told him I only knew the nicest things about her, and I told him she was a wonderful little girl, and she had worked for me at one time." In answer to the question whether she met Mr. Erlanger and the woman now calling herself Mrs. Erlanger, in August of 1919, in the elevator of the New Amsterdam Theatre Building, she answered, " Yes; " there was only the elevator man, Mr. and Mrs. Erlanger and herself present. *Said she knew the woman calling herself Mrs. Erlanger, as Mrs. Erlanger prior to 1920; between 1920 and December, 1929;* she saw the woman who called herself Mrs. Erlanger.

*Helena P. Evans*, Uplifters Ranch, Santa Monica, Cal., wife of Charles Evans, met Mr. Erlanger in 1926; knew Charlotte

Erlanger as Charlotte Lesley before she knew her as Charlotte Erlanger; visited them at their West End avenue home; they visited her at her apartment in Long Island, the Gibson Apartments; they had dinner there; her husband knew Erlanger a very long time, since 1900; had business relations with him; husband's name Charles Evans; they have been married twenty-six years. They visited them twice at West End avenue and once at Garden City Hotel; once the Erlangers had dinner with them in the Gibson Apartments; one visit at West End avenue was on May 18, 1926; up there to discuss the production of a musical comedy, the book of which the witness had written; greeted by Charlotte; taken upstairs, introduced to Erlanger, whom she had never met, although her husband and he were old friends; had dinner, Erlanger sat at one end of the table, Charlotte opposite him; during the dinner, Erlanger talked of changes he made in the book; witness said: "Are you going to produce it then? " Erlanger said: " I certainly am; it is the best book I have had handed to me since ' The Pink Lady.' " After dinner, to the library, and more talk about the book; Erlanger said: " Of course, I couldn't have done anything with it if it hadn't been good, but I am very glad I can put your opera on for you because I feel that I owe you a debt of gratitude for interesting yourself in Charlotte when she was in the Warfield Company. She told me that it was through your influence she secured an audition for Grand Opera." " I said: ' That was nothing. I got Will Davis interested in her and he did the rest. I thought it was too bad she should throw away her marvelous voice. I thought, too, if she got interested in a career she would forget you and she was so very unhappy then.' He said quickly, ' I know, I know, but I intend to make up to her for all those years. I would have done so long ago but little Charlotte has many enemies.' " Witness said: " Everyone in our company liked her, and she devoted herself to caring for a dear old Jewess in the company; no one could have said anything against her." Erlanger said: " There are people who would have said anything against her to keep us apart but they have not succeeded." At this point, Mr. Evans and Charlotte rejoined them, after looking at some Napoleonic books; made a date for May twentieth to bring the composer and his wife there so that he might hear the music; on May twentieth the Evans went again, taking a Miss Mary Bothwell with them, at Mrs. Erlanger's invitation, to sing the numbers, also Mr. and Mrs. Denni; sitting around the dining room table they talked about the need of a prima donna to fill the role of Elsie Daily, and Mr. Evans said: "Why can't Charlotte play it; she looks the part and certainly can sing it? " Charlotte said: " Oh, may I, Bunny, may I? " Mr. Erlanger

*seemed very displeased and spoke very severely to her. He said:* " *Charlotte, I have given you the protection of my name and have placed you at the head of my table and now you ask if you may go back to the stage. Say you didn't mean that, Charlotte." She said:* " *Certainly not, dear, unless you wanted me to. I just thought it might make you proud of me." The witness said, " remember this conversation distinctly because we talked it over afterwards, feeling sure that there had been a secret ceremony, although we had been told by friends of Mr. Erlanger that they were not married. Later the same evening, while we were all seated upstairs in the library, the front door downstairs was opened by someone and we heard steps on the front stairs.* ' Who is that?' said Mr. Erlanger. Charlotte said, ' It must be the chauffeur.' Mr. Erlanger said, ' Did you tell him to use the front door?' Charlotte said, ' Certainly not.' Mr. Erlanger arose and went to the door, meeting the man as he arrived on the landing, and he said, ' *Did Mrs. Erlanger tell you to use the front door?*' and the voice replied, ' No, sir.' Mr. Erlanger said, ' Then don't.' He re-entered the room and spoke to Charlotte and said, ' *You had better get rid of that man, I don't like him.*' "
In the month of June of the same year, witness called Mr. Erlanger up at his office, invited him and Mrs. Erlanger to dinner at the apartment they had taken in Flushing, the Gibson Apartments; witness had been unable to get Mrs. Erlanger on the phone at the West End address. He accepted and they dined with the Evans there. She said, " Mr. Erlanger and I were working on the book, and I do not recall any vital conversation, except the fact that he called her ' *his thrifty little house frau,*' *because she had been making some new curtains for the house instead of having them made.* Charlotte had not been feeling very well, I remember, and he said that the heat had been too much for his ' Little Blue Angel.' I remember the fact because as her eyes are very brown I wondered where the blue came from." Later in June the Evans were invited to dine with the Erlangers at Garden City Hotel; she was to deliver the corrected manuscript to him and say good-bye, as they were returning to California; had just arrived and were still on the porch when Mr. Erlanger and Charlotte drove up to the door. " Mr. Erlanger motioned to us to come to him and we went to him. He sat in the car and looked very ill. He excused himself from dining with us, saying that he had been ill all day. Mr. Evans said, ' I don't see why you don't stay here, Abe, and let Charlotte put you to bed, you look all in.' He said, ' *No, I'll go home. You see, I let the folks have my house and they expect me to spend some time there with them. This is the last summer though that Mrs. Erlanger and I will be separated,*' stressing that Mrs. Erlanger.*

(Note. It *was* the last summer in which they were separated.) Charlotte said, ' Oh, Bunny,' and hugged him and then got out of the car. I delivered the manuscript, we said good-bye, and drove away. I turned to Mrs. Erlanger who was beaming and said, ' Why so happy, Charlotte? ' She said, ' *Mr. Erlanger told me on the way home that he had arranged things so we could be married in February.*' I said, ' Why Charlotte, I thought you were married.' Charlotte said, ' *Not by a Justice yet; there has been some legal difficulty about his affairs, but Bunny says he can fix them.*' " When Erlanger addressed the contestant, he addressed her as Charlotte or Dearie, or My Little Blue Angel, but mostly Charlotte. She usually addressed him as Bunny or Bunny Darling. In relation to demeanor and conduct of Erlanger towards Mrs. Erlanger and of her towards him, *she said his demeanor was that of a very authoritative and possessive husband; and her demeanor was that of the most loving and subservient wife.* Mr. Erlanger conducted the rehearsal of her opera; Mrs. Erlanger was in the theatre at the time; asked how Mr. Erlanger introduced Mrs. Erlanger to any person or persons, she answered, " I do not recall ever having heard him introduce her." Knew her mother, Mrs. Fixel, " *therefore I knew that her name was Fixel, but she was always known to me at that time as Miss Lesley.*" Also asked: " If so, when and how long, and were you then on terms of intimacy with her? " In answer to this latter part, the witness replied, " Friendship, never intimacy, I knew her from 1912 as Charlotte Lesley until I received the letter from her stating that she was Mrs. Erlanger, but I cannot remember when that was." As to receiving any written announcement of her marriage to Mr. Erlanger, she said, " I received a letter, saying that she was now Mrs. Erlanger; the date I cannot remember. I never received an engraved announcement card, if that it what is meant, but I received a letter from her stating that she was Mrs. Erlanger. I have not the letter."

*Charles E. Evans, of Uplifters Ranch, Santa Monica, Cal.*, husband of Helena Phillips Evans, knew Erlanger thirty-five or forty years; knew Charlotte Erlanger fifteen years or more; before knowing her as Mrs. Erlanger knew her as Charlotte Lesley; had business with A. L. Erlanger; Mrs. Evans wrote " Happy-Go-Lucky; " witness was present in the city of Boston when the play was rehearsed; Mr. Erlanger conducted some of the rehearsals. Mr. Erlanger did speak of and made reference to contestant as Mrs. Charlotte Erlanger at their house on Riverside drive; he referred to the conversation in reference to her playing the part in " Happy-Go-Lucky," the same conversation Mrs. Evans testified to. He said: " *I suggested that she play the part and she seemed*

*quite pleased, and asked Mr. Erlanger's permission to do so, and he made the statement that he had given her his name, put her at the head of his table, and now she was asking to go back on the stage, and felt that she was wrong in desiring to do so."* Witness addressed her as Charlotte, deemed their relations toward each other to be man and wife; visited the Erlangers at West End avenue; dined with them at West End avenue house and witness' apartment; witness and wife stopped at the Copley Plaza in Boston; the Erlangers were there; they had the same room — apartment; heard people other than Mr. Erlanger address her as Mrs. Erlanger in his presence. Originally Erlanger was a booking agent for witness' attractions; when witness was at the Herald Square Theatre Erlanger arranged the attractions for his organization and booked them through the firm of Klaw & Erlanger; on very pleasant terms with Abraham Erlanger up to the time of his death. On cross-interrogatories he he said he was furnished no extract of questions, the nature of his evidence was not discussed with anybody; was given no instructions as to answers by Mrs. Erlanger; has not been promised nor given anything by Mrs. Erlanger; no one spoke to him in reference to his giving testimony; knew Mrs. Erlanger as a professional acquaintance since 1912 or 1914; *knew her as Miss Lesley; he was introduced to her when she was with Mr. Warfield in " The Auctioneer " around 1912 or 1913;* it was about the time of the production of " Happy-Go-Lucky " (*1926*) that he heard that she was Mrs. Erlanger; had never been on terms of intimacy with her; did not receive any written announcement of her marriage to Mr. Erlanger.

*Betty Gallagher*, an actress in " Happy-Go-Lucky " in August, 1926, stated that during the rehearsal Mr. Erlanger introduced to her the contestant as Mrs. Erlanger, stating that he wanted her to meet Mrs. Erlanger. At the opening of the play in Boston Mr. and Mrs. Erlanger were there; met them at their home at No. 232 West End avenue, and she always inquired of him for Mrs. Erlanger.

*George Alexander Wembridge*, the renting agent of No. 240 West End avenue, adjoining the home of decedent and contestant, saw Mrs. Erlanger there. Erlanger complained of the excessive noise that the builders were making and said Mrs. Erlanger was on the verge of a nervous breakdown; something must be done about the matter. This was around 1924.

*Mrs. H. S. Lavner*, of New York city, knew contestant in 1916 as Charlotte Lesley, *saw her in the summer of 1927* at the Shelburne Hotel, Atlantic City; had not seen her in nine years; when she met her witness was calling on her brother-in-law and her sister, Judge Klenert and wife, of Paterson, at the same hotel;

had not known at that time that she was Mrs. Erlanger; when she saw her was not sure it was Charlotte; saw her again in the evening walking through the lobby with Mr. Baron. They embraced each other and witness told contestant how she saw her and was not sure contestant was Charlotte Lesley; she went to the cashier and asked if there was a Charlotte Lesley stopping there. Witness told her she was very happy to know that she was married, and asked her how many years she had been married; she said seven years. On the next afternoon she saw Mr. and Mrs. Erlanger, and the latter beckoned to her and she went over and contestant said, *" Belle, I want you to meet my husband, Mr. Erlanger." She saw Mr. Erlanger going in and out while Mrs. Erlanger was always with him. She visited them in their apartment, heard him call for Mrs. Erlanger many times from his room. Witness sent flowers to them the morning after meeting her husband. Witness called upon Mrs. Erlanger at No. 175 Riverside drive when she got back to the city;* called on the telephone there and asked for Mrs. Erlanger and the housekeeper came to the phone and subsequently she got Mrs. Erlanger to the telephone. Witness was positive that the meeting at Atlantic City at the Shelburne was in August, 1927.

*Isabel Hobbs Rosenthal* (Mrs. Walter J.) testified she was at the Blackstone Hotel in *November, 1923,* as a guest of Mr. Erlanger on two occasions, the party being made up of Mr. and Mrs. Erlanger and party and herself, the Mrs. Erlanger being the contestant, whom she originally knew as Charlotte Lesley; first met her around *1910 or 1911* in a boarding house at One Hundred and Thirty-ninth street, New York, where witness' mother was living with Mr. and Mrs. Fixel, the parents of the contestant; again met her in *1915 or 1916* at another boarding house where witness' mother and father-in-law and her husband and Mr. and Mrs. Fixel lived; was first introduced (6004) to Erlanger by Mrs. Erlanger at the Blackstone Hotel; he was introduced *not as " my husband " but as Mr. Erlanger.* She left before they did; she always addressed the contestant as Mrs. Erlanger; on the second occasion when she came there the party consisted of Mr. and Mrs. Erlanger and herself; then she occupied one bedroom, and the Erlangers occupied the other. On the first occasion they went to see " No, No, Nanette," and when they drove up a gentleman addressed Mr. Erlanger and he turned and presented witness and Mrs. Erlanger to this gentleman. Contestant's father died before her mother (6032). She saw the contestant she thought in 1921; she went to her house at No. 232 West End avenue; she corresponded with contestant.

*Dr. Charles D. Aaron, of Detroit* (in a deposition); attended

University of Buffalo, University of Berlin; connected with Harper Hospital, Receiving Hospital, Tuberculosis Hospital, Shurley Hospital, and the Jefferson Clinic; is on the consulting staff of each of the above, except Harper Hospital; knew A. L. Erlanger, the latter introduced the lady known as his wife; saw him at the Shelburne Hotel, Atlantic City, during the summer of 1927; when he entered the sick room and shook hands with Erlanger, he said: *" Doctor, you have never met Mrs. Erlanger; "* he said, *" Darling, this is Dr. Aaron; "* as to the demeanor of Erlanger toward the lady known as Mrs. Erlanger, and her demeanor toward him, he said: *" I was very much surprised that she seemingly knew so much about medicine. I asked her if she had ever been a nurse, and she said no. I then told Mr. Erlanger that he was very fortunate to have a wife who knew so much of medicine, because she seemed very attentive; he was very kind and considerate of her; he told me then that he felt that he was very fortunate in having a wife such as she was; "* that he had not met Mrs. Erlanger up to the time Mr. Erlanger introduced her; only saw her in Atlantic City that time while he saw Mr. Erlanger, and she was present during the interview; he was there about an hour and a half. *He spoke about a letter that he wrote to Mrs. Erlanger. At the time he believed thoroughly that she was Mrs. Erlanger, for there was no reason for him to think otherwise, and for that reason he wrote this letter.* This letter was attached to the deposition and marked Exhibit 5. It was read into the record, addressed to Mrs. A. L. Erlanger, July 7, 1930, the Windermere, West End avenue at Ninety-second street, New York city. It is set forth in full on page 3377. It opens with an expression of his gladness to hear from her and a note of condolence and sympathy; spoke of having gone through the same experience himself, recalled a visit to the Shelburne, when he saw her and her husband, he remembered he introduced her as Mrs. Erlanger when he entered the room, was surprised when he read of the situation that came up after his death; said: " Your devotion to him at the time of my visit proved to me your worthiness, and I could not help but tell him of it. While I cannot recall the exact words that were used at that meeting I do remember that I came away with the impression that Mr. Erlanger had a faithful and devoted wife, and I mentioned this to some of my friends. I shall be very glad to do whatever I can to help you." *Dr. Aarons further said that he never told anybody that he did not believe that the woman calling herself Mrs. Erlanger was in fact Mrs. Erlanger.* (Note. See letter of Bert C. Whitney stating what Dr. Aarons said to him about Mrs. Erlanger.)

*Henri Carpentier*, the restaurant proprietor at Lynbrook, L. I.,

first made the acquaintance of Erlanger in the Plaza Hotel in *1907;* he mentioned various New York restaurants at which he met Erlanger, in various years, in some cases every day. Upon the witness stand in this trial he told of his own arrival in this country in *1907* and his first return to Europe since then was in *1919,* from which he came back in the *spring of 1920.* This latter fact he associated with the time he was introduced to contestant by Mr. Erlanger, whom he quoted as saying, *"Henri, my friend, I present my sweet, lovely lady, my wife."* He said that he had nowhere ever met her or seen her before this introduction in the *spring of 1920;* that after the *spring of 1920* decedent would come there mostly once or twice a week, sometimes more; Mrs. Erlanger was with him every time he came. He was confronted with the answers which he made when a deposition was taken in *1930* at a time when he was about to leave for Europe, and in which he fixed the time of his first being introduced by Erlanger to Mrs. Erlanger as 1913 or 1914; he was confronted with various answers which he had made in this deposition bearing upon the time when he first met contestant, and his invariable answer was that it was a mistake, and that he first knew that he had made a mistake about the time when he was on a trip to Europe (on the boat). He stated that it was absolutely in the *spring of 1920* that he first saw contestant.

*Henry Alfred Gibbon,* in the room service of the Shelburne Hotel, Atlantic City, knew Mrs. Erlanger; stated that he knew her by the name of Mrs. Erlanger; he never knew of her stopping there except when Mr. Erlanger was there; that the first time he met Mr. and Mrs. Erlanger was in the *summer of 1927;* that he received orders from Mr. Armswalde, the maitre d'hotel, who brought him up and introduced him to *Mr. and Mrs. Erlanger;* that he always addressed them as *Mr. and Mrs. Erlanger;* that he never addressed her other than as Mrs. Erlanger; that he would see them three times a day; that Mrs. Erlanger invariably did the serving herself. *She would serve the food to Mr. Erlanger, cut it up, butter his bread, scoop out a honeydew melon or cantaloupe, or whatever it would be; cut up his meat; that they did not seem to him " anything more than husband and wife." " She acted very kind and very attentive to him,"* that he had no reason to think that they were not Mr. and Mrs. Erlanger; that it *never entered his mind that they were not Mr. and Mrs. Erlanger; that he took an order one night when Mr. Baron was there; that he stated to Mr. Baron when taking his order, " Mr. Baron, Mrs. Erlanger has given me their order."*

*Paul O. Armswalde,* maitre d'hotel for ten years, recalled Mr. and Mrs. Erlanger being there in July, 1927. He knew her as

Mrs. Erlanger.  Mr. Erlanger said, " Mrs. Erlanger will give you all the orders."

*Martha J. Curley*, the chief telephone operator, knew Mrs. Erlanger in 1927.  She called their suite very often and knew her voice.  There was a call every day from New York for Mr. Erlanger, which she transmitted to *Mrs. Erlanger;* addressed her as *Mrs. Erlanger.*

*Mary Churchville*, the housekeeper at the hotel, supervised the rooms which they lived in in 1927 at that hotel.  *She knew Mr. and Mrs. Erlanger, and knew her as Mrs. Erlanger, saw her waiting on Mr. Erlanger during their stay at the hotel, and their attitude was one of affection; the decedent referred to her as Mrs. Erlanger.*

*Charles Contini*, the barber at the hotel, knew Mr. Erlanger at the Shelburne in the years 1927 and 1928.  He shaved him quite often in his apartment; always saw Mrs. Erlanger there.  *He testified that they acted towards each other as husband and wife, and that decedent called the lady Mrs. Erlanger.*

*Jennie Fielis*, who had charge of their suite at the Hotel Shelburne in November, 1926, prior to November, 1926, confirmed the general repute of *Mr. and Mrs. Erlanger* at the hotel at that time.  *She knew her as Mrs. Erlanger, addressed her as Mrs. Erlanger, never heard anybody address her in any other way than as Mrs. Erlanger.*

*G. Roland Heiss*, assistant manager of the Hotel Shelburne, testified that he knew Mr. Erlanger very well and saw him as a guest there, and knew *Mrs. Erlanger* as a guest of the hotel.  In October, 1927, he received from Mr. Bergman (general manager of the Erlanger Enterprises and a nephew of Mr. Erlanger) a telephone call for reservations; identified the reservation blank of the hotel (Contestant's Exhibit X); produced a record of the rooms occupied by Mr. and Mrs. Erlanger, valet and chauffeur, from July 27 to September 20, 1927, showing " Mr. and Mrs. Erlanger, valet and chauffeur."  He stated that the charge slips (460) read " *Mr. and Mrs. Erlanger;*" told how Mr. Erlanger when he was ill would come down in the elevator in a chair and go to the boardwalk; was wheeled to the front door; that *Mrs. Erlanger was with him on practically every such occasion; that Mrs. Erlanger arranged the chair before he was put in the chair, had a comfortable armchair in the room, and saw that it was fixed right, placed just so; that flowers were sent to the room by the president of the hotel, Mr. Weikel, addressed to Mr. and Mrs. Erlanger; that witness addressed her in the presence of Mr. Erlanger as Mrs. Erlanger;* that he never heard her addressed differently than Mrs. Erlanger; identified Mr. Weikel's card which accompanied the flowers, upon which was the inscription: " *Mr. and Mrs. Erlanger; Mr. Jacob Weikel;*" produced (490) a letter

from Mr. Bergman confirming the reservation for Mr. Erlanger for November 1, 1927, which letter was dated October 20, 1927 (Plaintiff's Exhibit 3). *This does not refer to " Mrs. Erlanger," but the letter of the Shelburne, Inc., to Bergman, dated October 17, 1927,* confirms *" arrangements made for Mr. and Mrs. A. L. Erlanger for their arrival on November 2d,"* and the hotel's letter to Bergman, dated October 18, 1927, notified Bergman *that pursuant to his telephone with Mr. Tait, the date of arrival of " Mr. and Mrs. Erlanger had been changed to November 1st."*

*Theodore Kroell,* manager of the Ambassador Hotel, learned of the intended arrival of *Mr. and Mrs. Erlanger* at his hotel; knew Erlanger in Europe a good many years ago, had never up to this particular time met Mrs. Erlanger; made it his business to see them; met them; identified the contestant as Mrs. Erlanger; he met her as Mrs. Erlanger while Mr. Erlanger was with her; he took it for granted that this was Mrs. Erlanger; they were there from September 21, 1927, to November 1, 1927.

*George K. Nelson,* Hotel Ambassador, said that they had at the hotel as guests Mr. and Mrs. Erlanger, that he met Mr. Erlanger, who said to him, *" I want you to meet Mrs. Erlanger sometime;"* went up to their apartment and he was introduced to Mrs. Erlanger. Witness explained the bills and checks produced (Contestant's Exhibits C-5, D-5, E-5, F-5, G-5); check dated November first (Contestant's Exhibit H-5). They stopped there June 23, 1929, and they left June twenty-sixth (Contestant's Exhibit J-5). Ledger sheet was received in evidence, beginning with September 21, 1927, and was headed *" Erlanger, Mr. and Mrs. A. L., New York City, 9/21/27, Reg. No. 9507,"* then appeared the room charge, the restaurant charges for each day, phone calls, items paid for baggage, papers, valet, and so forth. The second sheet was headed *" Erlanger, Mr. and Mrs. A. L., New York City, Room No. 727;" that was their suite, " 727–8–0, parlor and two bedrooms;"* she occupied that apartment with Mr. Erlanger continuously during that period. He explained the guests have register numbers (Contestant's Exhibit K-5). There was a registration number for Mr. and Mrs. A. L. Erlanger from September twenty-first. In making reservations in September, Dillon came there personally and spoke to the witness, and was shown different suites; there was a direction given, " absolutely no publicity." He said: " Lots of guests say that when they come in."

*Joseph Deare,* room clerk at the Ambassador Hotel, explained his duties; explained the reservation book; a card was sent up with flowers (Contestant's Exhibit Q-5) to *" Mr. and Mrs. A. L. Erlanger,* 1925, with respectful compliments," etc.; identified registration slips

M-5, N-5 and O-5; told how the names, etc., are typed out and sent to the various departments of the hotel, telephone, information, etc.

Mrs. *Rose Mondini,* telephone operator at the Ambassador, employed there from April 1, 1927, to the last of that year, told of receiving a record of the guests, *Mr. and Mrs. Erlanger,* and the date of their arrival, and the number of the suite they occupied; *they received numerous calls, for Mrs. A. L. Erlanger; she made the connection with Mrs. Erlanger; mostly all the calls were for Mrs. Erlanger, they would want to speak with Mrs. Erlanger.*

Dr. *Robert H. McConnell,* a practicing physician since 1895, attending physician at the French Hospital, and president medical board over twenty-five years, first met decedent October 12, 1927, at his office; had been asked to go there by Judge Erlanger, a proponent. The same evening he met contestant at Hotel Ambassador, in their suite and he met *a lady by the name of Mrs. Erlanger.* She was there *with Mr. Erlanger and the latter introduced her to him as Mrs. Erlanger.* He treated him on October 12, 18, 25, 31; November 10, 15, 16, 19, 20, 22, 26, 29; December 3, 7, 10, 17, 20, 24, 27, 31, 1929, and continuously down to his death on March 7, 1930. His testimony as to this later period will be reviewed further on.

In September of the years *1922, 1923, 1924 and 1925, Josephine Halloran, a masseuse of the Ladies' Baths, French Lick Hotel, Indiana,* knew *Mrs. A. L. Erlanger,* attended her in the baths; she introduced herself at the bath department as *" Mrs. A. L. Erlanger,"* and *her bath ticket charged to Mr. A. L. Erlanger,* who she said was her husband. She knew Erlanger by sight. *Contestant was the only one that ever informed her that she was Mrs. A. L. Erlanger. Mrs. Erlanger said to her that Mr. Erlanger and she came down the elevator together for their baths.*

In *September, 1922, Mrs. Minnie Adams,* superintendent of the baths at the hotel, first got to know Mrs. A. L. Erlanger; she was stopping at the hotel during *September,* the exact date she said she did not know; but she said she was there in each of the following years, *1922, 1923, 1924, 1925,* the witness declared that Mrs. A. L. Erlanger was known around the hotel as the wife of Mr. A. L. Erlanger. Contestant, however, she said, was the only person that ever told her that she was Mrs. Erlanger. Stated that they were known to her as Mr. and Mrs. Erlanger.

*That the parties were registered* at French Lick Hotel in the *fall of 1924* as Mr. and Mrs. Erlanger *was testified to by proponents' witness, C. B. Dillingham,* who stated that a lady whom Charlotte introduced to him asked him if he had seen Mrs. Erlanger, and

that he had never heard her called Mrs. Erlanger. So he said, " No," and walked away; and just then the clerk handed him a telegram right over the register, and on the register were the names " Mr. and Mrs. A. L. Erlanger." He went over to Erlanger and said: " Are you married?" And Erlanger said: " Certainly not." And then he said, " Your name is on the register;" and *Erlanger said, " Is it in my writing? " and he said, " No, sir; it is not "* (6185).

That the parties were present at the French Lick Hotel in *November of 1924* and occupied the same suite in the hotel *is vouched for by proponents' witness, George C. Tyler,* the theatrical man, who was a guest at the hotel at that time and who was present in their rooms. He stated, however, that he had not been introduced to her at that time, nor was he introduced to her when he met Erlanger and her at the Carlton Hotel in London in *1925,* where the parties occupied the same rooms. Tyler saw the contestant at the West End avenue house on two occasions. Whenever he went to that house he saw the contestant. His direct testimony will be reviewed further on.

*Another of proponents' witnesses, Marcus Heiman,* met Erlanger and contestant in the lobby of the hotel at French Lick in the *fall of 1923 or 1924,* and he saw them in the following spring in Chicago at the Blackstone Hotel. At French Lick Erlanger introduced her to him as " Miss McQueen " or some such name; he did not get it.

*Charlotte G. Donnelly,* sister of Mrs. Dillon, was private secretary from 1921 to 1926 to Mr. Golding, auditor of the Erlanger Enterprises; and from June 1, 1926, to June, 1930, she was secretary to *Milando Pratt, Jr.,* who became auditor. Her work embraced the preparation of bank balance statements and of deposits, the payment of notes at maturity, clippings of coupons of bonds, taking of dictation from the head of the department, making bank deposits, the obtaining of the payroll, arrangements for the renewal of notes, etc., on the bank balances; she had the assistance of Eddie Fitzgerald. *She said, and this is in contradiction of Pratt, that the income tax statements during the time she was in the employ of the Erlanger Enterprises, for Mr. Erlanger or for any of the corporations, were made up in the finance department always;* she told how they were made up, from the first year that she went into the employ of Erlanger, in October of 1921, up to the death of Mr. Golding, the auditor, Decoration Day, 1926. Pratt's position was that of tax expert; he had an office in the rear of Golding's office; Pratt usually got them out for Mr. Aguolia, and sometimes would fill in all the answers and figures and submit them to Golding with an initial on the lines where Erlanger was to sign, and Golding would hand them to Erlanger. When Golding died Pratt would have Aguolia make

out the income tax returns, fill in all the answers and the figures, and initial the line for Mr. Erlanger's signature. Pratt would go over these statements with Aguolia and submit them for Erlanger's signature, submit them to Erlanger for his signature. (*Aguolia was available as a witness, was in the court, but not called to the witness stand.*) Her attention was called to plaintiff's Exhibit 139 (an acknowledgment supposed to have been made before her). She identified her signature and said that she was a notary at the time; and, asked whether Mr. Erlanger ever came in to the finance department to acknowledge his signature, she said, " *No.*" *She said she did not ever go into Erlanger's office with these income tax statements for the purpose of acknowledging his signature.* She said in regard to this *that after Erlanger would sign the income tax returns he would send them up to Golding or Pratt to have her notarize them; that she did not either on the State or Federal income tax returns ever go over the figures with Erlanger; that she was not in Erlanger's office at all with relation to these income tax returns, and that Erlanger was not in the finance department at all with relation to these income tax returns. Her answers apply, she said, to every one of the income tax returns upon which she took acknowledgment, both corporation and personal, and to the best of her knowledge she took the acknowledgment of the returns of State and Federal income tax from 1925 on down to the .death of the decedent;* repeating that from 1925 she took the acknowledgments on both the corporation returns, State and Federal, and the individual returns of Erlanger from 1925 down to the time he died. (This is a direct contradiction of the statements made on the witness stand by Pratt.) The witness acknowledged Erlanger's individual State tax returns for the same period from 1925 on. She was shown a New York State income tax return, Exhibit 139, and it bore her acknowledgment, and the course of procedure that she had described did apply to this exhibit; she was shown individual Federal income tax returns (Plaintiff's Exhibit 133), which bore her acknowledgment for 1925. She said that plaintiff's Exhibit 140, New York State income tax return for 1927, bears her acknowledgment; also Exhibit 141, the New York State income tax return for 1928; also Exhibit 134, Federal income tax return for 1926; that also bore her acknowledgment, as does also Exhibit 136, being Federal income tax return for 1928; made the same answer as to the acknowledgment on Exhibit 135, being Federal income tax return for 1927; Exhibit 138, being State income tax return for 1925. Upon cross-examination she said she did not type the income tax reports; that she had nothing to do with the preparation, in addition to being the notary; she said in reference to income tax returns (6590), May, 1921, until May 31, 1926, Pratt prepared them,

made all answers, put in the figures and initialed the lines for Erlanger's signature, submitted them to Mr. Golding, who in turn submitted them to Erlanger for his signature; and from June 1, 1926, up until the time of her discharge Aguolia made those income tax statements, filled in the answers, put the amounts, and initialed the one which Erlanger was to sign, and Pratt in turn would submit them to Erlanger for his signature; that was the preparation of the income tax statements; with this she had nothing to do, except to notarize them; she would notarize them always in her office; Pratt or Golding would bring them to her; from 1926 on it would be Pratt in every instance, and prior to that, Golding. She again said she had nothing to do except as notary with these returns; that she did not type them; that she did not get any information out of the books for them, when Pratt became the head of the finance department; *she repeated again Aguolia prepared the checks, the returns, and answered all the questions; she saw him type the answers; she denied that she went with Pratt in the spring of 1928 to Erlanger's office and saw him submit the reports of the income tax returns for 1927 to Erlanger.*

*Meyer Keen,* of the Open Road Travel Bureau, first met contestant at the West End avenue home; she wanted to sail on the *Majestic* on June 4, 1927, and asked him to arrange for accommodations for herself and Mr. Erlanger. He produced a copy of the ticket that was issued and identified a duplicate of the ticket issued, which was brought to the court by Mr. Wall, the representative of the White Star Line. The original and copy of the ticket were marked in evidence (Exhibit N-3). They did not sail (1619); decedent was too ill; he canceled the sailing shortly before the steamer sailed. Keen received a message from Mrs. Erlanger (1622) to cancel the reservation on the *Majestic* and return the money, Keen having previously received money, $1,420, in the *form of a check from Mrs. Erlanger.* A letter sent by Goodman of the Open Road Travel Bureau to Mr. Wall of the White Star Line was marked in evidence (Exhibit R-3). In this letter, May 10, 1927, the writer referred to the contract ticket 182–544, "*For the ' Majestic,' June 4, Mr. and Mrs. Abraham Lincoln Erlanger.*" The money was returned by a check to the order of A. L. Erlanger, delivered June 14, 1927, to Mrs. Erlanger; the receipt for the check is Exhibit T-3 for identification.

*Edward K. King,* who knew decedent for from sixteen to eighteen years, talked with him in the spring of 1925 about procuring a passport; they went down to the passport office; the necessary statements were filled out; Aarons was a witness. King described himself as a tax consultant, insurance and real estate

broker, practicing before the Board of Federal Appeals at Washington; he said that on several occasions he had a man come up after hours from the passport bureau to take a statement of the persons going abroad; pressed for their names, he mentioned Mr. Belmont, Mr. Klaw, Mr. Henry Miller, Justices Guy and Burr, some member of the Lehman family, Otto and Gilbert Kahn; he stated that he was a captain of marines, under Civilian Class Six, during the war, having his appointment in 1915 from the government; that he was assigned to Ellis Island; that he resigned at the end of the war. He saw contestant sign the application; could not recall the questions asked; remembered her being asked her name; thought she stated the name was Charlotte Fuechsel or Fixel, and she said she was professionally known as Charlotte Leslie; he did not recall her being asked whether she was married or single. He said that she said she was single at the instigation of Mr. Erlanger, who, before witness left his office that morning, said to her: " Now, you are going under your maiden name " (6443). He said that " she was single " was said after the application was being completed and this correction was made. Afterwards, an effort was made by the proponent, aided by counsel for the contestant, to have witness reappear for further cross-examination. He could not be served, and thus no further testimony was given by him. Later, a record of conviction of one Emanuel Keyser, on June 25, 1909, on a confession of forgery in the third degree, before Judge Fitzgerald in the Criminal Term of the Supreme Court, New York county, was produced by proponents (Exhibit 390, 6887). No objection was made to the receipt in evidence of a photo of Emanuel Keyser; the objection to the receipt of the inscriptions upon the back of the photograph was sustained (6895; Proponent's Exhibit 393, for identification). Griffin, formerly a detective in the police department (6900), testified that he knew the person shown in the photo (Exhibit 390), as Emanuel Keyser, King and Meyer.

Summarizing contestant's parole proofs covering the period from 1920 to November, 1927, during all of which time, except certain summers or parts of summers at the summer home of his sister at Lawrence, decedent lived with contestant, we behold a long procession of credible witnesses, called from *all the contacts which decedent had during that period, from every sphere in which his life was spent.* Upon the subjects of general reputation, repute and acknowledgment testimony showing that contestant was held out by decedent as his wife, Mrs. Erlanger, and generally known to be Mrs. Erlanger, was given by the neighboring tradesmen: Keeley, the fishman (2057); Riley, the butcher (2066); Russo, the fruit and

vegetable dealer (2070), and Noll, the grocer (2238); the domestic group: Margaret Anderson, the cook (1187); Andre Fray, the butler and valet (658–661); Charlotte Heitmann, the personal maid (770–779), and Albert Knipping, the cook and waiter, and Jennie Fielis, the cook and housekeeper, all of whom knew contestant as Mrs. Erlanger, *heard her addressed as such in the home of the parties, saw her preside as head of the household and described the attitude and demeanor of decedent toward contestant; the office group:* Brown, the telegrapher and telephone operator for five years prior to May, 1926, *who testified that once a day, and at many times twice a day, for five years he called Mrs. Erlanger on the telephone at the West End avenue home* at the direction of decedent (2049); Eddie Fitzgerald, financial clerk, who spoke to Mrs. Erlanger (2174) and who addressed her over the telephone as " Mrs. Erlanger " (2176) and who saw many bills that came down from the house marked " O. K., Mrs. E." (2192); Lars Jorgensen, an office assistant from 1923, who went to the West End avenue home with messages and packages, the majority of them addressed to " Mrs. A. L. Erlanger " and some to " Mr. A. L. Erlanger," *two hundred times or more* (2142–2158), who never knew her by any other name than " Mrs. Erlanger " (2143); and Mrs. J. J. Dillon, decedent's secretary from 1918 to his death, who knew contestant as " Mrs. Erlanger " as early as 1921 (2275); the hotel group: (a) at French Lick Hotel, Indiana, Minnie Adams and Josephine Halloran, superintendent of baths and masseuse, respectively, *who knew contestant as Mrs. Erlanger* at that hotel; (b) Lakewood Hotel, Lakewood, N. J., Irving Ulick, room clerk, who testified that Mrs. Erlanger registered as " Mr. and Mrs. Erlanger " in February, 1924 (2391), and were known as Mr. and Mrs. Ehlanger; and Nathan Jacobs, proprietor of the Lakewood Hotel, who testified that they were registered by Mrs. Erlanger as " Mr. and Mrs. Erlanger " while Mr. Erlanger was standing beside her in January, 1924, and who described further incidents that took place there at that time; (c) *the Shelburne Hotel,* where they were " *Mr. and Mrs. Erlanger,*" as shown by the testimony of *Heiss,* assistant manager; *Armswalde,* the maitre d'hotel; *Gibbons,* in charge of room service; *Mary Churchville,* the housekeeper; *Martha Curley,* the telephone operator, and *Charles Mondini,* the barber, who shaved decedent quite often in his apartment at the hotel, always saw Mrs. Erlanger there, who testified that they acted toward each other as husband and wife and the decedent called her " Mrs. Erlanger;" and the various exhibits which showed reservations made for " *Mr. and Mrs. Erlanger* " and accounts kept in the ledger of " *Mr. and Mrs. Erlanger.*" (d) *the Ambassador Hotel,* New York city, where in September and

October, 1927, they were registered and *known throughout* the hotel offices as *Mr. and Mrs. A. L. Erlanger,* as shown by the testimony of *Kroell,* the manager; *Nelson,* the assistant manager; *Deare,* the room clerk; *Mrs. Mondini,* the telephone operator; *John J. Dillon, and proponents' witness, F. Richard Anderson* (5267); and by various exhibits (K-5, M-5, Q-5, C-5 to J-5). *Mr. and Mrs. Anderson* dined with them there (5267); *Henri Newell* (979) *dined* with them there; also *Mr. and Mrs. Denni* called on them there (1962); *the theatrical group; Eddie Cantor,* who was introduced by him to her in London in the summer of 1925 in this wise: " Eddie, I want you to meet my wife " (2220); *Betty Gallagher,* actress, who was introduced by Erlanger to contestant as Mrs. Erlanger (819), and who met them as " Mr. and Mrs. Erlanger " at their West End avenue home (822); *Albert H. Woods,* ˚the theatrical producer, who was introduced to contestant as " Mrs. Erlanger " by Erlanger at Atlantic City. Though " Al " Woods had extensive association with Erlanger in joint productions, he said, *" I have never been with him socially,* only in business " (155); *Charles Evans,* popular actor of a generation ago, who knew Erlanger for thirty-five or forty years, knew the parties as " Mr. and Mrs. Erlanger;" deemed them as man and wife, recounting meeting sat West End avenue home, at Copley Plaza in Boston, and at his own apartment, and heard people other than Erlanger address her as " Mrs. Erlanger " (3512); *Mrs. Helena P. Evans,* author of " Happy-Go-Lucky," who testified similarly to her husband (3488), and who quoted Mrs. Erlanger as saying (3495) when she was asked, " Why so happy, Charlotte? " *that Mr. Erlanger told her on the way home that he had arranged things so they could be married in February;* and of her saying further when Mrs. Evans said, " Why Charlotte, I thought you were married," " not by a justice yet; there has been some legal difficulty about his affairs, but Bunny says he can fix them." (This colloquy took place in 1926.) *Florenz Ziegfeld,* the producer, who in Exhibit P. 10 wired on August 11, 1927: *" Mrs. Charlotte Erlanger,* c/o Abe Erlanger, Shelburne Hotel, Atlantic City, New Jersey. Would like Abe's permission to announce ' Erlanger and Ziegfeld present Ziegfeld Follies.' Regards, Flo;" and again on August twenty-eighth a telegram to " Abe Erlanger " at the same hotel, concluding with " love to you and Charlotte," signed " Flo " (Exhibit S-10; pp. 3560, 3561, 3563, 3565). *Bert C. Whitney,* a theatrical producer who wrote a letter addressed to " Mrs. A. L. Erlanger, Shelburne Hotel, Atlantic City," on August 7, 1927 (Exhibit X-10), a social missive but including a reference to a business matter, a mutual note; a second letter on August 28, 1927 (Exhibit Y-10) with the same address, " Mrs. A. L. Erlanger," etc., and a third

letter with the same address on August thirtieth, " Mrs. A. L. Erlanger " (Exhibit Z-10). *Mary Bothwell,* who is professionally known as Mary Wells, knew Mrs. Erlanger intimately since 1926, visited at the West End avenue house, to whom Erlanger introduced her as " Mrs. Erlanger;" who met them at least fifty times from 1926 to the date of his death, heard Erlanger refer on frequent occasions to Mrs. Erlanger, whenever she saw " Mrs. Erlanger " she wore a wedding ring (identified by her as Exhibit F) and there came a time when she saw her wearing an additional ring (identified *by her as Exhibit G, 1644; the social group: Mr. and Mrs. William H. Conger and Mrs. Stoy,* the latter's mother, who were introduced to Erlanger as " my husband," etc., by contestant in 1920 in Atlantic City, and who visited with the parties in New York in their West End avenue home later; *Mr. and Mrs.°Frank McCulloch,* sister and brother-in-law of Mrs. Conger, who were introduced to Erlanger by contestant in the summer of 1920 as her husband and who knew them as " Mr. and Mrs. Erlanger " and who dined with them in their West End avenue home; *Dr. and Mrs. Frederick Stehle,* brother-in-law and sister of Mrs. Conger, who met and knew the parties as " Mr. and Mrs. Erlanger " in Atlantic City on several occasions, beginning in 1920; *Mrs. Amy Ashmore Clark* (881), who heard her addressed as " Mrs. Erlanger, Darling and Love," who knew them as " Mr. and Mrs. Erlanger " and addressed her as " Mrs. Erlanger " at dinner when Dillingham was present, who visited them at Hotel Shelburne and Hotel Ambassador in 1927, who never heard anybody address her by any other name than " Mrs. Erlanger " or by her first name or " Darling " or " Love " (887); *Mrs. Harry S. Lavner,* who met contestant at Hotel Shelburne in 1927; knew her as Charlotte Lesley; knew her in New York in 1916–1917; was introduced to Erlanger by contestant, saying, " *Belle, I want you to meet my husband, Mr. Erlanger;*" *Mrs. Ethel Morganroth* (1972), who was introduced to " Mr. and Mrs. Erlanger " (1986) by her uncle, Dr. Glass, a physician, at Lakewood, N. J. *Mrs. Caroline D. Barnett,* daughter of the vice-president of Durant Motors Company, who dined at the West End avenue home, was introduced by Erlanger to contestant as " Mrs. Erlanger " (2457); *Mrs. Margaret M. Reid,* of Port Huron, Mich. (deposition), who met Mr. and Mrs. Erlanger at French Lick Hotel in the spring and fall of five years, who said that Mrs. Erlanger was always with him, that she never heard her addressed by any other name (3388); *Mrs. Isabel Hobbs Rosenthal, of Pittsfield, Ill.,* who knew contestant since 1911, met her again in 1915 or 1916, was a guest of Mr. and Mrs. Erlanger at Blackstone Hotel, Chicago, on two occasions, whom contestant introduced on the first visit to " Mr. Erlanger "

(6005); who dined with them, and slept in their suite; *Miss Clara Kalisher*, contestant's music teacher, *who knew her since 1902, when Miss Olivia Levintritt, daughter of Judge Levintritt, and contestant's cousin, brought her to her studio,* who was introduced to Erlanger thus: " Clara, I would like you to know my dearly beloved husband; " she visited them in their home frequently. In addition there were: *George Alexander Wembridge,* the agent of the apartment next door to their home, to whom decedent complained of the excessive noise the builders were making, saying, " *Mrs. Erlanger is on the verge of a nervous breakdown; something must be done about the matter* " (709); *Pierre V. Sanegas,* the hairdresser, who knew her as Charlotte Lesley, and around 1921 as " Mrs. Erlanger," who produced records of appointments for hairdressing of Mrs. Erlanger (1479); *Henri Carpentier,* proprietor of Henri's Restaurant at Lynbrook, who made a deposition (4538); but testified (6516) that the parties frequented his restaurant; that in the spring of 1920 he was introduced to contestant by Erlanger, who said: " Henri, my friend, I present you my sweet, lovely lady, my wife;" *Dr. Charles D. Aaron,* of Detroit, who saw decedent at the Shelburne, to whom decedent said: " Doctor, you have never met Mrs. Erlanger," and further, " Darling, this is Dr. Aaron " (3357). See the letters, X-10, Y-10, B. C. Whitney, written from Detroit, to " Mrs. A. L. Erlanger," in one of which reference is made to Dr. Aaron's statements upon his return. *Dr. J. C. Marshall,* of Atlantic City, who knew the contestant as " Mrs. Erlanger," never heard her called by any other name, dined frequently with Mr. and Mrs. Erlanger, and heard Erlanger address her as " Mrs. Erlanger;" *W. S. Thompson,* bank teller, Union Dime Savings Bank, forty years, who knew contestant as a depositor for about twenty years, becoming acquainted with her under the name of " Charlotte Fixel;" she later changing the accounts to the name of *Charlotte Lesley; who came to know her as " Mrs. Erlanger " in possibly 1920 or 1921,* received the order for fifty shares Bethlehem Steel from " Mrs. Erlanger;" the account in the bank at that time being in the name of *Charlotte Lesley;* who wrote " Charlotte Lesley " on various records of the bank (6451), and at that time knew that Charlotte Lesley was Mrs. Erlanger. *Edward K. King* testified to his being introduced by Erlanger thus: " I want you to meet Mrs. Erlanger;" and as to colloquy with him about her traveling under her maiden name.

In addition to the foregoing testimony, various exhibits were offered in evidence by contestant as to this earlier period, *1920 to 1927* upon the issue of status. The following list embraces the more important exhibits:

(1) License, operate a car, *1922 and 1923*, issued to *Charlotte Erlanger*, 232 West End avenue (Exhibit Q-7). (2) Diamond ring purchased from Tiffany's by Erlanger, *November 29, 1924* (Exhibit F). (3) Order slip, Tiffany & Co. (Exhibit R-2). (4) Receipt signed by Erlanger for this ring delivered to him, *December 1, 1924, at New Amsterdam Theatre* (Exhibit S-2). (5) Bill, Tiffany & Co. to Erlanger, dated *December 31, 1924*, showing purchase of ring on November 29, 1924, for $880. This is a receipted bill showing payment on *January 15, 1925*, charged to Erlanger's personal account. (6) Check for the payment of the same, dated *January 15, 1925*, A. L. Erlanger special account (Exhibit U-2). (7) A wedding ring with the word " Dearest " spelled out by the first letter of names of individual precious stones set in said ring, being a diamond, emerald, amethyst, ruby, emerald, sapphire and turquoise (Exhibit G). (See testimony of Mrs. Conger and her mother, Mrs. Stoy, and of Mr. and Mrs. Dillon.) (8) Exhibit V, *engagement ring of contestant's mother and father, worn by her father and afterwards worn by Erlanger.* (9) Exhibit W, *Erlanger's watch with photograph of contestant* therein. (10) Records of the Shelburne Hotel, ledger sheets with the heading " *Mr. and Mrs. Erlanger,* valet and chauffeur," including the period from *July 27 to September 21, 1927*, and *November 1 to 7, 1927*, inclusive (Contestant's Exhibit Y). (11) Hotel record of reservation made by L. Bergman, naming *A. L. Erlanger and wife,* dated *October 17, 1927, for November 2, 1927* (Contestant's Exhibit X). (12) Copy of letter dated *October 17, 1927*, addressed to L. Bergman, confirming arrangements made for Mr. and *Mrs. A. L. Erlanger* and Mr. Erlanger's man, for their arrival on November second indicating arrangements for a porter with private conveyance to meet the train for *Mr. and Mrs. Erlanger* (Proponents' Exhibit 7). (13) Letter to Bergman from the Shelburne Hotel, notifying him that they have changed the date of arrival of *Mr. and Mrs. Erlanger* to November first from November second. (Proponents' Exhibit 8). (14) Order blanks, bills and checks of the W. J. Sloane Company for carpets for apartment 175 Riverside drive, and references, etc., to *Mr. and Mrs. Erlanger,* various dates in October, November, December, 1927 (Contestant's Exhibits 7, F-7, J-7, K-7); these carpets were selected and purchased by contestant and paid for by Erlanger's checks. (15) Reservation slip recording reservation, made *December 7, 1927*, by L. E. Bergman, for *Mr. and Mrs. A. L. Erlanger,* for *January 2, 1928*. (16) Copy of letter, Shelburne Hotel to L. E. Bergman, dated December 8, 1927, confirming his telephone request as to arrangements for *Mr. and Mrs. Erlanger* on their arrival at three o'clock, *January 2, 1928* (Contestant's Exhibit EE). (17) Thirteen can-

celed checks signed by *A. L. Erlanger*, drawn to the order of the Shelburne Hotel on various dates in *1927*. (Note particularly check of *November 6, 1927*, in the sum of $467.48.) (Exhibit FF). (18) Various sketches and blueprints, duplicate blueprints, architect's files, papers in relation to cost of construction ($60,000 and $62,000); memorandum and further sketches and later studies (among the various rooms shown on the plan are *" Mrs. Erlanger's room "* and *" Mr. Erlanger's room "*), all of which related to the plans of *Erlanger* to erect a villa upon the plot given to contestant in Garden City (see testimony of Upton, Anderson and Newell); (these exhibits are Contestant's Exhibits KK, LL, MM, NN, OO, PP, RR, SS, TT). (19) Steamship tickets for the steamship *Majestic* made out in the name of *Mr. Abraham Lincoln Erlanger and Mrs. Abraham Lincoln Erlanger.* (20) A card accompanying flowers which was sent to Mr. and Mrs. Erlanger by the manager of the hotel, Jacob Weikel, in an envelope addressed " Mr. and Mrs. Erlanger " (Exhibit AA). (21) Check to W. & J. Sloane for $4,785.05, dated December 19, 1927, for carpets selected by contestant for the apartment on Riverside drive (Contestant's Exhibit J-7). (22) Card record of photographic company with inscription, " Mrs. A. L. Erlanger, 175 Riv. Drive, between 89th and 90th Streets, *Apt. O-12-E,*" dated *December 8, 1927*, and showing a payment *December 21, 1927*, of $675 (Contestant's Exhibit A). (23) Photograph of contestant with the inscription, *" Charlotte Erlanger, New Years Day, 1927."* (See testimony, p. 21, containing statement by Erlanger ·" Darling, why don't you give Miss Baker a picture;" P. 56, Erlanger statement: " Now, you have *Mrs. Erlanger's* picture; as soon as mine are finished I will autograph one of mine.") (24) Photographic print of A. L. Erlanger (Contestant's Exhibits C and D). (25) Photo print, different pose, A. L. Erlanger (Contestant's Exhibit E). (Note ring on right hand pinky finger.) (26) Ledger sheets Ambassador Hotel, *September 21, 1927*, up to *November 1, 1927*, entitled *" Mr. and Mrs. Erlanger,* New York City " (Contestant's Exhibit K-5). (27) Bill, *A. L. Erlanger,* Hotel Ambassador, *October 19, 1927*, marked " Paid Oct. 20 " (Contestant's Exhibit L-5). (28) Registration slip, Ambassador Hotel, *October 20, 1927*, with the inscription, *" Mr. and Mrs. A. L. Erlanger, N. Y. C."* (29) Card record entitled *" Mr. and Mrs. A. L. Erlanger,* New York City, showing date of arrival 9 /21 /27 " and dates in *1929 and 1930* (Contestant's Exhibit R-5). (30) Blackstone Hotel records from departure book; " A. Wednesday, *Nov. 3, 1920*, A. L. Erlanger, room 717 " (Contestant's Exhibit D-14); B Monday, *November 5, 1923*, inscription " Not reg., 704, 5, 6, 7, *A. L. Erlanger and pty*," all of these " pty, valet; not

here to anyone; Miss Fixel, 707, Miss Rosenwald, 707 " (Contestant's Exhibit D-14.) (Note testimony of Isabel Hobbs Rosenthal, p. 6011); C. Wednesday, *April 9, 1924*, inscription " Private reg. 904–5–6 and 1002, Mr. A. L. Erlanger, Miss L. Erlanger and valet." (31) Private register under " A. L. and Miss L. Erlanger and valet room numbers 904–5–6, 1002," dated *April 11, 1924* (Contestant's Exhibit E-14). (32) Letter Blackstone Hotel management, describing photostat copies of entries forwarded by mail and explaining inability to locate private register covering Erlanger's visit of *November 16–19, 1924, March 1–2, 1925, and November 16–18, 1925.* (33) Card sent with flowers in *1927* to *Mr. and Mrs. A. L. Erlanger* by the management of the Ambassador Hotel (Contestant's Exhibit Q-5). (34) Ambassador Hotel registration record, " *Mr. and Mrs. A. L. Erlanger*, New York City," *September 21, 1927* (Contestant's Exhibit M-5). (35) Similar record for *October 20, 1927* (Contestant's Exhibit N-5). (36) Other Ambassador Hotel records referring to *Mr. and Mrs. E.* are K-5, L-5, R-5, S-5, C-14, D-14, E-14. (38) Thirteen checks, A. L. Erlanger to the Shelburne Hotel, dates: 8/3/27, 11/6/27, 9/14/27, 9/7/27, 9/14/27, 8/10/27, 8/11/27, 8/24/27, 8/31/27, 9/20/27, 1/7/28, 2/18/28, 4/7/28 (Contestant's Exhibit FF). (39) Steamship *Majestic* sailing *June 4, 1927*, names *Mr. Abraham L. Erlanger and Mrs. Charlotte Lesley* (Contestant's Exhibit O-3). (40) Receipt signed *A. L. Erlanger and C. Lesley* for refund, $1,420 on ticket issued to *Abraham L. Erlanger and Mrs. Charlotte Lesley* for the steamship *Majestic*, *June 4, 1927* (Contestant's Exhibit T-3). (41) Operator's license to operate car for the years *1923 and 1924*, with the name *Charlotte Erlanger*, 232 West End avenue (Contestant's Exhibit S-7) (42) Check for Durant car, *A. L. Erlanger* (Contestant's Exhibit R-7). (43) *Certified copy of New York State Census of 1925, covering the section in which 232 West End avenue is located; one line: 232 (West End) Erlanger, A. L.; relation, H; color, white; sex, M. age at last birthday, 59; nativity, U. S.; citizen, C; occupation, Theatre Manager; next line: 232 Lesley, Charlotte; relation, W; color, white; sex, F; age at last birthday, 35; nativity, U. S.; citizenship, C; occupation, actress* (Contestant's Exhibit J-14). (44) Envelope postmarked *December 23, 1924*, Port Huron, Mich., containing a card with Christmas greetings from Mrs. William Henry Reid and addressed to *Mr. and Mrs. A. L. Erlanger, 232 West End avenue, New York* (Contestant's Exhibit Q-11). (45)· Envelope from M. S. Spector, 260 West Forty-first street, New York city, postmarked *August 9, 1923*, addressed to *Mrs. A. L. Erlanger*, 234 West End avenue, New York (Contestant's Exhibit O-11). (46) Letter from Bert C. Whitney, Douglaston, Long Island, to contestant, beginning,

"Dear Charlotte," referring to Erlanger as "The Boss," to his health and his business, "and Jack Dillon is pugnacious, a fighter and yet a gentleman," closing with "Love from Coodie and myself to the boss, and yours always sincerely, Bert (Whitney)," dated *August 28, 1927;* the envelope is addressed "*Mrs. A. L. Erlanger,* Shelburne Hotel, Atlantic City" (Contestant's Exhibit Y-10). (47) Letter of *August 29, 1927,* opening: "Dear Charlotte, Enclosed is a renewal for Bayside; will you ask the boss to put his name on the back, and you mail it in enclosed;" closing with: "Love to you both and best wishes, yours sincerely, Bert C. Whitney;" addressed from Detroit, Mich., with special delivery stamp, to *Mrs. A. L. Erlanger,* Shelburne Hotel, Atlantic City; postmarked *August 30, 1927* (Contestant's Exhibit Z-10). (48) Letter, *12/20/27,* addressed to *Mrs. A. L. Erlanger, 175 Riverside drive,* from Columbia Carpet Cleaning Company (Contestant's Exhibit U-10). (49) Letter dated *8/7/27,* from Bert C. Whitney, The Whittier, Detroit, beginning: "My dear Charlotte;" the letter contains among other statements the following: "I am enclosing that mutual note, also envelope to mail it in," ending: "Love to you both, many thanks, sincerely yours, Bert C. Whitney;" post-marked and stamped envelope addressed to *Mrs. A. L. Erlanger,* Shelburne Hotel, Atlantic City (Contestant's Exhibit X-10). (50) Telegram, *August 28, 1927,* from Quebec, addressed "Abe Erlanger, Shelburne Hotel, Atlantic City. My dear Abe, I got away just in time or I would have had a breakdown; I did not realize how I had sapped my vitality; am getting real rest sleeping outdoors. Hope, dear Pal, you are getting on fine. *Love to you and Charlotte;"* signed "Flo" (Contestant's Exhibit S-10) (Flo Ziegfeld). (51) Telegram from Flo Ziegfeld to "My dear Abe," dated *8/28/27,* which concludes with the words, "Hope, dear Pal, you are getting on fine. Love to you and Charlotte," signed "Flo" (Ziegfeld) (Contestant's Exhibit S-10). (52) Telegram *8/11/27,* addressed to "*Mrs. Charlotte Erlanger, c/o Abe Erlanger,* Shelburne Hotel, Atlantic City. *Would like Abe's permission to announce ' Erlanger and Ziegfeld present Ziegfeld Follies.'* Regards, Flo" (Contestant's Exhibit T-10). (53) Radiogram to "Mrs. A. L. Erlanger, Steamship *Augustus. Have been compelled send Abe important wire; please have him give it careful consideration as if he refuses me I would lose money every week of capacity business.* Love;" signed "Flo" (Ziegfeld) (Contestant's Exhibit Q-10). (54) Decree of divorce, Supreme Court of the State of New York, county of Orange, *March 28, 1912,* in which Adelaide Louise Erlanger was plaintiff and Abraham Erlanger defendant; the decree dissolving the marriage of plaintiff and defendant solemnized on

*July 5, 1891,* at Toronto, Canada, and adjudging it lawful for the plaintiff to marry again during the lifetime of the defendant and that the plaintiff may be permitted to assume her maiden name if she so selects, and further provides that *it shall not be lawful for the defendant, Abraham L. Erlanger, to marry again until the death of the plaintiff, and further decreeing the payment by the defendant to the plaintiff of $1,500 each month during the lifetime of the plaintiff and for so long as she shall remain unmarried, and further decreeing that monthly payments of $1,500 shall be continued to be paid out of the estate of the defendant* (Contestant's Exhibit H-14). (55) *September 9, 1927,* bill Boardwalk Art Galley for chair and rug, made out to *Mrs. A. L. Erlanger,* marked " paid," and another bill dated *September 29, 1927,* made out to *Mrs. A. L. Erlanger,* of the Boardwalk Art Gallery, stamped " paid," for four rugs, lamp shade and jars; and a bill of Biddle's, Inc., jewelers, *September, 1927,* made out to *Mrs. A. L. Erlanger,* 232 West End avenue, New York city, for needlepoint chairs and needlepoint stool, blue lamp and shade, etc., said three bills forming contestant's Exhibit A-12. (56) Bill for electric service as of *11/10/27,* paid *11/16/27,* made out to *Mrs. A. L. Erlanger,* 175 Riverside drive, Apt. O-12-E, with " O. K., Pratt," on the back of same (Contestant's Exhibit L.). (57) Large photograph in a frame with the inscription " To Mac and Dorothy, A. L. Erlanger " (given to Mr. and Mrs. McCulloch, contestant's witnesses, 1923) (Contestant's Exhibit G-10).

Proponents called comparatively few witnesses to rebut the testimony of contestant's witnesses relating to the period from *January, 1920, to November, 1927,* though proponents have offered documentary evidence.

Proponents' witnesses were Joseph P. Bickerton, Jr., Nathan D. Stern and Saul J. Baron, who at certain times acted as attorneys for Erlanger; George W. Lederer, a former producer and later an employee of Erlanger's; Charles B. Dillingham, a producer and partner of Erlanger in some ventures; Murray Lachman, his clerk; George C. Tyler, a theatrical producer and tenant of Erlanger; Marcus Heiman, likewise in the theatrical business and associated with the Erlanger Enterprises; Frank Richard Anderson, manager, and Milando Pratt, auditor, of the Erlanger Enterprises; Alfred E. Aarons, at one time in the employ of Erlanger (all the foregoing, it will be noted, are business friends of decedent); Philip W. Schimmel, Blackstone Hotel, Chicago; A. W. West (S. P. C. A.); Helen Tenbroeck, a former newspaper writer; Otto B. Shulof, a friend of Erlanger's and his family; Fred Frankfort, a real estate man, and Lancey Milton Johnson, employed in Erlanger's garage, and the

following, who produced records marked in evidence: P. Wynn, G. W. Conklin, J. Leddy, C. A. Pinckney, O. Langspecht.

*Joseph P. Bickerton, Jr.*, an attorney for decedent from *1920* to *1925*, came in daily contact and consultation with him; identified a perpetual lease in which " Abraham L. Erlanger, single," and " Charles B. Dillingham, married," were lessors, dated *January 31, 1921;* an instrument in reference to the Mason Opera House in Los Angeles, dated January 21, 1924, with the recital " Abraham L. Erlanger, unmarried; " and another instrument dated *October 8, 1920,* from Kate Mason Demming and her husband to " Abraham L. Erlanger, unmarried." He identified three other instruments (Proponents' Exhibits 149, 151 and 152), the latter being a deed by decedent to his sister, Ray Erlanger, dated *July 18, 1922*, of premises No. 232 West End avenue, and another instrument of the same date from Erlanger, residing at No. 232 West End avenue, covering premises in Lawrence. Bickerton visited the West End avenue house frequently; first met contestant there some time about *1920 or 1921;* was introduced by Erlanger; is not certain whether she was introduced to him as Miss Lesley or Miss Fixel, but he knew that Miss Lesley was Miss Fixel. She was not introduced to him, he stated, as Mrs. Erlanger. When he dined at the house it was with Erlanger alone. He went to various places out of town with Erlanger on theatrical business. He was a guest at Garden City Hotel in *1922 and 1923.* During these summers Erlanger, to the best of his knowledge and belief, was at Lawrence. He thought contestant was stopping at the Garden City Hotel. He described a visit made by contestant at Erlanger's office some time between *July 1 and December 1, 1920,* he being at the time with Erlanger in his office and the colored attendant announcing that Miss Lesley was outside and handing Erlanger a note; that Erlanger usually read the note and gave Thomas some money; that this happened two or three times in that period. *He twice fixed the year as 1920* (4047) and stated that this was before he met contestant at No. 232 West End avenue, and he thought that the lady whom he met at No. 232 West End avenue was the same lady who was sitting outside at the time of the above incident. Bickerton testified that during all of his association with decedent he never told him that he was married; that he (4062) never addressed contestant in his presence as Mrs. Erlanger, and that he never heard any one else address her as Mrs. Erlanger in Erlanger's presence or otherwise, the witness referring to the period from *1920 to 1925; that he at Erlanger's request drew an instrument, " it would be called a release "* (4048), from Charlotte Fixel to A. L. Erlanger; he gave it to him (4050), *he never saw it executed and he did not know anything about it after that;* he saw it

again but he did not know it was signed; that as nearly as he could recall he did not know whether really he saw any signature on the document or whether it was folded up when he was spoken to again about it (4053). When shown a paper by proponents' counsel which he admitted having signed he said it did not refresh his memory; *that he had been asked to swear to it and that he hesitated seriously and did not do it;* that it was ten years ago (the " release " incident), and he had " *a very hazy recollection of these things.*" Bickerton further stated that he drew a will for Erlanger, he thought it was in 1922, he was present at the execution, he has a recollection of seeing people subscribe it, not definite but he thought he knew who they were, but in the next answer stated that he did not have a present recollection of whom they were; *that there was not any mention made by testator of a wife, nor of a Miss Fixel, nor of a Miss Lesley, nor of any Charlotte Fixel, nor Charlotte Lesley;* that the executors named in said will were himself, Judge Erlanger, Mrs. Bergman and Ray Erlanger. Cross-examined, the witness fixed the winter of *1920* and the winter months thereof as the time when he was there on frequent visits; he often saw Miss Fixel or Miss Lesley there, and there were maids and a valet. He testified that Tommy Tucker told him Miss Lesley was a friend of Mr. Erlanger's; that he would go to the Erlanger home on many Sundays; always saw the contestant; saw her there in *1921, 1922, 1923; he never saw a soul there except Mr. Erlanger and Miss Fixel;* his conversations with Erlanger on these *visits were in relation to business; always business* (4113). He reiterated that no one spoke to him about Miss Lesley or who she was except Thomas Tucker; witness understood that Charlotte Lesley was her stage name. He corrected (4128) the statement made previously (4053) that the paper (release) was folded, etc., and declared that (4027) he did not know as to whether Erlanger held it up or whether he had it folded, whether Erlanger told him it was executed or not, and that was why he was unwilling to swear; that (4128) he could not say that the paper was the same paper Erlanger had shown him.

*Charles B. Dillingham* knew decedent thirty years; was partner with him in many enterprises; knew contestant many years; she was in one of his plays, " Sergeant Brue," more than twenty years ago; he attended a birthday dinner at No. 232 West End avenue; did not remember the date; it was contestant's birthday, and there were present Miss Glass, Miss Kuhn, Charlotte (the contestant), Erlanger and the French baron; he guessed that Major Furlong was there, but he had forgotten. He denied the showing of the new " wedding ring " (6183), and to the effect that Erlanger had said in substance that he had bought the " wedding ring "

at Tiffany's, the witness stating that nothing like that happened when he was in the room; think that he left (see review of Mrs. Morganroth's testimony, *supra*); he saw Erlanger and contestant at French Lick in the *fall of 1924*, and he told of a lady asking him if he had met Mrs. Erlanger, his replying, " Mrs. Erlanger?" and that he was surprised, and that just then the clerk handed him a telegram, right over the register, and on the register were the names " *Mr. and Mrs. A. L. Erlanger*," and that he went over to Erlanger and asked him if he was married, and he said, " *Certainly not*," and that he said to Erlanger, " Your name is on the register," and that Erlanger said, " *Is it in my writing?*" and he said, " *No, sir, it is not.*" *Erlanger and contestant dined in his house; Miss Glass, Miss Kuhn and Charlotte (the contestant) and Mr. Erlanger, Sir William Wiseman and Dillingham were present;* described taking Erlanger and contestant to dinner at the Hoosier Club at French Lick, and of the introduction by him of Erlanger to Mr. and Mrs. Ballott, proprietor and his wife, and of Erlanger's introducing contestant by saying, " You know her." *Dillingham sent flowers and fruit to the contestant; in sending gifts he addressed them, " Sergeant Brue,"* because she was in a play by that name, and he did not *know how else* to address her; he did not ever address her as Mrs. Erlanger (but see Exhibit R-14, his telegram to " Mrs. Erlanger "), and he never heard Erlanger address her or speak of her as Mrs. Erlanger. He lunched with Erlanger for ten years, and Dillingham paid the checks for ten years. During his association with Erlanger, particularly *between 1920 and 1930*, he never spoke to him of having married nor of contestant as his wife; Dillingham said: " *Never to me; not to me.*" Erlanger never spoke of contestant to anybody else in his presence as his wife. Upon cross-examination (6190) he did not know just how he introduced Erlanger to Mr. and Mrs. Ballott. When interrogated as to Erlanger's mode of introducing contestant " you know her," witness responded, " words to that effect;" asked the same question again he gave the introduction as " you know Charlotte " or " you know her, something like that." And no reply was given to the question: " ' Charlotte ' to people who never met her before?" " Q. Your exact words were —I wrote them down — ' you know her '— then *Mr. Erlanger said, ' you know her?'* A. *That is good enough; that is all right.*" He stated that contestant in the contract under his employ had the name " Charlotte Lesley," but he did not introduce her as Miss Lesley to Mr. and Mrs. Ballott (6192); that he did not know the name " Charlotte Lesley " well, that he did not greet her often, that he was not well acquainted with her. (He previously stated he never heard her introduced by Erlanger as Mrs. Erlanger to anybody.)

*The witness then stated that he never heard her introduced by Erlanger to anybody,* emphasizing in the two following answers that he, as a matter of fact, never heard her introduced by Erlanger at all (6194). He met contestant at the Blackstone Hotel, Chicago, only once; they were going to French Lick; he went over into the rooms and saw them for a minute. Dillingham stated (6195) that he never saw Erlanger *except at luncheon; Erlanger went his way and Dillingham went his.* He stated, " I never asked him those things, where he was going;" he did not ask him where he came from or where he was going to or what he was doing in Chicago. Dillingham did not know whether he received any letters from contestant; he received a telegram, does not think that he ever got a letter; but he stated he got a note of acknowledgment of some fruit. He guessed that he knew about Erlanger and contestant going to Europe in *1925;* he stated (6204) that he never wrote her any other way except " Sergeant Brue." On August 22, 1927, he addressed a telegram to " A. L. Erlanger, Hotel Shelburne, Atlantic City;" he knew that Erlanger and the contestant were there, and the wire was, " *Dear Abe, glad to get your wire, by all means give the doctor his two weeks notice or send him with Schneider-Anderson. Best to you and the faithful Sergeant.*" And Dillingham said the " *faithful Sergeant* " *was Charlotte, the contestant;* and he signed the telegram " Charley." Dillingham interpreted the jokes contained in the telegram; he was shown a radiogram and his memory was refreshed; he remembered and he stated that he was on the *Majestic* when he sent it to Erlanger at the Cunard docks, being intended for Erlanger on the steamship *Franconia;* the telegram (Contestant's Exhibit P-14) was as follows: " *Erlanger, S. S. Franconia, Cunard docks. Pleasant trip to the General and the Sergeant.*" He stated that the " General " was A. L. Erlanger and the " Sergeant " was Charlotte Lesley; he stated that if he sent a communication to a Mrs. Erlanger it would not be the Mrs. Erlanger who was divorced in *1912.* On December 16, 1927, Dillingham sent a telegram addressed to " *Mrs. Erlanger, 175 Riverside Drive,* New York, N. Y." and signed as " Charley;" it was sent from Springfield, Mass., and is as follows: " On return to New York, and next week's contracts made with Boss to-day require Betty Brown Pudding with dinner as they are unique and extraordinary. Have placed Pase in Equity hands. Love to both. Charley." In his testimony he stated that he never addressed that, that he sent his secretary down to send a telegram to Charlotte, and if it was worded he never worded it that way; knew where the Riverside drive apartment was at Ninetieth street (6214–6216); explained the meaning of the telegram and the " Brown Betty Pudding," denied that he ever went to Aarons and asked

him to ask Erlanger about the registration at French Lick; said he never asked him anything; declared that he never had any talk with Aarons for more than three minutes in his life; he never went to lunch with Aarons and that Aarons never went to lunch with him in his life and never lunched with him and Erlanger in his life. (In all his testimony he flatly contradicted proponents' other witness, Aarons.) *As to being closely associated with Erlanger, he answered,* " *In business, not outside the business. In business, yes, sir.*" *As to going to Erlanger's house to dinner, his response was,* " *In thirty years four or five times; we made it a point to go different ways outside of business.*"

*George W. Lederer,* in the theatrical business for over forty years and partner of Erlanger in several ventures, entered Erlanger's employ in *1906;* visited at Erlanger's house repeatedly, he stated, when he was married to Adelaide Louise Balf (the latter divorced Erlanger in *1912*); after Erlanger's divorce he visited him at the West End avenue house occasionally, *probably two or three or four times;* witness knew contestant pretty close to thirty years, she having applied to him for a position on the stage as Miss Fixel, but she had assumed the stage name of Lesley, and he first gave her a position in a play called " Sally in Our Alley," introduced her to Erlanger, who engaged her for a play, " The Billionaire," but she was switched over to " Bluebeard " around *1902 or 1903; never met the contestant when she was in the company of Erlanger more than three or four times all told,* once in Boston, once at the George M. Cohan Theatre at the opening of " Ben Hur;" saw her once outside Erlanger's office around 1919 or 1920; he was with Erlanger and Tommy Tucker came in; the witness proceeded to describe something that happened then (5037), the answers being more or less confused, as this colloquy will illustrate: " *Q. Who told you that? A. The colored man. I was standing there. Q. The colored man told whom? A. Told me, told her over the phone, or was supposed to have told her. That is what he told me. He said, ' That was Charlotte Lesley,' who knew who I was.*" After more questions and answers Lederer stated that Tucker announced Miss Lesley to Mr. Erlanger, and that he reached down in his pocket, gave Tom twenty dollars, and he said, " She says you owe her $40," and he said, " Tell her that is all I got now." He stated (5040) that Erlanger did not introduce the contestant to him. (As to introductions, it was Lederer who introduced the contestant to Erlanger [5035].) After this first meeting he saw them in the dining room, Hotel Shelburne; he did not dine with them. The next meeting was at the opening of " Ben Hur " in *1926.* He said, " *Erlanger and Mrs. Erlanger were seated together watching the picture;*" that they came out between the

*acts and spoke to him, that he went down to where they were seated and congratulated Erlanger; other people came up to congratulate the latter.* Though the witness originally introduced contestant to Erlanger the examiner again asked whether Erlanger on that occasion introduced him to contestant. He next saw them in Boston together at the opening of the play " Happy-Go-Lucky." He stated that Erlanger directed him about hotel accommodations, that he wanted him to get his usual layout of rooms and to register the same way; he said, " The same as before?" and Erlanger said, " Yes;" that he registered them at Copley Square Hotel as Erlanger and Charlotte Lesley. He described a conversation with Erlanger (5044) on taxation, where he suggested to Erlanger that he save money on his taxes by distributing it among loyal employees; that Erlanger demurred at the suggestion and said that he was going to take care of his brother and two sisters and " *You know, I have no wife. She is getting $18,000 a year and I am never going to marry again.* That is all I am going to look after," thus referring to his former wife. This was in *1924 or 1925,* he declared. In cross-examination when asked about a trip to Cobleskill in connection with a law suit of Erlanger's and why Erlanger sent him he replied that Erlanger said that he could depend upon him, that he was diplomatic, and that he (witness) then said, " You have lawyers enough; your brother is a Supreme Court Judge," and that Erlanger said, " I know, but I cannot depend on them." He stated that he *never played favorites with anybody; had certain periods when he was in a temper, he used to go after anybody or everybody.* The cross-examiner went into the witness' statement that he saw contestant outside Erlanger's office in *1919 or 1920,* to test his memory and credibility; the witness had no idea what part of the year it was, he could say that it was the end or the beginning of the year, that he would only be guessing; when asked how many years it was between that occasion and the time when he first had seen contestant, he said *that there were long stretches between the time of his first meeting; he could not recall how many years prior to the occasion when he saw her at the office he had previously seen her; he recalled the episode of Tommy Tucker's announcement and Erlanger's statement " vividly;"* said that contestant came around the building *quite a lot, then he put it occasionally, and then probably two weeks or a week or two or three weeks,* and finally stated, " *Occasionally* " (5050). He could not recall whether at that time he was Erlanger's partner or in his employ; did not think he saw her in that building in *1929,* had no idea and did not know about *1928,* could not tell about *1927,* could not tell about *1926;* stated that (5054) " Ben Hur " was an important event that he was connected with; he has no distinct recollection of ever having

seen her excepting the dates he gave; he did not know whether he saw her in *1925*, or outside of Atlantic City in *1924;* had no idea about *1923*, nor *1922*, nor *1921*. The witness had difficulty in trying to remember when he last saw her prior to the Tommy Tucker incident; stated that he might have seen her in plays; that he had seen her on the stage several times and that she became a very beautiful soprano; he saw her with Weber and Fields; the other two parties to the Tommy Tucker incident are dead, Tucker and Erlanger; he said that he did not see contestant outside (the office) on that occasion; but that " they have a tremendously thick heavy door   *   *   *;"   he guessed as thick as this desk, as Tommy Tucker went out with this money he swung the door and he saw her standing out there; after this incident he could not recall when he next saw her; the time he previously mentioned in his testimony was at Atlantic City in *1924;* on this occasion, where they met going into the dining room, Erlanger did not invite him to dine with him; at that time he was business manager of one show.   He stated that the " Ben Hur " performance was one of the important events in Erlanger's life; that she was there with him, sitting side by side with him, and that at the opening of the show in Boston (" Happy-Go-Lucky ") the contestant was with him, got off the train with him, went to the same hotel and lived at the same hotel with him, and was with him at the rehearsal, and he stated that it was through the contestant that the whole business had been brought to Erlanger's attention; that she, contestant, sponsored the whole thing, that she and Baron were seated side by side throughout the dress rehearsal. *The only times that he can recall after 1920 when he saw contestant, he saw her with Erlanger.*   The following answer (5066) to the query, when was the last time that he went to the West End avenue house? illustrates the calibre of the witness: " A. I would think it would be — before his — before his final illness, around those same periods, I am — the same date we have been referring to, about, I would say, *1907*, or *1908;* may have been the last time — *1927 or 1928*.   I cannot recall that;" could not fix it at all; stated that he made several efforts to call on Erlanger there, but they would not let him see him.   Witness (5067) could not answer when was the last time that he saw Erlanger; was shown Exhibit 72, which indicated his debt to Erlanger of $500, which was marked " worthless."   The witness testified that in *October, 1930* (after Erlanger's death), in a production in a deal *between witness, Judge Erlanger and Baron, $37,000 was lost in the production, that the Judge made that deal with him* (5074).   In redirect he explained that they produced a play, tried it out for three weeks, that is, as far as they

had gone with it; it cost $37,000; he was to share in the profits; after the production paid for itself he was to get forty per cent; he directed the play, the rehearsals and was general manager of it after it was produced; the play ran three weeks, after a tryout in Washington and Philadelphia, and that now it is on the shelf. The witness (5491) stated that he learned of Erlanger's death in the morning papers; it was around noon, he sent a telegram (Exhibit H-13), dated March 7, 1930, 12:24 p. m., viz.: *" Mrs. A. L. Erlanger, 175 Riverside Drive. Perhaps in your hour of grief you may realize my sorrow. Please accept my deepest, heart-felt sympathy and condolence. George W. Lederer."* In redirect he stated that he called up the offices, was told to wire Mrs. A. L. Erlanger, and he said, " is she there?" and that he said, " yes, she is there;" that the witness had in mind in asking, " is she there?" *Louise, his wife, Erlanger's wife, his former wife, and that he intended the telegram for her, that Erlanger always mentioned her,* " stigmatized her as Mrs. Erlanger," that whenever he referred to his wife or Louise Balf to him he always mentioned Mrs. Erlanger. *In further cross he stated that he met her often after the divorce;* that he *did not know* that Erlanger had brought suit against her; seeking to annul the marriage on the ground that he had never been legally married to her; he did not know in what year Erlanger was divorced; he would say eleven or twelve years, which would make it *1919 or 1920.* (The divorce was in *1912.*) He stated that the Mrs. Erlanger he thought he was wiring to was Adelaide Louise Erlanger (condolences); *that she used to call on him when she would come back from Europe, perhaps three or four times in the last years,* that he would say that the last *time he saw her was four or five years ago;* that she came *to see him.* He again stated (5498) that when she came from Europe she called on him three or four times; that as soon as she learned that he was dead the witness assumed she would go up there, because they were both in love with each other. He could not fix any specific time after *1910* when he visited West End avenue. When asked whether he remembered Eddie Fitzgerald telling him that he was discharged because he refused to say that he knew the contestant other than to be Mrs. Erlanger, Lederer stated that he knew it was in connection with this case, he did not recall exactly the cause; that he *denied that he said to Eddie Fitzgerald: " Why, there was nobody in the building that could say that they knew her other than as Mrs. Erlanger." To meet the explanation made by Lederer and his statements as to meeting on different occasions Erlanger's former wife, Adelaide Louise Balf Erlanger, contestant produced a letter* (6662) from Adelaide Louise Balf Erlanger (6662-6669); it was agreed by both sides that the letter might be taken as if the writer testified as is stated in the

letter (6665). The letter, of December 27, 1931, from No. 498 West End avenue, New York, reads as follows: " *My dear Mr. Steuer: I have neither seen nor heard of Mr. Lederer for about twenty-five years. He had not called upon me nor I on him in that time. Yours faithfully, A. Louise Erlanger.*"

*John Emerson*, dramatic writer and former president of the Actors Equity Association, knew Erlanger; first personal acquaintance with him was in 1923 in connection with the Actors Equity Association; saw him chiefly in his office, with the exception of one time at his house in West End avenue; the daily announcement made of the play " Social Register " is " *Social Register, by Anita Loos and John Emerson;*" that it certainly does not say " the wife of John Emerson;" it would be absurd. He did not know of what clubs Erlanger was a member; he could not positively say that ever in his life he saw Erlanger in any club; that the arrangement for the production of the play " Social Register " was made with the Erlanger Productions, Inc., of which Judge Erlanger is president, and the arrangements were made with Baron. *His calls at Erlanger's office were four or five times perhaps; he never dined at Erlanger's house; Erlanger had no occasion in his talks with witness to refer to a wife or to a Mrs. Erlanger. When interrogated as to Erlanger's reputation among theatrical folk, as to whether he was or was not married, he answered that he knew Erlanger had been divorced, but that was as far as his knowledge went concerning his marital affairs.* Queried as to Erlanger's reputation among theatrical folk, as to his status as a married man or an unmarried man about the clubs, *he answered, " Oh, we understood he was not."* In the direct and in the cross it was disclosed that the witness and his wife, the *well-known writer, Anita Loos, had had a play running recently under the management of the Erlanger office;* that the play called " *Social Register* " was put on in *October, 1931,* by an *arrangement made with the Erlanger Estate.* When interrogated about his answer in the direct, " Oh, we understood he was not" (married), the witness said, " yes, sir, around the club," that he never understood anything else; he stated that sometimes the press would call his wife by her pen name, Anita Loos, sometimes as " Mrs. John Emerson " and sometimes " Anita Loos, wife of John Emerson;" it varied; that if they, the press, are referring to her as a writer they refer to her very frequently as *Anita Loos;* that if it is a social reference, they do not; asked to tell when he last saw her referred to as a social reference, as anything but Anita Loos, he stated that it was difficult to recall; that she came into prominence when she wrote " *Gentlemen Prefer Blondes;* " that her second book was " *Gentlemen Marry Brunettes;*" he never

saw her mentioned in that connection as Mrs. John Emerson; *that in connection with books she is known as Anita Loos.*

*George C. Tyler,* a manager and producer, testified that he knew decedent since he entered the theatrical business forty years ago; was interested with him in theatrical productions off and on; gave as his office address No. 214 West Forty-second street, which is the New Amsterdam Theatre Building; knew the contestant; he first saw her at French Lick Hotel, Indiana, in November of 1924; he was then a guest of that hotel. He stated that Erlanger was there on that occasion; he sent up his name to Erlanger and saw the contestant in the room with Erlanger; he remained a half to three-quarters of an hour; said the lady was not introduced to him; she was there practically all the time; saw her next in 1925; and then he saw Erlanger and her in the Carlton Hotel in London in 1925; she was in the room where he and Erlanger were; she passed out of the room and into the room again but was not introduced to him; *when he was in the West End avenue house he saw contestant there; said he was there maybe twice, and on these occasions he was not introduced to her.* In cross-examination he fixed the time he was in French Lick when he saw Erlanger as November, 1924; said he may have gone to French Lick in 1925; did not think he was there in 1924 or 1926; whenever he went to the house he saw the contestant; owed the proponents of the will money; said Erlanger financed productions at different times and that money must be earned back before he gets his; was shown proponents' Exhibit 72 and asked to look at the very first name on the exhibit and tell whether that is his name; he said it was; that was his name in 1930 and 1929. The exhibit recites: " Due Abraham L. Erlanger, George C. Tyler, $1,917.97." He said that is absolutely true; that was to Erlanger personally; asked how much has been added since then, he said, " A good deal. I would not call it a debt; I do not call it a debt if it is to finance my productions." *He was asked if his rent was not a debt,* and also: " When you owe rent and do not pay it, is that a debt?" He answered, " Yes, I imagine so." *He asserts the fact that he owes $4,600 rent, and he admits that he has not paid any of this rent since Erlanger died,* March 7, 1930. He testified to two visits made to West End avenue house; were made between the French Lick visit and the London meeting.

*Alfred E. Aarons,* Erlanger's general manager for about fourteen years, severed his relations in *1925;* was introduced by Erlanger to contestant in the Knickerbocker Theatre in *1921 or 1922,* the former saying, " Mr. Aarons, this is Miss Lesley;" had never met her before that, but had known of her for seven or eight years. Two or three years at least after the first meeting he saw her in

Erlanger's office; on one or two occasions. In *1925* he went to the Custom House with her at Erlanger's request to facilitate her passport; he was present when contestant signed this application for a passport as " *Charlotte M. Fuechsel, professionally known as Charlotte Lesley.*" She was asked various questions and he heard her answer " Single " to the question " Married or single?" He always addressed her as Miss Lesley. Erlanger always addressed her as " Charlotte." He did not ever hear him refer to her as " Mrs. Erlanger;" *called at Erlanger's house at 232 West End avenue on several occasions; it was on rare occasions — two or three times.* Visited Erlanger at his summer estate, Lawrence; went there two or three times. When credit department of Stern Bros. phoned stating that a lady, Mrs. Erlanger, wanted to open a charge account, and asking whether it would be all right, he spoke to Erlanger, who said to him, " you tell them that there is no Mrs. Erlanger, the only one in the Erlanger family entitled to credit in my name is Miss Ray Erlanger." Aarons stated that he met Dillingham and that he stated while at French Lick he noticed on the register that Erlanger registered as " Mr. and Mrs. Erlanger " and that Dillingham asked him if he knew anything about it, and was Mr. Erlanger really married; and he told him he knew as much about it as he did, and that he was going to ask Erlanger the first opportunity. He said that a few days after, he was at lunch with Erlanger in the St. Regis Hotel and said to him, " *I hear you are married,*" and that Erlanger said, " *Married? No, I am not married,*" and that he said, " Dillingham told me you had registered at the French Lick Hotel as Mr. and Mrs. Erlanger," and that he said, " I never registered; I never put my name on that register and I am not married." *Certain parts of his testimony are flatly and positively denied by Dillingham* (6218–6220). Aarons stated that he talked with Mrs. Dillon about contestant several times. *Upon cross-examination he stated that he did not go to lunch with Erlanger after he severed his relations with him (1925).* He transferred his office from the New Amsterdam Theatre Building *five years ago,* not very long after the severed relations; and *after the separation he never set foot in Erlanger's office and he was never there while Erlanger was alive.* He left Erlanger under very unpleasant circumstances; he stated that he always knew that Erlanger swore year after year that his sister was living with him (which was contrary to fact, p. 5095). His sister did not live at No. 232 West End avenue; she lived with her brother, Mitchell Erlanger. He described the manner in which he left Erlanger's employ (5096); they were both excited at the time, and he knew that he was framed, he stated. Again said he was framed (5099) back in *1925,* and quite a few others were, too. He witnessed Miss Lesley's affidavit in the

application for a passport; did not recall hearing Erlanger answering many questions in his passport application; recognized his signature on proponents' Exhibit 144. *He was not familiar with Erlanger's private affairs.* To facilitate the passports Aarons sent for Edward King; met Mr. King at the New Amsterdam Theatre around ten or eleven o'clock. He had been to *232 West End avenue* on several occasions before he made the affidavit in reference to the passports *and had seen the contestant there;* thinks Erlanger was ill at the time. He (5112) stated that contestant was living at No. 232 West End avenue. *He stated that it was not anything extraordinary for a theatrical lady to be introduced after her marriage by her stage name;* Erlanger asked him to facilitate the passports; he asked King to join him; he thought Erlanger knew King. He stated definitely (5115) that he brought King to that office and introduced him to Erlanger. Aarons did not know a soul in the passport office; King knew the people there. He stated that Mrs. Dillon knew all of Mr. Erlanger's affairs; he had a corporation called Alfred E. Aarons Circuit of Theatres; this corporation owed money to Erlanger; Mrs. Dillon said to him that she was not surprised at anything that Miss Lesley would do at that time, and that she said, " it is a nasty mess;" the whole thing she was disgusted with, and " that in fact she resented it, being in that atmosphere;" and Aarons continued, " *she did resent it, and I know she resented it, because she is a very fine lady.*" On redirect he said he was sorry to say (5134) that it was not unusual for a man in the theatrical business to be associated with a lady who was not his wife, but he also testified that he did not say it was a custom for a man to constantly introduce a lady who was not his wife as his wife in the theatrical business. He said it has been done, but he would not say it was the custom; he thought the show business is as good as any business in the world, and just as clean as any business in the world. *Erlanger never spoke to him after 1925 (5135), not one word after he left his employ in 1925; he did not write to him, nor Erlanger to him; he did not telephone to him, nor Erlanger to him.* In summarizing the testimony of Aarons, several things should be noted: (1) *That he testified that he met contestant on the occasions when he went to No. 232 West End avenue;* (2) *he confirmed the registration at French Lick of " Mr. and Mrs. Erlanger;"* (3) he met contestant but a few times during the period 1920 to 1925; (4) *he never met or talked with Erlanger after 1925; and the record is silent of his ever having met the contestant after 1925;* (5) *proponents' witness, Dillingham, flatly contradicted Aarons in several particulars, likewise Mrs. Dillon contradicted the statements attributed to her by Aarons.*

*Marcus Heiman,* witness for proponents, a theatrical man

connected with the Erlanger Enterprises, first met Erlanger about twenty years ago, but did not see much of him until 1923, stated that he saw decedent in French Lick in the fall of *1923 or 1924;* contestant was with him; Erlanger introduced her to him in the lobby of the hotel as " Miss McQueen " or some such name. " I did not get it " (4570). He next saw them in the Blackstone Hotel, Chicago, in the following spring in Erlanger's rooms, and the contestant was with him, also Dillingham. Thus there were only two occasions in the early period when he saw decedent and contestant up to *1924 or 1925.* All the rest of his testimony relates to *1928–1930.*

*Lancey Milton Johnson* started as a groom for Erlanger over twenty-one years ago, taking care of saddle horses, etc., cleaned brass and silverware and took care of the furnace and later in charge of Erlanger's garage; first saw the contestant at No. 232 West End avenue ten or twelve years ago, and saw her frequently thereafter, addressed her as " Madam; " said Erlanger in speaking of contestant referred to her as Miss Lesley; remembered when Erlanger got the stroke; that contestant showed him a ring at the West End avenue house about two years before Erlanger suffered the stroke, the maid and the butler being present; that the ring was a wedding ring, diamond set; that when she exhibited the ring she said that it was her wedding ring; that she said he should not say anything about it; *that Erlanger spent his summers at Lawrence up until he was taken ill; he would go down in April, sometimes in May, stay until September; that when Erlanger went to Lawrence his horses would be taken down there and his automobiles; that he was not away in the summer time; Erlanger was not away from Lawrence until his illness in 1927; that after that he did not spend his summer there; that he was not there in 1927, 1928, nor 1929,* and before 1927 *there was one summer during which he was in Europe;* that he was in Europe twice to his knowledge before his illness; that the last time was in *1925;* the first time in *1914 or 1915;* that he could not recall whether Erlanger upon his return from Europe in *1925* went to Lawrence and spent some time there; that the witness worked at the Lawrence house in *1929* and *1928,* but not in *1927;* that in the *summer of 1929,* Erlanger went there on about two occasions; that after Erlanger had a stroke he accompanied him to his sisters' and brother's house once a week, on Sundays, *after he recovered from the stroke.* He was laid up about two months and went to Atlantic City, and that from the time he returned, except for the periods when he was out of town, every Sunday the witness took him to his sisters' and brother's house. Johnson *testified that at 232 West End avenue and 175 Riverside drive the other servants addressed her as Mrs. Erlanger.* Upon cross-

examination, he stated that he used to attend the furnace; lots of times he did not see anybody because he had to go to the furnace room, which was not in contact with the other rooms. The first time he saw the contestant at the house was when he was attending the furnace; it was in the winter period; either the end of the year or the beginning of the year, *and from the first time that he saw her in the house she was living there, and on the occasions when he went to the house, except when he went into the furnace room, as a rule he saw her always; that she gave the orders in the house,* and that continued right on down to Erlanger's death; *that she lived in 232 West End avenue from the first time that he saw her there, down to the last time that he saw Mr. Erlanger in that house; that when Erlanger went from there after he got well enough to leave the house, he went straight down to Atlantic City, and she went along; that he saw them start; that it was about three or four o'clock in the morning, three or four, around that time; that the chauffeur brought the car over; that he, Johnson, had come over to help them to get away; there was no talk, no sir; that he helped him into the car; that contestant was in the car and that they drove off together; that it was two months before he saw either of them again, and that was in the Ambassador Hotel at the entrance; that during the years that contestant lived at 232 West End avenue Erlanger was living there all the time; that that had been his home as long as witness had known; that he was with him in 1910, and from that time on that was his home, until he moved from there to Riverside drive; after Atlantic City, they never went back there (232 West End avenue); that during the period Erlanger went off on trips; went to French Lick a number of times; that he used to go to different cities;* that he did not know of any trips to Atlantic City before his illness; *that he was always careful to call the contestant " Madam," never anything else; that he heard the servants in the house call her Mrs. Erlanger;* that she had an automobile; that she first had an automobile in Erlanger's garage in *1921 or 1922,* he thought it was *1921;* he saw the license. She had the first car three or four years; she got another; the first car was a Durant and the second a Flint, and the next one was a Packard; so she had a car all the  time she lived at 232 West End avenue. He would bring the car over to the house in the morning at nine o'clock; she would go shopping as a rule, marketing, *and the grocer addressed her as Mrs. Erlanger, and the butcher, he said, addressed her as Mrs. Erlanger; and he never went to any place with her where she was not addressed as Mrs. Erlanger,* for all the years; he used to go to 175 Riverside drive; and she gave him his orders; was with her when she selected the Flint car, and he heard the man while the car was being looked over and selected call her Mrs. Erlanger, and *Mr. Durant at that time addressed her as Mrs. Erlanger.* He always

brought her car to her at 175 Riverside drive; there were four cars in Erlanger's garage when he died, Erlanger's Packard, Erlanger's Rolls Royce, Madam's Packard, and Miss Ray's Rolls. He stated that Erlanger went to Europe in *1928, 1929;* in the *winter time of 1929* and in the *spring of 1928;* in the *summer of 1929*, Erlanger lived in Larchmont. *The superintendent at 175 Riverside drive addressed the contestant as Mrs. Erlanger; everybody there addressed her as Mrs. Erlanger;* that Erlanger used to come up during the early afternoon and go out for a drive every day. *When Erlanger was at West End avenue, contestant paid him his salary part of the time; while they lived at 175 Riverside drive she paid him his salary all of the time they were there; he regarded (5214) that he was in Erlanger's employ and he took orders from her, under directions from Erlanger.*

*Nathan D. Stern* met Erlanger in January, 1919, represented him in legal matters. *First saw the contestant at Erlanger's home, 232 West End avenue, along in 1923; certainly could not have been earlier than 1920; saw her there maybe two or three, four or five times. He was not introduced to her; she was not with them when he dined at the house with Erlanger;* Erlanger dined at his house; he dined at Erlanger's house several times; this was along in *1923 or 1924, possibly 1925;* he recalled being present at the opening of the picture, " Ben Hur" in the George M. Cohan Theatre, *saw Erlanger there and the contestant was with him.* Visited Erlanger during the summer months at Lawrence, during the years of *1920 and 1926.* He said that he visited Erlanger at Lawrence, between *1919 and up to the time of his death (4282).* (*The proofs indicate that Erlanger did not summer at the Lawrence house after 1926.*) He never saw the contestant at the Lawrence house. Again he stated (4283), " Oh, ·yes, certainly, I saw him there up to, I should say, as the best of my recollection serves me, up to the *summer preceding his death,* whenever his death occurred, I have not the date." Stern was queried concerning *a will which he drew for decedent in 1922 (4284) to which he was not a subscribing witness and only a copy of which he was producing* (4290). Contestant in her brief withdrew her objections to this and other prior wills of decedent (brief, p. 79). The will of 1922 will be marked in evidence (Exhibit 193) and has been considered by the court upon the issue involved herein. In said will after leaving certain personal effects to his brother and legacies of $1,000 to fourteen relations, he *devises and bequeaths all the residue of his estate to his brother and his two sisters share and share alike. There is no mention of a wife nor of a Mrs. Erlanger in the instrument, nor does he describe himself as unmarried in the will.* His brother, two sisters, Saul J. Baron and Nathan D. Stern are named as executors. Upon cross-examination (4291) he said

he knew Judge Erlanger before he knew his brother, the decedent; was appointed referee in three or four matters by Judge Erlanger; at the opening of " Ben Hur " Erlanger sat, he thought, in the last row on the aisle; *people were all around Erlanger offering congratulations.* Cross-examined as to Erlanger being at Lawrence during the years after *1926,* he still thought to the best of his recollection that Erlanger was there in *1929,* sometime *between May and October;* he did not know where Erlanger was making his abode in June, July, August or September or October in 1929. *Stern was never at Erlanger's home when he lived at 175 Riverside drive;* he could not fix the last time he saw Erlanger at his residence in the city; whenever it was, it was at 232 West End avenue; he could not even fix the year, *but he knew that he was never at the Riverside drive address.* The quality of the witness' failing memory is shown (4321–4323). He rendered his last professional service to Erlanger around the *summer of 1926,* and changed it to *April, 1927.* (Note. Meetings with Erlanger were practically entirely on business matters.) It then appeared (4301) that Erlanger was at his house only once. He saw Erlanger seated, wrapped up, in one of the rolling chairs in Atlantic City in 1927 but did not speak to him. The witness did not think that he saw Erlanger in the city at any other place than his office after he had the stroke; he saw him there once or twice; *when asked whether he distinctly remembered seeing him anywhere after that time, he declared that he did not, unless, as he said, he could not fix the year of going to Lawrence and seeing him on the veranda or in the parlor or in the little inclosed porch that they had on the house there; his recollection indicated to him that it was after the stroke.* (The proofs show that Erlanger did not, after the stroke, stay at the Lawrence house.) Stern did not visit the Lawrence house after 1926. In the cross-examination he displayed a weak memory, especially as to whether he saw decedent at all after *1927.* Taking the times when Stern said he himself was in Europe and what the record stated about Erlanger being in Europe in the *summer of 1928,* and in New Rochelle in the *summer of 1929,* and the general record that Erlanger did not stay at Lawrence after 1926, it was apparent that the witness' recollection was unreliable.

*Fred Frankfort,* in real estate business at Far Rockaway, met contestant in *1922,* as Mrs. Fixel, and through his office rented her a house in *1921, 1922, 1926 and 1927;* in 1921 in McNeil avenue, Far Rockaway, the term *May twenty-fifth to September twenty-fifth,* for $1,500, Hotel Marie Antoinette being put down as the address of Mrs. Fixel; *1922* lease (Proponents' Exhibit 195) was to Mrs. C. Fixel, in the house in McManus lane, $1,250 was the rent, and the term *June first to September twenty-fifth;* the address given of the lessee (Proponents' Exhibit 196) is 232 West End

avenue; the lease in *1926* (Proponents' Exhibit 197) was to Mrs. C. Fixel for a house on Lissmore road, the rent was $2,150, and the residence of the lessee given as 232 West End avenue; the *1927* lease (Proponents' Exhibit 199) was for the house in McNeil avenue, the same as she rented in *1922;* the rent was $1,250, the period *June 15 to September 15, 1927;* the address of the lessee was given as 232 West End avenue.

*Otto B. Shulof* knew Erlanger about fifteen or sixteen years at Lawrence, Long Island; he first met him at his summer home, and from the time they became acquainted, on an average of once or twice a week during the summer time he and his wife used to visit the Erlangers there; asked whether he saw Erlanger at the Lawrence place during all the years, he answered that Erlanger was in Europe in *1924 or 1925,* and that outside of his being on business trips for a week or so, *he was at Lawrence practically every summer up to the time he was taken ill.* (By " ill " he referred to the stroke in *May, 1927.*) The *summer before 1927* was the last summer that witness saw him at the Lawrence home; he saw him frequently at his office, had business relations with him and lunch occasionally; outside of having had a breakfast there he never dined at the West End avenue house; *he stated that he did not know the contestant; could not point her out;* he stated that *Erlanger never made a statement that he was married;* he met Erlanger at his brother's home in *February, 1930;* and Erlanger said to him (the witness, Otto B. Shulof) " as soon as I get back from the hospital, which I trust will be very soon, I am coming back here to live with them " (his brother and sister).

*Peter J. Wynn,* of the National City Bank, Forty-first street and Broadway, produced records from the bank covering an account in the name of Charlotte Lesley; there was a checking account and a special interest account, the thrift account being opened *January 2, 1924;* on the card opening the thrift account, concededly the name and address were in the handwriting of the contestant; the rest in the handwriting of one of the officers of the bank, Mr. Hemerich (Proponents' Exhibit 270); the account was closed April 4, 1927; deposit slips and withdrawal slips were produced (Proponents' Exhibit 271). Deposit slip with the initial deposit, marked proponents' Exhibit 272; deposit slip, February 7, 1924, in Hemerich's handwriting and marked proponents' Exhibit 273. Signature card for the opening of a checking account was filled out in Hemerich's handwriting; all but the signature is his; the signature, *Charlotte Lesley,* below the green line is conceded to be her signature (Proponents' Exhibit 275). This account was opened December 7, 1926, and closed April 10, 1929; deposit slips were conceded to be in the name of *Charlotte Lesley* (Exhibit 276).

*George W. Conklin*, board of elections, produced *registration lists* for the election district in which Erlanger lived from *1919 to 1926*, inclusive, in which the letter " S " appears in the column entitled " Married or single," which letter " S " indicated that the registrant stated " Single." *No registration lists for subsequent years were produced showing decedent registered from 175 Riverside drive.* He did not register in the years subsequent to 1926 (3921).

*John Leddy*, Emigrant Industrial Savings Bank, produced the card opening the account in the name of *Charlotte Fixel* (Exhibit 154); opened December 19, 1918, closed October 23, 1922; opposite the word in printing " Signature " is " *Charlotte Fixel*, residence 150 West Forty-seventh street; occupation, actress; age, 29; birthplace, New York; father, Rudolph; mother, Delia Ferdelein." Deposit and withdrawal slips were produced; two deposit slips (Exhibit 155) and the third (Exhibit 156); the latter dated December 28, 1920; the former dated December 19, 1918; the slip dated December 28, 1920, was signed " Charlotte Fixel." Fourteen withdrawal slips were marked Exhibit 157 (4171). The deposit slips have various dates in 1920, some in 1921, and some in 1922; show addresses of the Somerest Hotel and the Marie Antoinette Hotel (4171, 4172). This account was transferred from an account in the name of Delia Fixel; the latter account having been closed out by the administratrix of her estate, Charlotte Fixel, and $1,197.30 transferred to the latter's account.

*Charles A. Pickney* produced the files of the Greenwich Savings Bank account in the name of Charlotte Lesley, opened September 18, 1925; residence, 232 West End avenue; birthplace, New York, December 9, 1885. *All those deposit slips which preceded the fall of 1927 are addressed 232 West End avenue; those which began with the fall of 1927 are 175 Riverside drive.* The withdrawal slips ran through in the same name, and the address, 232 West End avenue, up until May 27, 1927; the next is November 20, 1929, in the same name but address is 175 Riverside drive.

*Otto Langspecht*, of the National City Bank, produced the records of Charlotte Lesley, opened October 6, 1925; it was in the compound interest department account. Exhibit 167 bears the name *Charlotte Lesley. Residence, birthplace, date of birth, father's name;* " *name of the husband or wife*," *is blank; the account was closed by some bank messenger; the address was originally 232 West End avenue, and over that was written 175 Riverside drive.* Counsel directed his attention to a certain slip on which the name *Charlotte Lesley* is written. The witness said he put that on the paper; he did not remember who told him to put it down; " I put it that way; I described her being — they won't address her as ' Mrs. Lesley.' "

The only information he got on the subject was from Charlotte Lesley; he presumed he got that from the signature card with the name of "husband" left blank.  Much discussion was had about the word "Miss" which was put there by this clerk; it appeared that on the signature card the space opposite the name of "husband or wife" was blank.  He did not recall whether he asked "Miss" or "Mrs." to the depositor.

*Arthur W. West* produced from the files of the Society for the Prevention of Cruelty to Animals the application for dog license of contestant, of *May 1, 1923*, signed *Charlotte Lesley* (Proponents' Exhibit 325); renewed in *1924 and in 1925, 1926, 1927, and 1928, which renewals are entered on Exhibit 325.  October 15, 1929*, there was another application made by Charlotte Lesley (Proponents' Exhibit 326).  "Charlotte Lesley" and the address "175 Riverside Drive" are conceded to be the handwriting of the contestant.

*Helen Ten Broeck*, a newspaper woman, said she knew Erlanger, first met him in *1902 or 1903*, when she was a writer on the *Morning Telegraph;* she wrote a letter to Erlanger; she received a reply (5557); she stated the date of the Erlanger letter was October 29, 1927, and that she could not state definitely, but thought it was ten days or two weeks after that letter that she saw Erlanger; she called at Erlanger's office on a matter of business, and at the close of the conversation, as she was leaving, she said she shook her finger at Erlanger and said, "You are holding out on me," and that he said, "What do you mean?" and that she said, "I heard some girls say a few days ago that you are married." She testified further: "*He — I think he said — I do not mean, I think, he said, I know he said, ' By God, I am not married, and I shall never be married again.' I said, ' Oh, I am so sorry, I am so sorry,' and he said, ' That is all right, Kid.'* I said, 'My mistake.'" In cross-examination, she stated that she was in Erlanger's office frequently; *she could not give a definite date as to when next preceding the occasion above described she was there, perhaps two or three months before then,* she could not state definitely.  Outside the above testimony she failed to state any more definitely when the interview took place.  She stated that she was *forty-eight years old;* that she had been a widow for *more than thirty years;* that she went to work on the *Morning Telegraph* when she was *seventeen years old;* she changed her age to forty-nine.  Said that she was born in Longfellow's house in Cambridge, removed to her grandfather's house in Rochester as a very small infant, did not remember the street or number there; Chestnut street, but the number "I cannot tell you, I would love to;" was educated at home by governesses and teachers, but went to no school where there was a record of

the fact; attended lectures at the Sorbonne; never went to any school in Rochester; for a little while took a special study in languages in a school, but could not remember the principal's name; did not go there very long; could not tell the year when she left Rochester, stating *"I am not well, I cannot possibly subtract eleven from forty-nine; I do not know how much it means."* When told she had not been asked to subtract anything she stated, *"I do not know how else to get the number excepting subtracting my age now from thirty-one. I do not know, I am a sick woman, I am sorry."* Her *mother remarried and she went to her stepfather's home in Camden, N. J.;* thought she *lived there about three years,* she thought, she left there around *1888 or 1889.* (Note. The witness previously testified that she was forty-nine years old, which indicated she was born in *1832.*) She came from Camden to New York, first lived in Bedford avenue, Brooklyn, *could not tell the number nor the location* but opposite what is known as "The Fountain" on Bedford avenue, and next to Bishop Darlington's church; did not live there very long; lived there until the death of her husband; she had married just before she left Camden; *she could not tell the year in which she was married; knew very well when she was married, but "cannot remember numbers today;"* had not the record of the year; could not remember the year without a record. "Not this morning." But she stated that she was married in Camden; thought she lived in Camden three years; and then declared that she could not say that she lived in Rochester eleven years. Then she declared she must have been older than eleven years when she left Rochester. When asked again whether she was eleven years old when she left Rochester, she stated, "I think I was — I must have been, lived in Camden for almost eleven years, or I should say five years, because I was not quite sixteen years old, I think, quite sixteen when I married my husband. No, I was not quite — yet * * *. I was not seventeen years old when I was married;" lived with her husband about five months, she asked to be excused for being so indefinite, stating: *"It is not my wish, it is my condition which necessitates it."* Her *husband was* cremated thirty years ago; her marriage certificate and her husband's *ashes were destroyed by fire;* said Erlanger called her "Kid" for a great many years; and in the next minute that he called her "Kid" occasionally; she again said that she was married in Camden, and asked at what place, she replied, in Brooklyn, and said that they were married by Rev. Dr. Darlington of Christ Church, that the church was next to the house where she lived. *When her attention was called to the contradiction, she said, "Of course, I was thinking of my poor husband's funeral,"* and when asked the year of the funeral, she

said " *Please don't ask me, please don't torture me with any more numbers; please don't;* " during that same year (1927) *she had seen Erlanger perhaps twice, not more; in the year previous to that (1926) she had not* seen him at all, being blind for several years; had not been seeing anyone; she had been out of work almost seven years. She was cross-examined (5582–5585) as to how she changed the date in her letter from *November third to December third* (her answers were entirely unsatisfactory); she never knew or heard of the contestant, she had never seen or heard of the contestant by name. She explained her feelings about the counsel for the contestant examining her, and when asked who put it into her mind that the counsel was Erlanger's worst enemy and that he was his, she answered, " God." She stated before the end of her testimony that prior to the alleged episode in *November, 1927*, she had seen Erlanger twice, *she had not seen him at all in 1926, the previous year, and once in 1925.* The above review indicates the calibre of the witness and the nature of her testimony, testimony which is entirely unworthy of any consideration or belief in determining the issue in this case.

*P. W. Schimmel*, chief cashier, Blackstone Hotel, Chicago, produced records of the hotel showing registry sheets, charges, etc., for the years *1922, 1924, 1925 and 1926;* the first record was made on Sunday, *March 30, 1924*, on lines 22, 23 and 24, and it was *"A. L. Erlanger and valet* " and *"Miss Charlotte Leslie* " (Proponents' Exhibit 305). The accounts (5517) showed the same names as the register. The next registration produced was of March 15, 1925, showing the registration of *Mr. A. L. Erlanger and* Charlotte Fixel (Proponents' Exhibit 307), conceded to be in the hand-writing of Erlanger; the accounts of the same period (Proponents' Exhibit 303) showed the same names. The next registration was for Monday, *February 8, 1926;* the registration, particularly sheet 144, was marked proponents' Exhibit 309, and the account proponents' Exhibit 310; the registration in the names of *"A. L. Erlanger, New York, Miss C. Fixel, New York;* " and the account in the same names. No claim is made that the signatures are the signatures of the persons named. The next registration sheet offered was dated Monday, *March 8, 1926*, lines 5 and 6 (Proponents' Exhibit 311) together with the account marked proponents' Exhibit 312; registration read *"A. L. Erlanger, Charlotte Fixel;* " the accounts showed the same name. Concession was made that the hand-writing was that of decedent. The next registration, a guest account covering the stay from *March 1 to March 2, 1925*, was offered; the account was marked proponents' Exhibit 314; the date of arrival was October 16, 1925, departure October 18,

and the names were " *Erlanger, A. L.; Leslie, Charlotte.*" Another guest account was on *January 6, 1930,* for part of the day, under the name of " Erlanger, A. L. and Pty." Pty standing for " party." Registration sheet 112, covering period, *January 29, 1926,* and the accompanying guest account were marked proponents' Exhibit 317. Registry sheet for Friday, *January 29, 1926,* was marked proponents' Exhibit 318; registry sheet and guest account of February 18, 1922, marked proponent's Exhibit 320; the account was marked in evidence proponent's Exhibit 319; the account and registry sheet for *December 3, 1922,* were marked proponents' Exhibit 321. The account and registry sheet for December 14, 1922, was marked proponents' Exhibit 322; the guest account, private registration, was marked proponents' Exhibit 323, having on it in ink writing, " *Miss Rosenwald and Miss Fixel,*" although there is above these names, "A. Erlanger and party." Witness was shown proponents' Exhibit 315, "A. L. Erlanger and party," and was asked the names of the persons who were in the party, to which he replied that he had not any idea. The registration was not made by Mr. Erlanger. When asked again to explain why underneath the typewriting there is added " Miss Rosenwald " and " Miss Fixel " in ink writing, *he vaguely implied that the names were put there after the arrival.* When pressed again he failed to explain the addition of those two names in ink writing, and when shown proponents' Exhibit 315, with no names given for the Erlanger party, and Exhibit 232, where these two names are added in ink, of Miss Rosenwald and Miss Fixel, he stated it was not important who was in the party, because they were there only part of the day; when asked whether or not there was any Miss Rosenwald at the hotel on that occasion, he assumed she was there, but did not know definitely (5553). (As a matter of fact, the lady in the party was *Mrs. Walter Rosenthal, of Springfield, Ill.,* who was a witness at this trial.) The witness stated that *Rosenwald* could be mistaken over the telephone for Rosenthal *and when queried about " Miss " and " Mrs." he stated that that is just an error which would happen;* he called attention to a hotel record where the word " Reslie " is used, he thinks for Leslie, illustrating the mistakes that happen. The examiner called his attention to Exhibit 324, where the name is " *Mrs. Charlotte Reslie* " and asked him if that also was a mistake; said it was a mistake if she is Miss, but said that he did not know the lady. When interrogated again about Exhibit 322, *Miss Rosenwald for Mrs. Walter Rosenthal,* he thought it was a mistake, human frailties, etc. The registration of *March 30, 1924,* "A. L. Erlanger and party, Miss Charlotte Leslie" (Proponents' Exhibit 305), was shown to

the witness, he was asked whether he recognized the handwriting and he replied that he could not amplify any more than he had, that the statement he made that it was Miss Lesley's handwriting was a guess on his part, and that he had no information on the subject at all. Proponent's Exhibit 309, particularly line 3, was pointed out and the handwriting " Miss " with two lines under it before " C. Fixel; " he said that " *Miss* " was in the handwriting of one of the clerks, put there after the registration was made, as he assumed *after finding out that the C. Fixel was Miss Fixel, or finding out the Fixel was a woman he had written " Miss " for it.* This he assumed, knowing the circumstances, of hotel work and people making reservation. On further questioning (5561) he stated that he took it that he (the clerk) ascertained the sex of the party and put " Miss " on; the *A. L. Erlanger* " was written by a clerk named Kelly.

*Saul J. Baron,* admitted to the bar in 1904, became Erlanger's general counsel in 1925, succeeding Bickerton; first met contestant in March, 1924, at the West End avenue house; Erlanger was present and he introduced him to contestant as "Miss Lesley;" met the contestant Thanksgiving night, 1925, then corrected the year to 1924, at the West End avenue house; Erlanger was present; he had been invited to dinner by Erlanger; the three dined together that night. Baron's attention was called to the testimony of Mrs. Morganroth to the effect that she attended a birthday party in December, she thought it was in 1924; that he was one of the guests and that it was a birthday party given for the contestant. He recalled attending such a dinner at the Erlangers' home but his *recollection was that it was 1925, not 1924;* at all events he did attend a birthday dinner, and *Mrs. Morganroth was present, also Charles B. Dillingham, Major Furlong, Miss Ethel Glass, Mr. Erlanger, the contestant and himself,* and he thought a *Mrs. Van Husen.* This question (5848) was put to the witness, " Q. This lady, Mrs. Morganroth, testified in substance that on the occasion of this dinner Mr. Erlanger said to the contestant ' *Show your new ring, show your new wedding ring* ' and that the contestant exhibited a ring to those present and that in that connection Mr. Erlanger said that he had bought the ring at Tiffany's. Now did Mr. Erlanger make any such statement as I have made here, recalling the evidence given, the testimony given by Mrs. Morganroth? " It should be noted (1) that Mrs. Morganroth did not testify that at the dinner Erlanger said " *Show your new ring, show your new wedding ring;* " (2) that Baron's memory was that the birthday dinner he attended was not in 1924 but in 1925 (5848). To this '

question he answered, "He did not." He further testified that Erlanger did not suggest in that or in any other language that contestant exhibit a ring to those present, that the contestant did not exhibit any ring to anybody, and that Erlanger did not either in words or substance say that he had bought the ring at Tiffany's. He said he was present throughout the dinner; that contestant was addressed by him as Charlotte; that she was not addressed by any of the guests as Mrs. Erlanger. *He did not recall how Erlanger referred to her on that occasion.* When he did hear him refer to her on that occasion or any other occasion, he referred to her as Charlotte or Dear, Lottie. During the period of his association with Erlanger, he saw him almost daily, except the time when he was not at his office. He described going to Garden City at the request of Erlanger to view lots. It was the latter part of June or the very early part of July, 1927. Thereafter the contestant went with him, the early part of July or some time prior to the eleventh. On that date he drew a contract for the purchase of one of the plots. The rest of Baron's testimony will be reviewed in connection with 1927.

*Murray Lachman,* a clerk with C. B. Dillingham, first met the contestant in 1927 at 232 West End avenue, having called with Dillingham; it was during Erlanger's illness; contestant said to him, "Hello, Murray; you know me;" and that he said, "Yes, I do, Miss Lesley." He said he went *there nearly every day during that illness;* with Mr. Dillingham. (*Yet Dillingham testified [6241] that in all of the period from 1920 to the time Erlanger moved away from there, he called there three or four times, during the whole period, that he only saw him at lunch, never saw him any other time hardly, very seldom. "I never went there, about four times in all the time he was there."*) Lachman testified to bringing Lindgren from the passport office to Erlanger's home to have the application for the passport made out; that Lindgren asked the questions in connection with the application, "Married, single, widowed," or "Divorced," and he heard her answer "Single" in the presence of Erlanger in his bedroom (Proponents' Exhibit 43, dated *May 23, 1927*). In cross he declared he did not look the paper over at all, there was only one man who wrote; was shown the notation on proponents' Exhibit 44 of "106 Central Park West," and he declared that Erlanger never said to Lindgren that that was his residence; he admitted that there were different handwritings on the application; he did not see Erlanger's photograph on it; that Miss Lesley happened to ask a question and Erlanger said, "Do as you are told;" that what the question was he did not know; he said the question "Married or single" was put to Erlanger by Lindgren,

and that Lindgren wrote the answer, and when he was confronted with proponents' Exhibit 44 and asked to point out the answers to these questions he stated, "It is not here." His testimony in this and other respects will be analyzed further on.

*Milando Pratt,* with the Erlanger Enterprises since 1902 (5325); auditor since 1926, prior to which time he was head of the income tax and accounting departments; described the methods in vogue in the finance department, the distribution and assignment of work, the various books of account of the Erlanger corporations, between forty and fifty in number, the weekly statement of operations of the theatres, preparation of bank balances; as auditor he succeeded E. S. Golding, who died in 1926; Pratt prepared the income tax returns for Erlanger from the books, corporations, individuals and partnerships; he supervised the preparation thereof even when he did not personally prepare them. He was shown proponents' Exhibit 128, a certified photostatic copy of the Federal income tax return of Erlanger for the year 1920, and he stated that he prepared it, and that he went over it with Erlanger before he executed it; that he did this customarily each year; preparing the return, he would submit it to Erlanger for his signature, *and he personally would ask Erlanger the various questions on the form after the name and address; that he read each question to Erlanger and that he made answer to each; further explaining, he said he read to him: " Were you married and living with husband and wife on the last date of your taxable period? Are you a citizen or resident of the United States?" and " Is this a joint return of husband and wife? "* He had charge of the filing of Erlanger's returns since *1917.* Shown the 1920 Federal return, he stated that Erlanger took an exemption for supporting one or more persons in his household, answering, " Yes " to the question as to " Head of Family? " On the State return Erlanger answered question No. 9, " What is the relationship to you of the dependent persons for whose support you claim exemption under questions seven and eight? " Erlanger answered " Sister." (Note. His sister was not living in the house with him in his home in *1920* or thereafter.) Shown proponents' Exhibit 137, the State income tax return for the year 1924, Pratt said he went over this return with Erlanger, just as he did with the Federal returns, going over the various questions with him; said that he went over with him question No. 6, in reference to being married, etc., during the year *1924,* and that the answer given by Erlanger was " No; " and that he answered " Yes " to the question about being the head of a family, as described in instruction D, and that he answered " *Sister* " to the question as to the dependent person, and took the same exemption

in the Federal return as in the State. Witness was unable to secure from the State Tax Department copies of Erlanger's returns for the years preceding 1924; but produced copies from the files of his office from 1920 to 1924, inclusive (*Exhibits 273, 279, 280, 281 and 282*). Answers were uniformly the same in each year of the State returns and include " No " as to being married or living with a wife; " Yes " as to being a head of a family, and " Sister " as to the name of the dependent. Pratt tried to explain answers in the *1923* New York State income tax returns by saying that " No " was the answer to question No. 4, and " Yes " was the answer to question No. 5, although it is two lines above the questions, and that " None " in type is the answer to question No. 6 by saying that inserting it in the typewriter it became uneven with the original. Pratt then said in reference to the exemption claimed for Erlanger's sister, that Erlanger stated to him that he was living with his sister in Lawrence, Long Island, *" around six months out of a year."* The question of income tax returns was taken up further on in cross-examination. Pratt took the Federal income tax returns, he said, into Erlanger and asked him the questions from *1917 on,* and beginning with *1919* he did it for the State returns. He denied the answers on the questions above referred to were already in these papers prior to the time of his seeing Erlanger, and stated that on the State return of *1919,* the first one that was prepared, he had to ask him those questions, that he did it every year. In answer to the question whether on the originals he did not have the place marked just for Erlanger's signature, he replied that on the originals he would mark the initials just where to sign, explaining that he would ask him the questions *previously,* stating, " Mr. Erlanger might have married any year and I had to get the proper information from him " (5448). He stated that he went repeatedly and asked him the same questions (5452); he did this year in and year out. *Pratt never called* on Erlanger at his residence. It was brought out that instruction D defined the head of a family as a taxpayer living with one or more persons to whom he was legally or morally bound for support. *Pratt said he supposed that she lived sometimes at 232 West End avenue, but had* no knowledge of it; that he received some of Erlanger's bills for his visit at Atlantic City in 1927, said they were *made out to Mr. A. L. Erlanger;* he was asked if he could produce a bill. Pratt said that if there were any hotel bills for any period in 1927, or any time subsequent to 1927, he turned them over to his counsel. *But when shown contestant's Exhibit Y and contestant's Exhibit V (duplicate of bills produced by the hotel clerk) and asked whether he still said that he saw bills for 1927, made out to Mr. A. L.*

*Erlanger, he answered, " No, sir."* He stated that in 1927, she (contestant) called up and asked him to send money over and said *" Charlotte Lesley."* He was shown contestant's Exhibit Y and contestant's Exhibit Z (various bills from the Shelburne Hotel, entitled *" Mr. and Mrs. A. L. Erlanger, valet and chauffeur, N. Y. C.").*

The proponents in addition to parol proofs presented various documents upon the issue of status for the 1920–1927 period. The following are the more important of these exhibits:

(1) Lease by contestant, house in Far Rockaway, *March 2, 1921,* in name of " Charlotte Fixel " (Exhibit 194). (2) Conveyance by her, property in Richmond Hill, *November 9, 1923,* as " Charlotte Fixel " (Exhibit 366). (3) Passport, *May 25, 1925,* in name " Charlotte Fuechsel " (Exhibit 45). (4) Application, passport of contestant (Exhibit 145), in which the signature, her handwriting, is " Charlotte M. Fuechsel, prof. known as Charlotte Lesley," and in the beginning of which application " Charlotte Matilde Fuechsel " appears, and two lines above the name is the inscription *" professionally known as Charlotte Lesley,"* with the word " single " inserted underneath the word " Charlotte " in " Charlotte Lesley." (5) Emigrant Bank signature card, with blank space opposite the printed words " wife or husband," *December 19, 1918* (Exhibit 154), deposit slips (Exhibit 155), withdrawal slip (Exhibit 157), all in the name of Charlotte Fixel; withdrawal slips for *1920* give the address as Somerset Hotel; one for *1921* gives Marie Antoinette Hotel; one deposit slip in *1920* gives the Marie Antoinette Hotel, one deposit slip for *1922* gives *232 West End avenue.* (6) Typewritten letter dated *December 3, 1924,* signed by A. L. Erlanger, which reads as follows: " New York City, December 3, 1924. Saul J. Baron, Esq., 32 Nassau Street, New York City. My dear Saul: In accordance with our recent talks, I am herewith transferring to you stock certificates Nos. 1, 2, 8 for respectively 600–300 and 100 shares, making a total of 1,000 shares of Loew's Metropolitan Theatre Company of Tennessee, to be held by you in trust for the following purposes: (1) To pay, or cause to be paid to me during my lifetime any and all income, dividends, or profits arising therefrom, and upon my death. (2) To pay, or cause to be paid, so long as she shall live, all income, dividends, or profits arising therefrom to the undersigned Charlotte Fixel. (3) Upon the death of Charlotte Fixel, provided she has survived me, I direct you to turn over the said stock represented by the above certificates to the proper legal representatives of my estate to be distributed as part of my residuary estate in accordance with the provisions of my Last Will and

Testament. I am, Sincerely yours, (Signed) A. L. Erlanger."
After which appears the following in typewriting, signed with the
signature " Charlotte Fixel " in the handwriting of contestant:
" Dear Abe: I have read the foregoing letter to Mr. Baron and appre-
ciate your generous thoughtfulness in my behalf and thoroughly
approve of the same. As ever, Your devoted friend, Charlotte
Fixel. December the 3rd, 1924." It should be noted here that
Baron drew this instrument (See p. 6069, in which he admits that
he dictated it, etc. See, also, testimony W. H. Conger, p. 176, in
which it appeared Erlanger inquired of him about [pp. 220, 221]
wills and deeds of trust and spoke of his plans for contestant.)
The following exhibits show the use of the name " Charlotte
Lesley," contestant's stage name: (7) Greenwich Savings Bank,
*September 18, 1925* (Exhibit 159), signature card, " *Charlotte Lesley;* "
word " single " in handwriting of contestant. (8) National City
Bank account in name " Charlotte Lesley " opened October 6,
1925 (Exhibit 168), with " Miss " printed below, various deposit
slips in name *Charlotte Lesley* (see testimony of Langspecht, Exhibit
168). (9) Union Dime Savings Bank, *September 26, 1921* (Exhibit
186), signature card, *Charlotte Lesley* in contestant's handwriting,
with a dash of a pen after word " unmarried; " name was later
changed to Charlotte Erlanger (see testimony of W. S. Thompson).
(10) Photostatic page, register of Hotel Traymore, *August 29,
1924*, showing registration of A. L. Erlanger and Charlotte Lesley,
which registration is conceded to be in the handwriting of the
decedent (Exhibit 400). (11) Passenger list, *Franconia, June 6,
1925* (Exhibit 50), containing names: Mr. A. L. Erlanger and Miss
Charlotte Leslie. (12) Passenger list steamship *Adriatic*, Liverpool
to New York, *June 4, 1924*, contained names Mr. A. L. Erlanger
and Miss Lesley (Exhibit 304). (13) Registration Flint car,
*November 30, 1926, signed Charlotte Lesley* (Exhibit 56). (14)
Application for dog license, 1923 (Exhibit 325), in name Charlotte
Lesley. (15) Christmas card, *1925*, in name of *Charlotte Lesley*
(Exhibit 351). (16) Signature card, account *Charlotte Lesley*,
opened *January 8, 1925*, Bowery Savings Bank (Exhibit 181).
(17) Deed, Garden City property, A. L. Erlanger to Charlotte
Fixel (Contestant's Exhibit H-7). (18) Duplicate original con-
tract, Davis to Dillon (Exhibit 345), containing assignment alleged
executed in the cigar store. (19) Deed, *October 8, 1920*, of Erlanger
of opera house in Los Angeles, in which he is described as unmarried
(Exhibit 150). (20) Conveyance of the same property with the
same description of Erlanger, *January 25, 1921* (Exhibit 149).
(21) Deed by *Charlotte Fixel, November 9, 1923*, conveying Rich-
mond Hill property, purchase-money mortgage in that same name

(Exhibit 366). (22) Passport, contestant, dated May 25, 1925, in the name of *Charlotte Fuechsel* (Exhibit 45). ·(23) Application for passport of A. L. Erlanger sworn to *May 8, 1925* (Proponents' Exhibit 144). Note this passport has no entry opposite the words " I will be accompanied by my wife " where there. is a blank space for a name, though there is a blank line running through part of the space. (24) Passport of A. L. Erlanger issued *May 25, 1927* (Proponents' Exhibit 42), on printed blank; where the words appear " The bearer is accompanied by his wife " there is a line in ink across it; this passport was issued for both *1928 and 1929 trips.* (25) Passport, contestant, *1928*, issued *May 25, 1927*, in the name of *Charlotte Fuechsel, professionally known as Charlotte Lesley* (Proponents' Exhibit 35). (26) Proponents' Exhibits 120 to 127 are original election records for district within which decedent lived for the years *1920 to 1926*, showing Erlanger registered for the elections in those years from *232 West End avenue, and in column 11, under the question " married or single " the letter " S " appears.* (27) Memorandum claimed to have been made by Baron in connection with contestant's Exhibit L-14 (Proponents' Exhibit 353) (p. 6156), giving date concerning contestant for adoption. (28) Christmas card of *December, 1924,* sent out by Erlanger in his own name only (Proponents' Exhibit 65). Card sent out *December, 1925*, signed *Charlotte Lesley.* (29) Registration for the Flint car, *November 30, 1926*, signed *Charlotte Lesley* (Proponents' Exhibit 56). (30) Bill, Betts & Co., car insurance, Flint, to pay, made out to Miss Charlotte Lesley (Proponents' Exhibit 86). (31) Eleven checks (Proponents' Exhibit 289), dated 5–13–27, 5–20–27, 5–26–27, 6–1–27, 6–17–27, 6–24–27, 6–30–27, 7–8–27, 7–15–27, 7–22–27, 7–23–27; all are for cash drawn on the A. L. Erlanger special account by L. E. Bergman, general manager and nephew of Erlanger, for $500, $500, $500, $500, $500, $500, $1,000, $500, $500, $500, $200, respectively, all indorsed by E. Fitzgerald; these checks supplied the cash which Pratt was *directed in various telephone calls by the contestant to send to the West End avenue apartment;* this was the period immediately following the stroke which Erlanger suffered on *May 4, 1927* (see Pratt's testimony). (32) Automobile proof of loss to Stuyvesant Insurance Company in connection with the Flint car, dated *September 27, 1926*, signed by *Charlotte Lesley* (Proponents' Exhibit 60). (33) Check, same company, dated *October 18, 1926*, covering damages by collision, made out to *Charlotte Lesley*, indorsed by Charlotte Lesley, receipt signed by *Charlotte Lesley* (Proponents' Exhibit 61). (34) Registration Bureau, Motor Vehicles, *December 14, 1926*, to *Charlotte Lesley*, signed by Charlotte Lesley (Pro-

ponents' Exhibit 56). (35) Passport, *May 25, 1927*, made out to " *Charlotte Fuechsel, professionally known as* Charlotte Lesley " (Proponents' Exhibit 35). (36) Passport, *May 25, 1927*, Abraham L. Erlanger; a line is drawn through the space after the sentence: " The bearer is accompanied by his wife " (Proponents' Exhibit 42). (37) Two certificates of stock, *Equitable Office Building Corporation, 100 shares each*, dated *August 19, 1926*, transfer on the back of each " To Charlotte Fixel," signed A. L. Erlanger, but undated; signature witnessed in each instance by Dillon; above the name " Charlotte Fixel " and apparently in different handwriting is the inscription on each certificate " c/o A. L. Erlanger, Apt. O-12-E, *175 Riverside Drive*, N. Y. C.; " the perforations indicate a cancellation of these certificates on *10-23-28*. (It will be noted that the certificates were issued on *August 19, 1926*, viz., in the earlier period; they were exchanged for 800 shares) (Proponents' Exhibit 207); and the same name " Charlotte Fixel " apparently was carried along into the new stock (Proponents' Exhibit 92). (38) Registration for Flint car, *12-7-27*, signed " *Charlotte Lesley* " (Proponents' Exhibit 57). (39) Letter Joe Toplitsky dated August 18, 1927, from the Twentieth Century Limited to Mr. A. L. Erlanger, Hotel Shelburne, closing with " My personal regards, remember me to Miss Charlotte; sincerely yours " (Proponents' Exhibit 398). (40) Letter from Helen Ten Broeck to " Dear Mr. Erlanger," inviting him to a tea in her one-room apartment at 38 Horatio street in the " tenth ward," and Erlanger's reply to the same, dated *10-29-27*, addressed to " Miss Helen Ten Broeck." (Note the " Miss; " she was married, but her husband died years ago.) The letter consists of two lines in which he expressed his regret that he would not be in town to join her (Contestant's Exhibit L-13). (41) Copies Erlanger income tax returns (State), *1926 and 1927*, in which questions as to being married are answered " No; " questions as to being head of family, etc., answered " Yes," and questions as to relationship of dependent answered " Sister." The signature, A. L. Erlanger, follows the initials A. L. E., acknowledgment by Charlotte G. Donnelly (Exhibits 139 and 140). (42) Federal income tax return for 1927 with answer " No " as to being married, and answers blank as to dependents; signature "A. L. Erlanger " is right over "A. L. E.," and acknowledgment is by Charlotte G. Donnelly (Exhibit 135). (43) Deed, February 26, 1925, Abraham L. Erlanger of 232 West End avenue to A. L. Erlanger Realty Company of property at Forty-ninth street and Tenth avenue, no wife joining with him in the deed (Exhibit 151). (44) Deed July 18, 1922, Abraham L. Erlanger, 232 West End avenue, to Ray Erlanger, residing at 232 West

End avenue, of property in Lawrence, no wife joining in the deed (Exhibit 153). (45) Deed, dated July 18, 1922, Abraham L. Erlanger, residing at 232 West End avenue, to Ray Erlanger, residing at 232 West End avenue, of property on West End avenue, between West Seventieth street and West Seventy-first street, no wife joining in the deed (Exhibit 152). (46) Unsigned copy of a consent to an adoption, claimed by Baron to have been signed by Charlotte Fixel (Exhibit L-14). (47) Application A. L. Erlanger, *May 27, 1927* (Contestant's Exhibit O-10), signed A. L. Erlanger, indicating a departure on the steamship *Majestic, June 4, 1927*. In the line with the words " Single, married, widowed or divorced " printed thereon, the check mark is after the word " widowed." (48) Christmas card, *December, 1925*, sent by Charlotte Lesley without mention of name of Erlanger (Contestant's Exhibit H). (49) Exhibit No. 348 is a copy of the propounded paper, probate of which is still pending. In this, Erlanger is described as unmarried; the will makes no mention of a wife or of contestant and makes no provision for her (Proponents' Exhibit 348). (50) Copies Federal income tax return for years 1919, 1920, 1921, 1922, 1923 (claims exemption for " sister "), 1924, 1925, 1926, in which Erlanger answers " No " to questions as to being married and living with a wife (Exhibits 337, 128, 130, 131, 132, 133). (51) Copies New York State income tax returns for 1919, answering " No " to question of marriage; 1920, answering " No " likewise, and name " sister " as one for whom he claims exemption; 1921, 1922 and 1923, giving similar answers; 1922, 1924, 1925, answering " No " as to marriage (Exhibits 335, 278, 279, 280, 282, 137, 138).

All of the parol proof and documentary evidence adduced by the proponents in connection with these years has been carefully and deliberately considered. The exhibits have been weighed in connection with the issue herein among them especially, as to the decedent, the income tax statements, the registration for election purposes, registration at hotels, applications for passports, the deeds in which he was recited as unmarried or as single; together with the exhibits showing the use by contestant of her maiden name or her stage name in banks, hotels and applications for passports, for licenses, etc., and in other documents. (a) As to election records showing Erlanger's registration as single as indicated by the letter " S " in the years 1920 to 1927, from the West End avenue home they have been considered in connection with all the evidence in the case. Surrogate WINGATE in *Matter of Callahan* (142 Misc. 28, 29) held: " Whereas, substantially self-serving declarations of this type are entitled to scant considera-

tion when opposed to direct proof, the court is of opinion that they are admissible for what they are worth (*Washington* v. *Bank for Savings in the City of New York*, 171 N. Y. 166, 175; *Farmers' Loan & Trust Co.* v. *Wagstaff*, 194 App. Div. 757, 760, 761; *Matter of Reinhardt*, 95 Misc. 413, 419; *Matter of Salvin*, 106 id. 111; cf. *Tracy* v. *Frey*, 95 App. Div. 579, 593) and they have accordingly been considered in reaching a conclusion." (b) The declarations in the income tax returns were admissible. With the limitations of the Federal statutes as to publicity they are *quasi* private statements. Since Erlanger was not claiming any deduction on the ground of being married, it was immaterial so far as the declaration went whether he was married or not. On the subject of declarations see *Tracy* v. *Frey* (95 App. Div. 578, at p. 593); *Richard* v. *Brehm* (73 Penn. St. 140, 145); *Stevens* v. *Stevens* (56 N. J. Eq. 488, 491); *Greenawalt* v. *McEnelley* (85 Penn. St. 352). (c) *Exhibit 339* was a paper addressed to Baron and signed by A. L. Erlanger. It was typed on letter stationery and purported to create a trust with 1,000 shares of Loew's Met. The. Co. of Tennessee stock with himself as beneficiary for life, and on his death with Charlotte Fixel as beneficiary for life and on her death to his residuary estate to be distributed under his last will and testament. At the bottom was a statement to " Dear Abe " appreciating his generous thoughtfulness and " thoroughly approving of the same. Your devoted friend," signed *Charlotte Fixel*, dated December 3, 1924. Baron prepared this paper. The reasons for Erlanger's act, the circumstances surrounding it, the part played by Baron in its preparation and execution are not disclosed. It bears contestant's maiden name and was admitted in evidence without objection. It has been considered and with it the testimony of William H. Conger concerning the discussion Erlanger had with him about making a trust as well as a will. (d) We come to the exhibits showing the use by contestant and by decedent of her maiden name, Charlotte Fixel, and of her stage name, Charlotte Lesley. A study of the case of *Washington* v. *Bank for Savings* (171 N. Y. 166, 175) is helpful in the task of appraising the probative force, if any, of names and relationships used in connection with bank deposits. The case involved several savings bank accounts, which had been opened by the decedent under the name of Margaret Brown, which was her maiden name, and the two accounts involved in the controversy were in trust " for son, Thomas," and in trust " for son, John." It was assumed in the decision that she had married a man by the name of Hunter, and if that was the fact he had disappeared, and during twenty-seven or twenty-eight years that she had lived in the house mentioned he had never been seen

by any of the neighbors. It was contended on one side of the litigation that the name of depositor was fictitious, her supposed married name being Hunter, and that the existence of the two sons was fictitious. After referring to certain facts and circumstances which appeared in the case and declaring them competent for the consideration of the jury upon the issue of fact, Judge O'Brien held as follows: " The jury in considering this issue might very well have adopted the reasoning of this court in the case of *Beaver* v. *Beaver* (117 N. Y. 430) where the court said in deciding a question of kindred character: ' *We cannot close our eyes to the well-known practice of persons depositing in savings banks money to the credit of real or fictitious persons with no intention of divesting themselves of ownership. It is attributable to various reasons; reasons connected with taxation; rules of the bank limiting the amount which any one individual may keep on deposit; the desire to obtain high rates of interest where there is a discrimination based on the amount of* deposits, and the desire on the part of many persons to veil or conceal from others knowledge of their pecuniary condition.' " The use of the name Charlotte Fixel, her maiden name, or the name Charlotte Lesley, her stage name, was not in itself either illegal or improper. While it is true the point sought to be made by the proponent is not that it was illegal or improper, but that it is evidence of strong probative value upon the true character of her relationship with the deceased, in approaching the appraisal of such weight as should be given this kind of proof, it is appropriate to consider the subject of the use of a maiden name and a stage name from every possible angle. The court may take judicial notice (See editorial, N. Y. L. J. March 26, 1932) of the fact that in later years the habit is growing on the part of married women to retain their maiden names, especially where they have been or are members of the theatrical profession. For many years it has been quite usual in the literary profession. One of the proponents' witnesses, John Emerson, conceded the use by his wife, Anita Loos, the writer, of her maiden name. It is interesting to note here that as far back as 1849, in the leading case of *Piers* v. *Piers* (2 H. L. Cas. 331, 354) it was held: " The fact of a formal marriage in 1821 between these parties by no means impeaches the validity of the marriage in 1815. It is evidence that Sir John B. Piers desired to conceal his marriage from his mother, from whom he had expectancies, and the second marriage was nothing but a public reassertion of the parties' intention, which had lawfully been carried into effect some years before. Nor is the circumstance of the lady being described in the certificate of that marriage, and signing it in her maiden name at all material. (Lord Campbell: There is nothing in that.

Lord Elden was married a second time. The second marriage took place in Newcastle; and though there was no doubt that he had been validly married in Scotland, yet his wife used her maiden name on this second marriage. The LORD CHANCELLOR: In case where a ward of court has been married clandestinely the court always directs a second marriage; and in such marriages the maiden name of the lady is always used.) By a similar reasoning, the use of the maiden name of Lady Piers in the certificate of baptism of one of the children in November, 1820, is accounted for. It was a frequent practice in the island to describe the mother by her maiden name, and such description did not in any manner affect the question of her marriage or even show that a doubt was entertained upon the subject of it." In the action by Frank Leslie, whose name originally was Henry Carter, against his son, Frank, Jr., also known as Henry Leslie (*England* v. *N. Y. Publishing Co.*, 8 Daly, 375, 381) Chief Justice DALY goes deeply into the question of real and assumed names, and referring to a prior decision of his in *Matter of Snook* (2 Hilt. 566) remarks that in the latter decision several adjudged cases were there cited, holding: " That a name might be acquired by reputation and by general usage and habit, and that where such had been the case, it would be taken as the true Christian and surname of the party." And then he quotes Chief Justice ABBOTT as declaring in *Doe* v. *Yates* (5 Barn. & Ald. 544) that " A name assumed by the voluntary act of a young man at his outset into life, adopted by all who know him, and by which he is constantly called, becomes, for all purposes as much and effectually his name as if he had obtained an act of parliament to confer it upon him." Fictitious or assumed names are referred to in 19 Ruling Case Law, at page 1333, as follows: " It is merely a custom for persons to assume the names of their parents, but it is not obligatory nor punishable to adopt another name; hence it is generally held that a person may adopt any name in which to transact business, and may sue and be sued by such name. Since the object and purpose of describing a person by his name is to identify him, the general rule is that one may be designated in legal proceedings by the name by which he is commonly known, although not his true name. This rule does not require that he should be known by one name equally as well as by the other, but only that he be known by both. Again, a contract or obligation may be entered into by a person by any name he may choose to assume. All that the law looks to is to the identity of the individual, and when that is ascertained and clearly established the act will be binding on him and on others. A person may even make the name and signature of another virtually his own, by using or allowing it

to be used as such in the course of his business, and such a case is not within a statute prohibiting the doing of business under an assumed name without filing a certificate." The Court of Appeals of Kentucky (*Baumeister* v. *Markham*, 101 Ky. 122; 39 S. W. 844) upheld the right of an actress to use her stage name in a litigation, in the following language: " Therefore, if appellee be the identical person who received the injury complained of, as is so, the judgment in her favor *should not be held invalid for the only reason that she chose to sue in a name adopted for* the stage, and by which she is generally known; for the appellants have not been thereby misled, nor can she maintain another action for the same cause against them or either of them." Speaking of the legal effect of an assumed name, Justice JENKS in *Gotthelf* v. *Shapiro* (136 App. Div. 1, 3) stated: " It is the identity of the individual that is regarded, not the name he may bear or choose to assume." (For a most exhaustive treatise on names, fictitious and assumed, see the annotator's notes in connection with *Proctor* v. *Nance*, 132 American State Reports, 563–580.) Moreover, this court takes judicial notice of the general practice and use by stage people of retaining their stage names both while active in stage work as well as after marriage and after retirement from professional life. How prone the courts are to look to the identity of persons more than to names, real names, maiden names, pen names or fictitious names, and what weight may in common-law marriage cases be given to the use of one or the other is indicated in (1) *Badger* v. *Badger* (88 N. Y. 555); (2) *Vincent's Appeal* (60 Penn. St. 228); (3) *Gall* v. *Gall* (114 N. Y. 109). In the first case decedent lived two lives; in one locality among relatives and friends he appeared as a bachelor; in another locality he appeared as " John Baker," a fictitious name, living with a woman, the intercourse creating no scandal but reputed to be respectable and that of husband and wife; no explanation was given for his assumption of the fictitious name. Yet the Court of Appeals reversed the judgment and granted the reputed wife a new trial. In the second case it appeared that the parties lived together under the wife's name and that their relationship was unknown to the friends and relatives of the man; his repute as a bachelor among those who knew him by his true name was proved, but no question was raised over it, and it was not allowed to prevail as against the general repute of marriage in the locality where both parties lived. In the third case, *Gall* v. *Gall* (114 N. Y. 109), the husband lived two lives. In one locality with his friends he was known as a widower maintaining bachelor quarters at a hotel. Elsewhere he maintained a home for a woman who had been his servant girl. There he was known as her husband. He introduced

her as his wife but did not take her to see his friends and relatives or old friends. In his will he referred to her as "Amelia Steib, servant of my wife." The court decided that the relationship constituted a common-law marriage. Finally in seeking the purpose and searching for the real meaning of any of the acts of Erlanger during this period, the ever-present possibility of a charge of bigamy being made against him must be seriously considered, and *a vital fact in the light of which all exhibits reciting Erlanger as "single" or "unmarried" or exhibits in the formulating of which he participated and which recited her by her maiden name or as single or by her stage name must be weighed and balanced is the provision of law that any marriage, ceremonial or non-ceremonial, contracted in this State would be in violation of the decree of divorce and would constitute the crime of bigamy.*

After hearing all the witnesses upon the trial, a careful examination of the briefs, the testimony and exhibits, it is impossible to escape the conclusion that during this period the parties bore the reputation generally of being man and wife, held themselves out both in their home and wherever they moved as man and wife. Their repute and acknowledgment as such has been firmly established. Proponents made a most persistent effort to show a meretricious relationship between the parties prior to 1920. It was apparently their purpose to seek the benefit of a presumption predicated upon such a relationship. Their argument (Proponents' brief, p. 19) is just as weak as the evidence upon which they base it, viz.: (1) They point to her letter after decedent's death to Pironti in Naples (conceded to be in her handwriting), in which she refers to her having been his wife for over twenty-eight years. The statement is so absurd on its face and so entirely without support in the record, and indeed so contrary to testimony of various witnesses, that it needs no further answer; (2) the testimony of the Pullman porter, Witherspoon, and his uncertain and wobbly reference to statements made to him by the contestant as to fourteen or seven years of marriage, is on its face undependable as proof of such a glaring charge; (3) they point to the deposition by Henri Carpentier that she was introduced by Erlanger to him in 1913 or 1914 as Mrs. Erlanger. On the witness stand he stated that that was a mistake, going into some detail concerning the time when she was first introduced to him; and fixed it as the springtime of 1920; (4) Lederer's story as to contestant receiving some money at Erlanger's office which must be rejected both on the quality of his memory, the vagueness of the story, and his proven incredibility as a witness; (5) Bickerton's testimony of a

similar episode which is too vague and indefinite to warrant giving any force or effect to the incident he was asked to describe; (6) the testimony of Riley, the butcher, as to when he began to serve provisions to contestant at the West End avenue house; of Mrs. Conger and members of her family as to the probable time when she received a letter from contestant stating that she was married; of Reine Davies in her deposition recounting her having first met her as Mrs. Erlanger is too uncertain to be of any weight upon such a contention. As to the witness Mooney his calibre and character as a witness are such as to cause the court to reject all his testimony. *The proponents failed utterly to establish a meretricious relationship between the parties.* From 1920 down to 1927, the period just reviewed, *there was an uninterrupted cohabitation between the parties,* and this cohabitation was: (a) In the only home that the parties had in this city, the home which previously he maintained with a wife who divorced him in 1912; (b) it was *open and unconcealed,* and with not a semblance of an attempt to carry on a camouflaged, covert, clandestine or concealed relationship; (c) it was continuous, consecutive and exclusive; (d) it was marked by the utmost fidelity of the parties to each other and without even a breath of impropriety, of taint or tarnish; (e) there was manifested throughout by each party for the other a love and an affection, a constancy and a devotion, a solicitude and an attention unvarying and continuous, both at home and away from their home. Witness after witness has testified to the devotion and the solicitude of the contestant for decedent. Renee Davis (p. 3524) described her attitude to him as most lovable, most sweet and most devoted, and his to her as most lovable; Amy Ashmore Clark (p. 887) described the demeanor toward each other as most affectionate; Mrs. Margaret M. Reid stated: " There was a great deal of devotion between both parties, so much so that it was very remarkable " (p. 3394). Of the same tenor is the testimony of Dr. Marshall, who spoke eloquently of her solicitude and devotion to decedent (284), of Dr. Aaron whose comment was narrated in the Bert Whitney letter (Exhibit Y-10); of Mrs. McCulloch who detailed the devotion of the parties to each other; of Mrs. Charles Evans, Mary Bothwell (Mary Wells), Mrs. H. B. Lavner, Mrs. J. J. Dillon, of the various attaches of the Shelburne Hotel and of many other witnesses; and more effective and forceful still as to her fidelity, constancy and devotion is the tribute paid by the decedent himself in November, 1927, to Benjamin C. Riley, a credible witness, to whom he said that if it had not been for her he would have been dead, and also that she took him to Atlantic City against the advice of his physicians (594) and that contestant

had saved his life by taking him to Atlantic City against the wishes of his physicians (603); (f) the place and the status of contestant in the Erlanger home in West End avenue; (g) the continuous presence of the contestant with decedent, in public places, at theatres, at conspicuous opening performances, in restaurants, hotels, in all and the only social activities and social life in which decedent moved.

I. After weighing all of these proofs covering the period from 1920 to November, 1927, my conclusion is that during this period they desired matrimony and that while by reason of the impediment of the divorce decree their relations were without lawful sanction, *they were nevertheless matrimonial.* In *Matter of Haffner* (254 N. Y. 238, 242) the Court of Appeals stated: " True, their relation in the eyes of the law was illegal in violation of section 6 of the Domestic Relations Law (Cons. Laws, ch. 14), but it was not intended by the parties to be ' meretricious in the sense that it was known to the parties to be immoral and unlawful, even if, as a matter of law, it was illegal and void ' " (citing *Matter of Crandall,* 214 App. Div. 363). Justice MADDOX expresses the same principle in *Townsend* v. *Van Buskirk* (33 Misc. 287, at p. 290): " There is, to my mind, a well-defined distinction between illicit relations, forbidden because of an undisclosed disability on the part of one of the parties thereto, and such relations as are mutually meretricious involving on the part of the woman knowledge that its character is not, and is not intended to be matrimonial, but of a wanton and lustful nature. * * * There can be no other conclusion from all the evidence in the case than that she and Townsend desired marriage, that that was their intention, and consequently ' their cohabitation, thus matrimonially meant ' made ' them husband and wife from the moment when the disability ' on his part was removed, and it was immaterial whether he knew of that removal, * * * the fact being that it was removed, and their consent to the matrimonial relation may be inferred from their acts and conduct." The late and learned Surrogate KETCHAM in *Matter of Biersack* (96 Misc. 161, 170) had the same concept in mind when he declared, " The original relation of the parties in the case at bar, though without lawful sanction, was not without a qualification. It was only the bar of the statute against a non-ceremonial marriage which robbed their conduct of the quality of matrimony." (*Davis* v. *Whitlock,* 90 S. C. 246; *Smith* v. *Smith,* 32 Ida. 480; *Matter of Wells,* 123 App. Div. 79, 82, 83; affd., without opinion, 94 N. Y. 548; *Hynes* v. *McDermott,* 91 id. 451; *Adger* v. *Ackerman,* 115 Fed. 131; *Smith* v. *People,* 170 Pac. 959; *Wilson* v. *Burnett,* 105 Misc. 282; 1 Bishop Marr., Div. & Sep. § 970; L. R. A. 1915E,

91 (note to *People* v. *Shaw*); *Chamberlain* v. *Chamberlain*, 68 N. J. Eq. 738; *Price* v. *Tompkins*, 171 N. Y. Supp. 844, 846; *Robinson* v. *Robinson*, 90 Atl. 314; *Mullaney* v. *Mullaney*, 65 N. J. Eq. 385; v. *University of Mich.* v. *McGuckin*, 87 N. W. 18.)

*The record for 1927 is all important since the events of that year marked a distinct change in the relationship of the parties and included the first week in November, within which the parties, it is claimed, made an agreement or consent of marriage.* A close study of the proofs offered upon this period bring out in clear colors the intentions of the parties and throw a penetrating light upon what took place in November. Decedent suffered a stroke on May 5, 1927, from which he was confined to his West End avenue home until he went to Atlantic City on July twenty-seventh. The stroke marked the beginning of a decided and definite change in the relationship between the parties. Never before, so far as the record shows, was this man, a monarch of the theatrical world, so long separated from his activities in his business; he and contestant remained in Atlantic City at the Hotel Shelburne from July twenty-seventh to September twenty-first, when they returned to New York, *but never again to the West End avenue home*, where they had cohabited from 1920; but to the Ambassador, to a suite selected at his direction by Dillon; they remained until the end of October, when they returned to the Hotel Shelburne and remained one week. It is within this week that the alleged agreement to marry took place. Many unprecedented things took place during the illness of decedent; we find Pratt telling of the contestant's calling up regularly for the first time in May, June and July and directing that definite amounts of cash be sent to their home; these directions were complied with; the money was sent; and in July at her direction two large checks of $50,000 and $30,000, respectively, were sent at her direction. The month of May marked the advent of Dillon into the employ of decedent; gradually contestant loomed into a more important personage in the life of decedent. In June he determined to buy a plot at Garden City, which subsequently he gave to her. Baron went first to look the ground over and later he and the contestant went there in July and prior to July eleventh, to look over plots of ground; a plot was purchased at a price of $40,000; the contract was taken in the name of Dillon, later assigned to decedent, and still later (Contestant's Exhibit H-7) by a deed August 15, 1927, but claimed by Baron to have been drawn and executed September 26, 1927; it was conveyed to contestant; *it was the plot selected by the contestant that was purchased;* coincidentally with the purchase of the plot steps were taken by the

decedent to have plans made for an elaborate villa upon said plot, to cost from $60,000 to $65,000. Plans, sketches, blueprints, etc. (Contestant's Exhibits KK, MM, NN, OO, TT, UU, VV), were prepared by the architects upon the order of Anderson, representing the decedent; the plans cost $1,240; Anderson who had been with the Erlanger organization for thirty-five years, told the story of decedent's discussion with him about the new house (5254) and his orders to get in touch with Warren & Wetmore and discuss the new house with them. He said decedent told him he had a plot in Garden City, that he wanted a moderate-sized house as a summer house, that he had been living at a summer home at Lawrence, and he did not want that sort of a house (he deeded the Lawrence property to his sister in 1922); that he took the matter up through Upton and secured a set of preliminary plans and took them up to the West End avenue home to decedent; that there were two sets, one set at one time and a revised set at another; not to his recollection did he have any talk with Upton or tell him anything about a Mrs. Erlanger; soon after that decedent went to Atlantic City; the question of the house was never discussed after that (5261); he did not tell Upton to mark anything (referring to the markings on the plans or sketches, " Mrs. Erlanger's chamber," and " Mr. Erlanger's chamber "), and the only room he discussed specifically was Mr. Erlanger's. The fact remains that the plans had a room marked " Mrs. Erlanger's bedroom " (5290), and further that all the plans and blueprints were taken to decedent at West End avenue by him, and from the time Erlanger went to Atlantic City in July, 1927, *he never again went to 232 West End avenue.* He said that Erlanger went to the Hotel Ambassador on his return in the middle of September and that when he went to a residence from there he went to an apartment at 175 Riverside drive. It developed in his testimony (5293) that he did not get the preliminary plans until November, 1927; he stated that he himself may have brought the second set of plans to 175 Riverside drive. Henri Newell, an interior decorator, told (978) of meeting decedent in the year 1927, at Hotel Ambassador, having reached the apartment after inquiry at the desk for " Mrs. Erlanger;" she introduced him to Erlanger; she greeted him when he came in and took him over to Erlanger; said, " Darling, this is the gentleman that I spoke to you of who is going to do the new apartment for us;" there were other guests at the dinner, Mr. and Mrs. Denni; they spoke of the apartment which he was interested in decorating, and decedent told him that he thought he would do for the work as long as Mrs. Erlanger had chosen him, and he turned over to her verbally the right to do all the selecting of colors, etc. He stated

(982) that Erlanger told him that Mrs. Erlanger, "who he had introduced to me as Charlotte," would take care of all the things that were necessary. The selection of colors for different rooms came up; decedent told him that he would allow Mrs. Erlanger to take entire charge of the details, and witness said he afterwards conferred about the decorations with Mrs. Erlanger; that he completely outfitted the house with the exception of a few linens for bedding; the carpets; that these and his services were paid for, and he spoke to Mrs. Erlanger about the payment for the articles, and always the next day after he had spoken to Mrs. Erlanger, he got the money; that it was in December of the same year, 1927; Mrs. Erlanger was present; he said that Mr. Erlanger asked him if he would be interested in working on a new proposition, and on being told " Yes," said " *Darling, get the blueprints of the new home,*" *and Mrs. Erlanger brought out some blueprints, and he told me that it was property in Garden City, that he was going to build a new home, and he wanted it to be as fine as money could buy;*" *and that the witness offered a few suggestions;* Newell further brought up the possibility of having the house reversed so that instead of facing the street it would face the garden; Erlanger told him that he relied entirely upon the men who drew up the plans; Erlanger pointed out on the blueprints where his rooms were going to be, and what he was going to do; he suggested some changes and Erlanger assured him that he would have the work of decorating; that an original sketch was exhibited to him; he identified certain blueprints and the sketch which he examined in December, 1927, and stated that he looked at the sketch of the house; Erlanger told him the entire house, decoration and all, would be also up to Mrs. Erlanger, but that he would talk with his architects as soon as they returned. Newell stated that he realized Erlanger's physical condition and he was very insistent on having a larger conservatory in glass and a gymnasium. He described his completion of the apartment at 175 Riverside drive and said that Erlanger had never been in the apartment while the work was being done on decorations and furnishings; that Mrs. Erlanger asked him to give particular attention to two rooms, decedent's bedroom and library. The furniture, bookcases, electric lighting fixtures, and accessories and the mirror above the fireplace on West End avenue were brought over intact, so that the room was an exact duplicate of the room in West End avenue. Witness dined there twice a week every week from the fifteenth of November until January; he heard Mr. and Mrs. Erlanger address each other on those occasions always in very endearing terms, *and he stated that they behaved towards each other as husband and wife, and Mrs. Erlanger always made the appoint-*

*ments for dinner.* In cross-examination Newell said that decedent said that he had presented to Mrs. Erlanger a piece of property at Garden City, Long Island, and was going to build a Spanish villa for her, perhaps not in exactly those words; *that Erlanger had shown him a $10,000 bill and stated: " I have given her this for her birthday present;"* and that he asked Mrs. Erlanger to get it out for him and show it; this was in December, 1927, her birthday; he was invited for dinner that night; as showing an apparently definite plan to completely change from the old home at 222 West End avenue to the new duplex apartment on Riverside drive, E. L. Seifert, from W. & J. Sloane, carpet house, which had done considerable business with decedent in supplying carpets for theatres, testified that Mrs. Erlanger came in; it was in the month of October, 1927 (preceding the events which took place during the first week in November at Atlantic City); she selected carpets for the apartment at the Fifth avenue store; half a dozen colors, calling for him on Monday, drove him to the Riverside drive apartment; they tried the carpets to see if they would be satisfactory for different rooms, and colors were selected; they discussed how quickly the work could be done; she insisted upon its being done by the fifteenth; the firm delivered the carpets on the twelfth and laid them on the thirteenth and fourteenth, so that the order was completed on the fifteenth; carpets were furnished for every room in the apartment, which was a duplex, except the maid's room; there were a foyer hall, music room, living room, which was combined with the library, a dining room, a breakfast room, a maid's room, a kitchen and pantry combined with the kitchen, a staircase leading to the second floor, where were located " *Mrs. Erlanger's room, Mr. Erlanger's room,*" and a guest room, and an upstairs hall. From other testimony it appeared that there were rooms for the help on this mezzanine floor. Bills for the furnishings and work, two, dated October 31, 1927; one, November 30, 1927; marked contestant's Exhibit F-7; the first bill was for $4,758, paid December 5, 1927, and the second one was for $61.90, paid December 21, 1927; paid through Erlanger's office; that he had never seen decedent and had no personal touch with him; his only information received was from the contestant, and when queried about " Mrs. Erlanger's room with three closets " he said he took it that she was Mrs. Erlanger and that was her room. On redirect he said she had told him as far back as *October, 1927,* that she was Mrs. Erlanger; bills were sent in, in which it was stated " Mr. Erlanger's room," " Mrs. Erlanger's room," and were paid; the apartment was brand new; nobody ever lived in the place; there was no furniture in it. How the apartment was selected was told by *Stevens,* the renting

agent for No. 175 Riverside drive; the terms were made with Mrs. Erlanger, he said, and then a lease was drawn; it was for a period of *five years* with an option of five years more (1387) at a rental of $5,500 a year; the lease was executed and they moved in; he stated Mrs. Erlanger handed him the signed lease and Mr. Erlanger was in his car outside; he spoke to the latter and *Mr. Erlanger wanted to thank him for his kindness and courtesy to Mrs. Erlanger;* he saw her on various occasions afterwards in the apartment, and he addressed her as " Mrs. Erlanger " and heard other people address her always as " Mrs. Erlanger;" that he saw Mr. and Mrs. Erlanger together on a great many occasions; that they conducted themselves towards each other as husband and wife.

*Caroline S. Stehle,* who had previously testified and who impressed me as a credible witness, stated (409) that she saw Mr. Erlanger in either the latter part of August or the first week of September in 1927 on the boardwalk when she was with her mother and her mother's cousin, Miss Harburger; that with Erlanger was his wife, Mrs. Erlanger, and Baron; that she and her mother and her mother's cousin had been taking a walk and were resting, sitting on a bench on the boardwalk, and that Mr. and Mrs. Erlanger and Baron were in a wheeling chair; that she spoke to them; that Mrs. Erlanger saw them and had the attendant push the chair over to the bench where her mother was; that Baron and Mrs. Erlanger stepped out of the chair; that Erlanger remained in the chair; that she believed he " had not been very well, and Mrs. — Miss Harburger had not seen Mrs. Erlanger for a great many years;" that Mrs. Erlanger introduced Baron to her mother and her cousin, and that the witness said: "Auntie, you remember Charlotte? She is now Mrs. Erlanger." Baron contradicted this. He also contradicted Mrs. Lavner, Dr. Marshall and Mr. and Mrs. Dillon.

*Elizabeth S. Conger,* of Atlantic City, *a highly credible witness,* whose testimony has previously been referred to, testified (150) that she saw them in the fall of 1927 in a chair on the boardwalk; that her mother and she were walking there and met them in a rolling chair; that they stopped and spoke to them; she inquired after Mr. Erlanger's health; he said he was feeling much better; that he talked about the weather and different things, and that *Mrs. Erlanger showed her a new ring she had; that she said, " Why, Charlotte, now you have two wedding rings," and with that Mr. Erlanger said, " Yes, and now we are doubly married; " that she had observed a wedding ring on Mrs. Erlanger's finger before, a band of diamonds, that she had a platinum band for a few years, a chased platinum band, an engraved platinum band, that the other (ring) was a band of diamonds.* She recognized the band of diamonds; she had seen that

ring on Mrs. Erlanger's finger for three or four years, maybe five, and in the presence of Mr. Erlanger (Exhibit F). *She reiterated her statement that Mr. Erlanger had said, " Now we are doubly married " or words to that effect.* She further stated that Exhibit F was one of the rings that Mrs. Erlanger had on on this occasion; *that then she saw for the first time another ring on Mrs. Erlanger's finger;* that she had never seen that ring on her finger before; that it was a new one, a platinum band with colored stones in it, one diamond, and then several colored stones, on the same finger with the ring, Exhibit F; she identified the latter (Contestant's Exhibit G), and stated as to the stones in the ring, " *They are the diamond, the emerald, the amethyst, the ruby, another emerald, a sapphire and a topaz, and that that is what she meant when she referred to the ring spelling " Dearest."* It is important to note the responses made by the witness under cross-examination. She repeated that she met them in the *fall of 1927, on the boardwalk in November.* She could not remember what date; she was sure that it was in November. She stated that it was the " first part of November, probably the first week, the first part of November." She twice denied it was the second week in November; she said that she knew they were there the first week. Again (348) she reiterated that it was during the first week of November; she had on a new fur coat, that she knew they were in Atlantic City in September, but did not recall the date, and that they were there a long time that summer; that she did not wear a fur coat in September. She again stated (349) that she did not remember what date it was, that she could not remember whether it was the *first, second, third, fourth, fifth or seventh day of November;* that she thought her mother, who was with her, wore a fur coat, too; that it was the afternoon, she would judge about four or four-thirty, that she (and her mother) were walking, and they were riding in opposite directions; that they were walking uptown; that from the Ritz to the Shelburne would be uptown; that they were on the boardwalk when they met; that she thought it was in front of the Chelsea Hotel, about there; that the lights were not lit on the boardwalk; that they talked to them probably ten minutes and then continued their walk uptown; that it was a fair day, not raining; that she did not recall that it was cloudy, that it was dry under foot; that it was cold, it was snappy, that her home was in Chelsea and that she was walking away from her home. The further cross-examination was searching; it brought out statements from the witness that she and her mother were just out for a walk; that their home was two or three squares on the boardwalk from the place where they met them; she did not believe she had rubber shoes on; that she was not walking with an umbrella, nor was her mother;

that it may have been cloudy; that she did not recall whether it was cloudy or whether the sun was shining; that it was not raining when she was out; that she was positive of this. Further, she stated that she knew that the contestant is seeking to establish that she is the widow of decedent; that, naturally, she had talked with contestant about the case and so forth. She was further examined as to conversations she had with the contestant. She stated that this was the first she had heard of the date, November 3, 1927. Cross-examination continued; and then upon the redirect she stated that when she visited the parents of the contestant, the latter's father wore a large seal ring, which she identified as the one she saw on the hand of contestant's father, Mr. Fixel. She testified he always wore it; *that she saw this ring (Exhibit V) on the finger of Mr. Erlanger a number of years and that with the exception of the initials, it looked like the same ring.* She looked at a watch (Contestant's Exhibit W) and recognized in it the photograph of Mrs. Erlanger. In reference to contestant's father's ring worn by Erlanger, she could not positively say it (Exhibit V) is the ring; that he, the father, showed her the ring; that he told her it was an engagement present from Mrs. Fixel; that she examined it and found it was a very heavy gold ring. She did not recall the name or the initials on it.

*Carrie Stoy, mother of Mrs. Conger, Stehle and McCulloch,* a venerable lady of seventy years, testified that she had been married to Mr. Stoy at the time he died nearly fifty years; that they lived in Philadelphia all their life; that she had four children, Dorothy, her son Clark, Elizabeth and Carrie. All except Clark have been witnesses on this trial. She stated that she first met contestant by the name " Charlotte Lesley;" that that was her stage name (388); that she met Mr. and Mrs. Erlanger on the boardwalk with her daughter, Mrs. Conger, in 1927, she thought; that she did not remember dates; she could not tell the day, month or year with any degree of certainty; that she and Mrs. Conger were on the boardwalk; that they were walking; that Mr. and Mrs. Erlanger on that occasion were in a chair; that they were alone, in the afternoon; that it was not raining; that she and her daughter stopped, and Mrs. Erlanger got out and kissed them both and then showed her daughter her hand; that it had two rings on it, and Betty said, " Oh, you have two rings, Charlotte," and *Mr. Erlanger said, *" Now we are doubly married;"* that she asked no questions of Mr. Erlanger, and

---

* While the typewritten minutes reported these words as " Mrs. Erlanger," *the court's personal notes record the words here as "Mr. Erlanger,"* etc., and the next question following this answer would imply that the witness said " Mr. Erlanger." However, the effect of the substance of the testimony is practically the same, whatever the witness actually said.

she stated that prior to that time and from the time she first got to know Charlotte Lesley by the name of Erlanger she saw a ring on her hand, on her wedding-ring finger, a white platinum ring, chased, a narrow ring. She identified the diamond band (Exhibit F) and the colored-stone ring. She said that they were both together on her hand; that she saw the colored-stone ring when she showed it to them on the boardwalk; that the contestant stepped out of the chair and kissed them both. The witness was closely cross-examined. She admitted that she did not recall dates very well; recalled when she first met Mr. Erlanger in Atlantic City; thought that the date of the boardwalk meeting (the ring episode) was somewhere around 1927 (395), not as late as 1928; that the weather was nice; that it was in the summer time; that it was in the afternoon about four o'clock; that it was not raining. She testified (382) to meeting Mr. and Mrs. Erlanger on the boardwalk.

Events that transpired afterwards confirmed the truth of the testimony of Mrs. Conger and Mrs. Stoy and showed definitely and undeniably the true significance of Erlanger's open declaration upon the boardwalk and the acquiescence therein of the contestant. Among the many developments of this year, 1927, was the strong friendship and companionship between decedent and contestant and the Dillons. Dillon rapidly became an important figure in the business life of decedent; his wife continued as his secretary and participated in many important business matters. But there was now added to the closely intimate business contacts, the social companionship between the Dillons and contestant and decedent. They visited at the Riverside drive apartment very frequently; they dined there; they dined out with the parties at various restaurants and hotels; the details of these social visits of the Dillons, of the motor rides and the dining out are detailed in the testimony of many witnesses. Mrs. Dillon, whose testimony in the main will be reviewed later, sheds a clear light upon the boardwalk episode; she stated that in November of 1927, she and her husband, Mr. Dillon, met Mr. and Mrs. Erlanger at Arrowhead Inn at Riverdale, New York; she said (2304) *that she asked Mrs. Erlanger to show her her ring she had mentioned to her over the telephone; that she displayed it at the table, and* the witness remarked upon its unusual appearance; *she described it as a ring with precious stones and diamonds in it, and stated that Mr. Erlanger said, " Yes," that now he had given Charlotte two rings, that she would never get away from him, or something to that effect; that he said, " Two wedding rings."* Shown Exhibit G, she identified it as the ring that Mrs. Erlanger showed on that occasion; she stated that prior to that time she had seen on Mrs. Erlanger's hand the ring (Exhibit F), " a ring very much like that (Exhibit

G);" that she is not sure whether it is the identical ring. She described Exhibit F as of plain diamonds, whereas the ring exhibited at Arrowhead Inn was a ring with colored stones in it. After the occurrence at Arrowhead Inn she spoke to Mr. Erlanger about the ring — she believed it was the next day — she asked Mr. Erlanger why he had given Mrs. Erlanger another wedding ring, and that *he said he had been advised that his marriage in New York was not legal, that to offset any doubt on that score he had married Mrs. Erlanger in Atlantic City and given her that second wedding ring to seal the ceremony.* She said that from then on she saw Mrs. Erlanger at least three times a week; that she would see her at lunch or in the company of Mr. Erlanger at 175 Riverside drive, at Ben Riley's Arrowhead Inn, at Weisheit's, at the home of Mr. and Mrs. Anderson, at Post Lodge, at Claremont Inn, at Henri's, at the ball game. The arrangements for her and Mr. Dillon's meeting with the Erlangers at Arrowhead Inn, already described, were made in Erlanger's office. The Dillons met them there, and she had never been before in any restaurant with Mr. and Mrs. Erlanger except at Atlantic City, on August twenty-seventh and twenty-eighth, *and up to that time, November 27, 1927, she had never dined at the Erlanger home.*

*John J. Dillon,* the husband of the latter witness, corroborated his wife's testimony as to the *ring episode at Arrowhead Inn in November, 1927.* He stated (2546) that he remembered Miss Donnelly, his wife, *asking Mrs. Erlanger to see the new wedding ring; that Mrs. Erlanger took it off her finger and showed it to Miss Donnelly and she naturally remarked how beautiful it was, and so on; that he never touched the ring, he just noticed it there being handled, and that Mr. Erlanger made the remark, " Well, I have given her two wedding rings; now she will never get away from me," or something of that sort;* that prior to that time he had noticed a wedding ring that Mrs. Erlanger wore; that from that time on whenever be observed her hand she wore two wedding rings. He identified Exhibit G as the ring he saw on that occasion, and Exhibit F as the ring he saw her wearing prior to that time. *He stated that Mr. Erlanger used to wear a ring on the little finger of his left hand* (Contestant's Exhibit V). He further stated (2548) a week or so after the ring incident happened he spoke to Mr. Erlanger, that he, Dillon, opened the subject in a general way by saying how happy Charlotte was with the new ring. Recalling the substance of what Mr. Erlanger said, he quoted him as saying, " *Well, I am glad she is so happy because I could not marry Charlotte in New York, I married her in Atlantic City in the eye of God when I gave her that ring.*" He was cross-examined (2630) about what took place at Arrowhead Inn at the

time previously described; he fixed the date in November, 1927, around Thanksgiving time; he described the subjects of conversation had with Mr. and Mrs. Erlanger and his wife; he stated that he remembered Mr. Erlanger's saying while Mrs. Dillon had the ring in her hand, " *Now, I have given her two wedding rings, she can never get away from me now.*" He stated that he did open up the subject about the new ring, just making a comment about how it happened — how happy Charlotte was with the new ring; that just then Mr. Erlanger spoke to him; *that he could not marry Charlotte in New York, but he did it in the eyes of God in Atlantic City when he gave her that ring;* that he had been asked in the cross-examination if he understood that Mr. Erlanger married once in New York, that he said, " *No sir, I did not know where he was married the first, second or third time until he told me he was married in the eyes of God in Atlantic City when he gave her that ring. I did not ask him where he was married the first time.*" He said that he did not know where he had married the first time, and he took it for granted when the decedent introduced him to Mrs. Erlanger in his own home, the first time he met the lady, that he, the decedent, said, " Jack, I want you to meet my wife, Mrs. Erlanger;" that he thinks gentlemen do that, and that he did not ask him for the wedding certificate. In answer to a further question he indicated *that the Atlantic City marriage had taken place about a month before the last quoted statement of Mr. Erlanger.* When questioned about his opening up an intimate subject with Mr. Erlanger, Dillon stated that the ring was the sequence of what went before it.

The testimony of another witness, *Benjamin C. Riley,* has, I have concluded, an important bearing upon what transpired in Atlantic City in November because of the calibre of the witness, and also because it relates to decedent's illness, the reason for his sojourn at Atlantic City from July to September and to the subject of his feelings toward the contestant. Riley had been in the hotel business in Saratoga all his life, until 1908, from which time he has been in that business in New York city. He first met decedent in 1914, and next met him in the fall of 1928 at Arrowhead Inn, Mr. and Mrs. Erlanger and Mr. and Mrs. Dillon being in the party. There came there at the same time Mr. and Mrs. Jackson, Dr. Philip Grausman. Riley testified that decedent, he remembered, introduced Mrs. Erlanger to all of them as his wife; he testified to seeing Mr. Erlanger in the spring of 1928, or about that time, at Arrowhead Inn; he went with him to a side table in the main dining room and shortly after they were joined by Mrs. Erlanger and Mrs. Dillon. They ordered their dinner, and from that time they came there very often, two or three times a week. Riley stated that he was with them practically

all the time; that he was always with them, and the old gentleman always sent for him to sit at the table; that part of the time he was their guest and part of the time they were his guests, and there were other people with them at times; that he was always with them because Mr. Erlanger always wanted him around; *that Mr. Erlanger told him, in fact referred repeatedly to the time when he was afflicted and to the time that Mrs. Erlanger took him to Atlantic City and nursed him back to health as much as she could; that in referring to her and speaking of her he said, " My dear " or " Mrs. Erlanger."* In speaking of how she had aided him, in what she had done for him, the witness quoted the decedent as saying *that if it had not been for her he would have been dead; that he also said she took him to Atlantic City against the advice of his physicians.* Riley saw the decedent frequently at his office. When asked whether decedent made reference from time to time to Mrs. Erlanger, Riley replied that he often spoke to him, *telling him about how she had taken him to Atlantic City, and it was a great joke that she got him out of the house against the advice of the physicians (594).* He stated that decedent would always bring Mrs. Erlanger and Mrs. Dillon and sometimes Mr. and Mrs. Anderson as his guests; that whenever they would come in, Mrs. Erlanger would go to the table and arrange his cushions and pillows so as to make it comfortable, and when they would sit down at the table she usually cut his food, prepared it for him, put a napkin around his chin, and she was always very attentive; that after the dinner was over she would take a cigar, put it in his mouth and strike a match for him; that they were always very attentive; that he always referred to her as " Dear." Riley said that he sometimes wished that possibly people would be as attentive to him; that he never heard Mrs. Erlanger referred to in any other way than as " Mrs. Erlanger;" that Mr. and Mrs. Dillon were not always but usually with them; that after the fall of 1928, the Erlangers and Dillons came very often; that after the introduction upon the first occasion when decedent was with Mrs. Erlanger at Riley's he remembered at that time he introduced Mrs. Erlanger as " Mrs. Erlanger " to Mr. and Mrs. Jackson; that his wife, Mrs. Riley, met Mrs. Erlanger, met her as " Mrs. Erlanger."

That we may have a fair picture of the whole of the record so far as it relates to the period running from May 4, 1927, until the first week in November (the time of the boardwalk episode); there is here set forth summary of testimony of the proponents' witneses concerned with the events during said months: of Pratt, Anderson, Baron and Cumberson.

*Pratt* remembered that Erlanger after the stroke was away from May, 1927, until the fall; it was his custom to draw money weekly,

invariably $500 a week, and when he was home ill after the stroke Pratt would send money weekly to his house; he did this pursuant to a telephone message from a woman calling him directly, and the message was to send a certain amount, and the voice said, " Miss Lesley." A check would be drawn; the first request to send money up in the above way was before Dillon joined the organization; Pratt would put the money in an envelope, address it to Erlanger and send it up by messenger; and the lady who called in the first instance called every week to tell him the amount to send up to the house; she would generally say, " *Miss Lesley;*" *at this time Erlanger was living at 232 West End avenue.* The same lady *told him to send a check on account of the Ziegfeld Follies of 1927, twice, and he followed directions and sent two checks up for Erlanger's signature; the checks came back and he deposited them to the account that handled the Follies account.* One check dated on *June 16, 1927, was for $50,000, drawn to the order of A. L. Erlanger, special, Ziegfeld Follies of 1927, and the other, dated 7/20/27, was for $30,000 drawn to the same order* (Proponents' Exhibit 283).

*Frank Richard Anderson,* with Erlanger for nearly thirty-five years, first met contestant twenty-five years ago at the production of " Bluebeard " in the Knickerbocker Theatre. She was in other Erlanger plays; he knew her then as, Charlotte Lesley, and he did not know her real name. Omitting such parts of Anderson's testimony as relate to the later period, the following are the salient parts of his testimony as to the period from *1920 to 1927;* he remembered (5250), he said, when Erlanger suffered the stroke, could not recall the exact date, but placed the date in 1930 (*the stroke was in 1927*). At first he became general manager in the *spring of 1930, in March, 1930,* he was not quite sure; in the next answer he stated that it was in the early part of *May, 1929;* and then asked whether that was the year that Erlanger got the stroke, he answered " No," and stated that he thought his stroke happened the following year in February, the year after he became general manager; he insisted that he was, not in error about this, but stated that he had not any exact recollection of the occurrence, of the stroke. Then, asked to tell the year of the stroke, again, he stated 1930, and repeated it (5251); said he visited Erlanger's house a short time after his stroke, at 232 West End avenue, and saw the contestant there; he was there three or four times during this period after the stroke, *and the contestant was present* on all of these visits. There was no introduction of himself to the contestant, nor the contestant to him; Erlanger discussed with him a new house; *Erlanger directed him to get in touch with Warren and Wetmore, the architects; he told him that he had a plot in Garden City, that he wanted a moderate-sized house as a summer home,*

*that he had been living in a thirty-room house and did not want that
sort of a house (referring to the Lawrence house). Anderson consulted
Warren and Wetmore, and negotiated with a Mr. Upton there and got
a set of preliminary plans and took them up to Erlanger at his house*
(Contestant's Exhibit JJ, AA, MM, NN, LL, OO, PP, QQ, RR, SS,
TT, UU, VV). He said that there were two sets of plans, the
original and a revised set; he thought that they consisted of a ground
plan, a second floor plan and possibly an elevator; he recognized
sheets 5, 6, 7, 9, 12 and 13 in Exhibit TT; he said that there were
a number of drawings made after this, apparently; did not recall
telling Upton anything about a Mrs. Erlanger nor tell him to pro-
vide a room for her; when he received the plans from Upton, he
took them up to Mr. Erlanger and left them there; soon after that
Erlanger went to Atlantic City; the matter of the house was not
discussed after that; these preliminary plans were drawn very
hurriedly, after Anderson spoke to Warren and Wetmore; when
asked to fix the time of the year, he could not, but thought *1929*
or the first part of *1930;* was not quite sure about it (the plans were
drawn, in fact, the *summer of 1927*). He admitted that he was
confused about the date. When asked to recall how many years
before Erlanger's death he was stricken with the stroke, he answered
that it was about a year. His memory was entirely unreliable
(5259). When asked about being introduced to the contestant, he
stated that he was not introduced; he had known her for a great
many years. On Erlanger's return from Atlantic City (in Septem-
ber, 1927) *Anderson had dinner with Erlanger twice, in the Ambassador
Hotel; Mrs. Anderson was with him on both occasions, and contestant
was present.* He believed that he introduced his wife by saying,
" Buster "— the nickname of his wife —" This is Charlotte."
He had known her as Charlotte Lesley for a great many years;
sent the contestant flowers, telephoning the order and having the
card written under his direction and directing that the card be made
out to *Mrs. Erlanger.*

The following summarizes that part of Baron's testimony con-
cerning this period: She and Baron discussed the price to be paid,
the terms, and so on for the Garden City plot. The price of the
lot purchased was $40,000. Dillon was named as the purchaser.
(Duplicate contract of purchase Exhibit H-9.) On the back of
contract was a form of assignment of the contract, signed by Dillon,
and underneath that an acknowledgment in type of the signature
to the assignment, dated August eighth (the other duplicate original
was delivered to Hock and associates, the vendors); Baron said that
Dillon signed the assignment, when it was drawn by him; that he
wrote the assignment right on the back of the contract. He said

that Dillon did not ask him at the time of the signing of the paper (this was in the cigar store just after the closing of the contract, in Brooklyn), " Is this for Mrs. Erlanger? " neither in words nor in substance, and that he, Baron, did not say to him, " Yes, this is for Mrs. Erlanger," and that Dillon did not say to him, " She is well deserving of it;" denied such conversation in substance or in words. He said Dillon signed it in the cigar store, right after they finished drawing up the contract, but not in the telephone booth. " *Some little counter was there; yes, after we left the attorney's office.*" Baron attended to the acknowledgment of the assignment; asked Miss Donnelly to take it and she did on August 8, 1927. He said he was in town on August 8, 1927. (There is some question raised about this date by contestant's counsel, due to the dates in the charge accounts at the Shelburne Hotel, where Baron was Erlanger's guest; the charge took in the day running from August eighth to August ninth with certain preceding days.) Baron thought that the charge was an error. (If the charge be correct, it would seem to indicate that Baron was in Atlantic City on August eighth; said he was in town on that date; that he did ask Miss Donnelly to take Dillon's acknowledgment to this assignment.) It seems that when Hock and the vendors learned that Erlanger would take title in his name, they communicated with Baron and stated that if Dillon was not to take title, they would want an assignment and an acknowledgment of the assignment. Dillon signed the paper July 11, 1927; the acknowledgment was taken *August eighth.* Hock's letter dated *August eighth* asked for the acknowledgment (Exhibit 344). Baron attended the closing of the title which was August 11, 1927, and the property was taken in the name of Erlanger by deed, dated August 11, 1927 (Davis and others to Erlanger, Proponents' Exhibit 343). Dillon was not at the closing. Baron was interrogated about Exhibit H-7; the paper is not only important on account of the conclusions which the proponents seek to draw from the fact that the grantee's name in the instrument is *Charlotte M. Fixel,* and because Erlanger is recited as *unmarried,* but also as involving the credibility of both Baron and Miss Donnelly (Mrs. Dillon). Before taking up the testimony it may be well to recall that Mrs. Dillon testified that when she took the acknowledgment of Erlanger to the instrument *it did not have the words* " *unmarried,* 214 West 42d St." following immediately after Erlanger's name in the recital, but that there was *no* " *unmarried* " in it, and that the address given immediately after the name of Erlanger was " *232 West End Ave.*" She further said that at that time the space where the grantee's name now is set forth in longhand, and concededly in Baron's handwriting, *was*

*blank*, there was neither grantee's name nor address. (Of course, if she be correct in her testimony, it would mean that the instrument had, subsequently to her taking the acknowledgment, been altered, that there had been erasures made with respect to the words following " Erlanger " in the first and second lines and the insertion of new matter, and secondly, it would appear that the grantee's name in the form of Charlotte M. Fixel and the address at the " Hotel Shelburne, Atlantic City " were placed there after the paper had been signed, and possibly after the alterations had been made respecting the characterization and address of the grantor.) *Baron answered that he did*, to the question as to whether he had anything to do with the preparation of the instrument; this " something to do with the preparation " was on September 26, 1927; he dictated the contents with the exception of certain portions that were written, to his secretary, Victor Cumberson; that he dictated the opening statement, the typewritten portion thereof, scme of it being in print, viz., " This indenture made the 15 day of August, 1927, between Abraham L. Erlanger, unmarried, of 214 West 42d Street, Borough of Manhattan, City, County, and State of New York." Proponents' counsel asked these questions: " Q. There appears an erasure under ' 214 West 42d Street.' When you dictated it did you dictate to Mr. Cumberson ' 214 West 42d St.? ' A. No, sir. Q. What did you dictate? A. ' 232 West End Ave.' Q. After having dictated that, what did you do? A. I called Mr. Cumberson in and told him to correct it to ' 214 West 42d St.' Q. When you dictated the instrument did you dictate ' Abraham L. Erlanger, unmarried? ' A. Yes, sir. Q. Now, after Mr. Cumberson had written up the instrument, corrected, as you have described, did he bring it back to you? A. He did. Q. When he brought it to you, was the name of the grantee and the address of the grantee on the instrument. *A. It was not. Q. Who wrote in the name and address of the grantee? A. I did. Q. When did you do that? A. Shortly after he brought it to my office. Q. Was that before the instrument was executed by the vendor? A. Before it was executed — yes, by Mr. Erlanger, the vendcr. Q. Before the acknowledgment was taken? A. Yes, sir. Q. Mrs. Dillon, or Miss Donnelly, has testified here that when she took the acknowledgment of the vendor to this instrument, the name of the grantee was not filled in, nor as I recall her testimony that the word ' unmarried ' was there.* Now, were you present when the instrument was acknowledged? A. Yes, sir. Q. And where did that occur? A. That occurred in Mr. Erlanger's room, the New Amsterdam Theatre. Q. Just what did occur? A. Why, I brought the instrument to Mr. Erlanger, and we sent for Miss Donnelly. She

executed it. I don't recall whether she sent outside to put her notarial stamp on or not or whether she did it in the room, but the execution of it took place in Mr. Erlanger's room." This, he stated, was on September 26, 1927. A more graphic description may be had of the testimony if it is literally quoted: " *Q. And at the time when the instrument was given to Miss Donnelly for acknowledgment was it in the exact same condition that it is now, with the exception of her signature and stamp, the recording stamp and the county clerk's certificate? A. And the recording data. Q. And the recording data? A. Yes, registration data.*" While there is an inference here that the answer is "Yes," it will be noted that Baron does not directly answer the question put to him. This was a question that went directly to the point of Miss Donnelly's testimony, to the effect that when she took the acknowledgment the face of the instrument did not have the word " unmarried " next to Erlanger's name and did not have the address, " No. 214 West 42d Street," and, thirdly, did not have the name of the grantee written therein nor the address of the grantee. This colloquy followed: " *By the Surrogate: Q. Why wasn't her name typed in the same as the rest of the instrument? A. Your Honor, I knew the relations between these parties, and I knew — it was my judgment, as I was going to have this instrument publicly recorded, it was my judgment it would not be wise — you mean as to my writing in her name? I didn't want to take my office into my confidence. Q. Is that your only reason? A. Oh, yes, absolutely, and that is the fact. Q. What did you think I asked you when you gave the first answer? A. I thought you asked me as to why I came to that conclusion, why my — why I decided that, why my judgment was to ——. Q. I did not ask you about your judgment. A. I ——. Q. I asked you why her name was not typed in when the rest of the instrument was typed. A. I now understand your question, your Honor, and my answer is, I did not want to take my office into my confidence. Q. In what respect? A. As to —I did not want to insert a name that would lead them to make any inference with respect to the relations between these two people. Q. Which two people? A. Mr. Erlanger and Miss Fixel.*" At this point Hock appeared with the contract, which had Dillon's assignment on it. The witness recognized the assignment as signed by Dillon and the acknowledgment (Proponents' Exhibit 345). Baron proceeded to testify and said: " Q. After this deed from Mr. Erlanger to Charlotte M. Fixel was handed to Miss Donnelly for her acknowledgment, when next did you see the instrument? A. On October 30, 1927." He then changed it to October 31, 1927. From this answer it would appear that Baron did not see the instrument until it was sent to him by the contestant, who

telephoned to his apartment and told him she was sending in Mr. Denni with the deed, and to please record it for her. He said he sent it to the county clerk's office to get the county clerk's certificate covering the authority of the notary and that then he forwarded it to the title company for recording. Baron visited the Erlangers at Atlantic City while they were there during the summer of 1927, on three occasions, the week-end of August fifth, the week-end of August nineteenth, the week-end of September second. *When he visited Mr. Erlanger during his illness following the stroke at No. 232 West End avenue he saw the contestant there, and when he visited him in Atlantic City during his illness he saw the contestant there. During one of the visits at Atlantic City he recalled a conversation with the contestant on the old iron pier; no one else was there.* It was on the pier off the boardwalk. Counsel asked him to tell the conversation, and after a statement of the conversation counsel asked: *" Is this all of the conversation as you recall it? "* And Baron answered, *" Yes, sir."* This is the conversation: *"A. Why, the contestant said that one of the ambitions of her life was to get the protection of Mr. Erlanger's name, and she turned to me and she said in substance, I am not attempting to give you the exact words, 'Don't you think, Saul, that Abe ought to give me the protection of his name?' I said, 'Charlotte, that is not for a lawyer to say; that is for the man himself to say.' Then she went on and said whether Abe did or did not give her the protection of his name, that she felt so honored and happy in her association with him that she would never do anything to attack his memory."* It will be noted that Baron said this was all of the conversation. Baron said he was not in Atlantic City on the twenty-seventh day of July; he said that what Dr. Marshall had stated in his conversation about meeting him and about Baron telling him he wanted him to attend Mr. Erlanger, and that Mrs. Erlanger knew all about the case, and that she would tell Dr. Marshall all about the case, and that he then introduced the contestant to Dr. Marshall as Mrs. Erlanger — did not occur at all; that he was not there on July twenty-seventh. He further testified thus: " Q. Did you meet Dr. Marshall in the hotel, there or anywhere else, and introduce him to the contestant? A. *I did not."* By the surrogate: *" Did you meet him at all? A. Yes, sir. Q. How many times? A. I met him on each of my visits at Atlantic City. Q. Did you talk with him? A. Yes."* Baron again contradicted Dr. Marshall's statement that he met him on only one occasion, Baron saying that he met him on more than one occasion, and that he met him on each of the occasions when he went down to visit with Mr. Erlanger, saying that sometime or

other during those week-ends he saw him and spoke to him. In reply to three questions put by the court (5879) Baron contradicted absolutely and for all the time he was there the testimony of Dr. Marshall. Baron made the broad and general statement that at no time did he have such a conversation with him (Dr. Marshall), nor did those incidents take place. The examiner brought up the testimony of Mrs. Lavner, that she had met Baron on an occasion in Atlantic City. He said that he met her and that the contestant was there; that he and contestant were sitting in the lobby of the Shelburne when Mrs. Lavner came up and she embraced contestant, and said, "Why, Lottie, I didn't know that you were Mrs. Erlanger. When were you married?" And the contestant said, "Last year;" that then they went on and talked and he volunteered to leave them, they both protested there was no occasion for that; they kept on, had a little visit and talked for an hour and a half or two hours, and when it got time to retire he volunteered to take Mrs. Lavner to the hotel and she said she was only stopping a couple of blocks below the Shelburne, etc.; that after Mrs. Lavner went contestant and he were alone, and the contestant turned to him and said, "Solly, what could I say when she asked me 'when I was married?' I said, 'I think you did the right thing, Charlotte.' She said, 'What she does not know won't hurt her.'" *Baron's statement is at variance with Mrs. Lavner's as to things that were said and done at the time of that meeting. The next witness of the contestant whom he contradicted is Mrs. Stehle.* He admitted that he met Mrs. Stehle when he was with Mr. Erlanger and contestant riding in a wheel chair on the boardwalk, Mrs. Stehle and her mother, Mrs. Stoy; he recalled a third lady with them, and that Mrs. Stehle came over and that he (Baron) was introduced to her; that then the contestant and he got out of the chair and he was presented to the other two ladies (contradicting Mrs. Stehle). "There was no such conversation as Mrs. Stehle testified to, as 'Auntie,' or whatever it was, 'This is Charlotte, you know Charlotte, she is now Mrs. Erlanger.' There was no such conversation. The whole thing lasted about a minute or two, our whole meeting." (So far, we find Baron contradicting Mr. Dillon, Mrs. Dillon, Dr. Marshall, Mrs. Lavner and Mrs. Stehle.) Baron identified the copy of a will which has been offered for probate in this proceeding. It was offered in evidence (Proponents' Exhibit 348). He was asked about a prior will, whether he had drawn a will before; he said in 1925, and that *when the 1927 will was drawn the other one was destroyed.* He was questioned concerning the matter of drawing up her will, two wills for her; objection made was sustained. Baron said he used

to go riding with Erlanger on frequent occasions, since the fall of 1927, almost daily, except the days when either he was not in town or not at his office. Baron said when Erlanger went abroad or went to California, " I spoke to him as to his family coming down to see them ———." He said he did not want them to come down, as he did not want them humiliated by the contestant, by the presence of the contestant. Baron and Judge Erlanger were given powers of attorney when Erlanger went to Europe in 1928, and the keys of the vault were left with him when Erlanger went abroad in 1928 and 1929, and when he went to California also. *During Erlanger's last illness, when he was confined to his room on Riverside drive, Baron was informed through Dillon, viz.,* "A. It was matter involving the adjustment of some properties and moneys in the City of Philadelphia between the Stanley Co. of America, C. B. Dillingham and Mr. Erlanger," involving almost a million dollars. The information as to the transaction was communicated to Erlanger through Dillon, who told Erlanger that the contract was ready for execution on his terms, and to give his instructions with respect to its execution. Dillon reported Erlanger was delighted, and that Erlanger told him (Baron) to go ahead and sign the contract. *He was kept informed as to Erlanger's condition during his last illness through Mr. and Mrs. Dillon; learned of Erlanger's death through Mr. Dillon.* He said that he heard the contestant addressed as Mrs. Erlanger; he heard Mrs. Lavner address her as Mrs. Erlanger; he heard the butler, Walter During, address her as Mrs. Erlanger, and the waiters down at the Shelburne Hotel, when he was there. He said he never addressed her as Mrs. Erlanger. He did not introduce her to anybody as such. Mr. Erlanger did not in his presence ever refer to her as Mrs. Erlanger. Sent Christmas cards to Mrs. Erlanger in 1924, 1925, 1926, address-ing her as " Miss Charlotte Lesley;" received Christmas cards from contestant signed " Charlotte Lesley." *He never received any cards* from her after 1927. He said that in 1929 he received an offer for the sale of the Lawrence property, but Erlanger said he was adverse to selling the property; that it was a large house, and there was where he hoped to end his days, with his brothers and sisters. (This property Erlanger deeded to his sister, Ray, in 1922.) Baron said this is correct, but that he exercised control over the situation. Upon cross-examination (5945) Baron stated that he renounced his executorship " yesterday," which meant December 29, 1931. (The trial began October 19, 1931.) He said it was not until about a week ago that any suggestion came up about his renuncia-tion. He admitted that one of the reasons why he was appointed temporary administrator was that he had been named as an

executor or offered to qualify as executor. He said he had no intentions at that time of renouncing the executorship; the intention was born recently; he met contestant first March 9, 1924; he knew that was Erlanger's residence; he met her there; at that time he did not know the contestant or anything about her; he knew that she continuously resided at No. 232 West End avenue and No. 175 Riverside drive; he knew that she lived at No. 232 West End avenue down to July of 1927, and that she lived at No. 175 Riverside drive beginning either November or December, 1927, down to and including the date the temporary administrator got possession of the apartment; that there was never a time when he did not know where she resided after March, 1924; that he does not recall who was Erlanger's butler on Thanksgiving Day, 1924; he dined at the West End avenue house five or six times; during Erlanger's illness visited him several times; after Thanksgiving of 1924, his next recollection of a dinner party is December, 1925, though there may have been a dinner party in between, he was not sure. He would not say that he attended more than one dinner party; fixed the first dinner party he attended as December, 1925; he did not recall that the ring was delivered in December, 1924; he attended a dinner when Mrs. Clark was there; had a recollection he dined with Mrs. Clark and Mr. Erlanger and contestant; he did not remember a cake that was brought in at the dinner; did not remember seeing " Mrs. Erlanger " on the cake; he was at a birthday party, it was in 1925, that was his recollection; he did not recall Albert Knipping, the butler; he did not see Albert bringing in the cake with the inscription on it, " Western Union Telegram to Mrs. A. L. Erlanger, 232 West End Avenue, New York City. Happy Birthday, from Albert." He remembered contestant's Exhibit S-2, which the representative from Tiffany's testified was the receipt for a ring and identified in the ring the number on the receipt. He recognized A. L. Erlanger's handwriting on the receipt for the ring, observed that it was on December 1, 1924; he remembered Erlanger wore a ring, and shown the ring in evidence he said it looked like the ring he wore, it looked as much like the ring he wore as any ring he could think of; he could not tell when he first saw him wear the ring or when he last wore the ring; he knew he had a ring on some time or other; he had seen his watch, but he never saw it opened; never saw the photograph inside the watch. He contradicted Betty Gallagher (5962, 5963). As to his memory — " I do not recall," and " I won't say he did," were frequent expressions. The charge account of the Shelburne Hôtel showed that (5968) Mr. and Mrs. Erlanger were charged for his being there on the eighth to the ninth (Baron's

records do not show an assignment acknowledged on August eighth). The Dillon assignment was acknowledged on August eighth. His tickler had no entry showing such an acknowledgment. On September — (5975) he said he dictated the date "August 15," but asked to explain the purpose for so doing he says *" the purpose was this, I was conveying the property from Mr. Erlanger to Miss Fixel, and as I knew the situation between the two and as I knew that this deed was going to be recorded, I wanted to fix an address that was not a common address between them, and I picked Atlantic City, where I knew her to be, and I fixed the date as near the* date of the original closing as I could, and picked August fifteenth; there was no ——." (The original closing, that is, the closing of the deed to Erlanger, vendee, was August eleventh; he said he did not dictate the acknowledgment, yet he admitted he was the one who got the acknowledgment. See Cumberson's testimony as to what Baron told him to do with respect to this acknowledgment.) Baron told his secretary to prepare an acknowledgment, yet he said the deed and the acknowledgment escaped his notice. Baron thus attempted to put over on Cumberson the false statement of the time of the acknowledgment, and at the same time he tried to justify the practice of the misstatement of the date in the deed and in the date in the acknowledgment (5976). *Baron declared that where the word " unmarried " was in the deed there was not an erasure; yet Cumberson admitted that there had been, when he examined the deed on the witness stand; and an erasure is plain to anybody inspecting the paper.* When the question was put to him again he stated he did not know what the examiner meant by an erasure; he repeated: " I do not know what you mean; " and then said that he did not think so, when asked if where " unmarried " now appears there was not something else written which was erased. In the face of what was brought out on the witness stand (5979), he declared that he did not ever know now whether —— " There is nothing there that indicates to me there has ever been an erasure." He reiterated this statement, and then tried to soften the effect of it somewhat in his next answers. In other words, Baron denied what is plain to the naked eye. *It should be noted here that he has admitted that there was an erasure of the address, No. 232 West End avenue, which was originally in the instrument, and which conformed to the address set forth in the contract for purchase, which preceded this deed.* In an application made in a preliminary proceeding for the appointment of temporary administrators, *where it was urged that the contestant knew that Mr. Erlanger was unmarried, by reason of this paper, this deed (Exhibit H-7), Baron did not inform the court of any changes that*

had been made in the deed; Baron said on the *witness stand:* " *There is nothing false about the date of the deed,* August 15th " (5983). Baron emphatically asserted that where the word " unmarried " is he did not know it said " 232," viz. (part of the original address and immediately following the words "Abraham L. Erlanger."). He admitted knowing on September twenty-sixth when he stated he drew the deed, that the Erlangers were living at the Ambassador Hotel, and that she was not at the Hotel Shelburne on September twenty-sixth. He said he could just as well have used some other address, the Ambassador. As to his reason for dating the instrument back to August fifteenth and fixing the address of the grantee at the Hotel Shelburne, he stated: " *It was my judgment, knowing the relations between these people, and as I knew that the instrument was a matter of public record I did not want to use a common address,*" *and when he was down in Atlantic City,* " *I was told by both the contestant and Mr. Erlanger that they were not going back to No. 232 West End avenue, so that I picked — I choose his office address, which I knew was his permanent address, his address, and I picked Atlantic City, where I knew she was on August 15. My judgment may not have been good, but that was my reason.*" He again offered (5986) explanation of his not typing the grantee's name in, but writing it in in longhand, stating that he did not want to take anybody in his office into his confidence, that it was a personal private matter, etc., and yet when shown a *letter dictated* later to his secretary that disclosed the name of the grantee, " Charlotte Fixel," he made answer: " But that was September [the dictating of the deed], and this [letter] was November." And when the examiner asked " *It was different in November?* " he replied cryptically, " *Yes, my whole attitude in the situation changed by that time.* Q. You did not want to keep them confidential in November? *A. I was not concerned, no. Q. It was only in September you were concerned? A. That is correct.*" When Baron was asked what was the reason and what change be made in the second line of the instrument so as to require it being scraped out, he spoke about his dictating, and his later correction of the dictating, and ends his answer with saying, " What he [Cumberson] did with respect to the erasure, I have not the slightest idea." He finally stated that the only man he was trying to keep it confidential from was Cumberson, the secretary. He said he did not know at the time of the selection of the Garden City property plot that it was intended for the contestant, yet (5994) the plans for the villa were ordered in July, and " Mrs. Erlanger " was in the plans (5993); " The plot that she picked was the one that was bought; " he said that he assumed that the contestant was to live

in the new house and that Erlanger was to live in new house; that it was after Erlanger returned from Atlantic City that he knew that this property was to be conveyed to the contestant, and that he did not know until then; that he had discussed the conveyance to the contestant with Erlanger a few days after Erlanger's return from Atlantic City; that it was at the request made to him by the contestant around October 31, 1927, that he had the instrument recorded; that there is no record in his tickler of this telephone message from the contestant. Concerning renunciation of the executorship under the propounded paper on the date before he took the witness stand, which was December 30, 1931 (6056), he stated that *his purpose was to prevent the opening of the door to the contestant's testifying on those matters to which he testified;* in other words to preclude contestant from testifying as to those matters concerning which he did testify. *Baron said he dictated the paper dated December 3, 1924* (*Proponents' Exhibit 339*) *and that he is the person* (*6070*) *who is responsible for the form in which this paper is. In this connection certain correspondence between Messrs. Steuer and Kresel was offered in evidence* (*Exhibits F-14 and G-14*). The propounded paper was dated *October 18, 1927.* Baron said he did not know that on the day before, Bergman, the general manager, a nephew of the decedent, had made a reservation for *Mr. and Mrs. A.L. Erlanger* at the Hotel Shelburne. He said that he did not know how far Mr. Erlanger took his nephew into his confidence, but he was general manager at that time. (The hotel wrote to Bergman, No. 214 West Forty-second street, among other things, that " Pursuant to your telephone request of this morning we beg to confirm arrangements made for Mr. and Mrs. Erlanger * * *. We shall be glad to arrange to have a porter meet the one o'clock train with a private conveyance on November 2 for Mr. and Mrs. Erlanger.") He admitted that he had not at any time produced an affidavit of Bergman, denying that he had received such a letter. Another letter produced from the Erlanger file from the Hotel Shelburne management, dated October 18, 1927, stated, among other things: " Pursuant to your telephone communication with our Mr. Tate to-day, we beg to advise you that we have changed the date of arrival of Mrs. Erlanger to November 1, from November 2." No affidavit of Bergman has ever been filed denying that he received such letter; moreover, Bergman was available during the trial of this action and was in court during part of the trial. *When asked if from the time that contestant said to him that her ambition was to get the protection of Mr. Erlanger's name, the parties spent every day and night together, Baron replied that he could not say from his own knowledge, but that he assumed that is true, and that he certainly does not know anything to the con-*

*trary.* He further stated that *outside of the few days when Erlanger was at his brother's home in East Seventieth street, in February, 1930, he did not see the decedent in any residence, day or night, where the contestant was not.* Baron said he did not see the Erlanger divorce decree until October 27, 1927. He admitted that in August he knew it was a New York decree, and that marriage contracted in any other State would be valid, in spite of the provisions of the decree. He admitted that while talking with contestant on the pier he knew the contents of the divorce decree; *yet he said he did not tell Mrs. Erlanger in the conversation on the* pier that the New York courts recognized as valid a marriage contracted in another State by a person inhibited from remarrying by a decree of divorce made by a New York court. Baron agreed that everything that Mrs. Stehle said with respect to the incidents on the boardwalk, where she and her mother and another lady, a relative, met Mr. and Mrs. Erlanger and Baron, took place, except that she said to one of the ladies: " Do you know Charlotte? She is Mrs. Erlanger now." He did not read the list of departures in the papers in 1928 on the 1928 trip when Mr. Erlanger went to Europe. Baron did not find out how his principal client was recorded in the census of 1925 (Contestant's Exhibit J-14). Baron did not recall speaking to Mrs. Dillon about the departure of Mr. and Mrs. Erlanger the day after the sailing in 1928, nor did he recall Mrs. Dillon telling him about the dinner party on board. *Baron was sure that he did not say anything to her (contestant) in the pier conversation about the illegality of any marriage contracted by Mr. Erlanger in New York.* Baron said that there was not any talk between him and the contestant in 1927 about how she could get to be an Erlanger (6127). He was asked again whether, in view of the answer he had just made, he did at Atlantic City in 1927 tell her what in his opinion was the only way that she could get the right to lawfully use the name of Erlanger; and he answered, " No, sir." Then ensued the following colloquy: " Q. Did you speak with her on that subject? A. On what subject? Q. The subject of her getting the lawful right to use the name of Erlanger. A. She spoke with me. Q. Was it a monologue? A. No, she — Q. Did you speak with her on that subject? A. Yes, sir. Q. Where was it you spoke to her on it? A. In the room at the Shelburne Hotel, and during that conversation at the pier that I referred to. Q. You did speak to her then in that conversation on the pier on that subject? A. Oh, yes. Q. You did not understand that I had been asking you time and time again whether, in the conversation on the pier, you said — you told her how she could get the right lawfully to use the name of Erlanger? A. That is exactly as I

understand your question, but that was not my talk with her. I was not telling her how she could get the use of the name Erlanger. Q. You were not telling her? A. No. Q. You made no suggestions to her on that subject? A. No, sir. She discussed a proposition with me. It was her suggestion." *At this point it developed that the witness' statement previously made of this conversation which had taken place between him and contestant on the pier had not been entirely told; he admitted that he did not tell the whole of it, taking refuge behind the statement that he was only responding to the questions put, and that was why he omitted to tell the whole of the conversation. He claimed that the question only called for part of the conversation.* Baron undertook to justify his failure to tell all of the conversation (6129–6136). The paper in the matter of the adoption of Charlotte M. Fixel was marked in evidence, contestant's Exhibit L-14. His tickler has no record of this having been drawn. He said that he prepared the paper (the consent) as the result of the conversation that he had with her in the rooms at the hotel. " By the Surrogate: Q. Mr. Baron, why didn't you say when you were on the stand anything about the conversation in the hotel on this subject that preceded, led up to the conversation on that subject on the pier? A. I felt, in view of your Honor's rulings, that it would bring in Mr. Erlanger in the conversation, and, if I may be permitted to state this thing in my own way — Q. Was he in the conversation in the hotel? A. He was in the room, yes. Q. Within the hearing of the conversation? A. Yes, sir; and if I may be permitted to state the entire situation or transaction, from the beginning to the end — Q. I did not ask you that. I have in mind that *you are a lawyer. A. Yes, sir. Q. While on the stand here, a witness subjected to examination, you are a lawyer? A. Yes, sir. Q. And a lawyer of the decedent? A. Yes, sir. Q. And that you are an officer in this estate still? A. Yes, sir."* The paper which purported to be a consent to an adoption, set forth on page 6144 of the record, was marked contestant's Exhibit L-14. It is to be noted (1) the paper was blank as to date; (2) was blank as to the name of the adopting party; (3) was blank as to the acknowledgment; (4) the conversations with contestant upon this matter began around August nineteenth, and Baron says he prepared this paper on the fourteenth or fifteenth day of September. When questioned whether in the preparation of this paper he did not know the name to be filled in the blank, he makes several contradictory answers as follows: "A. I knew there was no name going to be filled in the blank. I had no instruction or information on the subject. * * * A. I was waiting for instructions, Mr. Steuer, with respect to this whole matter." .Baron said he gave the three papers to

Erlanger upon his return from Atlantic City. After Baron's testimony, Victor Cumberson, his secretary, was called to the stand. Before considering his testimony, it is well to recall that Mrs. Dillon testified definitely: (1) That when she acknowledged the deed H-7 of the Garden City property, Erlanger to Fixel, the opening lines of the deed did not recite: "*Unmarried, of 214 West 42d St.*" (2) There was no name of a grantee in the deed, but the space right after the recital of the grantor was blank; (3) that immediately after the name "Erlanger" followed the words, "232 West End Ave., Borough of Manhattan," etc. As the instrument was recorded and as it stands at the present time, it recites after the name, "Abraham L. Erlanger" the words "*unmarried, of 214 West 42d St., Borough of Manhattan,*" etc., and has after the name of the grantee in longhand "*Charlotte M. Fixel, Hotel Shelburne, Atlantic City, N. J.*" This testimony if true and accurate would mean necessarily that an erasure or alteration has been made in the first and second lines, and that instead of what was there at the time when Mrs. Dillon took the acknowledgment of Erlanger's signature, there had been inserted following the erasure the words, "*unmarried, of 214 West 42d St., Borough of Manhattan,*" etc., and that the *name of the grantee had also thereafter been inserted in longhand, as above set forth.* This, briefly, was the state of the record when Baron took the stand. *He admitted that there had been a change in the recital above described after it had been typed, but confined his admission of the alteration and change to the space of the address only, insisting that the only change and the only insertion were the words "214 West 42d St., instead of 232 West End Ave."* He stated that he had written in in longhand the name of the grantee. We will not pause at this point to discuss all of the matters that were brought out in his direct and cross-examination. The instrument is dated August 15, 1927, and the acknowledgment bears the same date. *Mrs. Dillon testified that Erlanger was not in New York during the latter part of July, the whole of August, and part of September. In her direct and cross-examination she said that Baron had brought the instrument to her for acknowledgment, she was not sure of the date, but she said she knew it was while Mr. Erlanger was in Atlantic City.* Without going into detail it may be noted that he insisted that at the time Mrs. Dillon had taken the acknowledgment the face of the instrument was just the same as it is to-day, with the words "unmarried, 214 West 42d St." following Erlanger's name, and the grantee's name in longhand writing, as it stands to-day. Cumberson, his secretary, produced his stenographic notebooks upon the stand, and an effort was made to confirm Baron's testimony, both as to

the time the instrument was prepared and executed (September 26, 1927) and also as to Baron's disclaimer against any alterations or erasures having been made, except to the limited extent of substituting " 214 West 42d St." for " 232 West End Ave." Cumberson testified to having typed the deed H-7, upon his typewriter, after taking dictation from Mr. Baron on September 26, 1927. *The description of the property in the deed was not in his notebook;* he said that he took that from a title policy of a title company. He proceeded to read from his notes as dictated, he said, by Mr. Baron, the beginning of the deed: " This indenture made the 15th day of August, 1927, between Abraham L. Erlanger, unmarried, of 214 West 42d St., Borough of Manhattan, City, County and State of New York, and—— " he explained that the " 214 West 42d Street " was written in his notes above the address, 232 West End avenue. Counsel asked him if he observed an erasure over which is written " of 214 West 42d St.," to which he answered " Yes." And then counsel asked him if he recalled how that erasure came to be made. After the court had called attention of counsel and the witness to the fact that the erasure extended further and to the left of the address and immediately after the grantor's name, Cumberson stated that the change to the address " 214 West 42d St." was done under Baron's instructions, that he had started to typewrite the deed and had gotten quite a ways down in the description when Baron came into his office and said, " Change the address from 232 West End Ave. to 214 West 42d St.; " and he said that he thereupon changed, *merely erased* 232 West End avenue, and inserted 214 West Forty-second street. He testified that Baron told him to put in the regular form of acknowledgment, and that when he came to type the deed he filled out the acknowledgment as it now appears upon the back of the deed; that *after he typed the deed, he turned it over to Baron, and that when he turned it over, the space where now appear the words " Charlotte M. Fixel, Hotel Shelburne, Atlantic City," was blank.* He explained that in his stenographic notebook the pages were not numbered, and that he put the day and date when he commenced each day on the bottom of the page, when beginning a day's work on a given page; that the date of the day does not appear except at the bottom of the page. He pointed out to the court where he had written at the bottom of a page in his notebook " Monday, Sept. 26, 1927." As to the next date, September 27, 1927, it appeared, upon the inquiry of the court, that he did not follow this rule as to September twenty-seventh, making the answer, " This I do not quite understand why that is there," and further, " Yes, I do not understand why; it must have been that I put

that memorandum, meaning that probably I had no room — for some reason * * * not in that case, how that happened, I cannot explain how * * *." *When the deed was turned over to Baron by Cumberson,* there was no pen-writing at the space where the name of the grantee is inserted, where the words now are " Charlotte M. Fixel, Hotel Shelburne, Atlantic City; " that was blank when he turned it over to Baron. He said in his notebook he had a memorandum that Mr. Baron returned from Atlantic City on the morning of August eighth; said that Baron dictated a memorandum in his notebook on August 8, 1927. The witness pointed out a memorandum in Mr. Baron's tickler to the effect that on September twenty-sixth Mr. Baron prepared a deed for Mr. Erlanger on the Garden City estate matter, title No. 2907437. " These premises were conveyed to Mr. Erlanger by Thomas J. Davies, unmarried, George Schmidt and Adele Schmidt, his wife, and Benjamin T. Hock, unmarried, by deed dated August 11, 1927." Cumberson said that he made this entry from his shorthand notes (6260). These few questions ended his direct examination, at which point there was no attempt at an explanation by this witness of the erasures made on the first and second lines of the deed. It should be noted here that while Mr. Cumberson in his tickler memorandum, taken as he says *from his stenographic notes, is punctilious in the mentioning of Davies as unmarried and Hock as unmarried, two of the grantors to Erlanger, he makes no mention of Abraham L. Erlanger, unmarried, in this same memorandum, which he said* was taken from his stenographic notes. Cumberson again declared that the erasure made by him in the first line began at the word " of," and when asked whether he did not start the erasure where the word " unmarried " is written now, he answered: " *No. I have no recollection of having touched that at all. No, I did not.*" And then when pressed with the question, " Do you tell his Honor that where the word ' unmarried ' is now typed there was no erasure? " he answered, " Let me look at this." And then after being told to look at it carefully, he replied: " There seems to have been an erasure there." He then testified that the erasure he made on the address was made with a typewriting rubber; that naturally in erasing he always endeavors to erase everything that is there; he was asked what was under the word " unmarried," where " unmarried " now is, when he started the erasure, and he replied that he could not see anything to indicate what was there. He repeated that he could not see anything to indicate what was under the word " unmarried; " that he had no recollection of himself having rubbed out " unmarried." When he was asked if he did any *erasing on the second line, he answered that he could not*

*recall having made any erasure on that line.* (Baron also declared there was no erasure on that line, and in fact would not admit that there was any erasing where the word "unmarried" is.) When Cumberson looked at the paper through a magnifying glass, he said: "Yes, I see that there is an erasure * * *." On being asked to indicate where it begins and where it ends on the second line, he answered it begins with "Borough," that the erasures are on "*Borough of Manhattan, City, County and State,*" and asked where the word "State" ended, he stated that he had no idea what was written before the erasure; and when directed to look again and see whether he could not recognize the letter of the last word of the erasure, he stated that he could not tell from this what that letter is between the words "State" and "of;" that he saw the remnants of a letter there, which he could not discern. When asked to look at it closely and see if he did not discern remnants of a "K," he answers: "It looks as though it could be a 'K,' but it is very, very indefinite." He used a Remington typewriting machine, and when queried about the form of the deed H-7, he stated that it looked very much like a document that Baron carried in his files. He said that the printed word "between," on Exhibit T-14, for id., is identical with the same word on H-7, and that "Abraham L. Erlanger" begins at the same point on both documents. *He again admitted (6270) that it appeared there had been an erasure on two lines of H-7. He stated it definitely, said it was perfectly clear to him on the two lines; and he admitted typing into the deed, H-7, the words " of 232 West End Ave., Borough of Manhattan, City, County and State of New York," and using precisely the same spacing and the machine that he used in typing H-7 would have brought him to the end of where he says the erasure was, that is, at the point where the remnant of the letter ' K ' is.* Cumberson said that he made that erasure on Mr. Baron's telling him to change the address from 232 West End avenue to 214 West Forty-second street; that Mr. Baron came into his office while he was typing the deed. *Cumberson again stated that if the words in H-7 had been "Abraham L. Erlanger of 232 West End Ave., Borough of Manhattan, City, County and State of New York," these words would have ended exactly where the erasure in H-7 ends.* He again stated that the description of the property in the deed he secured from the title company policy. Then he changed this testimony, admitting an error, and stated that the description in H-7 he took from the deed of the same property to Mr. Erlanger. Again he was asked if he made an erasure on the second line of the deed, and he answered that at this time he could not recall making any erasure except the address; that is all that he could recall making at the time that the deed

was written. Again he stated that the only thing that he erased on the deed was " 232 West End Ave.; " that the erasure he made was on the first line; that he has no recollection of having made such a figure 8 as that on the second line which takes in about two-thirds of the second line; he again stated that he had no recollection of having erased that second line at all; he admitted that the type in there appeared to be the same as the type in the rest of the document. He stated that these lines are typewritten matter and not printed, that as it stands now it is typewritten matter and appears to be in the same type; that he had compared it with a magnifying glass, letter by letter, with other parts of the deed, and after such a comparison he stated that the type appears to be the same; that it looked identical with the other type. He admitted that he wrote in what is there now, the address *214 West Forty-second street, borough of Manhattan, city, county and State of New York.* When asked whether the writing of the second line was before the erasure was made, he answered that they had to be written in there after an erasure was made, but stated that he had no recollection of having typed that second line. He stated that the whole of the address was written by him from all appearances; his recollection was that the entire thing, " Borough of Manhattan, City and State of New York," was written by him; yet he had no recollection of making any erasure on the second line, but could see from the paper that some erasure had been made. Again he stated that he could see the erasure had been made on the document. He repeated twice that he could not remember making any erasure on the second line. He declared that somebody erased what had been written, and wrote in something else. He said that the second line was blank when the document went into the machine, that he certainly did not recall ever having erased the second line; and he reiterated the statement that the only changes he made in the document were the number and the street; he again admitted that where the word " unmarried " now is there was an erasure. He admitted further that something had been written there where the word " unmarried " now is, from the appearance of the document (6284). Again he admitted that beginning with the word " unmarried " he saw the erasure, and could recognize that there was typewriting other than that which he had made in these two lines, and said *that it would not have been physically possible for him to write what is now in the deed, H-7, that is, the first four lines, and finish it at the word " State; " it could not be done; and that if it was simply written "Abraham L. Eranger, of 232 West End Avenue, City, County and State of New York," it would have ended exactly where the erasure ends; further stated that there appeared to be no*

*erasure under the words " of New York."* He described how Mr. Baron dictated the matter which went into the deed, and said Mr. Baron said: " Put in the acknowledgment." In redirect it appeared that the statement previously made by Cumberson that he had taken the description of H-7 from a deed (Exhibit 343) was an error. In their effort to rebut the proofs offered by the contestant, particularly the evidence adduced as to the agreement of marriage in Atlantic City in the first week of November, 1927, they have called to the stand comparatively few witnesses, apparently relying in the main upon such force and effect as may be given to certain documentary proofs. Their greatest stress, it may be gathered from their argument, is based upon (1) the deed, dated August 15, 1927, from Erlanger to Fixel (Exhibit H-7); and (2) the propounded paper, dated October 19, 1927; each of these instruments has been carefully considered, and, in the light of the circumstances described in the testimony, carefully weighed and balanced with the proofs presented by both sides, both with respect to the documents and with respect to acts, declarations and transactions of the decedent and the contestant, contemporaneous with the execution of them. (1) Referring to the first, the deed, Erlanger to Fixel, it may be noted that the testimony of all the witnesses having to do with the preparation, execution and recording of this paper is very important; proponents laid great emphasis upon what they assert is a written declaration by Erlanger on *September 26, 1927* (the deed is dated August 15, 1927), that he was then unmarried, yet they have failed to satisfactorily explain when under what circumstances the alterations were made in the first and second lines of the recital in that deed, and why and when the name of the grantee, Charlotte Fixel, Hotel Shelburne, Atlantic City, N. J., was penned in that instrument by Baron. They stress this claimed declaration without frankly disclosing how and when the word " unmarried " came into the document. Cumberson, under cross-examination, was driven to admit that the alteration in the first line included not only the space used by the address but also the space occupied by the word " unmarried." He denied that the second line was altered, and when closely questioned and shown the instrument under a magnifying glass he was compelled to admit that the second line also had been altered. Because of these and further answers wrung from him, the conclusion is inescapable, not only that both lines had been altered, *but that they had most probably been altered for the purpose of finding a space within which to put the word " unmarried " after Erlanger's name.* Moreover, Baron's answers in attempting to explain why he did not dictate

and why he did not have typed in the instrument the name and address of the grantee at the time the rest of the instrument was being typed, and why he reserved that space to afterwards insert in his own handwriting the said name and address, *were entirely unsatisfactory*, just as was *his refusal to admit that there had been an alteration on the first line in the space occupied now by the word " unmarried," and secondly, to admit at all that there had been an alteration made in the second line*. Moreover, he failed to take the stand and meet the admissions that were made by his stenographer, Cumberson. The presentation of Cumberson's stenographic notebook and his attempt to explain the notes made therein, and the manner in which he kept the day and dates of particular dictations were *confusing and unsatisfactory, as proponents' failure to offer his* stenographic notebook in evidence was significant. Add to the above facts and conclusions the fact that Baron was a highly interested witness (notwithstanding the fact that he renounced his executorship under the will a day or two before he took the stand), his legal fencing with the examiner on the witness stand, his withholding information called by questions put to him, his continued attitude of the astute lawyer in the witness chair, and the result is the envelopment in doubt and in confusion of the instrument in question, *so far as the contention is asserted that in it the decedent intended to and did with distinct purpose declare himself to be unmarried at the time he signed that paper*. (2) Though this trial of the issue of status is *preliminary* to the actual procedure to secure probate of the propounded paper, *proponents stress the recital of " unmarried " in that paper which is dated October 19, 1927, as weighty proof of a declaration by Erlanger that he was " unmarried "* at the time of the alleged execution of said paper. While the paper was offered and received in evidence, *how and when and under what circumstances decedent signed the propounded paper have not been in any manner disclosed*. The probate of that paper is a proceeding to which this trial is preliminary and incidental, it being necessary for contestant to establish her status before being eligible to the contesting of said probate. Whether or not testator gave instructions for the drawing of the paper as it is drawn, whether he read it and each of its pages before he signed, when and how and under what circumstances he executed it, if he did, whether it is the same paper throughout that he signed, if he did, are all matters to be determined at some later day, and they in fact must be tried out before it may be fully decided whether the paper shall be admitted to probate in any event, and what probative force is to be ultimately given to said paper. II. I hold that the words used by decedent in the presence of and with the acquiescence of contestant and in the

presence of Mrs. W. H. Conger and her mother, Mrs. Stoy, after reference was made by Mrs. Conger to the ring (Exhibit G) on contestant's finger under all the surrounding circumstances constituted an agreement of marriage *per verba de præsenti* and that this agreement conforms with all the requirements of such a marriage as pronounced by universal authority. (1) Before reviewing the principal of these authorities, a word about the ring, and what it symbolizes is appropriate. This particular ring should be considered with the birthday ring of 1924 (Exhibit F) given to contestant by Erlanger in December, 1924, and the ring (Exhibit V) which was a gift from contestant to Erlanger and had been an engagement ring given to her father by her mother. It had been worn continually by decedent as the evidence shows. All of these rings have a deep significance when we consider the relationship of the parties. The wedding ring (Exhibit G) of November, 1927, must be considered in the light of all the evidence adduced at the trial and particularly the facts that preceded and were contemporaneous with and followed the boardwalk episode. Traditionally and historically wedding rings have been the symbol of love and loyalty, of fealty and fidelity between male and female, and the token of marriage. "For centuries the same seal of love and fidelity has been slipping down the fingers of innumerable brides. Just when and where the original found its place is a matter of delightful conjecture. It is known definitely only that a ring was the earliest form of jewelry, and that it was held in high esteem. Swinburne, after reading certain passages in Genesis, credits Rebecca with being the first bride to have worn a wedding ring, Isaac having sent her bracelets and earrings to honor their betrothal. Legend, however, favors the dusky sirens of the Nile as the first whose marriage vows were symbolized by a ring; while to the Romans is attributed the first use of the pledge ring. The Egyptian lord had early learned to carve a circle in hieroglyphics to represent eternity, and this became emblematic of the marriage ties, signifying that mutual love and affection should flow from man to wife, as in a circle continually and forever * * *. It seems to have been an early established custom for the Romans to give a pledge, or engagement ring, as a material sign that the marriage contract would be fulfilled. Thus when a short-tunicked Caius wooed a lovely Flavia in her marble courtyard, he placed a pledge ring of iron on her finger, and the wedding ring was coupled with it a later ritual. * * * Fidelity is, indeed, above all the virtue for which the wedding ring stands. This is clearly signified in the form of its blessings, according to the church's ritual when it is prayed that 'she who shall wear it, keep true faith unto her spouse

may abide in God's peace and will.'" (Sussellen Thompson in *The Signet*, vol. XIII, No. 1, p. 51; see *Merchant of Venice*, act III, scene II; act IV, scene I; act V, scene I; Bishop Jeremy Taylor's Works [ed. 1848], p. 207, Sermon on the Marriage Ring.) (2) It is not surprising therefore to find in common-law marriages the wedding ring as an important feature. Thus in *Lindo* v. *Belisario* (1 Hagg. Consist. 216, 232) the court declared: "Now the ceremony which is described to have passed in the present case, would certainly be a complete marriage by the law of nature; for, besides verbal declarations made in the presence of two witnesses, there is the *delivery of the ring — a form, which has found its way into the marriage ceremonies of most countries; and it is the very symbol of marriage, and the particular act, in our country, that gives a character to the whole ceremony; since* we say ' with this ring I thee wed.'" Likewise in *Bissell* v. *Bissell* (55 Barb. 327) it was disclosed that " on the 15th of July, the day appointed, the plaintiff left her sister's house, stating to her that she was going to be married. She met the defendant in New York, and they proceeded to Central Park, where they took an open carriage, and while in the carriage the defendant *produced a plain gold wedding ring*, which had been made from another ring that she had given him for the purpose, about a fortnight previous. He placed the ring upon her finger, stating, ' *This is your wedding ring; we are married.*' She received the ring as a wedding ring. He then said: ' We are married, just as much as Charles is to his wife [referring to his brother and his sister-in-law.] I will live with you, and take care of you all the days of my life, as my wife.' To this she assented, and they thereupon went to No. 110 Waverly Place, where he had previously engaged board for himself and wife." They lived there as man and wife for about five weeks. During all that time he treated her as his wife, addressed her, and spoke to her as such. In August he induced her to go to live with her aunt until his circumstances should improve. Since then he abandoned her, but shortly before abandoning her he induced her to sign a paper drawn by himself, stating that no marriage ceremony had been performed between them. The court held that an actual marriage was contracted by the parties. Concluding: " *If this be so, there is no reason why the defendant should not be held to the consequences of his acts; and if, while endeavoring to accomplish a seduction, he has blundered into matrimony, he has no one but himself to blame. If the practice is as common as the defendant alleges, of men passing off their mistresses as their wives and allowing them to bear their names without any marriage contract, it is time that they should learn the risks to which they expose themselves in thus trifling with the marriage institution, and that a check should be put*

*upon practices so dangerous to the good order of society.*" In *Matter of Lando* (127 N. W. 1125, 1126), a case in which the law of Germany was proven and applied to the marriage in question, the court remarked: " *Cohabitation followed. The wedding ring and the watch, with the initials thereon, which the doctor gave her,* were significant of that relationship." In *Davidson* v. *Ream* (97 Misc. 111) the record disclosed: " There were mutual promises to marry between these parties, *a wedding ring was procured by the man and placed on the finger of the woman* in the presence of witnesses; a wedding supper was provided at which they introduced themselves as husband and wife, they intended to marry and declared such intent to witnesses; they believed they were married," etc. *Two rings, an engagement ring and a wedding ring* figured in the trial of *University of Michigan* v. *McGuckin* (62 Neb. 489; 87 N. W. 180) in which the Supreme Court of Nebraska found that a common-law marriage had been contracted. Likewise *two rings* were important, *wedding rings worn by each of the parties,* in *Nani* v. *Nani* (198 N. Y. Supp. 207) in which Judge BENEDICT granted an annulment of a ceremonial marriage because of a previous common-law marriage. In *Homan* v. *Earle* (53 N. Y. 267, 279) the court observed: " The learned counsel for the defendant urged, upon the argument, the force of what he called the ' *negative evidence* ' *such as the want of presents or a ring,* or any married plans or arrangements, or letters and the like. These were considerations entitled to force before the jury, but they were not conclusive that no engagement existed." *Hynes* v. *McDermott* (91 N. Y. 451, 457), cited, quoted and followed in every jurisdiction, has its ring as part of the proofs, viz.: " He said he did not believe in the marriage ceremony or the mumbling of priests. He thereupon, in the presence of witnesses, *took a ring from his pocket* and gave it to her, saying that if she would wear the ring and be true to him, he would consider her his wife as much as if they had been married in church. She accepted the ring on these conditions, and he remained there that night, and *from that time until his death openly lived and cohabited with her.*" For other cases in which the wedding ring figured see: *Umbenhower* v. *Labus* (85 Ohio St. 238; 97 N. E. 833); *Matter of Brady* (N. Y. L. J. June 28, 1913, FOWLER, S.); *Gall* v. *Gall* (114 N. Y. 121); *People* v. *Portman* (159 App. Div. 702); *Matter of Spector* (129 Misc. 835); *Jackson* v. *Jackson* (94 N. J. Eq. 233). III. *There is more than ample authority in the rulings made by the courts of New Jersey for holding the agreement made between the parties in the boardwalk episode under all the surrounding circumstances to be an agreement contracted in words of the present tense, taking each other as husband and wife.* We may say at the outset that it was stipulated by the proponents and contestant

during the trial that common-law marriages were recognized by the laws of the State of New Jersey. Vice-Chancellor FIELDER in *Jackson* v. *Jackson* (94 N. J. Eq. 233; 113 Atl. 495, 496) stated: "Marriage is a civil contract, and no ceremonial is indispensably requisite to its creation. *Voorhees* v. *Voorhees Exrs.* (46 N. J. Eq. 411, 414; 19 Atl. 172; 19 Am. St. Rep. 404; affd., 47 N. J. Eq. 315; 20 Atl. 676; 14 L. R. A. 364; 24 Am. St. Rep. 412). Where there is no ceremonial marriage, there must be an agreement entered into between the man and the woman, in words of the present tense, to live together as husband and wife. *There are probably but few instances of mutual consent, by which each party in precise or unambiguous terms takes the other as spouse, but no particular words are necessary to declare an intention to enter into a contract of marriage.* If from what was said by the parties, aided by the circumstances surrounding their entering upon their relationship, it can be gathered that they proposed to enter into a contract thenceforth to live as husband and wife, it will be sufficient (*Stevens* v. *Stevens,* 56 N. J. Eq. 488; 38 Atl. 460; *Bey* v. *Bey,* 83 N. J. Eq. 239; 90 Atl. 684; *Schaffer* v. *Krestovnikow,* 88 N. J. Eq. 192; 102 Atl. 246; affd., 89 N. J. Eq. 549; 105 Atl. 239); and, where it appears that such relationship is matrimonial, rather than illicit, cohabitation and reputation will justify the presumption that the parties came together under a mutual promise to live as husband and wife (*Voorhees* v. *Voorhees, supra; Wallace's Case,* 49 N. J. Eq. 530; 25 Atl. 260; *Mullaney* v. *Mullaney,* 65 N. J. Eq. 384; 54 Atl. 1086)." Vice-Chancellor PITNEY, in *Stevens* v. *Stevens* (56 N. J. Eq. 488), expresses the same view, quoting and citing from many cases. He refers to *Pearson* v. *Howey* (6 Halst. 12) and from which decision he quotes Justice FORD as stating, " The common law requires nothing more of parties who are under no legal disability than proof of a contract, made in words of the present time, as, we take each other *now;* not that we *will,* at a future time, take each other, for this amounts to no more than an engagement which may never be fulfilled." And he quotes that justice as holding " that the statute which authorizes certain persons to perform the marriage ceremony is not restrictive and does not alter the common law in this respect." The vice-chancellor cites *Voorhees* v. *Voorhees* (1 Dick. Ch. 411, at p. 413), quotes therefrom Vice-Chancellor VAN FLEET's statement: " ' Two essentials of a valid marriage are capacity and consent. * * * Marriage is a civil contract and no ceremonial is indispensably requisite to its creation. A contract of marriage made *per verba de præsenti* amounts to an actual marriage and is valid,' quoting *O'Gara* v. *Eisenlohr* (38 N. Y. 296)." The vice-chancellor asserts that the same rule prevails in Pennsylvania (*Richard* v. *Brehm,* 73

Penn. St. 140). He also cites *Smith* v. *Smith* (23 Vroom. 207); *East Windsor* v. *Montgomery* (4 Halst. 39); *Wilson* v. *Hill* (2 Beas. 143) and *Fenton* v. *Reed* (4 Johns. 52). In *Clark* v. *Clark* (52 N. J. Eq. 650, 654) Vice-Chancellor VAN FLEET laid down the same rule. The agreement, however, in this case was made in New York city, and he determined the question as to the validity of the marriage by the law of the State of New York, citing *Brinkley* v. *Brinkley* (50 N. Y. 184, 197); *Clayton* v. *Wardell* (4 id. 230, 232); *Fenton* v. *Reed* (4 Johns. 52); *Jackson* v. *Winne* (7 Wend. 47); *Caujolle* v. *Ferrie* (23 N. Y. 90) and *Gall* v. *Gall* (114 id. 109). In *Bey* v. *Bey* (83 N. J. Eq. 239, 262; 90 Atl. 685) Vice-Chancellor GRIFFIN, in a lengthy opinion, takes the same view of the law. He cites Swinburne on Espousals, edition of 1686: "Albeit that the words of the contract, neither of their own natural signification, neither yet by common use and acceptation, conclude matrimony, yet, whereas the parties do thereby intend to contract matrimony, they are inseparably man and wife, *not only before God*, but also before man, in case their meaning may lawfully appear." He quotes also from *Van Tuyl* v. *Van Tuyl* (57 Barb. 235); *Starr* v. *Peck* (1 Hill, 270). (See, also, 26 Cyc. 839, citing *Atlantic City R. Co.* v. *Goodin*, 62 N. J. L. 394; 42 Atl. 333; 72 Am. St. Rep. 652; 45 L. R. A. 671.)

The decision of the United States Supreme Court in *Travers* v. *Reinhardt* (205 U. S. 425), which related to a New Jersey case, removes all doubt as to the validity of a common-law marriage in New Jersey. In that case there was no direct proof of an agreement *per verba de præsenti*.

IV. *The agreement made between the parties in words of the present tense on the boardwalk in Atlantic City constitutes under all the surrounding circumstances a valid marriage under the authorities of the State of New York.* This proposition needs very little elaboration, for the leading cases of New York, followed in every State of the Union and very frequently quoted, lay down the same proposition of law as to such agreements, holding them valid, holding that they constitute a valid marriage, and holding further that no particular form of expression or mode of talk or form of speech is necessary.

(1) Bishop (Mar., Div. & Sep. [1891], vol. 1) states in section 320 the following: "Any method — aside from formalities which in some states and countries must attend the consent to make a marriage complete, as explained in the next chapter, there is no exclusive method, not even words are in all circumstances necessary. Or it is sufficient that the parties, in language mutually understood, or in any way declaratory of intention, accept each other as husband

and wife. Even, says Swinburne, if the words do not of their own natural meaning ' conclude matrimony,' yet if the parties intended and this appear, ' *they are inseparable man and wife, not only before God but also before man.*' "

(2) In one of the earlier cases, 1857, *Cheney* v. *Arnold* (15 N. Y. 345, 351), Chief Judge DENIO declared: " Should it be said that this course of reasoning would repudiate marriages *per verba de præsenti* without solemnization, I answer *that the validity of such marriages is firmly established by judicial decisions in this State which we are not at this day at liberty to question* " (citing *Fenton* v. *Reid, supra; Jackson* v. *Clow,* 18 Johns. 346; *Jackson* v. *Winne, supra; Rose* v. *Clark, supra; Matter of Taylor,* 9 Paige, 611; *Clayton* v. *Wardell,* 4 N. Y. 230).

(3) Clare A. Briggs was divorced from his wife in this State on June 4, 1929. For several years theretofore he and the corespondent in the divorce action lived together and continued so to live until August 30, 1929, when they entered into an agreement of common-law marriage at Bound Brook, in the State of New Jersey. From the testimony in the case it appeared that Briggs was informed of the obstacles to a marriage in New York and the possibility of effecting a common-law marriage in New Jersey. The agreement was held to constitute a common-law marriage in the State of New Jersey (138 Misc. 136; affd., 232 App. Div. 666).

(4) In *Bissell* v. *Bissell* (55 Barb. 325) the court said: " And it is well settled that no religious ceremony or form, of any description, is essential to the validity of a marriage. All that is requisite is, that the parties shall be capable of contracting, and that they should actually contract to be man and wife. * * * This agreement may be written or verbal, with or without witnesses, and may be proved like any other contract. When proved to the satisfaction of a court of justice, it constitutes a lawful marriage " (citing Bishop Mar., Div. & Sep. §§ 78, 162; *Fenton* v. *Reed,* 4 Johns. 52; *Clayton* v. *Wardell,* 4 N. Y. 230; *Tummalty* v. *Tummalty,* 3 Bradf. 369; *Grotgen* v. *Grotgen,* Id. 375; *Rose* v. *Clark,* 8 Paige, 574; *Matter of Taylor,* 9 id. 611; *Cheney* v. *Arnold,* 15 N. Y. 345; *Ferrie* v. *Public Administrator,* 3 Bradf. 151, which case was tried before Surrogate BRADFORD, James T. Brady representing the claimant, Charles O'Connor representing the public administrator).

(5) Harry C. Fisher had been married and later divorced by his wife in this State. According to the terms of the decree of divorce and the laws of this State, he was forbidden to remarry during the life of his then wife. On board the steamship *Leviathan,* then on high seas at a point forty miles out from the port of New York, the captain of the ship performed a marriage ceremony, asking the

new wife-to-be if she took him for her husband and asking Fisher if he took her for his wife; when affirmative answers were made they were pronounced man and wife. That agreement was held to be a common-law marriage by the Court of Appeals, Judge KELLOGG in his opinion (*Fisher* v. *Fisher*, 250 N. Y. 316) declaring that the law pronounces a marriage to be valid wherever a man and woman, able and willing to contract, do *per verba de præsenti*, promise to become husband and wife, quoting from numerous authorities and citing a number of cases which are set forth *supra*.

(6) In *Davidson* v. *Ream* (97 Misc. 89, 108, 110, 120) Judge BORST declared: " If we lay aside, however, what the parties did in the State of New Jersey, looking to their marriage, yet what they did in the State of New York constituted a valid marriage at common law between them " (citing *Gall* v. *Gall*, 114 N. Y. 118; *Matter of Hinman, supra; O'Gara* v. *Eisenlohr, supra; Bissel* v. *Bissel*, 55 Barb. 325; *Matter of Garner*, 59 Misc. 116, 119). " *There were mutual promises to marry between these parties, a wedding ring was procured by the man and placed on the finger of the woman in the presence of witnesses; a wedding supper was provided at which they introduced themselves as husband and wife; they intended to marry and declared such intent to witnesses; they believed they were married; they occupied on the same date that all the foregoing was done the marriage bed which had been prepared with some pleasantries by other parties for them; they occupied that bed believing they were man and wife and had the legal and moral right to consummate the marriage; they and others recognized their marriage and that they were joined as man and wife.* All this was equivalent in law to a declaration in words in this state in the present tense that they took each other as husband and wife. To be sure, the parties lived together as husband and wife but for a few days, but the law does not require, as before noted, that they live together at all after the contract of marriage is made to render the marriage a valid one. The longer they continue to exercise the relation of man and wife, the stronger would be the proof to support the contract of marriage. The contract is the element needed to constitute marriage but to establish the contract the conduct of the parties has always been held important as evidence to prove it. *A single act of consummation and a single act of recognition would be competent to support the contention that the parties consented and actually entered into a marriage contract, just as much as many acts of that character, the number of such acts going to the strength of the proof.*"

To confirm what he has previously declared to be the law, Judge BORST then quoted extensively from Judge HARLAN's notable opinion in *Travers* v. *Reinhardt* (*supra*) and continued: " If he

intended in good faith to marry the plaintiff, then he should have abided by the ceremony of marriage. If he did not intend to marry her, then his conduct is most reprehensible and he has been guilty not only of a great wrong against the plaintiff but also of an imposition of the meanest character upon his friends, to whose home he took the plaintiff and at their table introduced her as his wife, when he in secret believed he was using her as his concubine. He left the plaintiff within a few days after the ceremony of marriage with professions of love and a promise of a speedy return; instead he sent his lawyer to her to learn how much he should pay. *To allow this judgment to stand would make the court a party to his immorality.*" -

(7) In *Matter of Seymour* (113 Misc. 421) Surrogate SLATER advances abundant authority holding mutual agreements between a man and a woman to be husband and wife in *præsenti* valid marriages. In it he states tersely: " It requires nothing more than a simple consent of the parties and that consent can be shown by mere words of present contract, by declarations and acts, or by the continued course or habits of living."

(8) Chief Judge CHURCH graphically enunciates the principle in *Homan* v. *Earle* (53 N.Y. 267, 272): " The charge could not have been misunderstood; the substance of it was that a mutual contract to marry was requisite to sustain the action, but that no particular form of words was necessary to constitute it. It was sufficient if the acts and language were such as the parties understood and intended as an engagement to marry. This is the correct rule of law as to all contracts; there are no set expressions required. If such language is used as to show that the minds of the parties meet, it is in law an agreement. The language used in making contracts depends upon the subject matter, the custom of transacting the particular business and other circumstances. If real estate or personal property is to be purchased, we should expect directness and more or less particularity, while in Wall street millions of property are transferred daily by a few words quite unintelligible to those not conversant with the business. The sale of a ' put ' or a ' call ' is as expressive and as well understood as if written out in detail. Contracts of marriage are unlike all others, they concern the highest interests of human life, and enlist the tenderest sympathies of the human heart, and the acts and declarations done and employed by parties in negotiating them are often correspondingly delicate and emotional. As matter of law, the learned judge was clearly right in holding that no formal language is necessary to constitute the contract of marriage. If the conduct and declarations of the parties clearly indicate that they regard themselves as

engaged, it is not material by what means they have arrived at that stage." (See, also, *O'Gara* v. *Eisenlohr*, 38 N. Y. 298; *Wilcox* v. *Wilcox*, 46 Hun, 32; 53 N. Y. 37; *Badger* v. *Badger*, 88 id. 546; *Hynes* v. *McDermott*, 91 id. 451; *Gall* v. *Gall*, 114 id. 109; *Boyd* v. *Boyd*, 252 id. 422; *Miller* v. *Amalgamated Laundries*, 257 id. 588.)

V. *Decisions of other jurisdictions likewise uphold, without question, the validity of such an agreement.* 1. Sir WILLIAM SCOTT declared in *Lindo* v. *Belisario* (161 Eng. Rep. 530–535; 1 Hagg. Consist. 216, 230): " According to juster notions of the nature of the marriage contract, it is not merely either a civil or religious contract; and, at the present time, it is not to be considered as originally and simply one or the other. It is a contract according to the law of nature, antecedent to civil institution, and which may take place to all intents and purposes, wherever two persons of different sexes engage, by mutual contracts, to live together. Our first parents lived not in political society, but as individuals, without the regulation of any institutions of that kind. * * * A marriage is not every casual commerce; nor would it be so even in the law of nature. * * * But when two persons agree to have that commerce for the procreation and bringing up of children, and for such lasting cohabitation,—That, in a state of nature, would be a marriage, and in the absence of all civil and religious institutes, might safely be presumed to be, as it is popularly called, *a marriage in the sight of God.*" (See testimony of John J. Dillon.) 2. Likewise in *Dalrymple* v. *Dalrymple* (2 Hagg. Consist. 54, 69) the same judge stated: " In the latter case of *Collins and Jesson* (3 Anne) it was said by HOLT, Chief Justice, and agreed to by the whole Bench, that ' if a contract be *per verba de præsenti*, it amounts to an actual marriage, which the very parties themselves cannot dissolve by release or other mutual agreement, for it is as much a marriage in the sight of God as if it had been in *facie ecclesiæ*.' " 3. In *Hutchins* v. *Kimmell* (31 Mich. 126; 18 Am. Rep. 164) the court declared: " Whatever the form of ceremony, or even if all ceremony was dispensed with, if the parties agreed presently to take each other for husband and wife, and from that time lived professedly in that relation, proof of these facts would be sufficient to constitute proof of a marriage binding upon the parties, and which would subject them and others to legal penalties for a disregard of its obligations. This has become the settled doctrine of the American courts; the few cases of dissent or apparent dissent being borne down by a great weight of authority in favor of the rule as we have stated." 4. Marriage *per verba de præsenti* is thus referred to in the note to *Grigsby* v. *Reib* (L. R. A. 1915E, 23): " Where express present consent is clearly shown, marriage is in most instances, held to have been constituted. To constitute a marriage *de præ-*

*senti*, the parties must be in the presence of each other when the agreement is entered into, and there must be an agreement to become husband and wife immediately from the time when the mutual consent is given; but it need not be made in the presence of a witness, though without a witness it might be difficult to establish it." Lord CRANWORTH in *Campbell* v. *Campbell* (L. R. 1 H. L. Sc. App. Cas. 182) said: "*The parties may express the agreement by parol; they may signify it by whatever ceremony their whim or their taste or their religious belief may select; it is the agreement itself and not the form in which it is couched which constitutes the contract; and the words used or the ceremony performed are mere evidence of a present intention and agreement of the parties. The agreement may be written or oral, with or without witnesses and may be proved like any other contract.*" 5. Judge SANBORN in *Adger* v. *Ackerman* (115 Fed. 124, 126) declared: " Marriage is a civil contract. It is the agreement of one man and one woman, competent to contract, to then become and thereafter to be husband and wife so long as they both shall live. It differs from ordinary civil contracts in the fact that it may not be revoked or dissolved by the mutual consent or act of the parties. Like other agreements, however, it may be made without ceremonies, civil or religious, and it may be either express or implied. It may consist of a formal written instrument signed by the parties or of an express parol agreement between them. But neither documents nor spoken word is indispensable to its existence. An implied contract of marriage is as binding and effective as one expressed in words or spread upon parchment, and such a contract comes into being whenever the minds of the parties meet in a common understanding of and consent to the present and future existence of the relation of husband and wife between them." (See, also, *Sharon* v. *Sharon*, 75 Cal. 1; 16 Pac. 345; *Meister* v. *Moore*, 96 U. S. 76; *Askew* v. *Dupree*, 30 Ga. 173; *Vincennes Bridge Co.* v. *Vardaman*, 91 Ind. App. 363.) VI. *The validity of the agreement is not impaired by reason of the fact that the decedent, barred by the divorce decree from marrying in New York during the lifetime of his former wife, went with the contestant to New Jersey to evade the inhibition that restricted him from marrying in this State.* 1. The Court of Errors and Appeals of New Jersey (1890), passing upon a so-called interstate marriage, declared as follows (*Smith* v. *Smith*, 52 N. J. Law, 207, 213): "It having been thus shown, that by the law of Massachusetts this was a valid marriage between the demandant and Hezekiah B. Smith, the next question presented by the exceptions is, will this marriage be recognized in New Jersey where the demand of dower is made. It was said by this court, in *Harral* v. *Harral* (39 N. J. Eq. 279, 287) that ' the doctrine generally adopted and supported by

reason and public policy is, that a marriage celebrated according to rites and ceremonies recognized by the laws of the country where the marriage takes place, is valid everywhere.' * * * Certainly it is a law of comity between the different states of this country. *This is the case even where the parties, being residents of one State, for the sake of evading the law, go into another State, where such a marriage is valid, are there married and immediately return and continue their place of residence; the marriage is valid there, and after the husband's death his widow is entitled to dower in his estate.* (*Putnam* v. *Putnam*, 8 Pick. 433; *Medway* v. *Needham*, 16 Mass. 157; *Van Voorhis* v. *Brintnall*, 86 N. Y. 18; *Moore* v. *Hegeman*, 92 id. 521; *Meister* v. *Moore*, 96 U. S. 76; *Ross* v. *Ross*, 129 Mass. 243; *Pearson* v. *Howey*, 6 Halst, 18, 21; 2 Kent Com. 87, 91, 92; Story Confl. Law, par. 123, etc.; 2 Greenl. Ev. § 460.) There is nothing in our law or any statute of this state which would make such a marriage as this invalid, if performed here, and there is no reason why it should not be here recognized, as entitling the demandant to dower in her deceased husband's land." (It is interesting to note here that in this decision twelve judges of said court concurred.) 2. The Court of Appeals in an opinion by Judge KELLOGG (*Fisher* v. *Fisher*, 250 N.Y. 313, 318) declared: "It is well settled that the provisions of our statute forbidding the remarriage of a party who has been divorced for adultery have no extraterritorial effect; that a subsequent marriage of the guilty party, during the life of the innocent party, in a sister State if valid in that State will be recognized here as a lawful marriage. (*Moore* v. *Hegeman*, 92 N. Y. 521.) " 3. The same court previously in *Cunningham* v. *Cunningham* (206 N. Y. 341, at p. 349) held: " We do recognize the remarriage of a former husband or wife who has been divorced and has been forbidden to again marry, where such remarriage took place in a state in which it was authorized, but this is upon the ground that the forbidding to remarry was in the nature of a penalty which had no effect outside of this state." (See, also, *Thorp* v. *Thorp*, 1882, 90 N. Y. 602, revg. 47 N. Y. Super. Ct. 80; *People* v. *Chase*, 1882, 23 Hun, 310; *Matter of Eichler*, 1901, 34 Misc. 667; *Reid* v. *Reid*, 1911, 72 id. 214; *Haviland* v. *Halstead*, 1866, 34 N. Y. 643; *Roberts* v. *Ogdensburgh, etc., R. Co.*, 1884, 34 Hun, 324; *Bolmer* v. *Edgall*, 90 N. J. Eq. 299, 306; *Horton* v. *Horton*, 198 Pac. 1106; *Matter of Seymour*, 113 Misc. 421; *Matter of Briggs*, 138 id. 136; affd., 232 App. Div. 666; *Miller* v. *Amalgamated Laundries, Inc.*, 257 N. Y. 70; *Matter of Schmidt*, 42 Misc. 463; *Matter of Garner*, 59 id. 119; *Earle* v. *Earle*, 141 App. Div. 611; *Fuller's Administrator* v. *Fuller*, 40 Ala. 301.) *No support for their contention nor strength for their conclusions can be derived by proponents from the two decisions which they,*

*stressed in oral argument and have emphasized in their briefs (Collins
v. Voorhees, 47 N. J. Eq. 555, and Matter of Pratt, 233 App. Div.
200), and which they try to make the basis of their attack upon the
marriage declaration and acquiescence of the parties in the board-
walk wedding-ring episode.* (A) They construe the *Collins* v.
*Voorhees* decision to require where the relations of the parties
have been meretricious, proof of an actual marriage subsequently
to the lifting of the impediment that has prevented a valid marriage;
and then they endeavor — futilely indeed — to argue that here
the marriage has not been proven and to support the latter propo-
sition they rely upon the *Pratt* case. In the face of the con-
vincing proof of the agreement of the parties during the first week
of November, 1927, adduced upon the trial and above carefully
outlined, it seems academic to dwell at length upon the *Collins* v.
*Voorhees* decision, but it may contribute to the force of our con-
clusions herein if a clear view be presented of the authorities in
New Jersey respecting so called " impediment " cases, viz., where
either or both of the parties cohabiting and desiring matrimony
are under some inhibition due to failure of divorce, a former spouse
still living, barrier of divorce decree, etc. *Before discussing these
authorities it should be clearly understood that in the present case
the actual marriage agreement has been proven and the change in the
relationships of the parties clearly shown.* Proponents' assertions
are as follows (p. 90 of the brief): " Particularly clear must be the
proof that there were indeed two such promises, where, as here, the
parties are shown long to have lived together meretriciously (*Bates
v. Bates*, 7 Misc. 547; *Collins* v. *Voorhees*, 47 N. J. Eq. 555; *Arnold
v. Chesebrough*, 58 Fed. 833 (affg. 46 Fed. 709). A meretricious
relationship having been (once) established, the authorities agree
that its continuance must be presumed until proof of a change
and of a marriage, and that in such a case marriage will not be
presumed from cohabitation and reputation, but proof of a sub-
sequent actual marriage is necessary. This may be shown by
circumstances, but they must be such as to exclude the inference
or presumption that the former relation continued, and to satis-
factorily prove that it was changed into that of actual marriage
by mutual consent (*Bates* v. *Bates, supra*)." The facts in the
*Collins* v. *Voorhees* case were, briefly, as follows: In 1867 Voorhees
sued for divorce in Connecticut for desertion. The proceeding
was a fraud from the beginning and under New Jersey authorities
the decree a nullity. He married a second time. Subsequently
the first wife obtained a divorce from him. Thereafter Voorhees
cohabited with the second wife and treated her before the world
as though he was married to her. It was urged upon the court

that such cohabitation formed the basis of an inference that there had been an interchange of consent. This inference was rejected by the Court of Errors and Appeals, BEASLEY, Ch. J., writing the opinion, which held that Voorhees knew that his divorce in 1867 was fraudulent and ineffective and that, therefore, he could not give the necessary consent to a common-law marriage, and further that that cohabitation, with habit and repute being accompaniments of the original status, could not *per se* be taken as proof that a new status had been agreed to by the parties. *Chief Justice Beasley erroneously asserted that the Breadalbane decision, reported* in Law Reports (2 H. L. Sc.), 269, was the only authority opposed to the conclusion of the court. Two facts should at this point be recorded: (1) Judge GARRETSON of this court dissented in a striking opinion in which he, destroying the conclusions of his colleagues, declared: " Where parties are cohabiting matrimonially but unlawfully because of an impediment to their marriage, matrimonial consent may be presumed to have been interchanged as soon as the parties were enabled by the removal of the impediment to enter into the contract," and " *It may, I think, be safely asserted that no case can be found in the New York Reports from 1809, when Fenton v. Reed was decided, down to Gall v. Gall, decided in 1889, in which any different doctrine had been held or even intimated.*" Concluding he states concerning the doctrine adopted by his court: " It stands, as it appears to me, as an innovation upon established law upon a most important branch of jurisprudence, and is radically destructive of the principle of public policy to which I have alluded, the uniform application of which is illustrated amongst others by the distinguished authorities to which I have referred." The decision and dissenting opinion were handed down in June, 1890. In the October term, 1904, the same court, with many new members and with Judge GARRETSON still a member, decided the appeal in *Chamberlain v. Chamberlain* (68 N. J. Eq. 737), affirming a remarkably scholarly opinion of Vice-Chancellor STEVENSON in the court below (*Chamberlain v. Chamberlain*, 68 N. J. Eq. 415), in which he adopts views in harmony with the uniform decisions of New York courts such as *Fenton v. Reed* (*supra*), *Rose v. Clark* (*supra*), *Matter of Crandall* (*supra*). Confirmation of this principle is found also in *Jackson v. Jackson* (113 Atl. 495); *Robinson v. Robinson* (83 N. J. Eq. 150, 156; 90 Atl. 311); *Bey v. Bey* (83 N. J. Eq. 239; 90 Atl. 684); *Schaffer v. Krestovnikow* (88 N. J. Eq. 192; 102 Atl. 246; affd., 89 N. J. Eq. 549; 105 Atl. 239); *Schuchart v. Schuchart* (60 Pac. 311); *Sorenson v. Sorenson* (219 App. Div. 344); *Matter of Haffner* (254 N. Y. 238); *Sheedy v. Riley* (189 App. Div. 582); *Applegate v. Applegate* (118 Misc. 359); *Hynes v. McDermott* (91

N. Y. 451); *Dodge* v. *Campbell* (135 Misc. 644); *Matter of Terwilliger* (Hopkins, S., 63 id. 479); *Townsend* v. *Van Buskirk* (33 id. 287); *Matter of Wells* (123 App. Div. 79); *Adger* v. *Ackerman* (115 Fed. 124); *University of Michigan* v. *McGuckin* (62 Neb. 489; 87 N. W. 180).

What little application the *Pratt* case has to the agreement at Atlantic City is clear when one learns the facts in said case. There decedent and Jones were married ceremonially April 26, 1910; four months later they made separation agreement. In April, 1911, she went to Reno and remained six months, secured a divorce from him. He filed a verified answer and at the trial appeared by his attorney, who took no active part in the trial. Thus he could not be heard to attack the judgment dissolving the marriage. On January 5, 1912, the decree became effective. Soon afterwards she mailed him a postal card on which was a poem " Old Pal." In the verses was expressed the idea of living the old days over. After her return to Syracuse from Reno she and Jones were riding in the latter's car when they met his brother, and she remarked, " Bennie is going to be with me; those papers don't mean anything; we are going to live as man and wife just as we did before." So far as the record showed Jones said nothing. The court calls this statement a " one-sided announcement." It did not appear whether he voted from her residence or where his domicile was listed in city or telephone directory or who paid the household bills. Appropriately the court pointed to the difficulty of believing that she would go to all the expense and trouble of going to Nevada and staying there for nine months to get a divorce from Jones, whom she had left after living with him for four months, and then after getting her decree rush back to him and make a contract to live with him, adding the statement, " There is no explanation for such a sudden change of heart." There were many other weak spots in the case. To illustrate: (1) Jones was never seen out with her after the Nevada divorce except on one or two occasions; (2) he never introduced her to his friends or acquaintances as his wife and, so far as the record shows, never recognized or acknowledged her to be such; (3) no act of his, unless it be his presence in her home or the doing of various chores about the house, even indirectly proclaimed that he had ever consented to resume marital relations; (4) the record was replete with undeniable assertions of decedent which showed conclusively that after the Nevada divorce she did not consider herself to be the wife of Jones. Many other strong facts and features of the case negative the idea of common-law marriage between the parties which for brevity's sake must be omitted. She died on March 17, *1929*. The evidence failed to

show that they ever saw each other after *1926*. Jones though
residing at the time of her death in the same city, did not go to see
her during her last illness, did not claim her body, nor see that
she received a proper burial, so far as it appears; did not attend
her funeral, and without protest permitted two strangers, a trust
company and an undertaker, to be appointed administrators of
her estate. When the court ruled, as it did, concerning the one-
sided announcement, and held it to be no consent, no agreement,
it doubtless had in mind the whole record, the events that preceded
and followed the colloquy between decedent and Jones' brother.
The pronouncement of Erlanger, acquiesced in by contestant
possessing and showing the wedding ring, was preceded by a long
period of cohabitation, habit and repute, in a relationship matri-
monial, though illicit; it was after decedent suffered the stroke
on May 4, 1927, it was preceded by salient, uncontradicted facts
surrounding the relationship, and acts upon the part of each of the
parties that definitely *marked a change, as well as an approach*
to the agreement of marriage, the illness, the confinement, the con-
valescence, the abandonment of the old habitat in West End
avenue, to which they never returned, contestant's transporting
him during the night to Atlantic City, and thus, as he asserted,
saving his life; the eight weeks there, the return to New York in
quarters in Hotel Ambassador; the return after forty days in New
York to Atlantic City for a week — the first in November. The
agreement of marriage in terms of the present tense was in the
presence of two honest, disinterested and dependable witnesses
and in the presence of contestant, displaying and wearing the ring,
and this agreement was followed by the cohabitation in New
Jersey and New York. Acquiescence? Consent? Bilateral agree-
ment? What more definite and more certain consent could there
be than the possession and display of the ring and the open expressive
acquiescence of contestant, who, the evidence shows, had desired
matrimony all along. The finely spun distinction of opponents
in their effort to stretch the situation in order to bring it within
some of the language of the *Pratt* decision *ignores the authorities
of New Jersey last cited above*, misinterprets the *Pratt* decision,
shuts out all understanding of the full meaning of the record pro-
duced at this trial and completely overlooks the rule so generally
accepted as to be axiomatic that no witnesses are necessary and
no particular form of words or special manner of expression are
required and the consent may be evidenced by any clear and
unambiguous language or conduct. (See *Caujolle* v. *Ferrie*, 23
N. Y. 90, 106; *Adger* v. *Ackerman*, 115 Fed. 126; *Ellis* v. *Kelsey*,
Burr, J., 118 Misc. 768; *Matter of Seymour*, Slater, S., 113 id.

424, 427, 428, and cases cited therein; and *University of Michigan* v. *McGuckin, supra.*) Surrogate FOWLER, in *Matter of Spondre* (98 Misc. 524), held: " The necessary declarations of Henry and Rachel Spondre to the commissioners of immigration at the port of New York, of themselves constituted, at common law a perfectly good contract of marriage *per verba de præsenti.* Their cohabitation and union is not denied and, indeed, is established beyond all peradventure." In *Comly's Appeal* (185 Penn. St. 210) a similar contention was made against a claimed agreement. The woman desired a ceremonial marriage, a marriage by a minister, the man argued with her that if " we live together and do what is right, we are just as lawfully married as if a dozen ministers married us." The court observes: "*The woman was convinced by it, and she accepted his offer to take her as his wife by immediately making her abode with him. Can it be possible that any words which she might have spoken could have made out a present contract on her part more absolutely than did this act of acceptance? * * * Was it necessary to say in words what this act said more loudly than words? In a hundred cases which might be cited it has been decided that silence means acquiescence.* In this case there was something more potent than silence — the deliberate act of the claimant." Justice HAGARTY (App. Div., Second Dept.) expresses the same idea: " That actions speak louder than words is sound law as well as proverbial wisdom," in *805 St. Marks Ave. Corp.* v. *Finkelstein Nos. 1 & 2* (234 App. Div. 15, 18). " Some criticism is made," declares the court in *Schuchart* v. *Schuchart* (61 Kan. 597; 60 Pac. 311), " upon the language employed by them to express their consent, but the surrounding circumstances and subsequent conduct of the parties leave no doubt as to the interpretation which should be placed upon their language." " *We have been getting married* " was the declaration made by Evans to the household of Hannah Maria Van Deventer after returning from a Fourth of July outing in Easton. The next morning Evans said to the mother: " *I am going to take my wife with me this morning.*" The court observed: " There can be no doubt but that if this statement be true *the declarations made by Evans to the household that night in the presence of Hannah Maria, followed by actual cohabitation, furnished evidence of a marriage contract as conclusive as evidence of a ceremonial marriage could have done.* The relation between these parties based thereon would not be illicit, but begin in lawful wedlock." (*Tracy* v. *Frey*, 95 App. Div. 579, 595, opinion by HATCH, J., concurred in by VAN BRUNT, P. J., and O'BRIEN, INGRAHAM and McLAUGHLIN, JJ.)

Covering the period from November, 1927, to March 7, 1930, contestant presented a mass of parol proof and documentary

evidence bearing upon the relationship of the parties, cohabitation, habit and repute. As with proofs previously considered our purpose will be to so literally present the essentials of these proofs that they may tell their own story rather than to substitute therefor paraphrase or narrative. Dr. J. C. Marshall, previously quoted, testified further as follows: That after September 20, 1927, he treated Erlanger on November 1, 2, 3, 4 and 5 of that year. Within these dates the boardwalk episode took place. Later he treated him January 2 to 7, inclusive, 1928, and dined with him once a week, and treated him on February 15, 16, 17 and 18, 1928, at the Hotel Shelburne; and on April 4, 5, 6 and 7, 1928, at the same place; later on October 11, 12 and 13, 1928, at the same hotel, also dined with him, and again on November 25, 1928. In 1929 he treated him on April 13 and dined with him in the evening; in the fall, on November 9, 1929, one day, and dined with him in the evening; likewise on December 7, 1929; on February 8, 1930, he was in consultation with Dr. McConnell in the New Amsterdam Theatre; this was the last time he saw decedent. *On these various occasions he said he dined with Mr. Erlanger; Mrs. Erlanger was present; she was always present.* He had occasion to observe the conduct and demeanor of the decedent toward the contestant and of her toward him, and he did not at any time subsequent to the date of his introduction to Mrs. Erlanger hear Mr. Erlanger refer to or speak of or address *Mrs. Erlanger any differently than he has thus far stated* (240). *He always referred to her as Mrs. Erlanger when he referred to her, and in addressing her directly he spoke to her as Darling, and she usually called him Darling or My dear Mr. Erlanger when she referred to him.* She referred to him as Mr. Erlanger when she addressed him, and when she addressed him personally it was " Darling " or " My dear; " produced a number of envelopes and contents thereof and all in his own handwriting, and signed by him, marked in evidence (Exhibits H, J, K); identified two papers sent by him to Dillon and other communications addressed to Mrs. Erlanger, seven or eight. (For exhibit numbers, see pp. 253, 254.) These letters were addressed to Mr. and Mrs. A. L. Erlanger at No. 175 Riverside drive and at foreign cities. They indicate that witness considered the parties as man and wife. In cross-examination he again stated that his visit to Mr. Erlanger was July 27, 1927; that on the same day he saw Mr. Baron at the hotel; he identified Baron in the courtroom as the man he met there, and stated he did not meet him since; he remained three to five minutes in Erlanger's apartment, and he did not see Baron after he was introduced to Mrs. Erlanger; that he examined

Erlanger; that neither Mrs. Erlanger nor Mr. Erlanger was present when he talked with Baron; that (264) the next day Mr. Erlanger said Baron was his lawyer; that (266) he believed when he wrote those letters that she was Mr. Erlanger's wife. He stated (274), " I was just introduced to Mrs. Erlanger, then she took me in to her husband;" that the food of the dinner was always ordered, that which he preferred, that she always personally took the chair from the waiter and placed it under him and fixed the cushions in it, cut up his meat for him and his food; that he was incapacitated partly for performing that act, and she watched over him in such a careful manner that it could not help but be noticeable to a stranger and that was continuous throughout the period of the dates that he had already mentioned. Appropriately we come now to the testimony which chronologically fits in with that of Dr. Marshall and which covers *many days of the period of 1927 to 1930.*

Dr. Robert H. McConnell, *a doctor since 1895,* has practiced for the intervening thirty-six years; is attending physician of the French Hospital of this city and *president of the medical board* and has been for over twenty-five years; first met decedent on October 12, 1927, at his office; was asked to go there by Judge Erlanger, the proponent. On that same evening he met the contestant; had seen Erlanger in the morning at his office and suggested that it was not a satisfactory place to make a thorough physical examination, so the doctor visited him at the Hotel Ambassador that evening and met the contestant by the name Mrs. Erlanger; she opened the door for him in the apartment of the hotel. She was there with Mr. Erlanger, and the latter introduced her to him as Mrs. Erlanger. He treated the former later and until his death. He testified in detail (1112, 1113) as to the exact dates on which he treated him. The days embrace October 12, 18, 25, 31, November 10, 15, 16, 19, 20, 22, 26, 29, December 3, 7, 10, 17, 20, 24, 27, 31, 1927, and thereafter he treated him in 1928, seven days in January, seven in February, ten in March, five in April, three days in May, three in September, four in October, six in November, and five in December; in 1929 he treated him once in January, and later treated him on ninety-two different days in the months of March, April, May, June, July, August, September, October, November and December; in 1930 on forty-four different days in the months of January, February and March; he recommended him to go to Dr. Porges at Marienbad (Contestant's Exhibit 1, as to Mr. and Mrs. Erlanger); also sent a cable to Dr. Porges; recalled the admission of decedent to the French Hospital on February 11, 1930, *and stated that at the time the decedent was neither in an unconscious condition nor so weak that he could not*

*answer the questions when his history was taken at the hospital.* (The record of the personal history, recorded at the hospital, of the decedent will be referred to later.) The visits of the witness were had in four places, Ambassador Hotel, decedent's office, French Hospital and at No. 175 Riverside drive, the great majority of the visits being at the office. *During the visits at Riverside drive he saw Mrs. Erlanger; heard them address each other; heard the servants and nurses address decedent; he stated that decedent called her Mrs. Erlanger or Darling; that when he called her Mrs. Erlanger it was in referring to her in speech with somebody else; heard her referred to as Charlotte;* that the attitude of Mrs. Erlanger toward him was very affectionate, manifested by her constant attention, getting up at night frequently when he would call her, *by the fact that he would rarely take any medicine unless she gave it to him; that he would take very little food unless* she coaxed him to do it; that at the night in the witness' presence he would call her Darling, and that she never failed to respond while he was there; that he has been married since 1899, and during the practice of his profession was brought in contact with many married people, and is familiar with the demeanor of married people toward each other, and *that from their address of each other and demeanor toward each other and from what he saw them do to and for each other, and from the introduction that he received, he regarded them as an affectionate man and wife.* In cross-examination many pages of testimony were recorded upon the subject of his pending bill against decedent's estate for $28,500. He was further examined as to any information which he gave to the contestant, or her lawyer, as to the physical condition of the decedent (see record 1128–1150 and 1156–1161); he stated that he thought the decedent was about seventy or seventy-one years of age when he died; asked whether decedent ordered him to say to his brother, in case he should die, that he wanted to be buried in the Jewish faith, the doctor replied that he never said it in that way, that his recollection of how he said it, *he never mentioned the fact of his dying because he was afraid to die, and he never mentioned such a thing,* but he said there were certain religious ceremonies that he would like carried out under certain conditions; that is about the way the witness remembered it; that in the last days of decedent's life Dr. Grausman, whom the witness knew as a surgeon for many years, was called in at Erlanger's request for consultation; that Erlanger did it at his suggestion; that he asked Erlanger if they would have a consultation about his condition, and they first called in Dr. Marshall, and then he was asked if there was somebody else he would like to see; Mr. Erlanger said Dr. Grausman. On redirect Dr. McCon-

nell stated that the decedent was reluctant to speak about his age at all and was indefinite about it. *It was brought out in this examination that the affidavit which the witness made for the contestant was made before his bill had been rejected by the temporary administrators; that the affidavit was dated March 24, 1930, and the bill rejected some time between May 23 and July 22, 1930.*

*Dr. Philip Grausman*, attending surgeon at Gouverneur Hospital for Joint Diseases and at Lebanon Hospital, described his meeting decedent in the fall of 1928 at Arrowhead Inn; told of going there with Mr. and Mrs. E. A. Jackson, and stated that as he walked in at the entrance he met decedent standing with Mr. and Mrs. Dillon and Mr. Riley and that he was introduced by Mr. Erlanger to a lady as Mrs. Erlanger. He identified the contestant as Mrs. Erlanger. Subsequently he treated Mr. Erlanger and also Mrs. Erlanger (Contestant's Exhibits WW and XX); after his treatment of Mrs. Erlanger he received a telephone call from the decedent to ask about her condition. He referred to her by her first name, *"How is Charlotte? "* Witness described his treatment of decedent in his last illness, fixing the time at about three weeks before he died. From the time he was called in on this occasion he saw the decedent every day until he died at No. 175 Riverside drive. On each occasion he saw Mrs. Erlanger (1060) and stated that she was very attentive to him and solicitous as regards his condition, and also in regard to what she could do to assist toward his comfort; furthermore, he stated he observed their demeanor toward each other over this period, and that he certainly would have considered them by their demeanor and conduct toward each other as a husband and wife; that he heard decedent address Mrs. Erlanger by calling her Charlotte. He fixed the fall of 1928 as the time when he met decedent at Arrowhead Inn, and he fixed July 29, 1929, as the date when he sent out the bill for treating Mrs. Erlanger. He reiterated (1083) his statement that he had observed that she was solicitous for decedent's condition, and that she assisted in making him comfortable, and that from what he observed he was of the opinion that they were husband and wife.

*Charlotte Donnelly*, sister of Mrs. Dillon, who was a stenographer in the finance department, said she never made up an original bank balance statement without making a copy; it was a strict rule to always make a copy of an original bank balance statement. Shown proponents' Exhibit 87, headed " Bank Balances, A. L. Erlanger, March 11, 1930," her attention was called to the testimony of Pratt, to the effect in his testimony that Eddie Fitzgerald typed it and then, changing his testimony, that Eddie Fitzgerald had not typed it, and then that she had typed it, she declared

that Eddie Fitzgerald never typed a bank balance statement; he assisted in the preparation of bank balance statements; *she typed this bank balance statement of March 11, 1930*, under the direction of Mr. Pratt, in order that Judge Erlanger might know the condition of his brother's property at the time of his death. She said she made a copy; she said when this statement (Proponents' Exhibit 87) was made there was a carbon copy, that an original was never made without making a copy; she stated that Pratt *would usually see a copy of the statement, he would generally give it back to her*, and take it outside *to put in a special compartment* of the desk to be held for future reference. This was the practice for years. Prior to the one made on March eleventh all of the bank balances were made up by showing the week before, and then the bank balances of the current week. *She was discharged in June, 1930, by Judge Erlanger.* Her attention was called to the testimony of Pratt, who said first that he got a certain invoice from the Edward H. Betts & Co., and that Erlanger in person handed it to him for payment, and that was why it had nobody's O. K. on it except his, Pratt's; she was asked whether Mr. Erlanger was in New York in July of 1928; she said she did not remember but she knew that of these three invoices (Proponents' Exhibits 286, 287, 288) neither of them ever went to Erlanger. She said Washburn, of Betts & Co., had his usual seance on Monday afternoon regarding insurance policies or insurance bills, and that he himself presented those bills to Pratt for payment; they were paid by him and they never went out of the finance department. After the death of Erlanger, Pratt was directed by Judge Erlanger to *remove from the files bills and papers which bore the O. K. of Mrs. Erlanger or were addressed to Mrs. Erlanger.* Pratt instructed Aguolia to make a complete survey of all the files in the bookkeeping department and with the assistance of Hemmer *to abstract from the files all receipted bills in the name of Mrs. Erlanger* or any papers in her name, to make a complete list of those bills and put them into a folder and give it to Pratt, who in turn would give them to Judge Erlanger. This was done, she would say, the latter part of March or the early part of April, 1930; that the income tax returns of Erlanger were made out in the finance department; Pratt was income tax expert from 1921, when she went into the employ of Erlanger; he usually got them out for Aguolia (6551) and sometimes would fill in all the answers and figures and submit them to Golding, the auditor, with an initial on the line where Erlanger was to sign, and Golding would hand them to Erlanger; when Pratt became auditor he would have Aguolia make out income tax returns, fill in all the answers and figures and initial the line

for Erlanger's signature; he would go over those statements with Aguolia and submit them for Erlanger's signature; she identified her signature on a return (Exhibit 139) as notary; said Erlanger did not appear before her; never came to the finance department to acknowledge his signature and she never went to his office for that purpose; her answers apply to all returns upon which she took acknowledgments; she took acknowledgments *from 1925* on to the time Erlanger died (6553); this was on corporation returns and personal returns, State and Federal. (See, also, pp. 6554, 6555, 6589–6597.) She stated that she did hear Pratt make reference to *Mrs. Erlanger* in the finance department on several occasions, she would say from February fifteenth up till the early part of March. *She heard Mr. Pratt address Mrs. Erlanger on the telephone as Mrs. Erlanger in 1930;* the check for the Arizona Biltmore Hotel (Contestant's Exhibit D-15) was dated January 21, 1930; was signed by Mr. A. L. Erlanger in person; the body of the check was conceded to be in contestant's handwriting (Exhibit T-12). Registration at Arizona Biltmore in handwriting of contestant. On cross-examination, referring to the bank balance statement of March 11, 1930, she remembered she told Judge Erlanger she was sure that she made up the statement and that if she did it was under the direction of Pratt; she was sure that she said it; she again stated that she prepared one copy, an *original and duplicate;* she recognized Fitzgerald's handwriting on Exhibit 285; asked to look at the statement of March 11, 1930, which she said she prepared and typed and to answer whether she found Exhibit 285, which is the pencil statement, is just exactly like Exhibit 87, which she said she typed, she answered, " No, sir; " that there was only one column showing on the bank balance statement of March eleventh and on the statement of March third there were two columns; when asked to compare the figures on Exhibits 285 and 87 she said, " *No, they are not in the same order.*" Asked whether the figures are the same aside from the order, she said " Yes, sir; " *asked by the examiner whether she had said yesterday that after she had typed Exhibit 87 the original was sent to Judge Erlanger and the copy filed, she replied,* " No, I said I gave both of them to Mr. Pratt. Mr. Pratt gave the original to Judge Erlanger and kept the copy himself." Asked whether the copy was put in the files, she said, " The copy I handed with the original to Pratt." Counsel retorted, " You testified yesterday that the copy was put in the files," and she answered, " *I said that the copies were put in the files, and this one was, too. * * * A. To the best of my knowledge it was;* " that she did not put it in the files, all she knew was that she gave both the original and the copy to Pratt; what he

did with them she did not know. Shown Exhibit 87, she said it was the original of the statement of March 11, 1930; then she was asked if she knew how this original got into the hands of the contestant and her attorney, and she said she did not know; that she had access to the files where a statement like that would be filed; Eddie Fitzgerald, Pratt, Aguolia and Hemmer, they were all employees in her time, all had access to these files. She made up bank balance statements from 1921 on, weekly; they were put in preparation on Wednesday, submitted to Pratt Wednesday night, so he might have them for Thursday for his seance with Mr. Erlanger. She reiterated that Pratt instructed Aguolia to make a complete survey of all the files in the bookkeping department, and with the assistance of Hemmer, to extract from those files all receipted bills in the name of *Mrs. A. L. Erlanger*, or any papers bearing her name, to make a list of those bills and take them and put them in a special folder and submit them to Pratt, who in turn would submit them to Judge Erlanger. She heard Pratt make to Aguolia these statements and she saw Aguolia do it; she had never discussed the testimony with contestant; had never told her sister what she would testify, never discussed the case with her or Dillon; she had with contestant's counsel denied (6600) taking any papers from the files to office of contestant's attorney and giving them to him; she said she was never to his office; she reiterated her denial that she had ever taken any paper and brought it to the office of contestant's counsel; again she made emphatic denial of her taking papers from the files and of ever knowing contestant's counsel or having gone to his office.

*Mrs. Dillon, previously quoted, gave important testimony as to the later period, 1927–1930; said she saw Mrs. Erlanger after the Arrowhead Inn episode very frequently* — at least three times a week; would see her at lunch or would see her in the company of Mr. Erlanger at No. 175 Riverside drive, at Ben Riley's Arrowhead Inn, at Weisheit's (between Stamford and Darien), at the home of Mr. and Mrs. Anderson, at Post Lodge, at Claremont Inn, at Henri's, at the ball games; said they were at Weisheit's about ten or twelve times with *Mr. and Mrs. Erlanger*, at the Claremont once, at *Post Lodge twice*, at *Henri's about fifteen times*, and at the *baseball games every Sunday in 1929, except when Dillon was in the hospital in June.* She and Dillon sent Mr. and Mrs. Erlanger a message of greetings at Christmas time (1927), addressed to Mr. and Mrs. A. L. Erlanger. She and Dillon entertained them at the New York Athletic Club, both at Travers Island and at the City Club. Mrs. Erlanger was most attentive to him; she would see that his chair was very comfortable with pillows, she would put his napkin around his

neck, and during the course of the dinner he would need two or three napkins; she would feed him. If there were anything particularly nice at the dinner he would take it off his plate as best he could — he could not handle food very well — and insisted that she partake of it. Mr. Erlanger drank ale at times. He always insisted Mrs. Erlanger should drink out of the same glass with him. Mrs. Erlanger did all the ordering of the food. *Whatever she wanted, the rest of the party had to eat. That was Mr. Erlanger's direction.* She described what occurred when she and her husband, learning of Erlanger's death, went to the Riverside drive apartment. She said, among other things: " Mrs. Erlanger presented herself as Mrs. Erlanger, and introduced me to Mr. Berliner as Mrs. Dillon, the wife of Mrs. Erlanger's chief executive. She told him that she wanted him to place Mr. Erlanger's remains in a bronze casket. She ordered two floral blankets, one of sweetheart roses and one of lilies of the valley. She told him she wanted Rabbi Krass to read the funeral eulogy. She asked him to take the remains over to his undertaking establishment and dress them, and she gave the undertaker Mr. Erlanger's wearing apparel, and said that she wanted Mr. Erlanger's remains put in the temple until the funeral service at two o'clock Sunday. She gave the undertaker an obituary which she asked him to have inserted in the papers; told him to go down to Mr. Dillon and find out from him who the honorary pallbearers and any business acquaintances of Mr. Erlanger were; told him to go to Judge Erlanger at No. 33 East Seventieth street and find out just what arrangements Judge Erlanger wanted with regard to automobiles for the funeral. I remember distinctly he said he did not know whether or not Judge Erlanger was in town. Mrs. Erlanger said, yes, he was. He accepted all these orders from Mrs. Erlanger. She asked him after he had seen Mr. Dillon to call her back and tell her that everything had been attended to including the obituary." Upon crossexamination (2324) her attention was directed to the close of her testimony the day before, and contestant's counsel's statement about not having anything else to add, and that he might have some questions to ask in the morning, and she was asked if she reminded him at the close of the session of the talk she said she had with Erlanger, and the witness replied that she did not; to the question: "About the ring? " she answered: " No, sir." She declared that she did not remind him of that. She reiterated the denial several times and then being asked specifically whether she told it to him " yesterday afternoon," she answered: " I did not." She was asked whether she told it to Mr. Levy or anybody in contestant's counsel's office, and she said, " No." Between 1921 and 1927 she

saw contestant altogether five times; she first knew of the existence
of Mrs. Erlanger when she met her in 1921. Before that she did
not know that there was a Mrs. Erlanger. Beginning with the
summer of 1927, her relationship with contestant had been very
close and intimate; she denied keeping Mrs. Erlanger posted about
Erlanger's going to lunch; denied that she telephoned every time
Baron left with Erlanger; *admitted she had a great interest in the
case; said it was the fulfillment of a pledge;* it was not a monetary
interest; resented the inference of one of the examiner's questions;
said she had been at the trial every day with her husband, once
on the argument of a motion; since Erlanger's death, had met
contestant about twice a month; said she had never seen any docu-
ment in which she was described as Charlotte Fixel; she said con-
testant had not appeared before her and acknowledged her sig-
nature as Charlotte Fixel; she admitted her signature as a notary
upon an agreement between Garden City Properties, Inc., and
Charlotte M. Fixel, dated November 24, 1928 (Exhibit 55);
admitted her handwriting in the acknowledgment of proponents'
Exhibit 55; said " December 14 " was not her handwriting, but
the signature was. Queried about the duties of a notary public,
she admitted that Charlotte M. Fixel did not come before her
on the date of the acknowledgment; said she might have examined
this instrument before she notarized it; had no recollection; *she
would not say that she never examined an instrument before she
notarized it;* she said she did not examine Exhibit H-7 shown to
her previously; *she said she saw what was on the top of it when it
was handed to her, and that was not examining it;* she saw the front
of it; she did not know what day it was; she knew it was while
Mr. Erlanger was in Atlantic City; she did not remember whether
the date was the 15th of August, 1927, or after the 15th of August;
*when the instrument was brought to her, the signature of Abraham
L. Erlanger was on it and Baron brought it to her;* as to realizing
that it was a deed of property when she saw the face of H-7, she
said, " Mr. Baron told me it was; " when she saw the face of it,
she was asked if she realized it was a deed of real property, she
answered, " No, I do not think I did; " she did not know whether
she realized the technicality as he mentioned it; she did not realize
it was a deed; she did not understand anything about a conveyance;
she did not realize that it was a paper by which the Garden City
property was being transferred from one person to another; made
no memorandum of this occurrence; made no note of the recitals
in the deed; but *remembered perfectly now, there could be no doubt
of it, that 232 West End avenue had been Erlanger's address for many
years,* absolutely; she had seen the address on numerous occasions;

it was not the address, 232 West End avenue that impressed itself upon her mind; she was positive that the address 232 West End avenue was there; she remembered the paper for another reason; she repeated that the paper read "Abraham L. Erlanger, of 232 West End avenue," said *Abraham L. Erlanger of 232 West End avenue came after the word " between;"* that there was nothing filled in where the name of the grantee, Charlotte M. Fixel, is now; she was positive of that; nothing there at all. Asked if she realized it was a very serious charge to make against Mr. Baron, she said, " I am not making any charge against Mr. Baron;" she did not know it was a crime for a person to change an instrument after it had been signed by somebody; asked whether it were true A. L. Erlanger came before her, was known to her and known to be the individual described in the instrument and who executed the foregoing instrument, and acknowledged to her that he executed the same, she said it was not true, he did not come before her; she did not read the form of the acknowledgment; *said she knew she was attesting Mr. Erlanger's signature;* Baron said that this was for the Garden City property and Mr. Erlanger had told " me he was going to build a villa on it for Mrs. Erlanger;" that is all she remembered was said. She said when she put her name as notary to this instrument she knew it was an instrument referring to the Garden City property; she knew the contract had been taken in her husband's name. Asked to fix the date when she notarized the Exhibit H-7, to fix the month, and to state whether it was in August, 1927, she answered, " I don't remember;" that the statement over her signature that it was done on the 15th of August, 1927, *was not untrue;* she did not see Mr. Erlanger when she put her signature on the instrument; she was positive of that; she next saw the instrument in May or June of 1930. She swore to the instrument, Exhibit 56, auto registration of Charlotte Lesley, but did not see contestant sign; she meant that she attested her signature; that was all she knew; she first met contestant in 1921; she was not on the stage then; she met her as Mrs. Erlanger then; to her knowledge she had been Mrs. Erlanger ever since 1921; five years afterwards she was using the name Charlotte Lesley; *Erlanger told witness she was using it because* it was her stage name; in reference to auto registration for 1928 (Exhibit 57), she never swore contestant to the instrument; she knew it was her signature; said the statement that it was sworn to before her was not true; when she notarized Exhibit 59 *she knew the signature " Charlotte Lesley " was made by the contestant;* admitted statement was not true; on another instrument on which contestant signed " Charlotte Lesley " did not remember whether acting as notary, notarized signature on an instrument with the " Stuy-

vesant Insurance Company " at the top; did not remember acting as a notary or the circumstances of putting her name on it; knew that the signature Charlotte Lesley had been made by the contestant (Exhibit 60). In the matter of the claim against the Stuyvesant Insurance Company, signed " Charlotte Lesley," acknowledged before her as notary public, she said the contestant did not appear before her at all, neither personally nor in any other way, and did not make the statements represented to have been made to her; nor did she administer the oath to her (the cross-examination of Mrs. Dillon began on page 2324, ran through 2390, was resumed on 2398); did not know that contestant was spending two summers at Garden City Hotel; did not know she had the house at Far Rock-away in 1922 or that she rented it in the name of Charlotte Fixel; or that she had another house at Lawrence in 1924; acknowledged sending Christmas cards; identified three that were sent out in behalf of Mr. Dillon and herself; recognized one for 1929, one for 1927, one for 1928; reiterated that Erlanger and contestant thought each other were kind and considerate; did not say that Erlanger's usual behavior toward people was kind and considerate, said he was not; he was very kind and considerate to her and to Mr. Dillon; said, " No, he was not kind and considerate to Mr. Baron," not in her presence; she reiterated (2416) this; the examiner then asked over sixteen questions of her about the birth of her baby, who died or was born dead, a lot of details on delicate matters for the manifest purpose of showing if possible a feeling against Erlanger for requiring her to keep on working and thus causing the death of her baby; after all these questions he said, " Of course, you have no great love for him on that account, did you have?" She answered, " I do not understand your question." Then followed this colloquy: " Q. What is the matter with that question? A. I had no great love for Mr. Erlanger? — I always had a great love for Mr. Erlanger. Q. Even though he was responsible for your misfortune that you have described? A. Yes." Beginning with page 2419 and running through 2431, the cross-examiner asked a question whether she furnished contestant's counsel with papers from the files of the Erlanger office; that and similar questions, some more specific than others, some broader in their embrace, but relating to the same query, whether she directly or indirectly gave out any papers from the files of the Erlanger office; they were put to the witness nine or ten different times, the same queries, and her answer continuously was " No." Incidental Exhibits 66, 67, 68 and 69 were marked; also Exhibits 70 to 76, inclusive, relating to various bank balances, weekly reports, etc., in the files of the Erlanger offices. Counsel openly stated the only purpose for which he wanted to use these

papers was to trace their origin, and how they got to the contestant. Obviously, the ultimate purpose was to impair the credibility of the witness. She made denial once and again and again (2419), including herself and Dillon and her sister, a comprehensive denial again, and a fourth denial, and again a definite and all-including denial, and again a sixth denial; then she was asked another long question along the same lines; she again made denial and (2428) repeated it, and made several denials on matters collateral to the main point. There was further detailed examination (2428, 2429) as to what papers Pratt brought down, where Mr. Erlanger kept them in his office, in a file, in a drawer, in a space in the private office. Notwithstanding all the previous denials, the same questions were put to her in another form, in various aspects, general and specific, on page 2430, and for the seventh, eighth, ninth and tenth times, she made further denial, and denied that she knew who did, which was the eleventh denial; yet again (2431) she was asked a similar question as to her having in her possession a list of corporations; she answered again " No." Then she was quizzed about the filing of financial papers (2432–2437) and about the safes and their combinations (2437–2439); about inventories of things in the safe (2439). She denied that she saw any agreement (Erlanger and Fixel); denied that Erlanger ever gave her any such agreement (this cross-examination began at 2324, ended at 2390, resumed at 2398, ending at 2445, began again at 2480, ended at 2506). In regard to the matter of whether or not she called contestant's counsel's attention one afternoon, after the beginning of her direct examination, to the episode of the ring at Ben Riley's, she was asked in the redirect to state whether it was a fact *that she never stated that conversation to him or whether she meant that she never stated it after she left the witness stand,* and the witness answered: " *I meant after I left the witness stand, I stated it to you at your house, Sunday, and I stated it to you the evening of Mr. Erlanger's funeral at your home.*" She did notarial business for other people in that building where the Erlanger offices were, for their accommodation; neither received anything by way of charges; never in all the time that she has acted as notary has she received anything in notarizing papers in Erlanger's office, sent to her by Erlanger or by Baron, or any of Erlanger's offices; never challenged any paper or declined to make any acknowledgment of any paper that was brought to her; asked about the pledge she said she had which she had made, which accounted for her deep interest in the trial; she stated it was made on February thirteenth; " It was February 13th, the day after Mr. Erlanger returned to his home at Riverside Drive from the hospital. It was in his office, and he asked me to promise him that if, after his death, his people tried to

make any trouble for Mrs. Erlanger that I would go to her and lend her every protection possible, and I told that to Mr. Baron in Judge Erlanger's home." She said in reference to her working up to almost the time her baby was born that it was at Erlanger's request; " He asked me to remain because he did not trust Mr. Baron;" was examined on March 14, 1930, by Messrs. Charles L. Craig, Kresel and Baron, a stenographer being present. *She was discharged the next morning at ten o'clock.* It was the last day that Erlanger was in the office, May 5, 1927, that Erlanger said to her he did not trust Baron; Baron was his regular attorney and did most of his legal work at that time. She cautioned Baron about bringing over " Kiki " from the Belasco Theatre to the New Amsterdam Theatre for the purpose of making some money; Baron figured that the only thing was the money to be made; she told him that Erlanger would not want it because of his deep friendship for Mr. Belasco. *Baron asked her to call up Mrs. Erlanger, which she did,* to find out whether or not it should be moved over, and the answer was " No " (May, 1927). She said Mr. Erlanger's terms designating the functions of Dillon's position were " chief executive and personal representative," his own terms, dictated to her on the *3d of July, 1927;* two photographs of Erlanger, which she recognized, and the inscription on them as Erlanger's handwriting, " Dear Saul, You have won my favor. A. L. E.," were marked proponents' Exhibit 83. Shown contestant's Exhibits A-9, B-9, Y-8, she said she type-wrote the envelope in each instance. Asked if she read over every one of these letters (sent by Dillon to contestant), Y-9, B-9, A-9, C-3, X-8, F-9, E-9, D-9 and W-9, prior to their being sent, she was not positive about one, because she was in Wernersville at the time, the one that is marked X-8; she said if she was not at Wernersville at that time, then she saw this letter; remembered she read X-8 over; *remembered Erlanger wearing a certain ring, it was in connection with the purchase of the Gaiety Theatre that Mr. Erlanger made use of a ring produced, with A. L. E. on it; she remembered the ring. He told her he sealed the papers with that ring.* Then asked if she knew a certain Mrs. Hazel Schade, she said, Yes, since 1925; asked whether she met her at Sag Harbor, she did not know whether it was there she met her or not; she could not say positively it was 1925; said that Mrs. Schade had been to see her at the New Amster-dam Theatre; about twice she gave her theatre tickets; one time she came about a divorce; she did not come frequently, and on quite a number of occasions, did not recall how many times, she might have arranged to give her theatre tickets. She would telephone to her; her best recollection was she saw her at the New Amsterdam Theatre twice; a passing acquaintance, that is about all. She was

very nice to her, very good to her; did not correspond as friends, as far as she recollected; had no recollection of having written to her; the Dillons were living in Flushing; took their meals there with Mrs. Schade in the house, not all the time; did not remember ever having talked to her about Mr. Erlanger other than that she worked for him; said she seldom discussed Mr. Erlanger with anybody; she never said to Mrs. Schade anything concerning which Dillon was questioned; had no recollection of anything else than what she stated; did not remember ever having talked to her about the contestant; she reiterated it and said, "No, sir;" said her recollection was sufficiently strong for her to be able to say positively that she did not — never talked to her daughter about Erlanger; said she was a child; never talked to the daughter about contestant. Mr. Dillon asked her (the daughter) to leave the house; "That is what I know." She judged the daughter was about fifteen or sixteen or seventeen years old then; she had no such conversation as testified to by Aarons with reference to the telephone message from Stern Brothers; never said to Mr. Aarons, "There is not anything that will surprise me regarding that lady," referring to Mrs. Erlanger (6686); she heard Dillingham call contestant Mrs. Erlanger. Witness did not know of ever acting as a witness to a will for Mr. Erlanger; if she did it had escaped her mind, as she had witnessed thousands of papers in the course of twelve years of employment.

*Testimony of Dillon having a bearing upon the marriage agreement has been previously quoted. The remainder of his testimony is now presented in a condensed form.* Dillon, husband of *Madeleine Dillon, known as Miss Donnelly in the Erlanger offices,* knew decedent thirteen or fourteen years; previous to 1926 he had been engaged in theatricals for twenty-three years; entered Erlanger's employment in March, 1927, making a more definite agreement with him in July; *first met Mrs. Erlanger June 7, 1927, at 232 West End avenue;* Erlanger had been confined since May fourth to his home by a stroke suffered on the latter day. In introducing contestant, Erlanger said to him, "*Jack, I want you to meet my wife, Mrs. Erlanger;*" talked about salary, business, theatres, bookings, etc. At this time Mrs. Dillon was in the hospital, which she left around June twenty-second; she, with Dillon, called at the West End avenue home just once prior to July third. Erlanger told Mrs. Dillon that when she was well enough he wanted her to come back to the office, and he expected before long to be back himself; he dictated a note to the following effect: "*This is Mr. Dillon, my personal representative and chief executive; any business you have to take up with Mr. Erlanger take it up through Mr. Dillon, and when Mr. Erlanger is out of the building Mr. Dillon is his representative*"

*— something along that line.* He took up his new duties on July fifth; his salary was $200 a week until January 1, 1928, then it was $300 a week; Christmas, 1928, Erlanger gave him a gift of $2,500 by check; a written expression accompanied the check (Contestant's Exhibit J-8); in Easter, 1929, a $1,000 gift was made by Erlanger to Dillon, contained in an Easter egg; Christmas, 1929, he gave Dillon a check for $5,000 with an expression in his handwriting. He also received a photograph of Erlanger with an inscription on it (2526): *" To Jack, who is a 100% plus."* At Atlantic City Mr. and Mrs. Dillon made one visit in the summer of 1927 while the Erlangers were there, August twenty-seventh. They asked at the desk of the hotel for Mr. and Mrs. Erlanger, and were directed to their suite. *Between July twenty-seventh and August twenty-seventh Dillon telephoned to Erlanger or Mrs. Erlanger every morning at ten o'clock and talked to Mrs. Erlanger; sometimes Erlanger would talk on the phone. He called up to give the receipts of the theatres, any important mail or telegrams, and to keep Erlanger in touch. In calling on them in the morning Dillon would ask for Mrs. Erlanger.* During the visit Erlanger said that he thought it would not be long before he would be able to get back to New York. He seemed to be in a very happy frame of mind. Dillon declared that one thing especially was mentioned by Erlanger, viz., *he did not understand how Charlotte could get along so much without sleep, so well without sleep, that no matter what happened during the night, if he coughed or wanted a glass of water, any time he would awaken she would be stand-ing right over him, and that she practically just lived for him.* Dillon himself had gone down to Atlantic City more than once; *each time he saw Mrs. Erlanger there;* for the Erlangers' return to New York Dillon had made reservations in the Ambassador Hotel under the directions of Erlanger, who told him to go over to the Ambassador and *get the finest suite in the hotel, register it for Mr. and Mrs. Erlanger, that if it was good enough for Georgie Cohan it was good enough for him.* Dillon went to the hotel, made the reservation and selected a suite for Mr. and Mrs. Erlanger; remembered *that they went back (2534) to Atlantic City about the first of November for just a few days.* During that time he communicated with them every morning and gave the receipts; when they returned to New York they went to live at No. 175 Riverside drive. Dillon's first visit to Riverside drive was December 1, 1927, on which occasion he saw both Mr. and Mrs. Erlanger; Mrs. Dillon was with him. Erlanger used to take up business, reading receipts, etc., on Sundays. Dillon was there every Sunday pretty nearly after that. When both were in town, they would practically spend their Sundays together at his apartment. Erlanger would always insist on going for a ride;

these visits to the apartment would average almost every Sunday and about once a week at dinner; when they and the Dillons went to places, they went to the New York Athletic Club in the city, New York Athletic Club at Travers Island, to Henri's, Lynbrook, the Claremont on Riverside drive, Ben Riley's Arrowhead Inn, Pickwick Arms, Boston Post Lodge, Weisheit's at Stamford; the four usually dining together; in some places different acquaintances came over to talk with them. When asked about the demeanor of Mr. and Mrs. Erlanger to each other, Dillon summed it up in just one sentence for both of them: " *Taking into consideration my own home and my own father and mother, I never saw such devotion in my life.*" He remembered their departure for Europe in 1928 on the steamship *Columbus;* he went down to see them off; he and his wife, at the request of Mr. and Mrs. Erlanger, dined on the boat that night; at the dinner were Mr. and Mrs. Erlanger, Mr. and Mrs. Lachman, Meyer Keen, Dr. McConnell, Mrs. Amy Ashmore Clark; they came back from Europe on the *Olympic* in September, 1928; From September, 1928, Dillon continued the same course of conduct with respect to visiting the Erlangers as he had prior to that time; dined with them at least once during the week and on practically every Sunday; used to visit the various places above enumerated; in *1929* Mr. and Mrs. Erlanger made a Mediterranean trip in January; left upon the *Augustus*, coming home around March fourth on the *Berengaria*, Dillon meeting them at quarantine. Erlanger presented him with cuff links for his birthday. After this return the Dillons continued their visits as before. In the summer of 1929 the Erlangers were at No. 175 Riverside drive; they took a house at Larchmont, but only held it a few days; *afterwards they took a house for the summer at New Rochelle, the rent of which was $6,000.* Dillon spent his Sunday afternoons during the period at the baseball games with Erlanger, except when Dillon was in the hospital. Dillon recalled going to Arrowhead Inn with his wife, meeting the Erlangers there in November, after the Erlangers had returned from Atlantic City. He recited the wedding ring episode at Ben Riley's, and the subsequent conversation with Erlanger, previously considered in this opinion. The Dillons accompanied the Erlangers as far as Albany on their California trip in January, 1930; in the party were Mr. and Mrs. Erlanger, the valet, Mark Heiman, George Stanton and Mr. and Mrs. Dillon. The latter met the Erlangers on the return trip at Albany, accompanying them to New York; he told him he was very tired, he had been on the train from Phœnix, Ariz., for five days; upon arrival in New York, Erlanger bade them good-night, saying: " *I guess Charlotte and I will go home, so you and Madeleine can go over to the hotel (Ambassador)*

*and occupy that suite.*" Before starting, Erlanger told Dillon about calling up Dr. McConnell to have him come up to the house. They went home to No. 175 Riverside drive. Dillon saw Erlanger the next morning in the office, the former continued to come to the office until February fifth about the middle of the week. On February eleventh Erlanger went to the French Hospital for observation. Dillon was with him, but not present with Erlanger when the answers were made to the questions which appear in Exhibit YY. Erlanger left the hospital the next morning. He continued to come to the office every day. The fifteenth of February was the last day he was at the office. From that day Dillon saw him at No. 175 Riverside drive; the first part of that period he was up, and later in bed. Dillon described (2555) the attitude of Erlanger toward Mrs. Erlanger while he was lying in bed propped up with pillows; took her by the cheeks with his hand and patted them, saying: " My little blue angel." Dillon was there every day between February fifteenth and March seventh; saw Mr. and Mrs. Erlanger there every day, except the last few days, when he did not look at Erlanger. On leaving the office on February 12, 1930 (day on which Erlanger left the hospital), the Dillons and Erlanger stopped down at the French Hospital to get some belongings and books left there, and as Mrs. Dillon returned to the automobile and was seated, the chauffeur said: " *Where to, Mr. Erlanger?*" Erlanger said to the chauffeur: " *To my happy hunting ground, Riverside Drive.*" When they arrived upstairs at the apartment they all greeted Mrs. Erlanger. Erlanger came in and sat down in the chair, and he said to the nurse that night, " *There is no use in bluffing, Reath; here is where I belong; here is where I am happy.*" Dillon was put through a long, searching and exhaustive cross-examination. It covered his boyhood, his youth, his college days at Syracuse University and later at Niagara University; his early occupation in his father's business, and later engagement in the theatrical business. He was interrogated about his salary, his functions, about different people who worked for Erlanger in the various departments, about Baron and Bergman, Richardson and Reid, about his knowledge of the various corporations, about powers of attorney, signing of checks, access to deposit boxes and every phase of the business. Among other things Dillon declared that Erlanger did not produce any new shows after he entered his employ, viz., after the stroke. " Honeymoon Lane " was the last show that Erlanger produced. He was questioned about all his relationships with Erlanger, in business and socially, where they went and what they did. He fixed the time of the first visit to Ben Riley's Arrowhead Inn as

*around Thanksgiving Day in 1927.* He told about the generalities, business and so forth that were discussed at that time. He reiterated what Mr. Erlanger said when Mrs. Dillon had the ring in her hand: " *Now I have given her two wedding rings, she can never get away from me now* " (2630). He told of other topics that were discussed; he repeated his story of the conversation with Erlanger *about a week after the ring episode at Arrowhead Inn,* where Dillon made the comment about how happy Charlotte was with the new ring; told how Mr. Erlanger said to him that he could not marry Charlotte in New York, *but he did in the eyes of God in Atlantic City, when he gave her that ring.* This colloquy took place in the examination: " *Q. You know that the Atlantic City marriage had taken place just prior, just shortly before you talked with him, did you not? A. Which talk with him, about what? Q. About the ring. A. Maybe a month or something like that. Q. About a month before that; is that right? A. Yes, sir."* Dillon was subjected to a long and searching interrogation concerning answers alleged to have been made by him *in the examination of him made a week after the decedent's death, in the theatre building, by Attorneys Craig, Kresel, Baron and Hershkopf,* the cross-examiner referring to a typewritten record of the inquisition. Dillon reiterated the directions given him by Erlanger as to registering them as Mr. and Mrs. A. L. Erlanger at the Ambassador Hotel in September, 1927. *On March 15, 1930, the day after the inquisition above referred to, Dillon was discharged by Judge Erlanger.* A persistent effort was made by the cross-examiner to force from Dillon an admission that he had taken papers and records from the files in the Erlanger offices and turned them over to the contestant. This consumed a long time and went into the whole subject of records and access to records, a knowledge of the records on the part of Dillon; the questions were put with all the genius of a skilled cross-examiner to the witness, in various ways and forms and under various aspects. As many as *ten different denials* upon the matter of the possession or turning over of such papers to the contestant or somebody representing the contestant were made by the witness. After going into other lines of inquiry the examiner returned to the same subject and plied questions to the witness about papers that might have come into his possession. The subject was again taken up after recess (2662) and continued to and including page 2681. *Dillon always knew the contestant as Mrs. Erlanger, he knew her as Mrs. Erlanger from the first day he met her,* but not only by that name. The other name by which he knew her after he met her was Charlotte Lesley (her stage name), and he is sure he did not know her by a third name. Her maiden name he learned later. When shown the transfer of

the 100 shares of the Equitable Building stock and the signature of A. L. Erlanger witnessed by him Dillon said he did not remember when he signed these transfers; that (2707) he certainly did believe that this lady was Mrs. Erlanger all the time that he knew her; that he believed it as strongly in 1929 as he believed it now; told of Mr. and Mrs. Erlanger going on the California trip in January, 1930; told of their going on the trip to Europe in 1928 and 1929 (2719); stated positively that during all that time he believed she was Mrs. Erlanger; told of the large number of cablegrams he sent to Erlanger abroad; being again directed to the certificate of stock of the Equitable Building Company, *he said he never read " Charlotte Fixel " on there in his life;* he could not recall the transaction and did not know who asked him to sign his name there as a witness; he had no recollection of where it was that he signed his name and had no recollection of having a talk with anybody about the transaction. The examiner returned to the possession of certain file papers (2738, 2739). Dillon was asked about distribution of theatre tickets with the theatre ticket agencies and as to directions given on this subject by Mr. Erlanger (2746); he went minutely into the relationships with theatre ticket agencies (2747–2749); asked if he got money from the brokers, he replied that he got gifts from brokers; could not recall how much the gifts were. Dillon said when he asked Mr. Erlanger the first time (presumably about gifts or money from brokers), Erlanger said, " *Take everything you get, Jack, as a present, because you are entitled to it, and I hope you will become a millionaire like my nephew, Bergman.*" A long examination was gone into of the witness concerning the answers he made when interrogated by Craig, Kresel and Baron. (Some of the methods used in this examination are illustrated graphically on pages 2768–2772.) When he was asked why he declined in the examination made by these attorneys to answer the question as to whether he made a statement at Mr. Steuer's office, he answered, " I declined to answer pretty near everything down there because I felt I was not in the room of honesty, with real God's good people;" that that was the remark passed by Mr. Erlanger about a certain party present. Questions on *matters usually involved in will contests were gone into* (for example, pages 2792–2799) the various counsel alternated in plying questions (2800–2805). Various efforts were made to draw him out (2806–2808) in this inquisition; Dillon then made a long statement (2808–2813). Dillon in the course of the inquisition said, " *I have everything in my heart to make me believe Mr. Erlanger is married.*" He said that the only interest he had in this litigation was the promise he made to Mr. Erlanger " that no harm will come to Charlotte from his brother or Mr. Baron," a promise

made February 13, 1930. Here he was queried about a woman named Hazel Schade and her daughter, their acquaintanceship with the Dillons, and statements alleged to have been made to them by the Dillons concerning the contestant and the decedent. Dillon denied emphatically that he made any of the statements ascribed to him by this woman; alleged statements were made to her between April and July of 1928, viz., that Dillon told Erlanger he was the king pin in the theatrical business and ought to travel and go to Europe and take things easy; that he told Erlanger to take a trip around the country and see all his theatres; that Charlotte was Mr. Erlanger's mistress and not his wife; that he had urged Erlanger to take these trips because this would give Charlotte a chance to show herself with Mr. Erlanger and establish herself as connected with him; that he had said, " We will establish her around as Mrs. Erlanger; and that when Erlanger died, Charlotte and he and Mrs. Dillon would be fixed for life; *that on Erlanger's death Charlotte and he and Mrs. Dillon would take a trip around the world, and that he, Dillon, figured that this would be around 1932, because Mr. Erlanger had not long to live, and that he had uremic poisoning and that he, Dillon, figured he would be dead by 1932;* that when Mr. Erlanger died, he would manage the business with Charlotte and run the theatres that she would inherit from Erlanger." *Dillon positively denied making any such statements.* Dillon told of an episode in the fall of 1928, shortly after Erlanger's return from Europe, when he met Judge Erlanger crossing the floor of the hall, on the fifth floor, to whom he said, " Mr. Erlanger is fine this morning, he is in great spirits, he looks fine, the trip did him a lot of good, Judge." He quoted the judge as saying, " He should be as good as ever only for that quack doctor;" whereupon Dillon said, " What doctor was that?" and the judge replied, " Dr. Glass;" and then Dillon declared that he said, " Judge, I never saw Dr. Glass in my life, I don't know anything about him; but I am only just speaking of how Mr. Erlanger feels this morning;" he, the judge, walked up and down, and he said, " You know, he is not married to this woman;" I said, " What?" and he said, " He is not married to this woman." " Why," I said, " your brother introduced me to Charlotte as Mrs. Erlanger;" and he said, " No, he is not married." And Dillon said, " Come inside and tell it to Mr. Erlanger " (2887). He said, " No, let us forget it, let us forget it." Dillon declared that the next time Erlanger sent for him to see him he told him just what Judge Erlanger had said, and Mr. Erlanger said to him, " How did I introduce you to Charlotte, Jack?" I said, " As your wife, Mrs. Erlanger." He said, " That is the answer." Erlanger said, " What does the judge think?" Much space in the record (2899–

2926) is taken up with an inquiry concerning various letters sent by Dillon to Mrs. Erlanger in Europe. He testified as to the so-called assignment which he signed for Baron in a cigar store just after the contract was made for the purchase in Dillon's name of the Garden City property; stated that he asked Baron, " Is that a transfer to Mrs. Erlanger?" and Baron said, " Yes," and Dillon said, " She is most deserving." Upon redirect Dillon said that he never acknowledged to anybody the assignment of the contract, and that he did not see the paper after he signed it on July eleventh; he did not recall (2935) that Baron brought to him on the 8th day of August, 1927, any paper. *He asserted that from the very beginning it was always said by Mr. Erlanger and by Mr. Baron that the property was being bought for Mrs. Erlanger; that since July 5, 1927, up to the day of Mr. Erlanger's death, to his knowledge, these two people were never separated for a single day or night, except for five or six days when Mr. Erlanger was taken over to his brother's house.* Quizzed concerning Exhibit 92 and Erlanger's signature, where Dillon is down as a witness, where the date is blank, Dillon stated that he did not know in whose handwriting the words " Charlotte Fixel, 175 Riverside Drive," were (*the photostats do not show the difference in the color of the ink, but on the original certificates Mr. Erlanger's signature is written in purple ink and also the signature of J. J. Dillon, witness, but the " Charlotte Fixel " on the back of such certificate is not in purple ink, but blue or black, and nothing like the color of the ink of the signature of Erlanger*). He stated when he was asked whether the writing " Charlotte Fixel, 175 Riverside Drive," was there when he annexed the signature that he " never read the top of this," meaning the certificate, " in my life. I just saw Mr. Erlanger's signature;" the filled in part was now shown to him; did not remember particularly the time when he witnessed the paper, and had no distinct recollection of signing it. It appeared that the ink in " Fixel " is entirely different ink than the ink used by Erlanger in signing it, and the interpolation over the " Fixel, $^{c}/_{o}$ A. L. Erlanger, Apt. O-12-E, Riverside Drive, New York City," is again in a different ink than the ink used in writing " Charlotte Fixel;" and they are all in different handwritings. He described (2963) a toast on February 12, 1930, made by Erlanger. (This was Lincoln's Birthday.) " Here is to Abraham Lincoln Erlanger, who today freed himself from the treachery of his family and Baron." He was quizzed about his affectionate language to Mrs. Erlanger in his letters to her. He repeated the toast made on February twelfth by Erlanger; said the nurse was outside in one of the rooms and nobody else was there.

Proponents, in their brief (pp. 85–121), seek by various argu-

ments to attack and destroy Dillon's credibility, which may be briefly summarized as follows: (1) They assert that his testimony on the stand did not harmonize with the answers given by him (in what was a most extraordinary and unusual inquisition of Dillon conducted by four attorneys, Craig, Baron, Kresel and Hershkopf) a week after Erlanger's death. (2) They assert that in affidavits made by Dillon in proceedings held before this trial, Dillon did not make reference to the conversation at Arrowhead Inn or the subsequent colloquy with Erlanger. (3) They assert that contestant's counsel repudiated Dillon (3067). (4) They say he received gifts from ticket brokers in connection with distribution of tickets (Dillon admitted the gifts and said they were received with the knowledge and approval of Erlanger). (5) They call Dillon's statement that he received from Erlanger a present of a check for $2,500 at Christmas, 1928, a pure fabrication, basing this harsh conclusion upon Pratt's, the auditor's, statement that he could not find an entry of the check in the company books. [(a) Dillon had received money presents from Erlanger at Christmas, 1927, Easter, 1928, Christmas, 1929, the latter one $5,000; (b) the letter containing, as Dillon stated, the check in 1928 was marked in evidence (Exhibit J-8); it fairly implies that there was an inclosure, for it read: " Dear Jack, 365 days of good health and happiness each year — but on leap year I am going to give you the same thought for 366. I appreciate you, A. L. E.;" and below, J. J. Dillon, Esq., No. 214 West Forty-second street, New York. A. L. E. /M. D. It was on Erlanger's private stationery with embossed initials " A. L. E.;" (c) besides, any deduction from Pratt's testimony involves the accuracy of his memory, the accuracy and thoroughness of his search of the books of account, his attitude and reactions on the stand and his credibility, the record speaks for itself.] (6) They refer to a remark which Dillon says he made at the closing of the contract for the Garden City property when Dillon signed the assignment of the contract, and Baron told him it was an assignment to Mrs. Erlanger, viz., " *She is most deserving* " (2391), and asserting that Dillon at that time knew contestant " only about a month," and they conclude " *of course, that is simply improbable, and naturally enough Mr. Baron denies it* " (5860). (Note. While Dillon's introduction to Mrs. Erlanger took place in June, 1927, his wife had known Mrs. Erlanger since 1920, and was secretary to decedent since 1918, and Dillon had known decedent for a long time, thirteen or fourteen years.) (7) They contend that Dillon is " *even more plainly discredited* " by the statement he made that the assignment was on a " mere scrap of paper," whereas it was the *duplicate original* on which Baron had

written out the assignment in long hand. (After the closing of the contract in the law office in Brooklyn, when Baron and Dillon came down to the street, the former led the latter into a cigar store where on the counter he had Dillon sign a paper; this turned out to be the assignment; Dillon's words were a layman's terms describing the paper signed in an informal manner, in an informal place.) (8) Referring to the acknowledgment of the assignment, dated August 8, 1927, they charge that " an attempt was made by the Dillons to impugn this acknowledgment, their claim being that Mr. Baron was in Atlantic City on August 8, 1927, while they were in New York that date, and hence the certificate of acknowledgment was necessarily false " (p. 98). (Note. I find nothing in the record to justify this statement. Mrs. Dillon did not assert that Baron was in Atlantic City August eighth, and Dillon did not so assert, though he did state that he did not see the assignment after he signed it July 11, 1927. Contestant's counsel pointed to the hotel record as indicating Baron's presence there August eighth; and the Hock letter [Exhibit 344], which occasioned the acknowledgment, was dated as late as August eighth, and proponents did not produce the envelope in which it was inclosed [5864].) (9) They attempt to discredit Dillon by attacking his testimony (2517–2519) concerning Erlanger's dictation of July 3, 1927, of a memorandum to be read to heads of all departments to the effect that Dillon was his " personal representative and chief executive," etc., and assert that Dillon's relation to Erlanger was more of a social nature than a business connection; they belittle the position filled by Dillon (brief, p. 100). (Note. The testimony of various witnesses clearly shows the nature of Dillon's official work in the Erlanger Enterprises, its scope and its importance. He grew rapidly in the confidence, respect and regard of Erlanger from the time he entered his employ. On the business side of Erlanger he was a very important factor and Dillon and his wife were the only employees who to any extent participated in his social life from November, 1927, to his death. As to whether an announcement was made to heads of departments, read testimony of publicity manager Reid [3991 and 4003] and Pratt's testimony [5637 and 5638]. See, also, Dillon's testimony as to his salary increases, the money presents, etc.) (10) Dillon's testimony (2513) that he was first introduced to her July 7, 1927; it was by decedent who said, " Jack, I want you to meet my wife, Mrs. Erlanger," and that he always knew her as Mrs. Erlanger, proponents say was a deliberate falsehood and they try to prove it a falsehood by claiming that he made an answer which was false to a question put to him on cross-examination as to whether he did not know her as Charlotte Fixel when he

stated that though in the fall of 1927 he learned from her that that was her maiden name, the first document that he ever had anything to do with was the deed (H-7) which he first saw in September, 1930 (2685, 2686); continuing, they assert that the two Equitable Building Company stock certificate transfers bearing the name of Charlotte Fixel as transferee were signed at the bottom by decedent with J. J. Dillon's name signed as witness to the latter's signature. (Note. Dillon on this point stated that he did not remember that he had signed these transfers, that he had no recollection of them [2689].) As another argument offered in support of their contention that Dillon's statement that he always knew her as Mrs. Erlanger was false, they point to the answer he made (2691) to a question as to his knowing before decedent's death that the property at Garden City stood in the name of Charlotte Fixel, to which Dillon answered " no " (2691) and they refer to the letter from the village clerk of Garden City, dated November 15, 1928, directed to Charlotte Fixel, referring to said property as hers and a copy of a reply thereto which had the initials J. J. D.-M. D. Dillon replied (2692–2695) that he had no recollection of the village clerk's letter and he denied that the letters J. J. D. were on the copy (2693). (Proponents overlooked the fact that back on page 2686 when they first began to ask Dillon about his knowledge of the deed Exhibit H-7, they asked him also whether he ever saw any correspondence bearing the name Charolotte Fixel, and he frankly answered " yes, sir," and on being asked when, he answered, " Sometime in regard to real estate in Garden City, something I saw, I do not recall whether it was last year, last year or this year." He could not remember whether it was after decedent's death.) Then they recall that when a bill for work done on the property referred to in the aforesaid letter made out to Charlotte Fixel and bearing Dillon's O. K. was shown to him, he admitted that he had seen it in January, 1929, which was twenty-one months before September, 1930, the time when he previously said he first saw *a document bearing the name Charlotte Fixel.* (See Dillon's cross-examination.) His reply was, " I know it when I see the deed," and he refused to say that his previous answers were not true (2698). (11) They say documents belie Dillon's statement that he always believed that contestant was decedent's wife and refer to a letter sent by Dillon to Erlanger representatives in Chicago concerning arrangements he wanted to make for the arrival of Erlanger in Chicago (January, 1930) *en route* to California *in which Dillon said the party would consist of four persons — and did not mention Mrs. Erlanger.* They assert that he did mention Heiman (a guest of Mr. and Mrs. Erlanger on the trip) and emphasize this fact by way of comparison

with the omission of reference to Mrs. Erlanger. (Note. These letters were strictly business letters and to the point, and Heiman, being a theatrical man associated with Erlanger, was doubtless referred to specifically because Dillon desired the addressees to get in touch with Heiman to have certain details for the comfort of Erlanger carried out.) (12) They refer to cablegrams sent to Erlanger abroad in 1928 and 1929 in which no reference was made by Dillon to Mrs. Erlanger. (13) They refer to certain letters (W-8, X-3, Y-8, Z-8, A-9) from Dillon to contestant while abroad. They call attention to the extraordinary intimacy and affection which appears to have existed between Dillon and contestant and argue that Dillon would not write them if he believed that contestant was decedent's wife. (Note. The interpretation to be given these letters will vary with the minds of the readers of them. Expressions engrafted from current plays, especially from the comedy kind, are bound to seem strange to non-theatrical persons when the plays have passed out and a year or two have gone by.) (14) The proponents seek to draw inferences against Dillon's credibility from Easter and Christmas greetings sent to Erlanger without any reference to Mrs. Erlanger, and to many telegrams sent to him while on his Western trip which likewise lacked any reference to Mrs. Erlanger. (15) They refer to a " black book " which Dillon had in his possession, containing data about the Erlanger business. The proponent Mitchell Erlanger demanded the surrender of the book and Dillon declined to surrender it and testified that he " burned the book;" proponents in their brief (p. 108) exclaim, " Who but an unprincipled employee would destroy the records of his employer? " (Note. This book was not a company book; it belonged to Dillon and had his name " John J. Dillon," and contained a great many personal matters, Dillon testified [2660].) No claim is made that it was company property. It is difficult to understand what right proponent Mitchell Erlanger had to the book or how proponents should call him " unprincipled " because he burned it; finally they call attention to the contestant's having in her possession after Erlanger's death financial papers from decedent's offices, statements of weekly balances, etc., and they charge the Dillons with having delivered them to the contestant (Proponents' brief, 106–108). (Note. The cross-examination of Dillon and his wife concerning their knowledge of, possession and contact with such papers consumed several hours; it was exhaustive. Very many times and with the questions put to him in a variety of forms Dillon emphatically denied that either directly or indirectly did he deliver to contestant any of such papers (2652–2654, 2671, 2677, 3069).

Mrs. Dillon's credibility also is attacked by proponents (brief, 109–122). The first pages are devoted to a statement of alleged testimony of Mrs. Dillon and her husband (2275–2282, 2306–2313, 2979, 2980), an effort being made to paint the Dillons as *the villains in a plot alleged to have been initiated when decedent suffered a stroke and was "a sorely stricken man."* They argue that the stroke suffered by decedent turned the minds of the Dillons and of contestant after the summer of 1927 toward the thought of what would happen when Erlanger would die. They charge the Dillons with cultivating and using the contestant. They refer again to Mrs. Dillon's testimony as to her conversation with contestant the day after the Arrowhead Inn occurrence, about his giving the contestant another ring, etc. (2313); they attack the testimony of both, calling it pure fiction and a recent invention on her part. As to a growing intimacy between the Dillons and the contestant the record is complete and convincing that from June, 1927, there developed a warm friendship between the Dillons and Erlanger, and from the return to New York from the November visit at Atlantic City the friendship and companionship became exceedingly intimate between the parties themselves and the Dillons; the meetings, socially on Sundays and weekdays, between both couples were very frequent and apparently very cordial and friendly. Dillon grew rapidly in the esteem of Erlanger, as was evidenced by the confidence placed in him and by the rapid increases in his salary and the bestowal of a number of bonuses. There is no reliable or credible proof in this record from which may be drawn the deduction that the Dillons were parties to any conspiracy or that they entered into any combination with the contestant or plot such as is charged by the proponents [p. 111]. The proponents attempt to show Mrs. Dillon's story was a recent fabrication by her; they refer to the fact that she began her testimony on November seventeenth, and was on the stand when the court adjourned for the day, and that next morning her redirect examination was resumed, and for the first time she told the story of her colloquy with the decedent the next day after the Arrowhead Inn incident. In their analysis of Mrs. Dillon's testimony, intended to show from her cross-examination that her testimony had been a recent fabrication, they begin by referring to a statement made by contestant's counsel [p. 2309] at the close of the first day's testimony, that he could not think of anything else to ask her, but that there might be something. The proponents then referred to the directing of her attention to this statement of her counsel, and asking her *whether she had reminded counsel about the alleged talk* held with decedent the day after the Arrowhead Inn incident, and they point to the

questions and answers in this cross-examination [pp. 2324, 2325], and by further references to Mrs. Dillon's testimony in her redirect examination; when she explained certain answers in her cross-examination, they criticize her explanation, saying it was even more disingenuous than the answers which she made on cross-examination. I do not agree with the deduction made by the proponents in their brief in this matter. This witness had been subjected to a long and tense direct examination and a most exhaustive cross-examination, and her credibility as a witness was established by her attitude and her answers during the whole of her testimony, throughout a most persistent and relentless cross-examination. Proponents' counsel brought up this particular point at the very beginning of his cross-examination, and his opening questions were focussed upon *what took place between her and contestant's counsel after the close of her first day's session*, and upon the query whether she had reminded said counsel of the talk that she had with Erlanger. The examination was tense from the beginning, and it may well be that in the questions that were put [pp. 2324, 2325] she understood that they were directed to talks, if any, on that subject which she may have had with her counsel or his assistant *after the close of that day's session*. I believe that when she used the words: " I never did, I did not, no, sir," and " Never," she had in mind that the questions applied to any conversations with her counsel upon that subject *after the recess was taken on the first day of her direct examination*. Proponents attempt to show [p. 112] Dillon's story of the alleged toast was a recent fabrication by him, claiming that he, too, " belatedly supplied at the trial and on the spur of the moment what the contestant believed to be a most important piece of testimony." Again they refer to a statement which contestant's counsel made at the adjournment of Dillon's direct examination on November nineteenth, that he did not think of any more at that time, but might overnight, and that he would make sure, as he did before, not to talk. Proponents urge that Dillon the next day had no further direct examination, and the cross-examination closed on Monday, November twenty-third, and on that day his redirect was commenced but not concluded, and that it was only on the next day, the twenty-fourth, at the end of his redirect examination that Dillon testified to the alleged dinner on *2–12–30*, at which the decedent is claimed by Dillon to have stated as a toast: " Here is to Abraham Lincoln Erlanger who has this day freed himself from the treachery of his family and Baron " [pp. 2962, 2963]. Proponents contend that this incident was not mentioned in either of the two affidavits which Dillon made for contestant's counsel, that it flies in the face

of the overwhelming weight of the evidence, which they claim clearly establishes that the decedent and his family were on the most cordial and affectionate terms. They refer to testimony of various witnesses concerning the relationships between Erlanger and his sisters and brother, and argue therefrom that the testimony was only a figment of Dillon's imagination.

They attempt to break down the credibility of Mrs. Dillon by pointing to her admissions on the witness stand of acknowledgments taken without the presence of the affiant in various instances. Proponents and their counsel know full well the practice of notaries public and commissioners of deeds is far spread, and quite common in law offices, of taking acknowledgments without the physical presence before them of the affiants, in cases where they are thoroughly acquainted with the signatures. The extent of this practice does not justify, though it may in part excuse, the acts of notaries who engage in it; but it is stretching the argument very far and especially as against the credibility of this witness, who worked in an office where Baron may be assumed to be in close touch with the instruments acknowledged, and who as a lawyer was in a position to inculcate correct practices upon the part of the notary. (*Matter of Napolis*, 169 App. Div. 469, at p. 472.) Proponents go so far in their attack on the witness as to use her acknowledgment of Erlanger's execution on the 15th of August, 1927, of the deed (Contestant's Exhibit H-7) against her and her credibility, in the face of the fact that under Baron's own testimony, he had charge of the preparation of this deed and it was drawn on September twenty-sixth, and actually executed then, and thus he was a party by reason of his connection with the instrument to the falsity in the acknowledgment as to the *date of the execution*. Proponents take up on page 116 their view of the effect of the evidence of Baron and Cumberson about the altered deed of Erlanger to Fixel. We have already analyzed and discussed their testimony in reference to the deed H-7. They criticise her testimony (p. 118, brief) concerning where Erlanger spent certain summers by citing her answer that she did not know (pp. 2407–2409) and *her failure to find refreshment for her memory* when shown a letter to decedent written and signed by her and addressed to him at Lawrence (Exhibit 79) and a letter of decedent to Sherman Whipple (Exhibit 78) which stated that decedent was at Lawrence and was, she admitted, typed by her. They accuse her with having an interest which was one with contestant and draw this conclusion, " Nothing, it is submitted, could be more destructive than this of the claim of this witness to the credence of a court." No fair conclusion can be drawn from the answers

to one of a group of questions. Her whole testimony should be examined [2405]. She stated that she did not remember where he spent *the summers of 1918 to 1926*, giving separate answers as to each year. Obviously the questions *were framed to elicit her knowledge as to* the *summer* of each year, not to a day or a week in any summer. As the examination proceeded (2407) the witness is quite frank in expressing what knowledge she may have had on the subject. For, when asked, " Did you ever know of his spending his summer at Lawrence, L. I.? " she answered, " No, sir; not the summer. I know he went down there. Mr. Erlanger did not tell me those years, where he was going." She said she did not know how frequently he went there, that he called her up from there on the phone on Decoration Day, 1926, *that that was not the only occasion*. She communicated with him at Lawrence, *there were other occasions and other years;* she did *not remember the years, but she remembered the occasions*. She gave similar testimony as to where contestant spent her summers in 1921, 1922 down to 1926 and said that she did not remember having any occasion to communicate with her during that period. As to her answers in regard to the letters (Exhibits 79 and 78) the whole of the questions should be read (2433); they ask about the " *summers* " of the particular years (2435), not the particular dates when the letters were written. Proponents charge (p. 119) the Dillons with helping contestant, and point their employment of Knipping and Jennie Fielis, formerly of the Erlanger household — two witnesses at this trial. The testimony of these witnesses speaks for itself. It bore no signs of partisanship or of being influenced. They were plain, simple and frank witnesses. The court has reviewed in detail proponents' attack upon these two witnesses — the Dillons — not because of the relative importance of their testimony — for the *court would have reached the conclusions herein recorded even if their testimony was entirely eliminated;* but this consideration has been accorded to the subject of their testimony because proponents have deemed it of so much importance as to devote to it 36 pages out of 125 pages of their principal brief. I find it impossible to agree with their conclusions with respect to the Dillons. It is true that they are sympathetic with contestant and her cause, and on this subject they have been very frank. However, they were subjected to a most exhaustive and relentless cross-examination, conducted by a most adroit and skillful examiner, and in my opinion their testimony under fire of and by itself established their credibility. The truth and accuracy of their testimony was confirmed in many particulars by the testimony of a number of witnesses who came to the witness stand after they had finished, among whom were some

of proponents' witnesses. I hold the Dillons to be credible witnesses.

*Meyer Keen* further testified (1633) that he heard from Lachman in relation to a contemplated trip of Mr. and Mrs. Erlanger and went to see Mrs. Erlanger in the early part of March, 1928, at the Riverside drive apartment. Mrs. Erlanger wanted to go away in the spring to Germany; Keen suggested the steamship *Columbus;* she stated that they wanted a *de luxe* suite; *a suite was selected on the Columbus.* Keen came back later with a plan of the steamer and submitted the rooms for approval. He came back the next day and they said: " It was perfectly all right; just what they wanted;" this was at No. 175 Riverside drive; a day or two later Keen brought the tickets (1679). Before that he had asked her: " How would you like to travel on the steamer? " and they said: " Like to go on the stage name." When Keen asked (1680) under what name she wished to sail, she said: " I would like to go under the name of Miss Lesley, stage name;" that was the same name to which he had changed the 1927 ticket (Exhibits O-3 and P-3 offered in evidence.) She signed both names on the receipt (Exhibit T-3); the return trip was made on the *Olympic.* (Tickets marked Exhibit V-3; they were delivered to Erlanger at his office.) Keen went to the *Columbus* for its sailing, it was on May eleventh, but in reality on May tenth, at night, he dined there at Mr. Erlanger's request; Mr. and Mrs. Erlanger were there and Mr. and Mrs. Dillon and Mr. and Mrs. Lachman and Dr. McConnell. Keen stated that Mrs. Erlanger was referred to during the dinner as " Mrs. Erlanger," and that nobody in his presence called her " Charlotte Lesley." He described meeting Erlanger in October, 1928, and of Erlanger saying to him: " I got some business for you again; * * * go over and see Mrs. Erlanger; she will tell you what I want." The witness thanked him and went up to No. 175 Riverside drive; he saw Mrs. Erlanger and she asked, " Did he select any steamer?" and he said, " No, he left it all to you, Mrs. Erlanger." Conference resulted in the steamship *Augustus*, Italian Line, being selected (1761). The witness' company, the Open Road Travel Service, Inc., sent a letter to the Italian Line dated November 7, 1928, inclosing check for $5,768.65 for the tickets on the steamship *Augustus* sailing January 3, 1929, and return trip on the steamship *Roma* February 22, 1929, tickets being issued " account of Mr. and Mrs. A. L. Erlanger." They and valet sailed on the former date (the original ticket is Exhibit H-4, and the copy Exhibit H-4; the tickets reading: " First-class outward contract from New York to Naples on the steamship *Augustus* sailing January 3, 1929, *for Mr. and Mrs. A. L. Erlanger and valet*").

*Walter Scato Gockinga* (by deposition), manager of the Knicker-

bocker Tours of Paris and New York, knew Meyer Keen when he was connected with the Open Road Travel Service. Queried concerning arrangements made by Keen with him for a tour for Mr. and Mrs. Erlanger in 1928, he said he and Keen and Lachman went to Mrs. Erlanger's apartment; he never knew the contestant by any other name than Mrs. Erlanger; met her at her apartment, was introduced to her and has always addressed her as Mrs. Erlanger; told her about the various types of automobiles which he could furnish Mrs. Erlanger on her European trip; showed her a tour upon a map and asked if it had Mrs. Erlanger's approval, and she said yes; she picked the automobile she preferred, it was an Hispano-Suiza; she wanted to have the very best and *most comfortable* automobile possible on the other side; " *she agreed with me to reserve that automobile and to make out a trip, according to the outline I gave on the map.*" He said he arranged a preliminary itinerary according to what Mrs. Erlanger wanted him to do; prepared an outline; identified the itinerary which he prepared, entitled " *Suggestion of Route for Mr. and Mrs. Erlanger and party, with de luxe automobile, English-speaking chauffeur* " (Contestant's Exhibit P-9). He sent one copy of it for Mr. and Mrs. Abraham Erlanger to Keen and kept one himself; sent the original to Lachman; saw Lachman at his office in the Globe Theatre, from there went to Mr. Erlanger's office and submitted the itinerary to him, about the *end of April or the first of May;* received a check from Erlanger (Exhibit A-5). This was his first meeting with Erlanger; Keen was present; the interview was brief. He said " Mr. Erlanger was not a man to do a great deal of talking;" Lachman told him that he, Gockinga, was the man who had arranged the itinerary with Mrs. Erlanger and spoke about a deposit. So Mr. Erlanger asked them how much they wanted and after a colloquy with Erlanger he said, " $975." Erlanger directed then a check for $975 be made out; he said a few little words about the itinerary. The arrangement was for the auto to meet Mr. and Mrs. Erlanger in Bremen on the arrival of the steamship *Columbus*, the auto to be at their disposal for from three to three and one-half months; he identified the letter to Lachman sent with the original itinerary (Exhibit Q-9); identified the letter dated 10–31–28, addressed to Knickerbocker Tours, Paris, for the attention of the bookkeeping department, entitled " *Mr. and Mrs. A. L. Erlanger, account of Open Road, New York;*" said it was a copy of a letter written from the New York office to the Paris office in 1929; corrected the date to 1928 (Exhibit R-9); shown a letter of November 1, 1928, addressed to Meyer Keen, Open Road Travel Service, etc., entitled " *Mr. and Mrs. A. L. Erlanger,*" attached to which were two sheets, entitled

" Suggested automobile trip for Mr. and Mrs. Erlanger;" he said that these papers were exact copies of the original sent to Mr. Meyer Keen (Contestant's Exhibit L-4). Shown another letter of *November 8, 1928*, to Knickerbocker Tours, dated November 8, 1928, 11 West Forty-second street addressed to Knickerbocker Tours, Paris, headed, *"Re Mr. and Mrs. A. L. Erlanger, account Keen, Open Road;"* he said this letter was received at the Paris office; it was written by the New York office and signed by " P. Tord," manager (Exhibit S-9). This suggested auto trip (L-4) for Mr. and Mrs. Erlanger was for an entirely different tour than the first one; it was to commence around January fifth in Naples in 1929; it was also arranged by this company for Mr. and Mrs. Erlanger (Contestant's Exhibit S-9); and the letter of November 23, 1928, addressed to the Paris office entitled, " Erlanger tours," was the original letter sent from New York to the Paris office, received there December first (Exhibit T-9). Contestant's Exhibit 74 is a carbon copy of bill rendered to Erlanger by the company about *February 26, 1929*, at Hotel George V in Paris; he was actually at that hotel about that time; the bill was given to Mrs. Erlanger in Erlanger's presence at the Hotel George V; the bill was fully paid; witness said he owed Erlanger a refund on his last tour; it was automatically deducted (Exhibit Y-9); he met Mr. and Mrs. Erlanger at the Hotel George V on both the first and the second trip; at the time of the second trip (February, 1929) met them in the sitting room; they had three rooms; check signed by A. L. Erlanger in person to the order of Knickerbocker Tours for $1,197.60, dated February 25, 1929, in payment of Exhibit Y-9, was marked contestant's Exhibit Z-9; Mr. and Mrs. Erlanger landed in Europe on the first trip on the steamship *Columbus;* on the second trip they landed on an Italian ship, the steamship *Augustus.* Witness saw them on board the steamer just before they sailed on the first trip; saw them and a lot of people he had not been introduced to; *Columbus* arrived on the twenty-first of May; Gockinga's wife had never met them; she was introduced to Mr. and Mrs. Erlanger; Lachman introduced Mr. Erlanger and Mrs. Erlanger: *"May I introduce Mrs. Gockinga, Mr. and Mrs. Erlanger;"* and said, " *Meet Mr. and Mrs. Erlanger* " (3272). He saw them when they arrived at the hotel in Paris after the first trip (George V); went there two or three times; thought he was there once while Mr. Lachman was there; outside of these visits on the first tour he did not see them at any other time in Paris; discussed with Mrs. Erlanger claims made by Mr. Erlanger for a rebate; this was on the second trip when they came back to Paris in the latter part of February; called the next morning to welcome them to Paris;

greeted and addressed Mrs. Erlanger in Mr. Erlanger's presence; on the first visit he came into the room with Mr. Lachman; *greeted Mr. Erlanger as Mr. Erlanger, and Mrs. Erlanger as Mrs. Erlanger.* Erlanger was present when he greeted Mrs. Erlanger as Mrs. Erlanger, and at all times the person to whom he referred as Mrs. Erlanger was the person he identified in the courtroom — the contestant; saw them some time in July, 1928, when they were in Paris; greeted Mr. and Mrs. Erlanger in the same manner by their names, " *Mr. Erlanger and Mrs. Erlanger.*" The third call he described, also the greeting used, " How do you do, Mr. Erlanger; How do you do, Mrs. Erlanger." Gockinga made all the arrangements and itinery for the second tour; they embarked at Naples about January 5, 1929; went to Sicily; then back to Naples; north to Monte Carlo and France, straight back to Paris. Saw them when they arrived in Paris; saw Mrs. Erlanger first at his office, and greeted Mr. Erlanger outside the office, where he was waiting in the auto, saying, " How do you do, Mr. Erlanger; pleased to see you back in Paris." Mrs. Erlanger asked him to the hotel for dinner; had occasion to call Mrs. Erlanger by name while talking to her outside the auto, viz.: *"When she asked me to dinner at the hotel, I said, ' Mrs. Erlanger, I would be pleased to come.' "* Erlanger confirmed the invitation to dinner at the hotel. Next time he saw them at George V he greeted them the same way; greetings were in the presence of each (3290, 3291); Erlanger described his health to him; talked about his contracts with Dr. Paul, whom he met in Vienna and who had a great deal to do with curing him of his trouble; all left for the theatre together; Dr. Paul had joined them before going to the theatre; they went to the Moulin Rouge, all sat together in a side loge; left about the middle of the show; Erlanger had a nervous spell; heard Dr. Paul talk to Mrs. Erlanger, but does not recall the conversation; went straight home to the hotel (George V); heard Dr. Paul say " Goodbye " to them but cannot possibly recollect how he did address Mrs. Erlanger when he said " Goodbye; " saw Mr. and Mrs. Erlanger once after that, during their trip in 1929; that was the second trip; again at the hotel to say " Goodbye." Witness addressed her as Mrs. Erlanger positively in the presence of Mr. Erlanger and the chauffeur; he heard Erlanger address Mrs. Erlanger usually as " My dear," or " My darling; " the demeanor of one to the other and conduct of one to the other on the occasions when they were together " *were all very nice and of the very cordialest.*" He said Erlanger was " at any time always a nervous man, had some spells occasionally when his conversation was kind of abrupt; " *on the other hand,*

*Mrs. Erlanger had always been shown to be very pleasing to Mr. Erlanger and very devoted;* as a matter of fact always smiling whenever he asked something of her, was of the most friendliest; " Mr. Erlanger at times, that he was very nice to Mrs. Erlanger," and so on; ascribed to his delicate health; "At one time he was very *pleasing and agreeable to Mrs. Erlanger, and maybe the next minute he was very difficult to handle and abrupt talking, and not so very pleasing."* In referring to her Erlanger said either " Mrs. Erlanger " or referred to her as " my wife " (3299). He did certainly mention Mrs. Erlanger as Mrs. Erlanger or as his wife a number of times to witness, who always addressed her as Mrs. Erlanger. He never said anything else. He said: *"And I did not know anything else."* Witness sent flowers to Mrs. Erlanger. Witness does not know exactly what Lachman was, what his position was; he knew Lachman met him at the Globe Theatre, and Lachman made him believe at that time that he was secretary to Mr. Erlanger. Witness corrected the answer given to questions about talking to Erlanger when Mrs. Erlanger was not present, and said: " I want to specify that I really do not recollect Mrs. Erlanger ever being out of the suite; so, if I spoke to Mr. Erlanger alone, it was only Mrs. Erlanger was maybe in the other corner of the room and being busy with something else in the room, that is all." On cross-examination he said that he went to see counsel at Mrs. Erlanger's request; contestant came to see him at his office about two and a half months ago; that would be April or May of that year; Dillon was with Mrs. Erlanger and Mrs. Dillon; when he went to see counsel Mrs. Erlanger was with him; did not talk with counsel about the case while Mrs. Erlanger was present. He described what took place the first time that he saw decedent at the George V on the second trip (year 1929); he believed it was in August; no one else was present; he came into the room and he was welcomed by Mrs. Erlanger, and of course Mr. Erlanger was sitting in a big armchair, and he said, " How do you do, Mrs. Erlanger," " and I then went up to Mr. Erlanger and said, ' How do you do,' " and then Mrs. Erlanger thanked him for the flowers that he had sent to the hotel. On the second call on the second trip he said: " Well, nobody else was present, again. Mrs. Erlanger again — I settled the amount with the refund with Mrs. Erlanger; gave her the bill, and she wrote a check for what was the balance that was coming to us, deducting the refund that we owed to Mr. Erlanger, and she wrote the check, and Mr. Erlanger signed the check, and I left. That is all." On the third call *nobody but Mr. Erlanger and Mrs. Erlanger* came in; was again welcomed by Mrs. Erlanger, invited to dinner at the hotel in their suite; then Mr. Erlanger was tired, he wanted

to sit in an armchair; Mrs. Erlanger brought him down to the armchair, and then after the dinner they went to the theatre. On the fourth visit, about nine o'clock, only Mr. and Mrs. Erlanger and the chauffeur were present; the chauffeur brought Mr. Erlanger down to the auto; almost no conversation upstairs because Mr. Erlanger was getting nervous spells.

*Gaetano Tommasella* first met decedent when he entered Erlanger's employ as a personal attendant for a trip to Europe; told him, "Mrs. Erlanger will tell you as to your duties." They sailed January 2, 1929, on the steamship *Augustus*, landing at Naples on January fourteenth. Decedent introduced Pironti, agent of Knickerbocker Tours, saying: "This is Mrs. Erlanger." *Mr. and Mrs. Erlanger occupied the same suite; Mrs. Erlanger gave him his directions in the presence of Mr. Erlanger. Witness addressed her throughout the trip as Mrs. Erlanger. Peltier, the chauffeur, addressed her as Mrs. Erlanger. Mr. and Mrs. Erlanger always sat together* in the rear of the car; they went from Naples to Palermo, back to Naples, then to Genoa, thence to Monte Carlo, to Marseilles, thence to Lyons and to Paris, stopped at the George V, getting to Paris about February twenty-second or twenty-third. The Paris edition of the *New York Herald* of Saturday, February twenty-third, contained a reference to *Mr. and Mrs. A. L. Erlanger* (Contestant's Exhibit K-2) as follows: "*Mr. and Mrs. A. L. Erlanger of New York who have been at Lyons for a short sojourn have returned to the Hotel George V.*" This paper on the twenty-seventh read: "*Mr. and Mrs. Abraham L. Erlanger, New York theatrical manager and Mrs. Erlanger,* are returning to the States by the *Berengaria*, sailing today from Cherbourg" (Contestant's Exhibit L-2). The *Paris Herald* on the 12th of February, 1929, had a notice which read as follows: "At Monte Carlo. *Another American staying at the Hotel de Paris is Mr. A. L. Erlanger, theatrical owner and manager, accompanied by Mrs. Erlanger.*" Passenger list of the *Berengaria* for the trip beginning February 27, 1929 (Contestant's Exhibit N-2) contained these names: "*Mr. Abraham L. Erlanger, and man servant; Mrs. Erlanger.*" *Mr. and Mrs. Erlanger had steamer chairs* on both the *Augustus* and the *Berengaria*, and on the *Berengaria* his chair had in the little hole where the card is inserted his name, Mr. Erlanger, and on Mrs. Erlanger's chair was a card with the inscription "*Mrs. Erlanger.*" Witness said (1420) that they traveled on the *Augustus* as Mr. and Mrs. Erlanger, but it was not listed in the passenger list. He repeated that they traveled as *Mr. and Mrs. Erlanger;* that she was not set down on the list as Charlotte Lesley; never heard the name Charlotte Lesley; *said he did not see the name* Charlotte Fixel. *He never saw and*

*never heard the name Charlotte Fixel;* the name was entirely strange to him; he did not know her as anything other than as *Mrs. Erlanger;* that he did not know the question of whether she was his wife or widow was disputed.

*Ernesto Sodo* (by deposition), owner of the jewelry shop, Naples, Italy, met decedent, knew the lady, whom witness addressed as Mrs. Erlanger, met her in January, 1929. Mrs. Erlanger introduced him to Mr. Erlanger, saying: " *Mr. Sodo, I would like you to meet my husband;* " visited them several times at the Excelsior Hotel in Naples. He addressed her and she addressed him as " my wife, my husband," respectively; witness addressed the lady; always stated she was Mrs. Erlanger, his wife; said the attitude of the wife toward Mr. Erlanger was that of a true and devoted wife, and the attitude of Mr. Erlanger towards Mrs. Erlanger was devoted; " one day Mr. Erlanger asked me to bring him a very nice emerald ring for his wife. I took over to the hotel a very nice emerald ring worth 250,000 lira. Mr. Erlanger stated that it did not have enough color and I brought his attention to the fact that if it had a better color it would have cost a million lira, to which Mr. Erlanger stated: ' Price is no question, nothing is good enough for my wife, and I wish to all the men in the world to have a dear and good little wife like mine.' " On cross-interrogatories he said he received no instructions or advice from anybody on behalf of Mrs. Erlanger or from her; as to receiving a letter, he said: " Yes, I received a letter from Mrs. Erlanger stating that her husband had passed away and that she was having a lot of trouble because his family was contesting the estate left to her. I destroyed the letter as I did not think at the moment that it might have been of use. I replied to Mrs. Erlanger and stated that if questioned I would say all the truth I knew about her." I had no reason to believe she was not Mr. Erlanger's wife; on the contrary, he had all the reasons to believe that they were husband and wife, and that Mrs. Erlanger was always presented to him as Mr. Erlanger's wife; never met Mr. Erlanger at any other place than Naples. The letter written by Sodo to contestant was marked Exhibit F-10.

*Louise Maier* (by deposition), private secretary of the manager of the Villa Igiea, Palermo, Italy; held the same position the years 1928 and 1929; knew Mr. and Mrs. Erlanger, met them as hostess of the hotel; had her photograph taken with Mrs. Erlanger, the lady known to her as Mrs. A. L. Erlanger; looked at the photograph on the back and stated that it is the photograph of herself and the lady known to her as Mrs. Erlanger, taken at Palermo, Italy; identified two bills (Exhibit 2 and Exhibit 3) made out at the Villa Igiea; said they were almost always together; she did not

hear Mr. Erlanger address her as Mrs. Erlanger, but on the only other occasion when she talked to Mr. Erlanger she recalled distinctly that he referred to the lady as *his wife;* as to demeanor of Mrs. Erlanger toward Erlanger and Erlanger toward Mrs. Erlanger she said, *" On all occasions Mrs. Erlanger showed a particular devotion toward Mr. Erlanger. As for Mr. Erlanger's attitude toward Mrs. Erlanger, he was, poor man, sick and dependent on help. She wrote to Mrs. Erlanger, she said. There was every evidence that Mr. Erlanger considered her his wife."* She heard other people address her as Mrs. Erlanger in the presence of Mr. Erlanger; the manager of the hotel and her uncle addressed her as Mrs. Erlanger. Upon cross-examination, *asked if she received any instruction or advice* from any one acting on behalf of the woman calling herself Mrs. Erlanger or from her as to the nature of the evidence to be given by her, she answered, " No, none whatsoever." Asked if she received any letter from Mrs. Erlanger or from any of her attorneys or representatives since March seventh, she says, " Yes, I received a letter from Mrs. Erlanger in June, 1930, at Oberammergau, which had been forwarded there from Villa Igiea. I cannot attach the above mentioned letter, as I answered it and then destroyed it since. I have subsequently received another letter from Mrs. Erlanger, dated August 19, 1930, which is attached to this deposition." The letter, written from the Windermere, is spread *in toto* on the record at page 3406; it opens with, " My dear Miss Maier: My attorney has requested me to write you this letter today. He and I are so anxious to get your deposition which is so important to my case, and you are so wonderful to give it to me." She asked her to make haste in the matter, etc.; offered if she were not in Palermo to defray all expenses for a trip she would have to take to get there; she had received no promise of anything of value from Mrs. Erlanger or any of her attorneys, " only that Mrs. Erlanger simply said that my expenses to Palermo to make this deposition would be defrayed by her attorney." She said, " There was no one addressing Mr. and Mrs. Erlanger and no occasion for anybody to introduce them to me. We expected them and welcomed them as Mr. and Mrs. Erlanger." *As to ever hearing her referred to as Miss Lesley she said, " A. No. I never knew that name (Miss Lesley) and I never heard her addressed as Miss Lesley; never heard that she* was not Mr. Erlanger's wife. She never had any reason to believe she was not Mr. Erlanger's wife; just to the contrary; had never told or written anybody that she was not Mr. Erlanger's wife, or that she did not believe that she was. As to how she could recall the words of introduction the witness says: " I welcomed them, knowing before that they were Mr. and Mrs.

Erlanger for whom I had reserved an apartment. As I said before, under the circumstances, no one actually introduced us." Asked whether the woman introduced herself as Mrs. Erlanger, she said, " A. No, we welcomed them as arriving guests, addressing them as Mr. and Mrs. Erlanger, for whom the apartment was reserved, and there was no necessity for her to introduce herself as Mrs. Erlanger." She sent the bills to the apartment of Mr. and Mrs. Erlanger, Mrs. Erlanger paid them. Mr. Peronti, manager of Brown's International Tourist Office at Naples, by telephone informed her that the guests were Mr. and Mrs. Erlanger; Count Galante, the hotel manager, in greeting Mr. and Mrs. Erlanger, used the customary phraseology used in greeting any guests who have been highly recommended to the hotel; she introduced her uncle, Paul Hafner, to Mrs. Erlanger, and she later introduced the uncle to her husband, Mr. Erlanger, and she recalled that her uncle said to Mr. Erlanger in the presence of Mrs. Erlanger that he certainly had a most devoted little wife and that he felt sure that he would recover from his illness. She said: " Both my uncle and I were touched by the devotion shown to Mr. Erlanger by Mrs. Erlanger in so many different ways." "All of Mr. Erlanger's party were registered on the public register of the hotel " (Contestant's Exhibit D-10).

*Alfred Fischer*, assistant manager at the Hotel Bristol at Vienna (by deposition) stated: " Reservations were made for Mr. and Mrs. Erlanger through the Knickerbocker Tours Service of Paris, as per original correspondence (Contestant's Exhibit E-10). " Mrs. Fischer dined with Mr. and Mrs. Erlanger once on the Semmering (3469) at the Hotel Suedbahn, and once at the Kobenzl. They both addressed Mrs. Erlanger as ' Madam; ' addressed him as Mr. Erlanger." When addressing her Mr. Erlanger called her *"Charlotte,"* when referring to her he called her " *Mrs. Erlanger."* She addressed him as " Teddy." He said he never believed anything else than that they were man and wife. *As to the attitude of one toward the other, I cannot say much about it. She looked after him all right. Their attitude towards each other was as ordinarily man and wife would act."* Witness introduced them to Mr. Hemmer and to Dr. Paul as Mr. and Mrs. Erlanger. He introduced Dr. Paul to Mr. and Mrs. Erlanger. Dr. Paul came to the hotel quite often to treat Erlanger. He received a letter from Mrs. Erlanger; did not receive any from anybody else. Letter offered in evidence by Kresel (3479); stationery of the Windermere, West End avenue at Ninety-second street, New York city, dated June 22, 1930, " My dear Mr. Fischer: No doubt you have read of my very great loss of my dear husband, and perhaps you have also

read of the great battle I am undergoing because of his very bad brother and sisters;" further she told about her lawyer, about sending someone to him, the many times they spent together, both Mr. and Mrs. Erlanger, the loving care which the addressee knew she gave her husband. *He was not promised anything;* on their arrival he met *Mrs. Erlanger;* did not hear her referred to as Miss Lesley; has not told anybody that she was not Mrs. Erlanger or Mr. Erlanger's wife; or that he did not believe that she was; during their stay at the Bristol they were registered as Mr. and Mrs. Erlanger; Mr. Erlanger never told the witness that the woman with him, who now calls herself Mrs. Erlanger, was not Mrs. Erlanger or not Mr. Erlanger's wife, or that she was Miss Lesley.

*Filippo Peronti,* manager Brown's International Tourist Office, 165 S. Lucia, Naples, connected with other firms, received letters regarding *Mr. and Mrs. Erlanger from the Knickerbocker Tours;* said he wrote letters to the Knickerbocker Tours or to Mr. Scato Gockinga (Exhibits B-1 to B-10); was agent for Naples and Provinces, first met A. L. Erlanger on board the steamship *Augustus,* January 5, 1928, and met the lady with him; the name by which he knew her was *Mrs. Erlanger, addressed her as Mrs. Erlanger,* does not remember how Mr. Erlanger addressed her, but he knew that he represented her as his wife; they lived at the Hotel Excelsior as *Mr. and Mrs. Erlanger;* as to Mrs. Erlanger's attitude towards Mr. Erlanger and Mr. Erlanger's attitude toward her, he said, " Very friendly and intimate like husband and wife and *vice versa;* " he arranged for their hotel accommodations in Italy and also for their passage home on *Berengaria* to the United States, always under the names of Mr. and Mrs. Erlanger. He received a letter from Mrs. Erlanger stating that a solicitor would come around to my office and ask some questions; but she did not give him any instructions or advice as to the evidence to be given. This letter, which was written on the stationery of the Windermere Hotel, West End avenue at Ninety-second street, New York city, dated June 24, 1930, was spread forth at length on page 3437 of the record. " My dear Mr. Peronti * * * " It spoke about the loss of her dear husband, Mr. A. L. Erlanger, and also the great lawsuit in which she is now involved through a very bad brother and sisters, and continued: " Remembering how gracious and kind you always were in your attentions to us both, and I know that you will help me now." It spoke of her attorney taking depositions all through Europe, and so on; asked, should anybody come to see him, would he be kind enough to say that he knew Mr. and Mrs. Erlanger, that he called on Mr. and Mrs. Erlanger at the hotel on several occasions, did all the bookings through Italy for them,

also arranged for passage on their return trip to America on the steamship *Berengaria* in 1929; that he was paid all moneys by Mrs. A. L. Erlanger; " Will you also remember my devotion and attention to my husband — I have been through a lot and suffered three very hard years because of Mr. Erlanger's stroke in 1927 but my dear husband died of cancer in March of this year. I have adored my husband and we were very happy for *twenty-eight and a half years*, and now his people are making me suffer, but ' right is might ' and all I am asking is protection and vindication, which are doubtless mine." (Proponents' Exhibit 118.) Copy of the letter from Peronti, dated Naples, July 11, 1930, and addressed to Mrs. A. L. Erlanger, the Windermere, West End avenue, at Ninety-second street, was received in evidence; he wrote, " *I had the opportunity to admire all the delicacy of your attentions to your husband during your short stay here last year, and can fully realize what you have suffered.* I am greatly surprised to learn that you are involved in a lawsuit. *I am certainly at your disposal, and you may* be sure that I shall only be too happy to give evidence to anyone about the true affection you had for your husband." He never heard her referred to as Miss Lesley; never learned she was not Mr. Erlanger's wife; never had any reason to believe she was not Mr. Erlanger's wife; never told and has never written to anybody that she was not Mrs. Erlanger or Mr. Erlanger's wife; or that he did not believe that she was; all her letters were addressed to her as " ' Mrs. Erlanger,' as I also took care of the mail addressed to Mr. and Mrs. Erlanger."

*The testimony of Jennie Fielis covers a period from 1926 until after decedent's death.* She said that she had known her as Mrs. Erlanger since 1926; knew the decedent; she lived with them at 175 Riverside drive, as housekeeper; she addressed her as Mrs. Erlanger in Mr. Erlanger's presence and never addressed her by any other name; never heard anybody in that *house from 1926 down to the time when Mr. Erlanger died address her by any other name;* did the cooking and general work, answered the telephone; people telephoned there always, asking for Mrs. Erlanger; *that Mr. and Mrs. Erlanger dined together in the dining room every day, had their breakfast and dinner, and that Mrs. Erlanger slept there all the time that she was housekeeper;* that she took charge of the room at the Shelburne at Atlantic City; *that Mrs. Erlanger was there under the name of Mrs. Erlanger,* and Mr. Erlanger under his name; that as she was leaving the hotel, Mrs. Erlanger asked her if she would like to come to New York to work for her; that she said she would; that she started to work for them in November; that she met the contestant in 1926 at the hotel; she came later,

on the fourteenth of November; she received money from Mr. Erlanger at Christmas, she thanked him for it, and she said, "*You were very kind to me,*" and he said, "*You are deserving of it. You are very good to Mrs. Erlanger;*" that visitors called during the last three months of Mr. Erlanger's life, among them Mr. and Mrs. Dillon and Mrs. McCullough, Dr. McConnell and Dr. Grausman; she is working with the Dillons now; the contestant did not attend the funeral; *that Mrs. Erlanger never came into her room and sat down to talk with her in her bedroom; that she came to her room at the door if she wanted or needed her; that when Mr. Erlanger went away, Mrs. Erlanger went with him; that on the two occasions when they went to Europe they went together; when they came back they came back together, and from the minute that he was away, she was away; that Mr. Erlanger called her " Mrs. Erlanger; " "Darling," I think, always; that whenever he spoke of Mrs. Erlanger to anybody in witness' presence, he always referred to her as " Mrs. Erlanger; "* that on the day when Erlanger died and on the next day she received telephone messages and telegrams. She said there were no drinking parties there; once in a while she did take a drink with contestant; she drank ginger ale, sometimes a cocktail or fruit and stuff like that; as for cocktails, not very often, once in a while; they often had a drink of ginger ale.

*Sherman W. Frost, superintendent of the apartment building,* 175 Riverside drive, testified that he met the contestant when he was superintendent of another apartment house, and that four or five months afterwards he became superintendent of 175 Riverside drive; that he knew Mr. Erlanger; the latter was a tenant before he came there as superintendent, and lived in a duplex apartment known as O-12 and O-14-E; that he saw him every day or every two or three days as he passed through the hall if he happened to be around, and he saw contestant in the apartment; that he received calls from the apartment and special directions about it from Mrs. Erlanger; *and that she resided there continuously from the day that he became superintendent up to the period succeeding the death of Erlanger, outside of different trips that they might have made away from the apartment;* that she was a resident of the apartment during the whole period, meaning the duplex apartment; that he knew they went away at one time to Atlantic City; at another time to Europe, and another time they took a trip west. He saw them go together and come back together; he saw them use their automobile, their private car; he saw them on occasions when they went on trips with the automobile and addressed them on such occasions, " Goodbye, Mr. Erlanger, goodbye, Mrs. Erlanger. A pleasant trip " or something of that nature; he saw people call at the building to see Mr. and Mrs. Erlanger; parcels and mail

came there addressed to Mr. Erlanger, Mr. A. L. Erlanger, and Mrs. A. L. Erlanger; *that on numerous occasions Mr. Erlanger would come back in the afternoon and call for Mrs. Erlanger to come down and they would go for drives;* that Mr. Erlanger did not get out of the car on these occasions, but told the doorman to call Mrs. Erlanger; that the doorman would go to the switchboard and call up Mrs. Erlanger's apartment and tell the butler who answered the phone that Mr. Erlanger was waiting in the car for Mrs. Erlanger; that during the first part of the time he was there Mrs. Erlanger would get out of the car first and come and see that the elevator was on the floor waiting for Mr. Erlanger when he would come in, so that he would not have to wait for the elevator; that then the last part of the time she would come in and see the elevator was there and also have the doorman call up for the butler to come down to assist Mr. Erlanger to the apartment.

*George Alfred Holmuller* was an elevator operator there about March, 1929, working six days a week; knew Mr. Erlanger; knew contestant from July, 1929, when he started on the elevator; took Mrs. Erlanger up and down from the apartment a great many times; he said: " Mrs. Erlanger, Mr. Erlanger come in the car." " The chauffeur come, he help him come out the car, Mr. Erlanger; Mrs. Erlanger, she go up first and open the door. I take Mrs. Erlanger up first, going down right away," then " help Mr. Erlanger the car, take him up on the fourteenth floor, sometimes the thirteenth floor." He stated, " Mrs. Erlanger was waiting on the door; " she always waited at the door, and she would help Mr. Erlanger off the elevator; that Mr. Erlanger always come with Mrs. Erlanger; that he called her Mrs. Erlanger and she called him Mr. Erlanger, and that he called her Mrs. Erlanger when Mr. Erlanger was there, and that he never knew any other name; that one time he got a special letter for Mr. Erlanger and he signed for the letter, and Mr. and Mrs. Erlanger came in the car. He said: " I say, Mr. Erlanger, I got a letter for you, a special letter." " He said, ' Don't bother me with a letter. Every letter coming, any special and everything, give my wife, Mrs. Erlanger.' He said, ' Give to my wife '— he no say ' Mrs. Erlanger.' He said ' my wife.' " He testified that Mr. Erlanger asked him one time, " 1929, Christmas, Mrs. Erlanger may have give something for Christmas," and " I said, ' Yes, she give me something.' " Witness worked there until March, 1930.

*Anthony de Thomas,* an elevator operator at the Riverside drive apartment in 1928, for two years, knew Mrs. Erlanger. They were always addressed as Mr. and Mrs. Erlanger. He received parcels

and mail addressed to Mr. and Mrs. Erlanger; never knew her by any other name than Mrs. Erlanger.

*Ermin O. Baker identified two cards, one of December 6, 1927, written in the Strauss-Payton Studio in the Chickering Building,* testified concerning cards which were written by her; the information for the same was given to her by Mrs. Erlanger; that they had been to Mr. Erlanger's home and photographed him; that prior to making out that card she had met Mr. Erlanger at his home at 175 Riverside drive; that Messrs. Payton and Hudson photographed him, and that he actually was photographed the day they went there; that there were present at the time *Mr. Erlanger, Mrs. Erlanger,* Mr. Payton, Mr. Hudson and herself; that she met Mr. Erlanger in the library; *that she and Mr. Payton entered the room first with Mrs. Erlanger,* and she introduced them to Mr. Erlanger. " *She simply introduced us to Mr. Erlanger, Mr. Payton and myself,*" saying, " *I want you to meet Mr. Erlanger;* " that Mr. Hudson came in and he was introduced to Mr. Erlanger. She stated that the introduction was, " Miss Baker, I want you to meet Mr. Erlanger. Mr. Payton, I want you to meet Mr. Erlanger; " that Hudson was introduced to *Mr. and Mrs. Erlanger;* that she said: " *Mrs. Erlanger, I want to present Mr. Hudson — Mr. Erlanger, Mr. Hudson.*" They acknowledged the introduction, and Mr. Erlanger said, " *Well, Mr. Hudson, how does it happen you never met my wife before?* " and Mr. Hudson said, " *Well, I did not happen to be in the studio when Mrs. Erlanger was present;* " that Mr. Payton photographed at the studio; that when they were there Mr. Erlanger was in a very jovial mood, and began to converse and talked with them about the pictures, and he said: " *You made beautiful things of Mrs. Erlanger, Mr. Payton.*" She said that as soon as the camera was ready Mr. Payton asked *Mrs. Erlanger* and her to leave the room, and Mr. Erlanger said: " *Miss Baker, have my wife show you her home.*" Erlanger told Payton some particular pose he wanted, that he said, " I want a standing picture and I want to stand over there in the corner; " that Mr. Payton and Mr. Hudson walked over to his chair to help him to arise and walk to the corner of the room, and he motioned like that (indicating), he said, " *No, call Mrs. Erlanger,*" that he said, " *Call Mrs. Erlanger,*" and that they did and she went in to help him, and the witness commented on how easily he got over there and he said, " Yes, with Mrs. Erlanger, *she is the only one that knows how to handle me;* " he said to *Mrs. Erlanger,* " *Did you show* Miss Baker the house? " and she said, " Yes," and he looked at her for a minute and he said, " *Yes, what?* " and *she said,* " *Yes, darling,*" that he said, " That is better; " that Erlanger invited them for

dinner some night and told them Mrs. Erlanger would phone when it was convenient to have them and he repeated that invitation at least three times during the time that we were there; that he selected those styles and they did that, and then he said that he wanted to have the five photographs of Mrs. Erlanger framed in one frame. *Then he explained to him that that was not being done. He said, " I do not care whether it is being done or not. That is the way I want them. I want them on the wall in my room where I can see them;"* that witness said, " Mr. Erlanger, you have a very beautiful home here." *He said, "Give Mrs. Erlanger credit for that. I had nothing to do with it except this one room, but, he said, ' I never saw the house until we moved in it just as you see it. This is my room and everything in here belongs to me;' " that there were books and pictures of Napoleon and one little cabinet with curios that were pertaining to Napoleon;* that she asked him, " *Why are you such an admirer of Napoleon?* " and he said, " *Because he was a fighter.*" He said " *I like a fighter. I have always had to fight myself;*" that she was there two weeks later on and saw *Mr. and Mrs. Erlanger;* that they had expected her for dinner and to bring the proofs of Mr. Erlanger's pictures, and Mrs. Erlanger met her at the door; that when she went there with proofs on January 1, 1928, he asked, " Did you bring the picture of Mrs. Erlanger? " that she said, " I did," and he said, " Darling, autograph it for Miss Baker." So she autographed it and started to hand it to her and Erlanger said he would like to see it; that she handed it to him, and he looked at it and handed it to her and said, " *Now, Miss Baker, you have Mrs. Erlanger's. As soon as my pictures are finished I will autograph one of those for you;* " that on the photograph was written: " To Miss Baker. Always lovingly yours, Charlotte Erlanger, New Year's Day, 1928."

*Leo Greenhut, a photographer connected with the Strand Studio,* produced two cards in relation to photographs to be made for *Mr. Abraham L. Erlanger and Mrs. Abraham L. Erlanger.* The cards came to him as a part of the business which he bought from the business of Strauss-Payton.

*Eugene T. Hudson, a photographer for seventeen years,* described meeting *Mr. and Mrs. Abraham L. Erlanger* on the same day at their apartment on Riverside drive with Mr. Payton and Miss Baker. He acted as photographer then. He was introduced to Mr. and Mrs. Erlanger by Miss Baker; confirmed Miss Baker's testimony as to who was present and what went on; *recalled that Mr. Erlanger wanted to know why he had not met his wife before, that he said he was not in the studio at the time she was there;* described taking the photograph, about twenty or twenty-five poses, about

seventeen or eighteen before Mr. Erlanger was moved at all; that they made several pictures of him the way he wanted to pose; that they were there altogether about two hours. He said that after he had finished making the photographs Erlanger was talking about his collection of Napoleon, which he was very much interested in, and he showed him several things, autographs and books and paintings, and photographs of Napoleon; that he appeared to be quite feeble; appeared to have difficulty in walking.

*John Archer*, Cunard Line, produced the record of the trip on the *Berengaria*, leaving Cherbourg February 27, 1929. The original passenger list (Contestant's Exhibit Z-4) bore the names " *Mr. Abraham L. Erlanger and manservant; and Mrs. Erlanger.*" On the purser's list (Contestant's Exhibit A-5) he said, " First name under the initial ' E ' is Mr. Abraham L. Erlanger and manservant; next to Mr. Abraham L. Erlanger is the capital letter 'A 46–48–50–52; ' " that these were the rooms that were occupied by Mr. and Mrs. Erlanger. Next to the inscription " and manservant " appeared "A-60," and next to " *Mrs. Erlanger* " appeared "A 46–48–50–52," precisely as next to the name " *Mr. Abraham L. Erlanger.*" He produced the Erlanger tickets (Contestant's Exhibit B-5); the ticket was issued to *Mr. Abraham L. Erlanger and Mrs. Erlanger*, with a line under the *"Abraham L."* and *the line immediately below was* " *Valet, Mr. Gaetano Tommasello.*" It was brought out that he arranged the European trip for Erlanger in 1925; remembered that there were two tickets issued in 1925 to Mr. A. L. Erlanger, and another to a lady; the name was *Miss Charlotte Lesley;* the steamer was the *Franconia;* it sailed June 6, 1925. On the passenger list of the *Franconia*, leaving here June 6, 1925 (Proponents' Exhibit 50), *A. L. Erlanger* was listed as a passenger, contestant was listed as *Miss Charlotte Lesley;* produced the berthing book, which showed the record of the issuance of the tickets (Proponents' Exhibit 51); the name was " Mr. A. L. Erlanger, c/o Mr. A. E. Aarons, 214 West 42d street." Under " Remarks " there was put down " Do not print or inform newspapers; " that the name " Charlotte Lesley " was in this record. *Archer, recalled, testified that he had made steamship tickets for ladies who used stage names on other occasions; did not remember any case of a married woman; he did not book Mary Pickford; never booked Ethel Barrymore when she was Mrs. Russell Colt;* he was questioned regarding Miss Geraldine Farrar, Miss Irene Bordoni, Miss Beatrice Lillie, Miss Kitty Gordon, Miss Nora Bayes.

*Frank Barry, of the North German Lloyd,* remembered the departure of the *Columbus* May, 1928; Keen asked him to come on and meet *Mr. and Mrs. Erlanger;* he did, was introduced to Mrs.

Erlanger; he was introduced by Keen to Mr. Erlanger, and Mr. Erlanger in turn introduced him to Mrs. Erlanger.

*Richard W. Scofield*, of Packard Motor Car Company, testified about the purchase of a car by Charlotte Erlanger; he identified a supplementary contract in which the type of the car was changed, after a certain car was ordered; the purchase was negotiated through him; he identified various papers and stated that he negotiated the last paper with Mr. Dillon. He never saw Mr. Erlanger. The particular car purchased was not delivered, but a later model, and in *October, 1929, it was paid for* (contract, contestant's Exhibit T-1; invoice, contestant's Exhibit U-1; checks, Exhibit V-1 [1344]; invoice [U-1] were marked contestant's Exhibit V-1 [1344]). These negotiations were carried on by *Mr. Dillon and Mrs. Erlanger;* a bill for $81.25 was sent to *Mrs. Erlanger*, and a *check* in payment thereof to the order of the Park Avenue Packard, Inc., signed *"A. L. Erlanger, by Mr. Baron,"* was received (Contestant's Exhibit W-1); the bill dated November 21, 1929, from the Park Avenue Packard, Inc., to *Mrs. A. L. Erlanger* was marked (contestant's Exhibit X-1. This bill and also L-1 were *made out to Mrs. A. L. Erlanger, and the checks covering them were signed by Baron and Pratt.* Continuing, the witness said, " Two Packard cars were bought within a month of each other, one bought for Mr. Erlanger and one for the contestant."

*Richard J. Duerk, of the Laffay Motor Coach Company;* engaged in automobile repairing; produced ledger sheets for year 1929 and carbon copies of bills (Contestant's Exhibits (V-6, W-6, X-6, Y-6, Z-6). *The ledger account was in the name of Mrs. Erlanger; the bills are for Mrs. Erlanger.*

*John Inskip, president, Rolls-Royce Company,* told of the sale of a car to decedent April 20, 1929; invoice (Exhibit D-2) entitled " Mr. A. L. Erlanger, 214 West 42nd Street, New York, N. Y." The original negotiations were with Mr. Dillon and later with *Mrs. Erlanger*, and the latter selected the car, and after she selected the car it was delivered. The selling price of the car was *$20,465.* He received a letter from *Mrs. Erlanger* asking them to secure a position for her chauffeur.

*Arthur Hill, a dealer in radios and music,* produced an account book (Exhibit Y-5), a receipt (Exhibit Z-5), a ledger sheet (Exhibit A-6) and a bill and check marked Exhibit B-6 from the Liberty Music Shop, dated December 17, 1929, referring to goods sold to Mrs. A. L. Erlanger, 175 Riverside drive. The bill was produced from the files of deceased. It is marked " O. K. Mrs. Erlanger," " O. K. Dillon," " O. K. M. Pratt, Jr." The check in payment was marked in evidence, a day book, Exhibit C-6; a check covering

the items, C-6, Exhibit D-6. *Several of these bills are made out to Mr. A. L. Erlanger, 175 Riverside drive.* The witness stated that he knew the sales ticket was made out to *Mrs. Erlanger* and that the salesgirl copied the same. The sales book was marked Exhibit J-6 and the entry on page 32 was marked K-6. It is headed: " Aug. 1, *Mrs. Erlanger*, 175 Riv. Drive."

*Earnest H. Woywod, a merchant tailor,* identified the contestant and said that he knew her by the name of Mrs. Erlanger; that he first met her April 24, 1928; she had ordered a tuxedo suit, she selected the material, there was no one with her at the time; that after the material was selected, he met Mr. Erlanger at his office at Forty-second street; he took the samples of cloth selected by contestant, went there to take measurements, made up a tuxedo suit out of the materials selected by Mrs. Erlanger; that Mr. Erlanger only looked at it and he said, " Is that what the madam picked out? " and he said, " Yes;" that he looked at the material; that he later went down to get the fitting and finished the clothes; that he sent a bill ($232.50, dated May 7, 1928), Exhibit T-5. He saw Mrs. Erlanger after that in his place of business November 9, 1928; she picked out two suits for Erlanger, and he went over to measure him at his office, taking samples of the goods that " Madam " picked out. When witness said " Madam," he meant Mrs. Erlanger. He said Erlanger was quite anxious to see what was picked out for him; he asked what the Mrs. had picked out for him; witness showed it to him, and when he looked at it, he said, " It is all right;" bill and check dated January 1, 1929, were marked U-5. The clothes were delivered by the witness to Erlanger at 175 Riverside drive.

*Through Philip Richman, a bookkeeper for Warnock Uniform Company,* a day book was produced and in connection with it a bill dated August 7, 1929, and a check, the bill being addressed to *Mrs. A. L. Erlanger* and bears the *O. K. of Dillon and the O. K. of Pratt,* and the check drawn on the A. L. Erlanger special account is signed by Baron and Pratt (see Exhibit N-6). Another entry in the same book was produced (Exhibit P-6). It showed a charge to *Mrs. A. L. Erlanger, 175 Riverside drive,* for a chauffeur's coat and gloves. The check of Mr. Erlanger, signed by Pratt and Baron, was marked Q-6.

*Michael Meyer,* manager of the Post Lodge, which is owned by his mother, stated on the stand that he met contestant in the early summer of 1929 with Mr. Erlanger. The witness was sitting at a table having dinner with Harry Frazee, a theatrical producer, and Mr. Erlanger came in with contestant and another gentleman, and the two of them were assisting him into the place. Mr. Frazee

stood up and called him Abe, introducing Mr. Meyer and Mr. Erlanger, and then Mr. Erlanger turned and introduced the contestant as Mrs. Erlanger, and then introduced witness as Mr. Meyer; introducing was done by Mr. Erlanger. Witness saw them very often; described Post Lodge as a place of refinement for people who appreciate good food and intelligent service; said that Mr. and Mrs. Erlanger came every Sunday and sometimes once or twice during the week.

*Ole Andreasen, the head waiter, Post Lodge,* testified that he knew Mrs. Erlanger and decedent; saw him first in the summer of 1929 with Mrs. Erlanger at Post Lodge; stated that he saw Mr. and Mrs. Erlanger there about once a week in the summer of 1929, between May fifteenth and the latter part of August; that Mr. and Mrs. Anderson came quite often with them; that every time they were there the witness addressed her as Mrs. Erlanger and that he had no idea that her name was not Mrs. Erlanger; that he never addressed her differently than Mrs. Erlanger; that he addressed her thus in the presence of Mr. Erlanger and heard others address her as Mrs. Erlanger; described how the contestant arranged the seats, sometimes calling to him to get a cushion or pillow from the lobby, and arranged it; Mrs. Erlanger would order the food for him; most of the time she would cut up the food or he, the witness, would; decedent was not able at that time to cut his own food. Witness saw Mr. and Mrs. Dillon with them twice. He declared this to be a favorite resort, seating three hundred people, frequented by very fine people; very high-class clientele.

*John C. Aten, the head waiter and manager of Weisheit's Half Way House,* Stamford, Conn., testified that it is a high-class place, and well known; that he knew decedent and he knew Mrs. Erlanger; he described how in May of 1929, the first time that decedent came there, he said, " I am Mr. Erlanger and your place has been recommended to me by Mr. Dillingham;" how he said, " Yes, we know Mr. Dillingham;" and how he said, " This is Mrs. Erlanger;" that he took their order, that Mrs. Erlanger always carried in the cushions and would take care of the chairs; she would place them and they would pull the table over to him so that he did not have to exert himself, and she saw that everything was comfortable; that a call would come out of Mr. Erlanger's office by his secretary that Mr. and Mrs. Erlanger would be there for dinner and told him what they would like to have and he would get it up and have it prepared for them; that Mr. Dillon had been to the place.

*Sidney Lane, an assistant head waiter,* first met decedent in the summer of 1929 at the Half Way House, " a very conservative type of roadside restaurant " owned by Carl Weisheit; he came in

supported by a chauffeur and Mrs. Erlanger, and the manager told him " that is Mr. and Mrs. Erlanger;" saw them on an average of three or four times a week in June, July and August of 1929;. they would arrive about five o'clock, always in early evening. On several occasions Mr. and Mrs. Dillon accompanied them; that they were there with Mr. and Mrs. Erlanger. Mrs. Erlanger gave the order at the table and witness gave special orders in the kitchen for special dishes. After seeing him several times, he addressed Mr. Erlanger as " Good evening, sir, and Mrs. Erlanger." Mrs. Erlanger would never be seated until she had placed a number of cushions on Mr. Erlanger's seat and made him generally comfortable.

*Dermott Hall, a waiter at Weisheit's Half Way House,* worked there from *July 15 until November, 1929.* He waited on the parties several times and got to know Mrs. Erlanger. Mrs. Erlanger always brought some cushions with her and when Mr. Erlanger sat down it was necessary for him to have the cushions; they were arranged by Mrs. Erlanger; they came quite frequently — two or three times a week during the season, and Mrs. Erlanger always paid the checks; that he had heard them addressed as Mr. and Mrs. Erlanger, and he addressed Mrs. Erlanger when he asked her questions, calling her Mrs. Erlanger in the presence of Mr. Erlanger; never heard it suggested that she was not Mrs. Erlanger; explained how he called her Mrs. Erlanger different times during the service of the meal.

A real estate man who had something to do with the leasing of the summer home in Larchmont *in 1929* and later in New Rochelle in the same summer, *was Benedict F. McGrath,* of Yonkers, connected with the Larchmont office of Fish & Marvin. He first met contestant in Larchmont; she was with Mrs. Anderson (wife of a witness hereinbefore referred to). He showed her several properties and *she finally selected one and a lease was made for it. The lease was signed by decedent.* The rent for the season was $6,000.

*Percy L. McCoy, of New Rochelle,* also connected with the real estate office of Fish & Marvin, found a client ready to rent, and he negotiated with Mrs. Erlanger over the telephone for the sublease of the house leased by decedent in Larchmont. The arrangements for the subleasing were made by Mrs. Erlanger and Mr. Erlanger signed the lease.

*Joseph M. Ceretta,* real estate agent, leased to decedent the summer home in New Rochelle for the summer of 1929. He testified that he knew contestant as *Mrs. Erlanger;* that he met her in the office of *Fish & Marvin;* that she introduced herself to him as Mrs.

Erlanger; that she afterwards leased the house through said firm, which was a furnished residence leased for the summer in June, 1929. He said that he had gone to see Mr. and Mrs. Erlanger in a house at Larchmont (which he had previously leased); that he asked for Mrs. Erlanger and she came to the foyer and met him and he presented the lease. *Mrs. Erlanger introduced him to Mr. Erlanger.*

*George Frederick Stanton* of the passenger department of the New York Central railroad, knew decedent; met him when he got out of his automobile at the Grand Central Terminal to depart for the California trip in *January of 1930*. With decedent were Mr. Heiman, Mrs. Erlanger and Mr. and Mrs. Dillon. Dillon introduced him to Mrs. Erlanger. He accompanied the party as far as Albany, where he and the Dillons left the train. At the table in the car at luncheon, Mr. Erlanger was at one end of the table and Mrs. Erlanger at the other. On leaving them at Albany he wished Mr. Erlanger and Mrs. Erlanger a very pleasant trip.

*John J. McMitchell*, valet, who accompanied the parties on the California trip, said that always on way out to coast he addressed contestant as Mrs. Erlanger in presence of Erlanger and of Heiman. Mrs. Erlanger gave the orders to waiter and porter and any person who came in that car; they addressed her as Mrs. Erlanger. She used to see to his comforts, saw him comfortably seated, cut his food; gave him every attention she could (619); Erlanger called her mostly "darling" or "my dear;" he was very much devoted to her and she to him; Heiman addressed her as Mrs. Erlanger; Stanton addressed her as Mrs. Erlanger in presence of Mr. Erlanger and in presence of Mr. Heiman; Mrs. Erlanger ordered the food all the way through. At Phœnix, Ariz., people coming to see them addressed them as Mr. and Mrs. Erlanger; the passenger agents where they stopped addressed them as Mr. and Mrs. Erlanger; saw Erlanger sign his name; could have registered at a hotel if he wanted to; Mrs. Erlanger discharged him; received $200 a month from Mrs. Erlanger; Mrs. Erlanger went riding with him in Los Angeles — sometimes Mr. Heiman; people came to call on Mr. and Mrs. Erlanger in Los Angeles; they came to see either of them; they inquired for Mr. and Mrs. Erlanger when they came; reiterated that Heiman always addressed her as Mrs. Erlanger.

*Frank J. Revett, Erlanger's chauffeur from April 22, 1929, to the date of his death,* contradicted Mahoney as to coming down on the car (elevator) with Erlanger; said decedent kissed Mrs. Erlanger and said "goodbye;" witness contradicted Mahoney in other particulars (6708, 6709); that Erlanger kissed her and said, "Hello, darling," on his return. On cross-examination (6710) he testified as

to going to No. 33 West Seventieth street (defendant's sister's home) with Erlanger, and taking him from No. 33 West Seventieth street to the office; no one else entered the car with him — possibly, on one occasion, the doctor. On redirect, he said that on February 5, 1930, he drove Erlanger to the judge's home; on February eleventh took him to the French Hospital, returning from which place Mr. Erlanger instructed him to take *him back to the " happy hunting ground;"* witness said that he asked, *"Do you mean Seventieth or Ninetieth street?"* and he said, *" Riverside drive, of course;"* never afterward did he drive him to Seventieth street; he testified that Dillingham said to him, " How is Mrs. Erlanger?" that Baron sent candy to Mrs. Erlanger December 24, 1929, " with the request to deliver it to Mrs. Erlanger."

*Sidney Grant, a waiter, on the Pullman car* on the California trip in January, 1930, testified that he knew the contestant as Mrs. Erlanger; that he met her first in that private car; that he made the trip to Los Angeles and back to New York, living on the car at the various places where it stopped; that it was the decedent who told him that she was Mrs. Erlanger; that decedent told him that he was Mr. Erlanger and " this is Mrs. Erlanger;" said that he, as waiter, alternated with the porter, John Witherspoon; he remembered Mr. Erlanger speaking to Mrs. Erlanger. On one occasion he heard him call her Charlotte and he said that he was calling Mrs. Erlanger, " Go and call her," and he went in and told Mrs. Erlanger that Mr. Erlanger wanted her. *He testified also that Mr. Heiman addressed her as Mrs. Erlanger;* that witness positively always addressed her as Mrs. Erlanger; that in the presence of Mr. Erlanger he always addressed her as Mrs. Erlanger; that he never heard her called by any other name except that of Mrs. Erlanger and Charlotte. He stated that he heard Heiman call her Mrs. Erlanger several times; that Heiman would tell him to bring some water for himself and Mrs. Erlanger when he was playing cards with her; that at Los Angeles the party was met by Joe Toplitsky.

*John W. Witherspoon, the Pullman porter* on the special car used in the California trip in January, 1930, testified that he knew Mr. Erlanger and Mrs. Erlanger; was introduced to the latter by the New York Central man, and Mr. Erlanger introduced him to Mrs. Erlanger (1234), saying, " This is Mrs. *Erlanger, John, look after her and do as she said do."* He told of her service to decedent on the trip, saying, " *There is nobody in the world who could do any more for a man than she did for him* " (1236), and further described her attention to decedent; he heard people address her as Mrs. Erlanger (1242) and never heard her addressed in any other way than Mrs. Erlanger. In a statement which witness had made in the Pullman

office in New York he described the lady who was in the car on the trip, the lady " *whom Mr. Erlanger introduced to me as his wife;*" he stated in said statement that decedent wanted him " to go and take care of him as long as he lived, in an apartment in a hotel with decedent and John, the butler, and said nothing whatever about Mrs. Erlanger living in the house with us;" that she told him that she had been married to him for *seventeen years* and that he had been an invalid *seven years* (Proponents' Exhibit 27). In the cross-examination (1259) he said she told him she had been married *several years*, he thought, or *seven years*, it may have been longer than that, *seven years or fourteen years, he knew there was a seven in it,* he could remember now, he knew there was seven in it, all right (1260), *finally (1261) he fixed the years at seven.* Again he described contestant's behavior toward her husband and her attentiveness (1287, 1288).

*Augustine Mathieu, admitting clerk in French Hospital on February 11, 1930, in charge of the* taking of patient's history, with the hospital five years, described a blank form used for this purpose; stated that the hospital has used the same history form since she was there; explained the questions asked when a patient is admitted: his name, address, age, etc., and how she wrote them up; identified a paper as in her handwriting; did not remember anything about the patient because she had to admit thirty and sometimes more in a day; said that she correctly sets down the answers that every patient makes with respect to each patient alike; that she rewrites the history, taking it usually in pencil and rewriting it in ink, and that becomes the permanent record of the hospital, a large book, a register; explained different answers on the statement; how she gets the data from the patient when the patient is not too sick. She said that she did write each of the matters on the paper in question (J. Dillon was marked on the paper as the nearest relative or friend's name); *that where the patients come there very ill they do not make the answers themselves; some one makes them for them; the relations have to.* The paper was marked Exhibit YY. In the paper a check mark is opposite the query " married," the inquiries being married, single, widow, or divorced. She explained how she puts the check mark over married when the patient answers " married."

*Helen E. Byrne, the chief record clerk of the French Hospital,* testified as to the transcription into the permanent records of the history taken upon the occasion when Mr. Erlanger arrived at the hospital. Upon her record, she stated if the person is married, the " S " and the " W " are x'd out; if single, the " M " and the " W " are x'd out; and if they are widowed, the " M " and the " S " are x'd out.

*Joseph W. Reath, a registered nurse* of eighteen years' experience,

first went into the service of the decedent on *February 7, 1930*, at his brother's house, *No. 33 East Seventieth street*, and attended him up to February 11, 1930. He saw him at the French Hospital on the latter date. He identified contestant and stated that he recorded on a record (Contestant's Exhibit B-1) a good bit of what he observed about the patient but no small details. Next saw him at 175 Riverside drive on February 12, 1930, on which occasion he greeted him with a smile and said, *" Good evening, Mr. Reath,"* and then he said, *" Mrs. Erlanger, allow me to present Mr. Reath, my night nurse."* At the dining room table witness walked alongside of them until *Mr. Erlanger had been seated at the dining room table, Mrs. Erlanger placing the chair and placing a pillow under his left arm.* Mr. and Mrs. Dillon were present. There were some little jolly discussions and among one of them Mr. Erlanger said, " There is no use of my denying the fact that I have been very unhappy and I am glad to be home." He stated that from February twelfth until February nineteenth he was *relieved at seven-thirty in the morning by Mrs. Erlanger,* and that at times she would dress him; at times he would dress him; that on the nineteenth he was relieved by a day nurse; *that during the night Mr. Erlanger would call many times for Mrs. Erlanger, referring to her as " darling."* He would call *out loud, " Darling." The butler addressed her as Mrs. Erlanger; the doctors addressed her as Mrs. Erlanger, and the day nurse addressed her as Mrs. Erlanger. She demeaned herself as his wife and he as her husband.* Before concluding, he testified that on Tuesday morning, before Mr. Erlanger left his brother's house, *his sister* asked him what hospital he was going to and she said to him, *" I think, Abe, you will return here when you are through there." He looked at her and said, " Rae, I am not a pauper."*

In addition to the foregoing parol proofs, contestant introduced in evidence many exhibits, of which the following are the more important for this period:

(1) Reservation record Hotel Shelburne, *9–27–29*, *" Mr. and Mrs. Erlanger "* (Exhibit BB). (2) *Shelburne Hotel to Dillon, acknowledging reservation for " Mr. and Mrs. Erlanger "* (Exhibit CC). (3) Letter 8–26–29, Shelburne Hotel to Dillon, referring to Mrs. Erlanger (Exhibit DD). (4) Photostatic copy registration at the Arizona-Biltmore Hotel, Phœnix, Ariz. (Exhibit T-12), " Mr. and Mrs. Erlanger." (5) Letters between Knickerbocker Tours and Meyer Keen in reference to the arrangements for the European trip in *1928*, in which *Mrs. Erlanger* is mentioned, date April or May, 1928 (Contestant's Exhibits, F-4, G-4, K-4, L-4, M-4, N-4, O-4, P-4, R-4, S-4). (6) Knickerbocker Tours suggestion of route for *Mr. and Mrs. Erlanger* (Contestant's Exhibit

P-9). (7) Further correspondence with the Knickerbocker Tours in which the names are used (Contestant's Exhibits R-9, S-9, T-9). (8) *Berengaria* passenger list westbound commencing *February 27, 1929,* on which the parties returned from France, reading, " *Mr. and A. L. Erlanger and manservant, Mrs. Erlanger* " (Contestant's Exhibit Z-4). (9) Ticket steamship *Columbus,* sailing May 11, 1928, North German Lloyd, ticket made out to *Mr. Abraham L. Erlanger and Mrs. Charlotte Lesley* (Contestant's Exhibit V-3). (10) Return trip ticket on the steamship *Roma,* sailing *February 22, 1929,* " Mr. and Mrs. A. L. Erlanger and valet " (Contestant's Exhibit J-4); they did not return on the *Roma,* but came back on the *Berengaria.* (11) Letter North German Lloyd Company to Goodman Open Road Travel Service, dated *5–15–28,* referring to *Mr. and Mrs. Erlanger* and their trip (Contestant's Exhibit X-3). (12) Passenger berthing list, steamship *Olympic,* sailing *September 12, 1928,* showing the names *Mr. A. L. Erlanger and Mrs. C. Lesley* (Contestant's Exhibit D-4). (13) Original and copy of ticket steamship *Augustus,* sailing *June 3, 1929,* in the names of *Mr. and Mrs. A. L. Erlanger* and Gaetano Tommaselli (Contestant's Exhibit H-4). (14) The sailing sheet of the steamship *Augustus, 1–3–29* (Exhibit U-4) bearing the names *Mr. and Mrs. A. L. Erlanger* (passenger list of steamship *Augustus* [Exhibit 41] does not bear their names). (15) The purser's list of passengers *Berengaria,* leaving Cherbourg *2–27–29,* bearing the names *Abraham L. Erlanger and manservant and Mrs. Erlanger* (Contestant's Exhibit A-5). (16) Ticket issued by the Cunard Line for Cherbourg, sailing *2–27–29,* to *Mr. Abraham L. Erlanger, Mrs. Abraham L. Erlanger* and valet (Contestant's Exhibit B-5). (17) *Paris Herald, 9–9–28* (Contestant's Exhibit H-3), with an announcement in the columns headed " News of Americans in Europe," the item " *Mr. and Mrs. A. L. Erlanger* of New York are at the Hotel George V, Paris." (18) *Paris Herald,* dated *2–12–29,* under the heading " At Monte Carlo," the news item " *Another American staying at the Hotel d'Paris is Mr. A. L. Erlanger,* theatrical owner and manager, *accompanied by Mrs. Erlanger* " (Contestant's Exhibit M-2). (19) *Paris Herald, 2–23–29,* under the heading " News of Americans in Europe," the item " *Mr. and Mrs. A. L. Erlanger* of New York, who have been at Lyons for a short sojourn, have returned to Hotel George V " (Contestant's Exhibit K-2). (20) *Paris Herald, 2–27–29,* containing an item under the same heading " *Mr. Abraham L. Erlanger,* New York theatrical manager, and *Mrs. Erlanger,* are returning to the States by the *Berengaria,* sailing today from Cherbourg (Contestant's Exhibit I-2). (21) Certified copy of New York *Herald Tribune, 5–11–28,* in the list of passengers sailing

that day, printed in the column entitled "Paris, *Majestic* and *Columbus* sailing today," appear under the paragraph referring to the *Columbus* the names " *A. L. Erlanger, theatrical producer, Mrs. Erlanger* " (Contestant's Exhibit P-15). (22) Photostatic copy, New York *Times*, 5–11–28, in the column giving the names of some of the persons departing on different vessels has under the headline " *Aboard the Columbus* " the names Mr. and Mrs. A. L. Erlanger (Contestant's Exhibit R-12). (23) A contract for purchase of a Packard car made with Park Avenue Packard, Inc., in the name of *A. L. Erlanger* and signed at the bottom with the name in ink, " *Mrs. A. L. Erlanger,*" with pencil notation " Address all communications to J. J. Dillon, c/o A. L. Erlanger, 214 West 42nd Street, residence address, 175 Riverside Drive," the purchase price being $3,480 and the date 5–11–29 (Contestant's Exhibit M-1). (24) A supplement to contract with the same company with the name *A. L. Erlanger,* underneath it in typewriting " *Mrs. A. L. Erlanger,*" dated 10–1–29 (Contestant's Exhibit K-1). (25) A bill of the Park Avenue Packard, Inc., covering the car mentioned in the first contract (Exhibit M-1), said bill being made out to *Mr. A. L. Erlanger,* 214 West Forty-second street, New York city, total bill covering the price $3,480 and extras, being $4,229.75, and showing a deposit of $1,000 paid, leaving a net of $3,229.75; bill has in pencil " *O. K. Dillon* " and also " *O. K. J. J. Revett,*" *Erlanger's chauffeur;* the receipt of payment is indicated on this bill (Contestant's Exhibit U-1). (26) Check A. L. Erlanger, dated *6–12–29,* to the order of Park Avenue Packard, Inc., for $3,229.75, the balance shown upon said bill (Exhibit V-1). (27) Check A. L. Erlanger, 6–11, to the order of J. J. Dillon for $1,000 to cover deposit made by him on said car (Contestant's Exhibit V-1). (28) Check A. L. Erlanger special, signed by Baron and Pratt to the Park Avenue Packard, Inc. (Contestant's Exhibit W-1). (29) Similar check drawn A. L. Erlanger special account, by Baron and Pratt, to the Electric Service Engineering Corp., $10.22 (Contestant's Exhibit P-1). (30) Bill of the Electric Engineering Service stamped " O. K., M. Pratt, Jr.," which bill is for electric service covering the period from *11–11–29 to 12–11–29,* paid *12–16–29;* this bill is made to *Mrs. A. L. Erlanger, 175 Riverside drive* (Contestant's Exhibit R-1). (31) Bill, Park Avenue Packard, Inc., for $18 for Packard emblem and license plates frames, receipted by the company, bearing " O. K. Pratt " and " O. K., Dillon;" the bill is dated *10–26–29,* and made out to *Mrs. A. L. Erlanger, 175 Riverside drive;* bill also has the stamp of the financial department on it (Contestant's Exhibit L-1). (32) Park Avenue Packard, Inc., bill for supplies to the Packard car made out to *Mrs. A. L. Erlanger, 175 Riverside*

*drive* (Contestant's Exhibit X-1). (33) Contract with the Park Avenue Packard, Inc., *7–1–29*, by A. L. Erlanger, signed at the bottom " *Charlotte Erlanger, business address 214 West Forty-second street; residence address, 175 Riverside drive* " (Contestant's Exhibit B-2). (34) Check drawn to the order of the Park Avenue Packard, Inc., dated *10–21–29*, amount $3,840, signed by *Charlotte Erlanger* (Contestant's Exhibit C-2). (35) Bill, Taylor Trunk Works, made out to *Mrs. A. L. Erlanger*, New Amsterdam Theatre Building, dated *4–13–28*, for $139.50, with the " O. K., Dillon " and " O. K., M. Pratt, Jr.," which bill is marked " Paid," a check drawn on A. L. Erlanger special account by L. E. Bergman (his general manager and nephew) for the amount of said bill, check being dated *4–3–28* (Exhibit P-12). (36) Letter Stearn Company, Cigar Importers, dated *8–7–29*, to *Mrs. A. L. Erlanger*, thanking her for order of cigars for the account of *Mr. Erlanger;* the envelope with the letter is addressed to *Mrs. A. L. Erlanger*, 175 Riverside drive, postmarked *8–7–29*. The bill for cigars stamped paid, has upon its face " O. K., Mrs. Erlanger; O. K., Dillon; O. K., M. Pratt, Jr." (Contestant's Exhibit T-10). (37) Electric Service Engineering Corp. bill, *8–13 to 10–11–28*, for electric service, stamped paid; bill is addressed to *Mrs. A. L. Erlanger*, 175 Riverside drive, and stamped " *O. K., M. Pratt, Jr.*" (Contestant's Exhibit S-1). (38) Bill marked paid of Laffay Motor Coach Corporation for repairs to a Flint coupe, said bill being made out to *Mrs. A. L. Erlanger*, 175 Riverside drive, bearing the indorsement " *Mrs. E., O. K.; O. K., Dillon; O. K., M. Pratt, Jr.*" (Contestant's Exhibit B-6). (39) Bill, Laffay Motor Coach Corporation repairs a Packard touring car, stamped paid, made out to Mr. A. L. Erlanger, with indorsement " *O. K., Mrs. E.; O. K., Dillon; O. K., M. Pratt, Jr.; O.K., F. Revett* " (Contestant's Exhibit W-6). (40) Check *10–4–29*, to the order of the Laffay Motor Coach Corporation drawn on A. L. Erlanger special account and signed by *Baron and Pratt* (Contestant's Exhibit Y-6). (41) Bill stamped paid, of Warnock, Inc., makers of uniforms, made out to *Mrs. A. L. Erlanger, 25 Broadview, New Rochelle, New York* (summer home of contestant and decedent, *summer of 1929*), for uniform for chauffeur bearing the " *O. K., Dillon and O. K., M. Pratt, Jr.*," on its face (Contestant's Exhibit O-6). (42) Check *8–10–29*, drawn on the A. L. Erlanger special account by Baron and Pratt, and made out to the order of the Warnock, Inc. (Contestant's Exhibit O-6). (43) Check paid to Courtney, village clerk, Garden City, $353.60, *7–6–28*, and drawn upon the A. L. Erlanger special account by his nephew and general manager, L. E. Bergman (Contestant's Exhibit P-13), the check being paid for taxes of the

Garden City property, deeded to her by him, *9–26–27*. (44) Three bills for *taxes* on the Garden City and Lawrence property are marked as contestant's Exhibit Q-13 and the Erlanger check which paid these bills was marked contestant's Exhibit S-13, this check being a personal check drawn by *A. L. Erlanger* himself, dated *1–3–29* (p. 5749). (45) Contestant's Exhibit R-13 is a memorandum showing how the one check was distributed on the several bills. (46) The investment ledger sheet (Contestant's Exhibit T-13) showed how these items were carried on the books of account. Pratt said that these bills were paid under a *direct order from Erlanger*. (47) Bills for taxes for *1928* (Contestant's Exhibit U-13) were paid for by check marked Exhibit V-13, *drawn on A. L. Erlanger special account by L. E. Bergman, his nephew and general manager*. (48) Taxes for *1929* on the Garden City property (Contestant's Exhibit X-13) and paid for by check dated *8–6–28* (Contestant's Exhibit Y-13), *drawn on the A. L. Erlanger special account by L. E. Bergman, his general manager and nephew*. (49) The mortgage interest on the *Garden City property was paid by Erlanger*, Baron's check for the same (Contestant's Exhibit A-14); the bill for this interest on the Garden City property dated *1–3–28*, was made out in the name of *Charlotte Fixel*, has stamped on the back " *O. K., M. Pratt, Jr.*, personal account, A. L. E.; ordered by S. B.;" Baron was reimbursed by check of *1–18–28* for $300, drawn on the A. L. Erlanger special account by A. L. Erlanger (Contestant's Exhibit B-14). (50) A bill of the Liberty Music Shop in the name of *A. L. Erlanger*, 175 Riverside drive, and envelope with the same address on it, sent by that firm (Contestant's Exhibit N-1); the face of this bill bears the following indorsement: " *O. K., Dillon; O. K., Mrs. E.; O. K., M. Pratt, Jr.;*" and two stamps of the financial department; *postmarked and addressed to Mrs. A. L. Erlanger, 175 Riverside drive;* this bill was for services rendered in December, 1928 (1069). (51) Contestant's Exhibit N-4 is a batch of copies of thirteen letters addressed to managers of Italian hotels in Rapallo, Messina, Siracusa, Genoa, Venice, Rome, Taormina, Nice, Milan, Florence, Palermo, Naples, St. Remo, introducing *Mr. and Mrs. Abraham Lincoln Erlanger* and requesting that everything possible be done to insure *Mr. and Mrs. Erlanger's having an entirely comfortable and enjoyable sojourn at their hotel.* (52) Bill for taxes of *1928* on the Garden City property under the name *Mrs. Charlotte Fixel, c/o Abraham Erlanger*, 214 West Forty-second street, with notation indicating the payment by check signed L. E. Bergman (Contestant's Exhibit O-13). (53) Bill, Liberty Music Shop, *12–17–29*, made out to *Mrs. Erlanger*, 175 Riverside drive, for radio supplies; it has on its face: " *O. K., Mrs. E.; O. K.,*

*Dillon; O. K., M. Pratt, Jr."* (Contestant's Exhibit B-6); was paid by a check drawn on the A. L. Erlanger special account by Baron and Pratt. (54) Bill, Liberty Music Shop, radio supplies, *11–1–28,* stamped paid, bearing upon its face, *" O. K. Dillon, and O. K. Pratt,"* with two stamps of the financial department on it; this bill is made out to " Mr. A. L. Erlanger," paid for by check on his personal account, drawn by L. E. Bergman (Contestant's Exhibit F-6). (55) Bill, Liberty Music Shop, made out to Mr. A. L. Erlanger, 175 Riverside drive, indorsed, *" O. K. Dillon "* and stamped with a stamp of the financial department; paid for by check drawn on A. L. Erlanger personal account, by L. E. Bergman (Contestant's Exhibit E-6). (56) Bill dated *7–29–29,* made out to *Mrs. A. L. Erlanger,* from Dr. Phillip M. Grausman, for professional services, together with (Contestant's Exhibit XX) a stamped envelope postmarked addressed to *Mrs. A. L. Erlanger, 175 Riverside Drive,* and readdressed to 25 Broadview Avenue, New Rochelle. (57) Receipted bill dated *7–31–29,* addressed to *Mrs. A. L. Erlanger, 175 Riverside drive* (Contestant's Exhibit WW), together with stamped envelope postmarked and addressed to *Mrs. A. L. Erlanger, 175 Riverside drive;* this bill was for services rendered in 12–28 (1069). (58) Copies of letters written by Knickerbocker Tours to *thirty-five hotels in different places in Europe, referring to Mr. and Mrs. Abraham Lincoln Erlanger,* and the accommodations to be furnished to them (Contestant's Exhibit V-9). (59) Letter from the general manager of the Excelsior Hotel, Naples, *12–9–28,* to Knickerbocker Tours, Paris, in regard to *Mr. and Mrs. A. L. Erlanger* (Contestant's Exhibit W-9). (60) Contestant's Exhibit X-9 consists of carbon copies of various letters and three telegrams; one is addressed to Erlanger by Knickerbocker Tours, concerning the itinerary cf the European trip; the second is addressed to Abraham Lincoln Erlanger and concludes with: *" With kind regards also to Mrs. Erlanger;"* a third from Knickerbocker Tours to Erlanger at Hotel Excelsior, Naples, welcomes him and *" Mrs. Erlanger "* on European soil again; and the next is addressed to Erlanger in New York and refers to *" Mrs. Erlanger;"* the next is addressed to *Mrs. A. L. Erlanger* from Knickerbocker Tours; the next is addressed to *Mrs. Erlanger* from Knickerbocker Tours; the next is addressed to *Mrs. A. L. Erlanger,* Villa Igiea, Grand Hotel, Palermo; the next is a telegram addressed to *Mr. and Mrs. A. L. Erlanger, Berengaria,* Cherbourg, by Gockinga, of Knickerbocker Tours; the next is addressed to *Mr. and Mrs. A. L. Erlanger,* Hotel Excelsior, Naples; the two further telegrams are addressed to Erlanger, Hotel Miramare, Genoa, and to Erlanger, Hotel Excelsior, Naples, by Gockinga. (61) Registration record of the Hotel Villa

Igiea, Palermo, showing arrival of " *Mr. and Mrs. Erlanger* " of New York and 'Dr. Gustave Paul, arriving there on *1–21–29* (Contestant's Exhibit D-10). (62) Receipted bills for their stay at the hotel, issued to *Mr. and Mrs. A. L. Erlanger* (Contestant's Exhibit C-10). (63) Letter Dr. J. C. Marshall, *6–22–28*, to Mr. A. L. Erlanger, Hotel Esplanade, Marienbad, with the opening line, " *My deal Pal, and his dear wife, Charlotte,*" and closing with " With much love to Charlotte and yourself," etc. (Contestant's Exhibit H). (64). Letter of Dr. J. C. Marshall, *1–27–30*, addressed to " My dear Pal and Mrs. Pal," and closing with " With much love to you both, I am as ever Your Pal " (Contestant's Exhibit F). (65) Letter of Dr. J. C. Marshall, 12–1–27, addressed to " *My dear pal and his Blue Angel* " (Contestant's Exhibit K). (66) Envelope of postmarked letter of Dr. J. C. Marshall, from Atlantic City, addressed " *Mrs. Charlotte Erlanger, Ambassador Hotel,*" 10–24–27 (Contestant's Exhibit M). (67) Card from Dr. J. C. Marshall, *11–22–28*, in a postmarked envelope, addressed " *Mrs. A. L. Erlanger,* 175 Riverside drive, New York," postmarked *11–23–28* (Contestant's Exhibit N). (68) Letter of Dr. Marshall, 10–22–27, " *My dear Mrs. Erlanger,*" sent from Atlantic City in stamped envelope to " *Mrs. Charlotte Erlanger,* Ambassador Hotel, New York " (Contestant's Exhibit P). (69) Letter, *12–10–29*, addressed to " *My dear Charlotte,*" together with postmarked envelope addressed to " *Mrs. A. L. Erlanger,* 175 Riverside drive, New York " (Contestant's Exhibit O). (70) Letter of Dr. J. C. Marshall, *9–23–29*, mailed from Atlantic City, " Mrs. C. Erlanger, 175 Riverside drive, New York city" (Contestant's Exhibit Q). (71) Letter from Dr. Marshall, 11–29–29, envelope addressed to Mrs. A. L. Erlanger, 175 Riverside drive, postmarked 11–30–29 (Contestant's Exhibit R). (72) Telegram, *1–2–30*, A. E. Erlanger, 175 Riverside drive, " just to wish you a happy New Year and a delightful trip through the West with your good wife, and I will be so glad to see you when you return East again; with much love, I remain, Your Pal " (Dr. Marshall) (Contestant's Exhibit T). (73) Christmas card, *12–18–28*, J. Chandler Marshall, with envelope postmarked Atlantic City, *12–18–28*, addressed to *Mr. and Mrs. A. L. Erlanger,* 175 Riverside drive, New York city (Contestant's Exhibit S). (74) Card addressed to *Mr. and Mrs. Erlanger by Mr. Al. Woods,* in 9–28, to announce himself at the Hotel George V when calling upon them (Contestant's Exhibit G-3). (75) Telegram from Joe Toplitsky, *3–7–30*, addressed to Mrs. Charlotte Erlanger, 175 Riverside drive, " *Received sad news this morning, and I can appreciate your feelings as measured by mine; I believe you and I had a deeper appreciation and a better realization of the wonderful*

man he was than anyone else in the world; I exceedingly regret being unable to be there at this time, but am detained here for at least ten days by an engagement that cannot be broken or postponed. However, I hope to see you in about two weeks. In the meantime please realize that my thoughts are with you in sincere sympathy. Your realization of your wonderful devotion should be a source of comfort to you now. Joe Toplitsky, Los Angeles, California " (Contestant's Exhibit T-4). (76) Entering card, French Hospital, of A. L. Erlanger; " History of Patient, French Hospital, 2–11–30, of A. L. Erlanger," with the printed word " single " and " widowed " stricken out and a check marked over the word " married," with the entry " Nearest relative or friend," the name " J. Dillon " (Contestant's Exhibit YY). (See testimony of Augustine Mathieu, pp. 1089–1091, as to how these records were made.) (77) Transcript of a record kept in the regular course of conduct of French Hospital with the name of A. L. Erlanger and the letters S. W. crossed out and M. standing (Contestant's Exhibit ZZ). (78) Bound book of " Patients admitted " shows the entries for 2–11 of A. L. Erlanger, age 60, civil condition, M; occupation, theatrical; birthplace, U. S.; time in U. S., 60; time in New York, 40 (Contestant's Exhibit A-1). (79) Letter, Knickerbocker Tours, New York, to Meyer Keen, 12–17–28, referring to the Erlanger tour and to Mr. and Mrs. Erlanger (Contestant's Exhibit M-4). (80) Letter, Open Road Travel Service, Inc., to N. G. I. Line, inclosing check for $5,768.67 and a direction to " Kindly issue tickets account Mr. and Mrs. A. L. Erlanger, who are sailing on the steamship Augustus, 1–3," this letter is dated 11–7–28 (Contestant's Exhibit G-4). (81) Receipt of North German Lloyd, dated 2–20–29, made out to the Open Road Travel Service, Inc., acknowledging remittance of a $1,000 as deposit and referring to Mr. and Mrs. Erlanger and valet (Contestant's Exhibit R-4). (82) Letters from the Knickerbocker Tours to Meyer Keen, suggested automobile trip in Europe, dated 11–1–28, the title of the letter is " Mr. and Mrs. A. L. Erlanger;" the itinerary is headed " Suggested automobile trip of Mr. and Mrs. Erlanger " (Contestant's Exhibit L-4). (83) Letter from the Italian-American Shipping Corporation to the Open Road Travel Service, Inc., with the heading " Mr. and Mrs. A. L. Erlanger and valet, Suite G and No. 75, steamship Augustus, 1–3–29 " (Contestant's Exhibit P-4). (84) Two cablegrams to Dr. Gustave Paul, Vienna, sending holiday greetings, both dated 12–25–28, one from A. L. E. and the other from Charlotte (Contestant's Exhibits N-7 and O-7). (85) Letter of Dr. Gustave Paul to Erlanger, acknowledging receipt of a fee, and saying, " With heartiest greetings to you and your charming wife." Letter · dated 8–5–28, in Vienna, and delivered personally in an

envelope addressed " *Mr. and Mrs. A. L. Erlanger* " (Contestant's Exhibit D-12). (86) Letter of Dr. Gustave Paul addressed to " *My dear friends, My dear Charlotte, My dear A. L. E.,*" and beginning with this sentence, " Since my last letters addressed to you both and since your redeeming word, ' Mezpah ' quoted from you, my dear Charlotte, again, months have passed without any news from you;" dated *12–3–29*, signed " Dr. Paul " (Contestant's Exhibit H-12). (87) Envelope from Dr. Paul, postmarked and addressed to *Mr. and Mrs. A. L. Erlanger,* 175 Riverside drive, New York (Contestant's Exhibit K-12), envelope of letter from Dr. Paul addressed *Mister and Missus A. L. Erlanger,* 175 Riverside drive, New York city, U. S. A. (Contestant's Exhibit G-12). (88) *Application for visa, made 4–6–28, by A. L. Erlanger, in which the checking is in the space next to the word " Married " and no checks beside the words " Single, widowed or divorced "* (Contestant's Exhibit N-10). (89) Signature card, Corn Exchange Bank and Trust Company, dated 4–1929, with the name *Lesley, Charlotte, Miss,* printed above, with the signature, Charlotte Lesley, contained thereon, and then added below, " *Charlotte Lesley* " in other handwriting, " c /o Mrs. A. L. Erlanger, 175 Riverside drive, Apt. O-12-E (Contestant's Exhibit X-14). (90) Signature card dated *9–20–29,* by which the former account was changed into a new one; has in print at the top line " Erlanger, Charlotte," down below the signature " *Charlotte Erlanger, Charlotte Lesley* " (Contestant's Exhibit Y-14). (91) Signature card, Central Savings Bank with the signature Charlotte Lesley, 175 Riverside drive, Apt. O-12-E, dated *3–21–29;* opposite the words " Name of wife or husband " appears A. L. Erlanger (Contestant's Exhibit U-14). (92) Ticket on steamship *Columbus,* sailing 5–11–28, made out in the name of *Mr. Abraham L. Erlanger, Mrs. Charlotte Lesley,* suite 143–145 (Contestant's Exhibit V-3). (93) Return ticket steamship *Olympic,* sailing Cherbourg 9–12–28, suite 40–42–44, in the names of *Mr. Abraham L. Erlanger, age 64; Mrs. Charlotte Lesley, age 43* (Contestant's Exhibit Y-3). (94) New York *Times,* 5–11–28, news article, lists among those sailing on the *Columbus* " Mrs. C. Lesley;" the same list has the names " Mr. and Mrs. A. L. Erlanger " (Contestant's Exhibit R-12). (95) Envelope from Dillon addressed to *Mrs. A. L. Erlanger, c /o Knickerbocker Tours, Paris,* forwarded to her at Hotel Bristol in Vienna, postmarked *7–28,* containing a letter addressed " My dear Charlotte," with references to *Mr. Erlanger and Mrs. Erlanger* and her devotion to him (Contestant's Exhibit W-8). (96) Letter dated *8–16–28,* addressed to Mrs. A. L. Erlanger, c /o Knickerbocker Tours, Paris, forwarded to Hotel Bristol, Vienna, beginning: " Hello, Mama," referring to

Mrs. Erlanger (Contestant's Exhibit X-8). (97) Letter from Dillon in envelope addressed in typewriting, " *Mrs. A. L. Erlanger*, c/o Brown's International Travel Office, Naples, Italy," dated *1–29–29;* the letter opens: " My dear Charlotte," referred to " Mr. Erlanger and Charlotte Darling," closing with " God bless you both;" signed " Your Jack Rabbit " (Contestant's Exhibit Y-8). (98) Letter 2–14–29, Dillon to contestant, with the opening " My dear Mama," referring to theatres and theatrical personages (Contestant's Exhibit Z-8). (99) Envelope addressed in typewriting, *Mrs. A. L. Erlanger*, c/o Brown's International Travel Office, Naples, Italy, postmarked *1–31–29*, containing a letter from Dillon to contestant, opening: " Hello, Mama," referring to Mr. Erlanger and to " You and Mr. Erlanger " (Contestant's Exhibit A-9). (100) Envelope 2–18–29, sent to Paris, to Mrs. A. L. Erlanger and readdressed from the George V Hotel to 175 Riverside drive, containing letter from Dillon to her, opening with the lines: " Oh, Mama," referring to Mr. E., and closing " God bless you both, and always your Jack Rabbit " (Contestant's Exhibit B-9). (101) Envelope addressed *Mrs. A. L. Erlanger Biltmore Hotel*, Los Angeles, Cal., readdressed Biltmore Hotel, Phœnix, Ariz., containing letter from Dillon to contestant, opening with " Charlotte, Dear," dated Tuesday, *1–14–30*, referring to Mr. Erlanger and closing " with all my love, always your Jack " (Contestant's Exhibit C-9). (102) Envelope addressed to Mrs. A. L. Erlanger, Hotel Biltmore, Phœnix, Ariz., postmarked *1–16–30*, containing letter from Dillon to contestant, opening " My dear Charlotte," and referring to Mr. Erlanger and closing with " Lots and lots from me, too " (Exhibit E-9). (103) Envelope addressed to Mrs. A. L. Erlanger, Biltmore Hotel, Los Angeles, Cal., postmarked *1–9–30*, addressed to contestant by Dillon, opening with, " Hello, Mama," referring to Mr. Erlanger, and closing with " All our love always, Jack " (Contestant's Exhibit D-9). (104) Envelope dated *1–18–30*, addressed *Mrs. A. L. Erlanger*, Biltmore Hotel, Phœnix, readdressed to 175 Riverside drive, from Dillon to contestant, opening with " Dear Charlotte," referring to Mr. Erlanger and closing with " Always Jack " (Contestant's Exhibit F-9). (105) Letter from Joe Toplitsky to Erlanger, Hotel Esplanade, Marienbad, dated *7–3–28*, addressed: " Dear Mr. Erlanger." It concluded with the expression, " I do hope *that you and Charlotte* had a marvelous trip and that you are both enjoying every minute of your stay;" and closing, " Hoping this finds you enjoying the best of health, believe me your friend — Pal — Partner Joe " (Contestant's Exhibit S-11). (106) Letter of Joe Toplitsky, dated Los Angeles, *2–3–30*, addressed to *Mrs. Charlotte Erlanger*, 175 Riverside drive, New York city: " Thanks for your kind note

of 1–29 apprising me of your safe return home. Words cannot express my appreciation of your letting me know how the boss stood the trip, also that he has improved * * *. Again thanking you with all my heart and with love to *Mr. Erlanger, not forgetting yourself,* sincerely yours, Joe " (Contestant's Exhibit R-11). (107) Telegram dated 5–11–28, addressed from Douglaston, N. Y., to Mr. and Mrs. Erlanger, steamship *Columbus,* Pier 86, N. R., signature, " Coodie and Bertie " (Bert C. Whitney) (Contestant's Exhibit A-11). (108) Letter, Adlon Hotel, addressed to Mrs. A. L. Erlanger, referring to their prospective arrival at the Adlon on July fourth (Contestant's Exhibit B-11). (109) *Five envelopes* which were sent through the mails by *Miss Marie Wells* to *Mrs. A. L. Erlanger,* three to the Biltmore Hotel in Los Angeles, and two to the Hotel Biltmore in Phœnix, Ariz., during *1–30* (Contestant's Exhibit E-11). (110) Envelope and announcement card, Millinery Company, N. Y., *1–7–28, addressed to Mrs. Erlanger,* 175 Riverside drive (Contestant's Exhibit X-11). (111) Envelope postmarked *12–13–29,* to *Mrs. Charlotte Erlanger,* 175 Riverside drive, from Madame Laura (p. 3591) (Contestant's Exhibit P-11). (112) Postmarked envelope, Chicago, Ill., from Mrs. Quigley (p. 3589), *1–3–30,* addressed " *Mrs. A. L. Erlanger,* Biltmore Hotel, Los Angeles, Calif." (Contestant's Exhibit G-11). (113) Postmarked envelope from Evan Vranken, 153 Dana avenue, Albany, addressed to *Mrs. A. L. Erlanger,* Hotel Biltmore, Phœnix, Ariz., readdressed to Apt. O-12-E, 175 Riverside drive, New York (Contestant's Exhibit M-11). (114) Postmarked envelope, Mrs. A. L. Erlanger, Hotel Biltmore, Los Angeles, postmarked *1–17–30* (Contestant's Exhibit I-11). (115) Two postmarked envelopes addressed " *Mrs. A. L. Erlanger,* Hotel Biltmore, Phœnix, Ariz., from *Mrs. Lucian Denni,* 1037 S. Holt, Los Angeles, Cal.," dated *1–18–30* (Contestant's Exhibit F-11). (116) Stamped envelope, Hotel Algonquin, 59 West Forty-fourth street, from Amy Ashmore Clark, addressed to *Mrs. A. L. Erlanger,* Biltmore Hotel, Los Angeles, Cal. (Contestant's Exhibit N-11). (117) *Five envelopes from Mrs. McCulloch,* postmarked four of them airmail, and one with a two-cent stamp, addressed to the Biltmore Hotel, Cal., one readdressed to 175 Riverside drive (Contestant's Exhibit E-11). (118) Envelope postmarked Babylon, N. Y., from Mrs. Greve, p. 3590, " *Mrs. A. L. Erlanger,* Biltmore Hotel, Los Angeles " (Contestant's Exhibit J-11). (119) Two envelopes from the Arizona-Biltmore Hotel, Phœnix, Ariz., from *Mrs. Natalie Lewis* (3590) to *Mrs. A. L. Erlanger,* 175 Riverside drive, New York city, dated *1–27–30* and *2–11–30* (Contestant's Exhibit H-11). (120) Letter dated *10–23–28,* from J. Heulsenbeck, from the Radium Ore Re-vigor Company,

New York, addressed to Mrs. A. L. Erlanger, 175 Riverside drive (Contestant's Exhibit V-10). (121) Letter, Cuevas Diaz, Cigars, New York city, dated *5–13–29*, addressed to *Mrs. A. L. Erlanger*, 175 Riverside drive, New York (Contestant's Exhibit W-10). (122) Telegram *5–11–28*, to A. L. Erlanger, steamship *Columbus*, expressing regret that he missed him. Wishes for his health and concluding "*Love to you and Charlotte. Bon Voyage and safe return,*" signed *Flo Ziegfeld* (Contestant's Exhibit R-10). (123) Letter from San Francisco, from the Consulate of Luxembourg to Mrs. A. L. Erlanger, 175 Riverside drive, Apt. O-12-E, New York city, dated *10–22–28*, addressed to "My dearest Lottie" and referring to Mr. Erlanger (Contestant's Exhibit Y-11). (124) Letter, *3–5–30*, from P. Reiter, Jr., addressed to *Mrs. A. L. Erlanger*, postmarked 3–5–30, letter opening "My dear, dear Lottie," and referring to Mr. Erlanger (Contestant's Exhibit Z-11). (125) Postal card postmarked Atlantic City, *2–11–29*, addressed to *Mr. and Mrs. A. L. Erlanger*, 232 West End avenue from Evelyn L. Friedberg, c/o Boardwalk Art Gallery (Contestant's Exhibit B-12). (126) Application for visa for passport *3–12–28*, giving 150 West Eightieth street as the present address; signed "Abraham L. Erlanger" (Contestant's Exhibit C-12). (127) Bill, electric service, made out to *Mrs. A. L. Erlanger*, 175 Riverside drive, Apt. O-12-E, covering period from *6–12–29* to *9–12–29*, marked "paid" and stamped with the finance department and bearing "*O. K., Pratt,*" immediately over the name "*Mrs. A. Erlanger;*" also certain bookkeeping notations (Contestant's Exhibit L). (128) Bill, electric service, *5–11–28* to *6–11–28*, stamped with the stamp of the financial department, bearing the stamp, "*O. K., Pratt,*" immediately next to the address "*Mrs. A. L. Erlanger, 175 Riverside drive,* New York city" (Contestant's Exhibit L). (129) Bill, electric service, addressed to Mrs. A. Erlanger, 175 Riverside drive, covering a period from *2–10–28* to *3–12–28*, stamped with the stamp of the financial department, with another stamp indicating that the charge is to the account of A. L. E., personal (Contestant's Exhibit L). (130) Bill, electric service, dated *1–11–28* to *2–10–28*, addressed to Mrs. A. Erlanger, 175 Riverside drive, stamped "*O. K., Pratt*" and with another stamp indicating that *it was charged to the account of A. L. E., personal* (Contestant's Exhibit L). (131) Bill, electric service, *4–11–28* to *5–11–28*, addressed to *Mrs. A. Erlanger*, 175 Riverside drive, bearing the stamp "*O. K., Pratt*" and another stamp indicating that it was charged to the *personal account of A. L. E.*, Riverside drive (Contestant's Exhibit L). (132) Bill, electric service, *3–12–28* to *4–11–28*, made out to Mrs. A. Erlanger, 175 Riverside drive, Apt. O-12-E, stamped with the stamp of the

financial department and with another stamp indicating that it is charged to A. L. E., personal account, Riverside drive, also stamped " O. K., Pratt " (Contestant's Exhibit L). (133) Bill, electric service, *10–11–28* to *11–10–28,* made out to Mrs. A. Erlanger, 175 Riverside drive, Apt. O-12-E, stamped with a stamp indicating that the bill was charged to the *personal account of A. L. E. for home;* also stamped with the *O. K. of Pratt* (Contestant's Exhibit L). (134) Bill, *12–11–28* to *1–10–29,* electric service, made out to Mrs. A. Erlanger, with the O. K. of Pratt upon it, the stamp indicating it was paid, and another stamp indicating that the bill was charged to the *personal account of A. L. E.,* Riverside drive (Contestant's Exhibit L). (135) Bill, electric service, for the period *1–10–29 to 2–13–29,* made out to *Mrs. A. Erlanger,* 175 Riverside drive, Apt. O-12-E, stamped paid with an *O. K. of Pratt,* also stamped with another stamp indicating it was charged to the personal account of A. L. E., Riverside drive (Contestant's Exhibit L). (136) Bill, electric service, *2–13–29* to *3–12–29,* made out to *Mrs. A. Erlanger,* 175 Riverside drive, Apt. O-12-E, stamped with O. K. of Pratt (Contestant's Exhibit L). (137) Bill, *3–12–29* to *4–11–29,* electric service, made out to *Mrs. A. Erlanger,* 175 Riverside drive, O-12-E, stamped with *O. K. of Pratt,* and *O. K. of Dillon,* also bearing bookkeeping notations stamped on the back to indicate that it was charged to the personal account of A. L. E., Riverside drive (Contestant's Exhibit L). (138) Bill, electric service, *10–11–29* to *11–11–29,* made out to Mrs. A. Erlanger, 175 Riverside drive, O-12-E, stamped with O. K. of Pratt (Contestant's Exhibit L). (139) Bill, electric service, *9–12–29* to *10–11–29,* made out to *Mrs. Erlanger,* 175 Riverside drive, bearing on its face " O. K., Pratt," pencil notation, " Riv. Drive " (Contestant's Exhibit L). (140) Bill, electric service, *12–11–29* to *1–10–30,* made out to Mrs. A. Erlanger, 175 Riverside drive, stamped with the *O. K. of Pratt,* also stamped with another stamp indicating charge to the *personal account of A. L. E.* (Contestant's Exhibit L). (141) Thirteen checks to Electric Service Engineering Corporation drawn on the A. L. Erlanger special account by L. E. Bergman, who was general manager and Erlanger's nephew, of the following dates: 11–16–27, 12–24–27, 1–18–28, 2–24–28, 3–19–28, 4–18–28, 5–23–28, 6–20–28, 7–17–28, 10–17–28, 11–21–28, 12–17–28, 1–15–29; also five checks to the order of the Electric Service Engineering Corporation, drawn on the A. L. Erlanger special account and signed by M. Pratt, Jr., and Saul J. Baron, upon the following dates: 2–16–29, 3–22–29, 4–16–29, 6–18–29, 1–17–30 (Contestant's Exhibit M-12). (142) Three checks to the order of the Electric Service

Engineering Corporation, drawn on A. L. Erlanger special account and signed by Saul J. Baron and M. Pratt, Jr., on the following dates: 9–23–29, 10–21–29, 11–23–29, and one check to the order of New York Telephone Company, drawn on A. L. Erlanger special account, signed by Saul J. Baron and M. Pratt, Jr., dated 2–17–30, and nine checks order of Elesel Holding Company, Inc., drawn on A. L. Erlanger special account, signed by Saul J. Baron and M. Pratt, Jr., on the following dates: 7–1–29, 8–1–29, 11–1–29, 11–4–29, 12–2–29, 12–2–29, 1–1–30, 2–1–30, 3–1–30; one check Consolidated Gas Company, A. L. Erlanger special account, signed Saul J. Baron and M. Pratt, Jr., dated 12-31-29 (Contestant's Exhibit N-12); these fourteen checks were for electricity, rent, phone and gas. (143) Letter from Dr. Gustave Paul, dated 12–3–29, addressed "My dear friends, my dear Charlotte and my dear A. L. E.," expressing his friendship to them and concluding "with the most hearty greetings, I am, in love and devotion, your G. Paul" (Contestant's Exhibit H-12). (144) Letter (1–29–30) from Dr. Paul to "My dear friends," expressing his joy over learning that "both of you are in good health," and signed "Your true friend, Paul" (Contestant's Exhibit J-12). (145) Envelope with canceled stamp thereon, addressed to *Mr. and Mrs. A. L. Erlanger*, 175 Riverside drive, New York city, U. S. A. (Contestant's Exhibit K-12). (146) Letter dated 6–28–29, to Robert H. McConnell, M. D. (Erlanger's physician and a witness for contestant), as follows: "My dear Doctor, thanks for your fine attention, Yours, A. L. Erlanger," in Erlanger's handwriting (Contestant's Exhibit M-13). (147) Telegram Dillingham to contestant as follows: "Western Union, 1927, Dec. 16, P. M. 9:15, Received at GZ A480 33 N.L.W. 12 MK, Springfield, Mass. 16, *Mrs. Erlanger, 175 Riverside drive, New York, N. Y. On return to New York and next week contracts made with Boss today require Betty Brown Pudding with dinner as they are unique and extraordinary have placed case in equity hands, love to both*" (Exhibit R-14) Charlie (Dillingham). (148) Letter dated 7–7–28 (Exhibit M-14), *Dillingham to contestant*, in part as follows: "July 7, 1928. Dear Charlotte: Your letter of June 26th is received and I was very glad to hear from you and to learn that you and Abe are fine. Best love to you and Abe and, as Jay Gould said to his sons when he gave them the Missouri, Texas & Pacific R.R.'s: 'I hope these lines will find you well.' Sincerely, Charlie (Dillingham)."

Pratt, the auditor, testified as to matters relating to the later period; quizzed about certain insurance bills which he said he paid because Erlanger handed them to him, *though he knew they were for Miss Lesley's car insurance*, and naturally the policies were issued in the same name in which the car was carried, he said the

bills were made out according to the policies, and were for the insurance premiums on the car that was in the name of Charlotte Lesley. Shown contestant's Exhibit P-12, he was familiar with the check, made out to C. A. Taylor Trunk Works, Inc., and drawn on A. L. Erlanger special account, and with the bill made out to " Mrs. A. L. Erlanger," New Amsterdam Theatre Building, with " O. K. Dillon " on its face and two stamps of the financial department. *He did not ask* Mr. Erlanger about this bill (5465). It was dated April 13, 1928. He identified Exhibit L-12 (fifteen bills from the Electric Service Engineering Corporation), the earliest being *November 10, 1927,* and the rest of which covered the periods in *1928 and 1929, made out to Mrs. A. Erlanger, 175 Riverside drive, with Pratt's O. K.* on each of them. He identified and stated that he O. K.'d contestant's Exhibit F-7 (5470) and that it had the general manager's stamp on it, but was not O. K.'d by him; that he, Pratt, looked it over and checked it up; the bill was for, among other things, *Mrs. Erlanger's room and three closets, and he O. K.'d it without speaking to Erlanger about it;* he knew W. & J. Sloane was a responsible concern; admitted that he saw on the bill *" Mr. Erlanger's room and two closets " over " Mrs. Erlanger's room and two closets."* The bills were dated *October 31, 1927,* and *November 30, 1927,* the former addressed to Mr. A. L. Erlanger, 175 Riverside drive, New York city, c/o New Amsterdam Theatre, Forty-second street, New York City, and the latter, addressed to Mr. A. L. Erlanger, 175 Riverside drive. The former was for a total of $4,785.05, the latter was for $61.90. He knew contestant's name was *Charlotte Lesley in 1927* (5478). Pratt *had no (5481) social intercourse with Erlanger's home.* The penciled bank balance statement of *March 11, 1930,* proponents' Exhibit 285 (discussed at length in proponents' brief), was prepared for Judge Erlanger. *Pratt said that he never gave a copy to anybody else but him;* two kinds of bills which passed through the office, business bills and personal bills. *The general manager O. K.'d the business bills and the personal bills,* and after Dillon came into Erlanger's employ, he did. Pratt included household bills in personal bills with an O. K. (5377); he O. K.'d them with a rubber stamp and his initial; sometimes (5378) Erlanger handed bills to him personally; he handed him insurance bills; was shown a document and said Erlanger handed it to him, told him to pay it; nobody's O. K. was on it; he said Erlanger handed it to him and told him to pay it, in *June, 1928;* it was dated June 1, 1928, was to Miss Charlotte Lesley, from Betts, insurance brokers, *May 9, 1928,* to *May 9, 1929,* Flint coupe, a charge to A. L. E., personal account; another bill he said Erlanger handed to him personally and told him to pay was

dated *September 5, 1928,* to Miss Charlotte Lesley, for auto liability insurance (Proponents' Exhibit 287), and a further insurance bill of Betts, insurance, dated October 28, 1929, Miss Charlotte Lesley, liability insurance Packard coupe. He was examined about bills that passed through the finance department, bearing indorsement " *Mrs. Erlanger, O. K., Mrs. E.;*" he observed these markings; *he did not ask Erlanger or anybody else about these markings,* nor did he pay any attention to them, relying upon Dillon or Bergman, as the case might be. Bergman had then been manager for some time and continued as such; was Erlanger's nephew. He was shown contestant's Exhibit B-6, contestant's Exhibit O-12, which is made out to " Mrs. A. L. Erlanger," also contestant's Exhibits O-12, T-10, F-7, Q-7, O-6, V-6, W-6, L-1, N-1, and also contestant's Exhibits R-1 and S-1, which are bills from the Electric Service Engineering Corporation; he recalled that they came in monthly; he observed that they were made out to *Mrs. A. L. Erlanger* and *said he* observed that from the time that they came in; as to various checks (5386–5391) in February, 1930, the cash for which was sent to Erlanger's house on Riverside drive, he said that *they were sent pursuant to instructions on the telephone from the same lady who gave directions in 1927, to send cash to Erlanger's house, 232 West End avenue.* In *February, 1930,* the lady on the telephone said that she was *Mrs. Erlanger.* Money was sent three times between *February 15, 1930, and Erlanger's death.* The cash was turned over to Dillon, who brought back the receipts signed by " Mrs. Erlanger " (Contestant's Exhibits M-9, N-9) (see 5671). He said he did not at any time in speaking over the telephone *mention Mrs. Erlanger;* he was directed by Erlanger to purchase five shares of the Bowery and East River Bank stock made out in his name (Proponents' Exhibit 221) and that when purchased he gave certificate to Erlanger, *the back of which was blank;* that Erlanger told him he was going to transfer it to Miss Fixel and to keep it until further orders, *and at that time he made a note thereof on the back of the certificate; yet the note itself, which he admitted having made, in pencil, on the back of the certificate, was " Transfer name of Charlotte Lesley;"* that he had it in his safe until Dillon called for it, a few days before March 20, 1928; he gave it to Dillon, taking his receipt (Proponents' Exhibit 294). In *November of 1928* Erlanger instructed him to have the certificate issued to (5396) Miss Charlotte Fixel, the five shares transferred into the Bank of America, with which the former bank had merged; Pratt said (5397) that Erlanger had made transfer of the five shares into the name of Charlotte Lesley, Bank of America, but in the next answer changed the name to Fixel; he said that Erlanger directed him to have eleven, five and five shares made

out in his name, and thirty-six shares in the name of Charlotte Fixel (Proponents' Exhibit 224). Pratt was shown proponents' Exhibit 92, certificates of Equitable Office Building Corporation stock, each for a hundred shares, and he stated that the name on the reverse side of these certificates, " Charlotte Fixel, c/o A. L. Erlanger, 175 Riverside Drive, Apt. O-12-E, one hundred shares," *is in his handwriting*, and that he wrote this at Erlanger's request; that Dillon witnessed Erlanger's signature, and that he wrote it in *October, 1928;* that he went to the office of the transfer agent, and had the stock transferred to the name of Charlotte Fixel, the Equitable Company issuing four for one, the trust company rendering a bill for transfer stamps in which was written to " Common stock transferred to Charlotte Fixel." Pratt delivered the certificates to Erlanger 10/22/28. He stated that he was unable to find in the personal and business books of Erlanger any entry referring to a check for $2,500 which Dillon said he received in *December, 1928,* from Erlanger (5408). (As to Pratt's inability to find data in the books, see pp. 5452–5454.) Pratt prepared the check dated *April 26, 1929,* for $750 for Charlotte Lesley at Erlanger's request; he signed it and kept it (Exhibit 299); October in the same year Pratt had a check drawn at his request for $3,990 to the order of *Charlotte Fixel;* signed it and kept it (Exhibit 300); and a third check he prepared dated *December 5, 1929,* at his request for $500 to the order of *Charlotte Fixel* (Exhibit 301). This check is indorsed " Charlotte Fixel, Charlotte Lesley." Exhibit 300 is indorsed " *Charlotte Fixel, Charlotte Erlanger;*" on Exhibit 299 the indorsements are " *Charlotte Leslie and Charlotte Lesley.*" He said (5423) that the Dillon gift check for $1,000, dated *March 28, 1929,* could be found in stub book of the check book from A. L. Erlanger personal account; shown the ledger account of which he spoke, he pointed out the entry, saying the paper on which this was written was a *sheet from Erlanger's ledger* (Proponents' Exhibit 302), but inquiry about another gift check to Dillon for $5,000, dated *December 16, 1929* (Contestant's Exhibit M-8), *was recorded in a cash book as well as in a ledger* (5425); asked in cross-examination to explain how the $5,000 check to Dillon found its way into the regular cash book, and the $1,000 check did not, he answered there were two different accounts, *but he failed to explain why these checks were put in two different accounts.* As to Pratt's inability to explain the different checks paid to Dillon, see pages 5426–5431. Shown proponents' Exhibit 287, he stated that he received it from Erlanger in September, 1928 (it is dated September first); he stated he received proponents' Exhibit 288 from Erlanger probably the *first day of November* or the *last day in October;* the date of the bill

enabling him to state when he received it; he received these exhibits, 287 and 288, *from the hands of Erlanger,* and also proponents' Exhibit 286, a few days after its date, *June 1, 1928,* giving separate answer that it was in the month of June and in Erlanger's office. *When he was reminded that Erlanger sailed for Europe on the eleventh day of May he admitted his error.* He could not *explain why he swore* that he received these bills from Erlanger's hands (5429, 5430). *He admitted that his recollection was wrong,* but denied that he created the story to meet the condition; *again he stated in connection with his recollection that he only paid bills on Erlanger's sanction, that they were not O. K.'d by any one in his employ;* yet he admitted that it was clear that he did pay this bill without Erlanger's sanction and without his handing it to him. *He denied that within one week after Erlanger's death he gave an order to his subordinates, Aguolia and Hemmer, to make a survey of the bills and take out of the files everything that related to Mrs. A. L. Erlanger (5434) and he denied that it was actually done, and he denied that these papers were turned over to Judge Erlanger. He reiterated the denial,* and thought that the first order he gave was when he received the order to produce (in connection with this trial). *After these several positive denials, he was asked if it were not a fact that every paper relating to Mrs. Erlanger was taken out of the files during the month of March, 1930; he replied that it was possible, that he did not have a definite recollection of it and then in spite of the above.denials, he stated, " I have gone through the files and I had the files gone through;" had ordered Aguolia and Hemmer to go through them. He went further and admitted that when they went through them they took out every paper that related to Mrs. Erlanger; they had gone over the files time and time again to get those papers.* At this point the court ordered Aguolia, who was making motions to the witness, to leave the court room. He admitted that papers were taken out of the files and *were all turned over to one of proponent's attorneys.* Then Pratt stated (5436) that the best recollection he had of turning over any papers was to Mr. Lipper, on his request or the order to produce; he reiterated that the first that he remembered was this order to produce; *then when the question was hurled at him as to whether every scrap of paper that related to Mrs. Erlanger had not been taken out of the files within a week of the time Erlanger died,* he answered that if he were asked for them, they were. He was queried about his testimony concerning the bank balance statement of *March 11, 1930;* he again stated one typewritten copy of it was made, and *when asked about his previous testimony that he had addressed and sent it to Judge Erlanger, he replied, " Delivered it to him;"* and said that if he did state that he had addressed it and sent it to Judge Erlanger he did

send it. His testimony (5336) was read to him (5437, 5439); in it he was recorded as saying he sent it down to the fifth floor addressed to Judge Erlanger, and now he stated that he *sent it down by himself;* he admitted that every time up to that time (March eleventh) when a bank statement or bank balance statement had been got up, there was a copy kept in his files of his department, and one delivered to Erlanger. He attempted to explain the change in policy on this occasion, in not making an additional statement for the files, by saying that Erlanger had died, and he simply got this statement up for the information of Judge Erlanger, who had not received any bank balance statement (though he had the same typist there that he had before, the same machines, the same facilities for making carbon copies) (5441). He later added to the explanation that conditions had changed and he just gave it to the judge for his information, that nobody told him to change his method; that he did this just that once. Again he was queried about the income tax returns; from 1917, he said he prepared them himself and went in to Erlanger and asked him the questions; beginning with 1919 he did it for the State returns. Shown proponents' Exhibit 278, he was asked whether the answers were not in these income tax returns prior to the time of seeing Erlanger at all, and he denied this, stating that " On the State, of 1919, the first that was prepared, I had to ask him those questions," and then in the next answer he said he did this every year. For the years 1920, 1921, 1922, 1923 the originals of the State income tax returns were not available. On the originals he stated that he would mark the initials (A. L. E.) just where to sign; that before submitting the completed form he would get the information from Erlanger (see contradicting testimony of Charlotte Donnelly), and that on the working papers he would have a form of the State or the Federal with a working schedule, the figures made out, and go over the figures with Erlanger and *ask him the questions each year.* As to a deduction taken for a head of a family as defined in instruction D (which deduction he said Erlanger took for his sister, Ray) he said that it defined a head of a family thus: " If the taxpayer were living *in the household with one or more persons to whom he was legally or morally bound for support,*" and Pratt had no knowledge as to where Miss Ray Erlanger lived, except in the summer time at Lawrence; he had no knowledge of where she lived in Manhattan; he never had occasion to send a message or checks for Erlanger to Miss Ray Erlanger; at no time; checks were drawn for her, but he would leave them with Erlanger; he sent money at the request of the contestant over the telephone in *February, 1930,* when *she told him that she was Mrs. Erlanger, and he got receipts for that money, signed " Mrs.*

*Erlanger*" (5452). *He had been with Erlanger a great many years, but had never called at his residence; he never made* any inquiry about when she became Mrs. Erlanger. After the parties went to Atlantic City in July, 1927, Erlanger would draw his own checks for any money he needed there; Pratt got some of the hotel bills from Atlantic City, but *he would have to look at them to tell how they were made out; said he had produced all of them to Mr. Lipper, and when asked if he remembered how they were made out, he answered, " Mr. A. L. Erlanger,"* yet when confronted with *contestant's Exhibits Y and Z, produced by the clerk of the hotel, he changed his answer,* and admitted that he saw the return checks for the hotel bills. Queried as to the Durant car purchased in 1923 from Mr. Daley, he found the entry under *" April 7, 1923,* A. L. E., C. F. Daley, purchase Durant car, $1,787.30;" he identified contestant's Exhibit R-7 as the check paid for it. *The witness declared that he did not know that the check was in payment of a Durant car which stood in the name of Charlotte Erlanger, that the office paid for the license plates and for the insurance, the bills being made out to Charlotte Erlanger.* He said that his work at that time was with corporations and these entries were made by others. Shown contestant's Exhibit P-7, dated *April 5, 1923,* he stated that the date of the check in payment for the car was April seventh, and he admitted that the *letter was addressed to Mrs. A. L. Erlanger* and that it went through the mails, but he said, *" This is the first time I have ever seen the letter."* Shown contestant's Exhibit P-12, he stated that he was familiar with the check and stated the bill was made out to the order of *Mrs. A. L. Erlanger,* and the bill had on it *" O. K., Pratt;"* and he said he looked at the bill, saw how it was made out, *but did not ask Erlanger anything about it;* that he never went beyond Dillon's or Bergman's O. K. He noted " O. K., Pratt " on contestant's Exhibit O-12, stated he looked at the bill before he O. K.'d it for payment, that *it was made out to Mrs. Erlanger;* that *he said nothing to Erlanger about it;* that it had the O. K. of Bergman and of Dillon; that that was the reason for not saying anything to Erlanger about it; he admitted he O. K.'d one Exhibit L-12 for payment, on which he could not find any O. K. besides his own; he found right underneath that *" O. K., Pratt " was " Mrs. A. L. Erlanger, 175 Riverside Drive."* He said the bills came in monthly, and this is one of them, and he O. K.'d them for payment; nobody else's O. K. was on it; Mr. Erlanger was at 175 Riverside drive from *1927 to March 7, 1930,* and he got these bills *" Mrs. Erlanger, 175 Riverside drive " from November, 1927, to March, 1930,* and during all that period he never asked Erlanger a word about Mrs. Erlanger; he never went beyond the O. K.'s; from the first regular

monthly bill *he never spoke to Erlanger about Mrs. Erlanger*, and when he asked Erlanger about his tax returns *he did not say to* Erlanger, " *I am O. K.'ing and ordering bills paid monthly that come made out to ' Mrs. Erlanger,' or ' Mrs. Erlanger, 175 Riverside drive.' "* Contestant's Exhibit F-7 he and the general manager O. K.'d; it had his stamp on it; he did not O. K. it but put a stamp on it. Shown contestant's Exhibit F-7, a special bill, he said the general manager besides himself O. K.'d it; the former did not O. K., but put a stamp on it; Pratt O. K.'d it; he looked it over before payment, had it checked up in the office, and admitted that he knew among other things that the bill was for " *Mrs. Erlanger's room and three closets;*" and *Pratt O. K.'d it for payment without saying a word to Erlanger about it;* it came through the general manager's office. He knew it was from Sloane's and that that firm did business regularly with Erlanger in connection with his theatres, a responsible firm, and admitted that he did probably see the items on the bills, and *immediately under* " *Mr. Erlanger's room with two closets,*" " *Mrs. Erlanger's room with three closets.*" He said that *Bergman*, general manager (Erlanger's nephew), had written in pencil on the bill that it was to be charged to the account of " *A. L. E., 175 Riverside Drive.*" Shown contestant's Exhibit O-6, he stated that it related to the car, the insurance for which was charged in proponent's Exhibits 286–288; when Exhibit V-6 was shown Pratt he admitted that he saw that bill, that it was made out to " *Mrs. A. L. Erlanger,* 175 Riverside Drive," for work done on Flint coupe, for which insurance bills were paid. Shown a bill for Erlanger for a Packard coupe and admitted he saw on it the " *O. K., Mrs. E.*" yet he did not call Erlanger's attention to that; said it was O. K.'d by Dillon, supposed he attended to that if it were necessary; admitted he saw contestant's Exhibit O-6 and that it was for a bill made out to *Mrs. Erlanger,* which he, Pratt, ordered paid, and he *admitted further that he signed a good many checks accompanying these bills jointly with Baron;* the latter exhibit was made out to " *Mrs. A. L. Erlanger, 25 Broad View, New Rochelle, New York;*" he knew that Erlanger had taken a house for the summer at New Rochelle; admitted that Mrs. Erlanger O. K.'d contestant's Exhibit L-1 for payment, and that the bill was made out to *Mrs. Erlanger,* and that it was for the Packard car, covered by proponents' Exhibits 286–288; he admitted that the emblem was put on " *Mrs. Erlanger's car;*" bill was addressed to Mrs. Erlanger. He identified contestant's Exhibit B-7, said that he O. K.'d it for payment, that it was indorsed " *O. K., Mrs. E.,*" and that the bill was made to " *Mrs. Erlanger;*" he admitted that a similar " O. K., Mrs. E." was on contestant's Exhibit N-1, and that that bill was to Mr. A. L.

Erlanger, 175 Riverside drive; likewise he identified contestant's Exhibit T-10, made to "Mr. Erlanger" and with "*O. K. for payment, Mrs. Erlanger*" on it; noted that letter accompanying it was addressed to *Mrs. A. L. Erlanger,* and that the envelope was addressed to "*Mrs. A. L. Erlanger;*" yet he never called Erlanger's attention to any of these things; saw that contestant's Exhibit R-1 of *December 16, 1929,* was made to "*Mrs A. L. Erlanger,*" and stated that actually he was surprised when he heard the voice over the telephone say: "*I am Mrs. Erlanger,*" after the voice saying "Miss Lesley" (*in May and June, 1927*), stating further, "*I wondered where the ceremony took place;*" that he first knew that Miss Lesley, Miss Fixel and Mrs. Erlanger were all the same person in *October, 1929,* when he was asked to draw a check to order of Charlotte Fixel; to the best of his recollection *that is the first time he heard the name Charlotte Fixel;* and the bills that came from *1927* on fixed in his mind that it was one and the same person. He repeated this statement (5480) and added that *up to October, 1929, he had never heard the name Charlotte Fixel;* then, when his attention was directed to the date of the acquiring of the stock of the Bank of America in *October, 1928, he stated that he was mistaken;* that *he did not have any social intercourse with Mr. Erlanger's home* (5481), though he was very close to Mr. Erlanger in a business way; his recollection was that from *1920 up to 1927 he had never learned that there was a lady living from 1920 on at 232 West End avenue;* and, asked when he first learned it, he replied that the first impression was made on him when Miss Lesley telephoned in *1927;* that he relied upon *Dillon because he understood him to be Erlanger's representative, his personal representative;* in *May, 1927,* he sent money up to Erlanger's house on the telephone message of *Charlotte Lesley;* he did not inquire who she was; and he fixed the *earliest time that he heard them say that she was Mrs. Erlanger was at a time after Dillon came, he "would hear of sending messages up to Mrs. Erlanger."* He furnished Erlanger (5487) with a monthly account of his drawings. He commented on the indebtedness to Erlanger of George C. Tyler, one of proponents' witnesses, of $14,917; stated that he did not recollect any royalties coming in for Tyler for any plays that he was interested in to be credited against that indebtedness. It came out in his testimony that Tyler also owed for rent; had not paid a cent of rent (5626) since the demise of Mr. Erlanger (see Tyler's own testimony); and it further developed that *Lederer* was indebted, and *Aarons owed money on the books.* As to Erlanger's instructions to him in regard to transfer of Bowery and East River National Bank stock to Charlotte Fixel, he did not remember any one being present. Asked: "If he gave you instructions to *transfer* the

stocks to *Charlotte Fixel*, why did you then and there write on the back of the paper, ' Transfer, name of Charlotte Lesley,' '' and he replied, " I did not do it right then and there." Then followed the question: " Haven't you testified that you did?" and he answered: " Not right then and there. Q. When did you do it? A. I did it when I first bought the certificate for him." *Erlanger told him he wanted to transfer these five shares to Charlotte Lesley* (5631); it was at the time when he delivered the stock to him that he told him he wanted it transferred to Charlotte Lesley; after Erlanger gave him back the stock he said he wanted it in the name of Charlotte Fixel (5632). (Note. Inspection of the back of the certificate shows the notation at the top thereof, " Transfer, name of Charlotte Lesley." The transfer statement on the back is blank so far as any name of a transferee goes, but at the *bottom of the transfer in purple ink is the date, " Mar. 21, 1928, Charlotte Lesley, A. L. Erlanger."*) He admitted that when he first brought the stock to Erlanger, he said to him, " I want this transferred to the name of Charlotte Lesley, and you hold it;" that he took it back to his office and held it until he delivered it to Dillon, and it always bore this notation: " *Transfer, name of Charlotte Lesley;*" yet he did not have it transferred to the name of *Charlotte Lesley, but to the name of Charlotte Fixel in October of 1928.* He indicated in his testimony (5633) that after Erlanger had handed him this stock in *March*, with the direction to transfer it to Charlotte Lesley, he turned the certificate over to Dillon at his request and received a receipt dated *March twentieth;* he was obeying the instructions of Dillon, viewing Dillon as Erlanger's representative; this view of Dillon he held from the time Dillon first came there; Dillon announced to him that he was the personal representative of Erlanger; he thought that Dillon would announce it to each of the other departments; he did announce it to him personally, a personal visit to his office. Right here he was *confronted with the substance of an affidavit in which he, Reed, and Leffler denied that there was any such meeting as described by Dillon, or that he (Dillon) or any one else made any such statement either in words quoted or in substance; he admitted that he joined in such an affidavit and remembered swearing to it.* He said that the statement of Dillon was made to him, not collectively with others, but personally; his further explanation was in substance *that he only intended to convey that he had not been present with others when Dillon made the announcement; in other words, collectively, but that if he had been asked to he would have sworn to the statement that Dillon personally notified him.* It will be noted that this is entirely contrary to the affidavit signed by him, which not only denied a meeting with Dillon, *but also that he, Dillon, or any one else made to them any such*

*statement* either in the words quoted or in substance. He stated that the voice in *1927* stated to him, " This is Miss Lesley," and asked him to send money over to the house, *and that he never heard the voice before;* that he only received orders from Mr. Erlanger in regard to Miss Lesley; did not recall anybody being present when Erlanger spoke about her, but thinks Dillon might have been present; *that Dillon was present in Erlanger's office a great many times.* He interpreted Dillon's language announcing that he was Erlanger's personal representative, etc., to mean that the instruction was delivered to all the department heads at the same time in the same room. He said that at the time when the affidavit was made he told the attorneys that he received these instructions but not in the presence of the others (5641, 5642), *but he found nothing like that in the affidavit.* When asked whether at the time the voice in *May, 1927,* directed that money be sent up to the house, he had told Bergman of the voice, he stated that he did not speak about it to Bergman, but he told Bergman that Erlanger wanted his money sent up to the house, and Bergman signed the check and the money was sent up; he again pointed out that the *same voice directed him to send a check on account of the Ziegfeld Follies for $50,000, and that solely by the direction of that voice he drew the check because the check had to be signed by Erlanger himself.* (*Note the date of this $50,000 check is June 16, 1927.*)

On July 20, 1927, Pratt received from the same " voice " (Miss Lesley) an order to prepare a check for $30,000; he never asked Dillon who is this " voice;" never spoke in any way about Miss Lesley. Pressed (5648) with a question as to why he remembered telling Baron about the voice of Miss Lesley and not telling Dillon about it, he answered that he probably told Dillon that Miss Lesley asked for this money to be sent up to the house, and then said, " I think I did." Baron, Pratt stated (5648), conducted negotiations and prepared the papers with Ziegfeld in the Follies matter; that Ziegfeld knew Baron's relations with Erlanger, *but he could not explain Ziegfeld's going to Miss Lesley to ask Miss Lesley to have this money gotten.* He said that he first became acquainted with the name Charlotte Fixel when Erlanger talked with him about the Equitable stock, in *October, 1928;* that Erlanger paid taxes on the Garden City property in *1927* through his business books (5653); that *he O. K.'d the bill for payment of the taxes on the Charlotte Fixel property at Garden City.* After some interrogation he found entries in regard to the purchase of the Garden City lots in the A. L. Erlanger personal ledger, *the sheets of which he said were not complete;* and in *the investment account the property appeared as the purchase of Garden City lots* (5659). (Pratt showed vague knowledge of

various entries and headings, etc., in the ledger [5660–5667] and gave a confusing description of the bookkeeping system.) Queried about the system of bookkeeping, particularly of the cash book and the ledger, he admitted there was nothing in the cash book opposite any item which had been posted in a ledger to show the kind of ledger and the page in which it was posted, saying that this was so, " *No, sir, because it was filed, the leaves would be filed alphabetically, loose-leaf in the ledger under the title of whatever it would refer to;*" that the loose-leaves in the ledger are not numbered; *that there are no cross-references in the cash book and nothing there to tell the ledger page of the ledger where it was posted because, Pratt stated, there are no pages in the ledger, and this is true of the corporation ledgers and of the A. L. Erlanger ledger.* During the inquiry about the sending of the cash on direction of Mrs. Erlanger, he stated, " *She might have been Mrs. Erlanger for all I know. He might have got married in any one year and I would not know it* " (5678). As to the check of *October 14, 1929,* to Charlotte Lesley for $3,990, he said that it was made out the way Erlanger told him; when his attention was called to bills coming in addressed to *Mrs. A. L. Erlanger,* he admitted that *he surmised that Mrs. Erlanger's name was Charlotte* (5680). When asked which were the corporations that he referred to when he swore that he knew in his lifetime that Erlanger had given away the stock of his corporations, he replied, " *Those were two corporations. The Erlanger Amusement Enterprises, Inc., and the Erlanger Real Estate Corporation;*" that these were the corporations in which Erlanger had his property; that neither of them paid dividends. He admitted that he did swear that *Erlanger had given away the stock of these two corporations in June, 1925; he stated (5686)* *that he gave away all of it, that he stripped himself of all the stock of the A. L. Erlanger Amusement Enterprises, Inc., and of the A. L. Erlanger Real Estate Corporation, that owned all the real estate.* He said: " *That is, he handed the stock; he gave it away; he gave it away to Judge Erlanger for the Judge and his sisters;*" that he had the stock cut up in three equal parts, excepting the incorporated stock. Asked whether the papers that were gotten up showing the various corporations' interests were gotten up after *June, 1925, he replied that he would like to look at them, that he did not remember the date and he did not believe they were prepared in his office;* they were not prepared in his office, they were not kept in his office. *He admitted that he swore to this* statement (5689): " *This does not include the stock of the A. L. Erlanger Amusement Enterprises and the A. L. Erlanger Real Estate Corporation, which to my knowledge Mr. Erlanger gave away to his relatives during his lifetime.*" He admitted that when he swore to that he did not state at what time Erlanger gave it away;

and he admitted further that he did not state at that time to whom he gave it away, but that now he stated it was in *1925*. The Amusement Enterprises, Inc., was incorporated in *February, 1925;* he said that the stock four months later was handed to the judge in Erlanger's office, *a hundred per cent of both stocks; the stock was indorsed certificates;* that Erlanger himself had been the owner of a hundred per cent of the stock, that the whole of it had been issued in the name of Abraham L. Erlanger, that there were 20,000 shares of the A. L. Erlanger Amusement Enterprises and that Erlanger carried 19,998 of these shares, one share being in the name of Bergman and the other in the name of Bickerton; *he admitted (5691) that he did not make an entry of the transfer of that stock at that time and that nobody took the stock and. put it back in the stock book and issued new stock for it to the judge or anybody else. He further stated that the amusement company stock was not to his knowledge transferred on the stock book, nor was any new stock ever issued to Judge Erlanger as long as Erlanger was alive, and that there was not to his knowledge any other stock issued to Ray Erlinger while Erlanger was alive, nor to Mrs. Bergman; that all the business was conducted by the Enterprises in precisely the same way after this alleged transfer as it was before,* by Erlanger being at the head, and that Erlanger was president and treasurer of the two corporations, and that *he imagined he always did exactly as he pleased all the time;* that he did not see Erlanger confer with anybody to find out what he was to do; that the A. L. Erlanger Real Estate Corporation had 40,000 shares in *February, 1925*, and that it was incorporated in *February, 1925*, and that of these 40,000 shares of stock, Erlanger had in his own name 39,998, one share being in Bergman's name and one in Bickerton's, and that he gave away in *June, 1925*. Pratt became auditor in *June, 1926*, so he fixed the date of the transfer as a year before he became the auditor. He said that he had the stock in possession when Erlanger had him come to the office, that it was in his possession to record on the books and his ledger, that it was handed to him to record, and he thought that it was in *June, 1925*, that he made a record of the stock. Asked why he did not do it in February, he said, " *I did not have the stock; the stock was not issued, I believe, until later on.*" Shown Exhibit 76 (made up of thirty-four sheets giving details as to various Erlanger theatrical corporations, names of officers and directors and stockholders), and when asked where it was got up, *Pratt said he could not say;* yet he was the man who made the record on the ledger; he said that this was not taken from the ledger, and when asked what it was taken from he answered it would be taken from the books in the legal department; that the ledger corresponded with this exhibit only as to the stockholders,

that he put down as stockholders the same as the stockholders here on these papers, that these sheets would agree with the ledger entries as to the stock. He said that the stock was given him in his possession in *June, 1925, and then denied that the stock was issued to Erlanger in June, 1925;* and when asked when it was he stated that he did not know when it was, that the stock books would show that; then he stated that he could not say when the stock was issued, after *February, 1925,* but that he received it in June, and that it was in the name shown in this exhibit, *and that he put in the ledger 39,998 shares in the name of A. L. Erlanger;* the examiner inquired: " Mr. Bergman one share and Joseph P. Bickerton one share? " and Pratt answered: " No, my ledger would show that those 39,998 shares were split up into three equal parts in the name of A. L. Erlanger;" and when asked whether he never had Mitchell L. Erlanger as a stockholder on his books of this corporation, the A. L. Erlanger Real Estate Corporation, Pratt replied: " *The stock books would have to show that;" and when the examiner said, " I asked you on your books in the ledger there? " Pratt answered, " No;" so that the ledger entry of the stock which would be put on in June, 1925, remained precisely the same up to the date that Erlanger died, and it was changed towards the middle or the end of March of the same year* (Erlanger died March seventh), *under the instructions of Saul J. Baron.* He stated (5697) that the stock of the A. L. Erlanger Amusement Enterprises was handed to him to be entered up on the *stock ledger in the name of Mr. Erlanger, 19,998 shares, in June;* that his ledger will show three certificates, he had three certificates, not one, when he recorded it in Abraham L. Erlanger's name; there were always three certificates, all being in the name of Abraham L. Erlanger; each certificate was for the same amount, and that is the only entry that Pratt made. After he entered them in the ledger he took them down to Erlanger, he saw him hand them to his brother after that; that was the last he saw of them. They were indorsed when he had them, *but Pratt did not see them indorsed,* did not see Erlanger indorse them; that the indorsement was in blank; but Pratt always carried them on the ledger in the name of Abraham L. Erlanger, and after he saw him hand them to the judge he next saw them when they were transferred in *March, 1930;* that nobody asked him to transfer them prior to that time.

He explained the queries that he put to Erlanger when he prepared his income tax returns (5702) and what he told Erlanger about exemptions which he could claim, that *he could make the same claim for exemption that he could make if he claimed that the person was his wife;* he told him the exemptions were identical; that it would be

the same exemption *and would not cost Erlanger a cent whether he said " wife " or did not say " wife," but said that he was at the head of the household, and that there was somebody living in that household who was a relative of his and whom he was supporting;* that he read to Erlanger the definition showing that the *person who was claimed to be part of the household must be living in the house.* When asked why he read that to him, Pratt said he was undetermined what the head of the house was; and he said, " *That he made it clear to Erlanger that the person because of whom the exemption was claimed had to live with him in the house; and that he explained to him that if he were claiming to be a single man and supporting a dependent outside the household then the exemption would be less,* and that then it was that Pratt determined to put in *the exemption under the provision of the person closely related living in the house with Erlanger, of which he was the head of the house.* He again stated that in *1920 he asked Erlanger whether he was a citizen of the United States, and that he kept right on asking him that up to 1930.* The quality of Pratt's testimony is well evidenced on page 5724; when closely interrogated as to his previous testimony, he stated about the books indicating the transfer of the Garden City property (5725, 5726), " I supposed that I had given orders to have a counter-entry made, but I found out that there were no entries made in the old books after the date of Mr. Erlanger's death." Pratt stated that he did not know when the transfer took place, when Erlanger deeded the property away; not from the information given to him; not until after he was dead; thought that Baron gave it to him, but during his lifetime he had no information that this property had been transferred, *no official information to take it off the books,* and that so far as the books show, the property was always Erlanger's. Shown a sixteen-dollar bill which he had O. K.'d for payment in Garden City property, *he stated that in business he drew a distinction between ordinary knowledge and official knowledge* (5729); that he always deemed the property as Erlanger's property, notwithstanding that *he had O. K.'d proponents' Exhibit 94,* notwithstanding proponents' Exhibit 74 had been O. K.'d by Dillon and O. K.'d by the general manager, notwithstanding the fact he plainly saw on it " Charlotte Fixel, c/o A. L. Erlanger;" he did not recollect that Charlotte Fixel, to whom he was making a record of transfers of stock, was a Miss or a Mrs.; *he testified that the transfers that he made were " Charlotte Fixel " without a prefix. Shown contestant's Exhibit O-13, he notices that she was " Mrs." on that,* and stated that (5734) *when he heard the three names he knew that Charlotte Erlanger, Miss Fixel and Miss Lesley, Charlotte Lesley,* were all the same person; and when asked, " Did you know that Charlotte Erlanger was Mrs. Erlanger?" he

answered, " I knew she was — I did not know she was Mrs. Erlanger. I knew she was addressed as Mrs. Erlanger;" queried about the bank balance gotten up on March eleventh, after Erlanger's death, he said no one asked him to make it up, that he did it of his own volition in the middle of the week, that there was not the usual carbon copy kept of this *particular report made upon March eleventh, just a pencil copy;* for all such bank balances prior to March third a carbon copy was kept on file in his office. He never sent any of these reports to Erlanger's house while he was ill; if he was not in the office he retained the originals and left them in his office for him when he returned, addressed, " Mr. Erlanger, personal." But, it appeared (5767), he did not carry out his usual practice as to the March third report, and why he did not he does not recollect; and on the eleventh of March he made up this statement of his *own volition at a time which was not yet the regular time.* In the continued cross-examination on this point, he said that he made one up for February seventh, fourteenth, twenty-first and twenty-eighth and the next date it would be due would be the *seventh of March,* the day of Erlanger's death. Right here he was asked why he made one up for the third of March, and he answered, " *I probably had this — I had this pencil copy made by Mr. Fitzgerald for my own benefit;*" and *just three days later he had a typewritten one made* (5768); and offered as a reason that it was necessary in his position to know the bank balances, necessary every day. But in all the years he did not have one in the middle of the week prepared. Again being asked why, his answer was that he needed it in his position in the financial department. Being pressed further for an explanation, he said that things were very upset on account of Erlanger's illness, and yet he conceded that he had been very ill between February fourteenth and the twenty-first and February twenty-first and the twenty-eighth, and had been very ill in May, 1927. He then stated that he had given all the explanations he could think of as to why he made up the statement on the third of March; when he first went on the stand, he testified that Eddie Fitzgerald typewrote the statement (Exhibit 87) of the eleventh of March, only to correct his testimony later in this respect. In the meantime, Eddie Fitzgerald had told him that he never typewrote such a statement in his life. The confusion of the witness is shown by the following question and answer: " Q. Then you came in the next morning and said — Mr. Kresel asked, ' Do you want to make a correction in your testimony?' do you remember that? A. Yes, sir; I would not be — I would give this — ask, request statement, typewriting would be done outside my office." Then he

stated that he thought Miss Charlotte Donnelly had done the type-writing of this statement; when asked whether he himself had done the typewriting of this statement (part of proponents' Exhibit 87) he said that he did not; and he tried to offer some explanation for not having on this bank balance statement of March eleventh the two columns, one showing the result of the prior week, as was the regular custom and this even though the pencil memorandum from which the paper was typed had the two columns. He said that he did not give this statement of *March 11, 1930*, to Tommy Tucker, that he would not deliver a statement like that to Tommy Tucker; yet when asked if he had never delivered one to Tommy Tucker for Erlanger in all the years, he answered, " It is possible. I do not recollect." And after several questions he stated that it was possible he might have left it with Tommy Tucker. On redirect, he identi-fied proponents' Exhibit 334, a *1923* will of A. L. Erlanger, and stated that the signature of Milando Pratt, Jr., on the last sheet of the document was his signature, and he recognized the other signatures, Edwin S. Golding and James Cullen, and he said that both were present at the time when he, Pratt, signed the paper, and that Erlanger signed it.

*James Mahoney,* employed as a valent in the Erlanger apartment from September 5, 1929, to the middle of November, 1929, when he was discharged, testified as to the manner in which he was employed, of what he claims to have seen and heard in the apart-ment occupied by the parties. His testimony covers over 190 pages of the minutes, beginning with page 4717. Because of the conclusion I have arrived at with respect to his calibre and credibil-ity, *there is no necessity of going minutely into his testimony.* Seven pages of the minutes are covered with the inquiry into how he was hired by decedent. Mrs. Erlanger, on his first calling there, showed him around the apartment. This viewing of the apartment con-sumed, he said, fifteen to twenty minutes. She showed him his room and sat down on the side of the bed with him and entered into conversation (most intimate — to describe it mildly). He told of her telling — at this first meeting with the contestant — " *about him having a stroke and about taking him, against doctor's orders and his brother's, to Atlantic City, saving his life,*" and further of her telling how decedent said to her, " *Charlotte, darling, if you do not take me away I will die. I am sick and tired of looking at these four walls,*" and that night at twelve o'clock she had the chauffeur come around and she bundled him up and took him to Atlantic City; that " *when she got there, she fired the nurse, the nurse was no good, that she told him not to notice anything Mr. Erlanger said; the stroke had affected his brain.*"

He stated that the first night he was there Mrs. Erlanger came in and showed him how to undress Mr. Erlanger, and the second night she was going to do the same thing, and Erlanger told her to get out of his room and stay out; that " *she did not come into Mr. Erlanger's room while he was there;*" that " *around about a week after* " he had gone there, Mrs. Erlanger said *Miss Donnelly asked her if he could be trusted.* He described visits there of Miss Donnelly (Mrs. Dillon) and remarks made by the latter reflecting upon Mr. Erlanger. He told of Mrs. Erlanger directing him to give decedent *some pills, three every night* (p. 4736), and *that she said they were harmless and soothing and that he, Mahoney, had a cold and took some of these pills, went to bed at ten minutes to eight and overslept in the morning (pp. 4755, 4756), and he said to Mrs. Erlanger after taking the pills,* " *There is something in those pills, as I slept for twelve hours and I was groggy half the day after them.*" On the subject of the pills he stated on cross-examination, " *I do not say that I believed his life was in danger; Mrs. Erlanger would not be bad enough to take his life;*" that the pills were maybe to put him to sleep, the pills were not to kill him but to put him to sleep (p. 4876).

He described Mrs. Dillon as calling Mr. Erlanger " *a cold-blooded old murderer* " and " *that cold-blooded old murderer that gives me the creeps every time I look at him,*" his conversation the next morning with Mrs. Erlanger when he asked her *what Mrs. Dillon meant and how Mrs. Erlanger went into details upon the intimately personal and delicate subject of Mrs. Dillon's experiences just prior to the birth of her baby,* how Mr. Erlanger kept her working late at night (p. 4738), *how the baby boy was born dead,* and *further private and personal matter.* He described the attitude and action of the Dillons toward Mr. and Mrs. Erlanger and the friendly relations between the latter and the Dillons. He described Mrs. Erlanger as saying — after he had told her of Mr. Erlanger almost slipping down the stairs, " *It was too bad he did not fall downstairs. He would be as well off dead as alive;*" he described her statements concerning *Miss Erlanger and Mrs. Bergman and a nephew and of Judge Erlanger, the brother of Mr. Erlanger.*

He further testified, " *She told me Mr. Erlanger had a will made and he had left everything to his ' old skunk of a brother.' She told me that he was worth sixty-five million dollars.*" (*This was after he was there a couple of weeks [p. 4797].*) " *She knew that for a fact.* I said to her, ' *Won't you get one-fifth? Isn't that a widow's rights?*' She said she would be satisfied with $1,000,000;" that she frequently came to his room; *that she told him she was married to Mr. Erlanger, that he asked her,* " *Where?*" *Then she hesitated a little, that he said,* " *Was it a religious ceremony, Mrs. Erlanger?*" *and she said* (p.

4749), " It was by a judge, James, and I will show you my wedding dress; that she took him into the room and showed him the bottom part of the dress, just lifted a cloth that was covering it; he thought it was white lace across the bottom, white or cream, he does not know which, that she said it was very expensive lace and she was going to have it made into an evening gown; that she said, to the best of her recollection, she was married seventeen years; that Mrs. Erlanger would tell him how long he was going to live, he was only supposed to live three months from the time he, Mahoney, got there; that in case of his death, she told me, " She was going to take a little house in the country not so far from New York and Jennie and me and herself would live there, and in the summer time she would take me traveling to Europe with her and we would spend six months abroad." He described how Mr. Erlanger discharged him and how Mrs. Erlanger told him it was necessary for him to go, that Mr. Erlanger would not be in a hurry getting a valet; that he could occupy the room until that time, that he told her he did not want it, he was going right away; that she told him never to be short, if he ever wanted money, he could always come to her, she would be glad to help him at any time; that going out the door he told her he was going to Judge Erlanger and tell him the way his brother was treated; that after he left there he never saw her until he " seen her out here in the hallway of the court."

On cross-examination (p. 4759), Mahoney stated that he came on subpœna the very day of the case (October nineteenth) and except some days he missed — about a week in all — he was there every day, viz., up to the day of the above testimony (December fourteenth). He stated (p. 4763) that when they (proponents) were calling witnesses he stayed away, but when contestant was putting on witnesses he was present in the courtroom. He had not worked since he left Mr. Erlanger. During part of the time after his discharge he spent some months in two separate periods at a monastery at Graymoor, where he said he entered the community to become a brother. He was what was known as a postulant — lay brother. The first period was one of about four months. He stated that he had no bank account when he was working for Mr. Erlanger, he had no money in the bank; he had no job since that time nor made a cent of income. He returned to Graymoor on November 8, 1930, and remained till September 23, 1931. He testified that Mrs. Erlanger came into his room, " She was not robed and all exposed," " She would bring her dress on her arm," " practically in a state of undress and exposed," " She would have a slip on her sometimes, then she came in her bloomers " in his room, to be helped on with her clothes. As to his thinking it was improper for her to come into his room in that way, " Indeed I did not. I never thought of it and never

*gave it a thought."* He thought Mrs. Erlanger and Mr. Dillon and Mrs. Dillon were *plotting against Mr. Erlanger* (p. 4775); and asked the same question afterward (p. 4776) about their plotting, he said, " *No, indeed, I did not think anything of the kind."* Again queried about his view that they were plotting, he said, " *So many things went on there — Mrs. Dillon calling him a ' murderer ' and Mrs. Erlanger saying that he should fall down the stairs, it is only natural I should think that they were plotting against him."* He testified (p. 4785) that he thought Mrs. Erlanger and Mrs. Dillon had him discharged and so he thought they were plotting against him (Mahoney); he was very unhappy over the discharge; that " *sure I knew she wanted him to die, she said about thirty times she hoped he would fall dead, at least thirty times,"* " *over and over again — I would hear it a couple of times a day."*

After trying in vain to answer what one-fifth of $65,000,000 was (which according to his previous testimony was the estimate made by contestant of decedent's property) he stated: " *There was lots of things was done there, I did not think was right, but I kept it to myself,"* and when asked what it was, he said, " *such as pushing Mr. Erlanger downstairs. * * * No, but she told me. Do you think it was right for her to tell me what she did? * * * Not pushing down the stairs — let him fall down the stairs — excuse me. * * * I mean let him fall down the stairs. He would be as well off dead as alive."* He continued: " *I knew she was waiting for Mr. Erlanger to die to have a good time — as she used to call it. * * * She even dressed up in the dress she would wear, with a white coat, I think it was trimmed with white fox fur and her emeralds she was to wear at the first dinner after Mr. Erlanger died "* (p. 4806).

*The testimony of this witness is not of itself worthy of the detail into which we have gone and which we would not . have set forth had proponents not given it so much space in their briefs.* The quality of his testimony, his whole makeup personally, his attitude under examination and cross-examination, the contradictions in his own testimony and the contradicting testimony of credible witnesses — Jennie Fielis, Mrs. J. J. Dillon, Frank Revett, all these factors stamp Mahoney as a witness entirely unworthy of belief.

*Robert Harrower,* deputy village clerk, Garden City, identified letter from the village clerk, dated July 2, 1929, to " Miss Charlotte Fixel, c/o A. L. Erlanger, 214 West 42d street." The bill for the removal of certain grass from the plot is in the record; the letter inclosing a money order, dated July 9, 1929, was signed " Charlotte Fixel."

*Arthur Newman,* Palisade Park, N. J., connected with Excelsior Savings Bank as new account teller, produced the files of the bank

in reference to the account in the name of *Charlotte Lesley*, signature card, etc.; testimony about signature card, pass book, etc.; account was opened *April 2, 1929;* signature card in her handwriting; the account was closed *December 17, 1929.*

*William McKenna*, American Savings Bank, produced records of an account opened by *Charlotte Lesley, 175 Riverside drive,* Apartment O-12-E, November 17, 1928; the space opposite " name of husband " is blank.

*James P. Hynes*, securities clerk in the Bank of America, Times Square Branch, produced the original of proponents' Exhibit 233, the cashier's check of the bank, dated March 18, 1929, received in evidence (Exhibit 383); it was a check for the proceeds of the sale of the Bank of America stock, thirty-six shares, standing in the name of Charlotte Fixel; identified proponents' Exhibit 224, and stated that it was the original stock certificate for these thirty-six shares of Bank of America stock, standing in the name of Charlotte Fixel; produced a record from the bank containing an entry of the sale of that stock; it is called " Sale and Purchase Record." The number of shares was thirty-six, the certificate No. 0134713 (Exhibit 224), the amount of check is $8,675.48.

*Harold F. Hunkele,* assistant trust officer, Bank of America Trust Company, described the merger of the Bowery and East River National Bank with the Bank of America; produced records showing that Erlanger was a stockholder of five shares of the Bowery Bank, and on requisition this was turned in and instructions given to the bank by letters from Erlanger to Dr. Giannini as to how to issue the new shares of stock. Pursuant to Erlanger's instructions the certificate for thirty-six shares was issued to *Charlotte Fixel;* the other shares were issued to Erlanger; the stock certificate issued to her was surrendered April 26, 1929; subsequent pages of the record contain further correspondence with regard to this stock and show dividend checks indorsed " *Charlotte Fixel, Charlotte Lesley*," both names.

*Marcel Tucci*, assistant secretary, Union Dime Savings Bank, with the bank twenty-four years, produced records in reference to the account of *Charlotte Lesley*, book No. 882595; account opened *September 26, 1921;* next to the printed word " unmarried " there is a mark, like the dash of a pen; it is not a check mark; all the other items, like name of wife, married, etc., have no check mark after them; the testimony shows how the bank account is opened and how the information put on the card is acquired. A withdrawal slip to buy shares of Bethlehem Steel was offered in evidence; also another withdrawal slip applying to the purchase of thirty shares of Otis Steel under date of December 4, 1928; twenty-seven

shares of Otis Steel, purchased in the name of Miss *Charlotte Lesley* (4244–4266).   (It should be noted that while the bank purchased said stocks in the name of *Miss Charlotte Lesley, she had opened the account in the name of " Charlotte Lesley."*)

*Monroe E. Thonet*, branch manager for the Corn Exchange Bank and Trust Company, at the West Eighty-first Street Branch, knew the contestant since *April, 1929.*   He represented the bank at the opening of an account by her in *April, 1929.*   The signature cards were made out in duplicate.   The original signature card, made out at the opening of the account, was September 20, 1929 (Exhibit X-14).   *In print at the head of the card is " Lesley, Charlotte, Miss," the print being that of the witness;* the card reads: " Below please find my signature, which you will recognize in payment of funds or the transaction of other business on my account," etc.; signature, *" Charlotte Lesley, account, Mrs. A. L. Erlanger, 175 Riverside Drive, Apt. O-12-E."*   The witness wrote on the signature card, *" Acct. Mrs. A. L. Erlanger, 175 Riverside Drive,"* also " Apt. O-12-E;" and he wrote " account Mrs. A. L. Erlanger " at the time the account was opened, and the depositor wrote " Charlotte Lesley."

He said that *she stated that Charlotte Lesley was a professional name,* that she wished to carry the account in that name, *and all communications should be addressed to her as Mrs. A. L. Erlanger, 175 Riverside drive.*   Witness did not know of any objection why it should not be carried that way.   On September 20, 1929, a new signature card was prepared; it was produced.   Witness said his assistant printed on the paper which was produced the words *" Erlanger, Charlotte,"* and the words *" Address, 175 Riverside Drive," are in Mrs. Erlanger's writing* (Exhibit Y-14).

On Y-14 stands the name " Erlanger, Charlotte," signature " Charlotte Erlanger, Charlotte Lesley, 175 Riverside Drive," and under it the bank recognized either signature, *Charlotte Erlanger or Charlotte Lesley.*   Originally the signature card was made out on April 9, 1929.   Witness verified the reference given by Mrs. Erlanger.   One of them was the Bank of America.   The witness called the names Charlotte Lesley and Mrs. A. L. Erlanger synonymous as far as he was concerned.   To the best of his knowledge she told him that she was *Mrs. Abraham L. Erlanger* and that any communication addressed to her at that address would be accepted. He thought he stated before that she stated at the time she was opening the account in her professional name, and probably replied it was quite all right, that it was a custom to accept accounts in professional names.   *He remembered she told him she was a housewife and that her name was Mrs. Erlanger;* she told him she was

married. He said he wrote " *Miss Charlotte Lesley* " on the records *but that " Miss " did not denote a married lady.* He believed that " Charlotte Erlanger " and " Charlotte Lesley " on Exhibit Y-14 were written at exactly the same time, on September 20, 1929. The witness stated that in June the account was not in the name of Mrs. Charlotte Erlanger, but in the name of Charlotte Lesley, and it was not changed to Charlotte Erlanger until the 20th of September, 1929.

*Carl J. Dinslage*, the new account clerk of the Central Saving Bank, Broadway and Seventy-third street, produced the signature card in connection with the opening of an account on March 21, 1929 (U-14). Signature, *Charlotte Lesley*, her residence, 175 Riverside drive, Apt. O-12-E, date of birth and birthplace, 12–9–1885, New York city; name of wife or husband, A. L. Erlanger; the words " A. L. Erlanger " are in his writing; certain numbers were not filled out on the ledger card opposite the words residence, occupation, father's name, mother's maiden name, and name of husband and wife; only the address was carried forward from the signature card to the ledger sheet.

In cross-examination he stated he could not identify the depositor; he described the *modus operandi* for opening accounts and making out signature cards; he took the information from the depositor; speaking about the name, she signed " *Charlotte Lesley*," the examiner asked, " Of course, you would expect it if she were a married lady, her husband's name would be Lesley? " *Witness said, " Not necessarily."* Then he was asked, " *You mean that, as a rule, ladies have one name when they are married, and husbands have another, is that what you want to say?*" "A. I do not. Q. What you do mean is that there are exceptions? A. No, I do not. Q. You do not mean to say that even? A. No, sir. Q. Then, when you asked her for the name of her husband you did not expect her to say her husband's name was Lesley, did you? A. I had no idea what the answer would be. Q. *You expected her to give you the name Lesley? A. Not necessarily.* Q. But naturally that would be so? ·A. I do not know how I can say it. Q. You cannot say that? A. No, I cannot. Q. She gave you another name? A. Yes. Q. You asked her to spell it out for you? A. Yes. Q. Did she spell it for you? A. Yes. Q. You wrote it down as she spelled it? A. Yes. Q. In her presence? A. In her presence, yes."

*William Rieber* of Glenwood, Long Island, division head of the stock transfer bookkeeping department of the Chase National Bank, which is transfer agent for *Otis Steel Company*, produced records showing the issuing of this stock in the name of *Miss Charlotte Lesley*, December 5, 1928; two stock certificates were

offered in evidence, one for twenty and one for ten shares; he described the dividends that were paid, and the indorsements on the check, etc.

*George H. Dirkes*, Park Ridge, N. J., accountant with the Equitable Office Building Corporation for the last eighteen years, produced the original records with respect to the issue of certain stock of the corporation to *Charlotte Fixel*, care of A. L. Erlanger, 175 Riverside drive, produced the original ledger showing stockholders (4400); stock was issued to Charlotte Fixel, *October 22, 1928*, eight certificates, each one covering a hundred shares of common stock; later testimony described a stock dividend in which there was a split-up of the original shares into a number of other shares and the new stock distributed to the stockholders; 800 shares were issued to the contestant in place of her original 200 shares; the stock still stands in the name of Charlotte Fixel.

*F. Richard Anderson*, general manager of the Erlanger Enterprises, testified also as to events that took place in the years 1928, 1929, 1930; his memory was particularly weak as to date (5259); he placed the time of decedent suffering the stroke as a year before his death, whereas it was in May, 1927; then he placed it in 1930; finally he admitted that he was very much confused. Anderson lived at New Rochelle, and he and his wife were helpful in the matter of the Erlangers securing a summer home there in 1929 (5260). They, as previously noted, dined with contestant and decedent at the Ambassador Hotel in 1927; and he said that his manner of introducing the contestant to his wife was, " Bust, this is Charlotte." The witness said that he had been in the habit of addressing her (5263) as " Charlotte," after meeting her at Erlanger's house in West End avenue, after he had the stroke. The Andersons went with Erlanger to various places in 1929 — Arrowhead Inn, Weisheit's of Stamford, the Greenwich Inn in Greenwich, and the Post Lodge in Larchmont — " Miss Lesley, Mr. Erlanger, my wife and myself." He said (5264) that at no time during his connection with him did decedent speak of the contestant as Mrs. Erlanger, and that he did not hear him speak of her to anybody as Mrs. Erlanger; he did hear other people address her as Mrs. Erlanger, the witness saying, " Nearly every place that we dined she was addressed as ' Mrs. Erlanger ' by the attendants, waiters, the head waiter in the presence of Mr. Erlanger;" that speaking of the contestant to him, Erlanger referred to her mostly as " Charlotte;" that he had what was apparently a nickname for her, the witness stating, " *I asked him if he would dine with me and he stated that he would have to speak to the queen of Holland.*" When asked whether he had ever visited Erlanger's house (5253) witness

answered, " A short time after his stroke;" and he recalled visiting at the house three or four times during that period, and the contestant was present; there was no introduction between him and the contestant. (In fact, Anderson had known her for years.) He stated that he thought the house was a gloomy place for an ill man and suggested that he go to Atlantic City or away from the house. Before going to the West End avenue house, when decedent was sick from the stroke, he had heard that the contestant was living there; had heard so for several years before that. In sending flowers to Mrs. Erlanger in the Ambassador, he gave instructions to have the card addressed " Mrs. Erlanger;" and he further stated that " Mrs. Erlanger was living under that name at the Ambassador Hotel;" and when he sent flowers to No. 175 Riverside drive he addressed her as " Mrs. A. L. Erlanger." He and his wife dined with contestant and decedent at the Ambassador Hotel; he identified his wife's handwriting upon an envelope and a letter, the letter reading: " Wednesday, October 12, 1927. My dear Mrs. Erlanger: I just want to say again how much we both enjoyed our evening with you and Mr. Erlanger. It is splendid to see him so well; I hope we did not tire him with our chatter. I am looking forward to seeing you both out here. With best wishes, ' Patsy ' Anderson." Witness explained that " Patsy " was Erlanger's pet name for his wife. He heard Mr. Riley greet contestant as Mrs. Erlanger at Arrowhead Inn; stated that contestant was addressed as Mrs. Erlanger in Greenwich Inn; his wife knew contestant by another name, Charlotte Lesley; asked whether he knew, as a matter of fact, very few actresses used as their stage name their real name, he answered, " Absolutely yes." The witness thought he did (6312) bring flowers and a book to Mrs. Erlanger when they left in 1929 on the Mediterranean trip; he and his wife went to the train when the Erlangers took the trip to California; he thought that he brought some flowers. Speaking about the delivery to Erlanger of the preliminary plans for the prospective Garden City home, he stated that he did not think that Erlanger would be able to read plans and specifications, which were already prepared on July 7, 1927; he stated that he understood from the moment Dillon came there he was Mr. Erlanger's personal representative; thought that decedent told it to someone, and then he added, " I will say I understood he was Mr. Erlanger's personal representative, Mr. Erlanger may have told me that."

*Murray Lachman* testified for proponents concerning events in 1927 and part of 1928. *He proved to be a flippant and an uncertain witness.* His testimony in the main related to the preparation of the application of decedent and contestant for a passport in 1927

and writings at that time made in the application, and secondly, to conversations and events that took place on a trip to Europe which he, a clerk in the employ of Charles Dillingham, took with the parties, he acting under a salary, supposedly engaged to be a secretary on the trip. He stated (4928) that he and Meyer Keen arranged for the tickets for the trip, that Gockinga of Knickerbocker Tours took a part in the arrangements; that Erlanger told him as to the tickets that one ticket was to be made out to Abraham Lincoln Erlanger, one ticket for Miss Charlotte Lesley, and one for Murray Lachman. He described the accommodations on the boat; he and the parties dined in their suite, taking their meals together on the trip; they spent one week over and one week back, and sixteen weeks in Europe. He said that the party was listed on the passenger list of the *Columbus* as " A. L. Erlanger, Charlotte Lesley and Murray Lachman." (Note. The name is not Miss Charlotte Lesley, but Charlotte Lesley without the title.) They came back on the *Olympic*, sailing from Cherbourg in September; Erlanger asked him not to have his name or Miss Lesley's on the passenger list; on the tickets the names were Charlotte Lesley, Abraham Lincoln Erlanger and Murray Lachman (4930). He described the arrival at Bremerhafen, of motoring to Berlin and thence to Marienbad; how they stopped at the Esplanade in Marienbad and at the Adlon in Berlin; how they remained five or six weeks at Marienbad and went from there to Vienna, where they stopped at the Bristol for five, six or seven weeks, and from Vienna to Munich, then to Strasbourg, from which place they went to Paris, stopping there at the Hotel George V; that Dr. Porges attended Erlanger at Marienbad; that they used to drive to Carlsbad frequently for lunch; that they always took their meals in their suite in every hotel at which they stopped; that Miss Lesley signed the checks for the meals; that he observed how she signed the checks, and that she signed them as " *Mrs. Erlanger;*" he said that he said to decedent, " *Mr. Erlanger, do you know that Miss Lesley is signing her name as Mrs. Erlanger to these checks?* " She happened to be out of the room; and when Miss Lesley came back he said, "*You have got an awful nerve to sign your name ' Mrs. Erlanger ' when you know that you are not.*" She did not answer him back, just smiled; that she said, "*I didn't mean anything by that;*" he said, " *Don't let it happen again.*" (Note. *The witness, proceeding, said that it did happen again, and that he saw her later sign meal checks as Mrs. Erlanger; he again stated that she signed the check on all the trip [4934]; the whole trip [4935].*) *He said that going over, Mr. Erlanger met just one lady on board, he did not " catch her name."* In the direct the following colloquy · took place: " Did you hear the contestant tell people

who she was? A. Yes. Q. What people did you hear her tell who she was? A. *Oh, the chambermaids, waiters and the likes of that.* Q. What did she tell them as to who she was? A. She always addressed herself as Mrs. Erlanger." He recalled the name of the chauffeur as Fernand (Peltier); he described an episode at the *Imperial Hotel in Carlsbad* (4937), where they had had lunch, as usual: " And Miss Lesley got away from the dining room table after we had the meal finished;" Erlanger and the witness started out and the latter said that she was talking to some jeweler in the hotel lobby; he further stated, " *She says to this jeweler, ' I am Mrs. Erlanger,' so Mr. Erlanger and I walked by her and he started to grumble to me; he said, ' Who does she think she is, calling herself Mrs. Erlanger? '* About that time we got to the front door; and *Fernand* and he said, ' *What is the matter? '* and *Mr. Erlanger said, ' This damn fool here, calling herself Mrs. Erlanger,'* and Fernand said, ' *I know, that is your wife, Mr. Erlanger,'* and he said ' *She is not my wife and she never will be, Fernand,'* and then we put Mr. *Erlanger in the car.*" (This is the man Peltier, who was only his chauffeur and who stated in his deposition he was unable to speak English.) He described another occurrence at the Imperial Hotel at Carlsbad; he said that she ordered a suite of rooms; she wanted to move from the Esplanade to the one in Carlsbad, so he told Erlanger about that, she had already gone down to the manager and told him that they were going to move to Carlsbad, that is, the manager of the Esplanade; that he told Erlanger about that, and the latter said, " *You go downstairs and tell that manager that she is not Mrs. Erlanger and he will take orders from me;"* and witness said, " He notified me to cancel the reservation that she had made at Carlsbad, which I did." And he also told the manager of the Esplanade what Erlanger had told him.

When asked as to any other occasion when he had a talk " with Mr. Erlanger as to his relations with this lady," he answered affirmatively and said it was going over on the *Columbus*, where they had three chairs on the deck marked " Mr. Erlanger, Lesley and Lachman." He said (4939), " One morning aboard the *Columbus* we were having breakfast and Miss Lesley ordered something, and when it got to the table she did not want it or said something to the waiter, and after breakfast I was taking Mr. Erlanger upon the deck to his chair, and she stayed back in the cabin. When we got up there he said to me, ' *I wonder who the hell she thinks she is around here, making a lot of noise.'* He says, ' *Murray, let me tell you something,'* he says, ' *there is no use kidding you, you know she is not Mrs. Erlanger. You knew that for a long time,'* and he says, ' *if anything happens to me,'* he says, ' *she is well provided for.*

I have given her money. I have given her real estate on Long Island, and I have given her jewelry,' and, '*he says*, she is a very bad woman.' *He says*, 'She is a dangerous woman.' *He says*, 'If anything happens to me, and don't forget this, whatever she says about me is what she has manufactured.'"

Another scene or episode was added to the collection of the witness when he described contestant taking Erlanger over to the case of the jewelry stand in the hotel one day, saying that she would like that wrist watch; there was nothing said; they walked away and had lunch; then on the way out she brought him over there again; he did not say very much about that either; that going down in the car she kept talking about the wrist watch; he said, " If you want the wrist watch, instead of bothering me, go get it;" it was a diamond wrist watch; she went over and priced it; witness believed that it was $900; *Erlanger said "All right, we will be up there tomorrow and we will get it." The day after, they went back and she got the wrist watch.* The witness described himself as saying to her she should not buy things like that in a hotel, especially in the lobby of a hotel, that she said, " *I got to get it while the getting is good.*" He said as they proceeded from place to place messages were sent to the hotels where they were about to arrive, notifying of the proposed arrival, that Fernand attended to that, that he heard Erlanger give Fernand instructions as to how he wanted the rooms reserved, the instructions being a room and bath for Mr. Erlanger, room and bath for Miss Lesley, and a sitting room between, room and bath for Mr. Lachman. (The testimony of Gockinga and the numerous exhibits in evidence and the depositions of various hotel people show how meticulously arrangements were made for reservations upon the itinerary, yet Lachman testified that the chauffeur looked after the reservation of rooms [4943].) He says, she was always nagging him, always wanted to keep going from one place to another; wanted to keep moving; wanted to go around and see the country; always wanted something different from some one else. Then this colloquy took place: " Q. Did Mr. Erlanger desire to move or didn't he? A. *He didn't pay a damn bit of attention to her.*" He said on the trip he addressed the contestant " sometimes Charlotte " or " sometimes the lady," and during the entire trip Erlanger spoke of the contestant when he had occasion to speak of her to third parties as " the lady." As a rule, he would call her " the lady " or " Charlotte;" he never heard Erlanger speak of the lady as " Mrs. Erlanger," and he never heard her speak of herself as " Mrs. Erlanger."

On cross-examination he said as to the proposed 1927 trip to Europe, " *I do not know as the tickets were ever gotten, because I*

*believe they were cancelled."* (The fact was that the tickets were issued and paid for.) He told Meyer Keen that Erlanger *" would like to have a sitting room and a bedroom and a bath for Mrs. ——, for Mr. Erlanger and one for Charlotte Lesley."* (See his testimony |4928] about Miss Charlotte Lesley.) He declared again, though he had been corrected upon it by his own counsel in the direct examination, that these arrangements were in the cold weather, saying, " It seemed to me like it was." (It was in May, 1927.) He insisted that he was the one who gave the orders for Erlanger about the arrangement of the rooms and the directions to get a room for Charlotte Lesley with a bath, a room and bath for A. L. Erlanger, and a sitting room in between; saying that Erlanger told him just how he wanted the rooms made out; and that he told Meyer Keen and that he still stood by the story that at West End avenue Erlanger told him he never got the tickets because he canceled them; he said, " That is just exactly what he told me." And to the question: " He never told you he paid Myer Keen for those tickets, did he? A. Not that I remember. Q. On the contrary, he told you that they. were canceled? A. Yes, sir. Q. Before they were delivered. A. That is right. Q. He never told you that they were actually delivered? A. No, sir. Q. And he never told you that he actually paid for them? A. No, sir. Q. Were the checks signed by himself? A. No, sir;" he reiterated that he told his attorneys he saw Erlanger *in cold weather* up at the house, and he told him he had canceled the tickets and never got them. (*Yet, the tickets were received and paid for by Mr. Erlanger's own check.*) Asked what boat he was told that they got the tickets for, he said, *" I do not know;" he could not remember; he had no idea.*

As the examination continued it appeared that as a matter of fact Lachman knew little or nothing about the details of the arrangements for that prospective trip which was later abandoned, for under cross-examination (4955) he conceded that Mr. Erlanger did not tell him what boat he wanted to go on, but told it to Meyer Keen. Apparently, he did not know definitely whether Meyer Keen and Erlanger got together on the matter of the trip for 1927, for he said, " I believe they did, yes." He was shown the ticket and asked to read it, and then the query was put to him, " Did Mr. Erlanger ever tell you he had paid for a ticket made out to Mr. and Mrs. Abraham L. Erlanger? " And he answered, " No, sir. Q. This is the first time you know that? A. Yes, sir. Q. Yet you say that this man told you in his own home that before the ticket was ever delivered he canceled the trip? A. Absolutely; *I never even seen the tickets."* And he still said that Erlanger told him never got them, that he canceled the tickets before they were

delivered (4945). He conceded that the ticket, contestant's Exhibit N-3, was a ticket made out to *Mr. and Mrs. Abraham L. Erlanger*, and he conceded that Meyer Keen did not follow his instructions very closely and that he never knew that the money was paid. He said, "I never saw them [meaning the tickets]; this is the first time I ever saw them." He was queried about holding himself out to be a decent, married man and taking his wife to a party at a dinner with the contestant present. Mrs. Lachman never met Charlotte before; yet, he introduced her: "Stasia, meet Charlotte," and he declared, "*I generally do that with what I think is friends; I have done it a lot of times with my wife, bring her to my office, and say, 'Stasia, I want you to meet May. May, this is Stasia.'*" He said (4962): "Mr. Dillingham and I used to go up there pretty near every day;" and every day he went there he saw Charlotte. He said, "We went there a great many times in 1927;" he did not know just how many "a great many" was; maybe a dozen times; he said, "Saw Charlotte two or three times;" that Dillingham addressed her as "Charlotte;" that he never said "the lady." Speaking about the contestant in the home there, he said she would walk upstairs with Mr. Dillingham up to Mr. Erlanger; she would go up to Mr. Erlanger's room; that was the bedroom where he was in bed. Lachman did not go up; he waited downstairs; said he was prevented from acting as secretary on the trip by "Miss Lesley;" and to this question: "And the man who could command the situation, who at least three times on the trip said to you, 'Who does she think she is, the damn fool?'—she prevented him from letting you act as his secretary?" he answered, "That is right, absolutely." The cross-examiner took him into the making out of the applications for passports in Erlanger's room. Lachman declared that Lindgren did the writing; "*He did some writing; yes, I seen him do some writing there;*" that nobody else did any writing; then he added the name of Mr. Erlanger and the names Mr. Lindgren and Miss Lesley; he said he was pretty sure Meyer Keen was not there at that time; he said Goodman, for whom Meyer Keen worked, was not there; *that the questions and the answers on this application were put down in Erlanger's room; he said Erlanger mumbled a lot then. He stated that he did not look the paper over at all.* He was shown Exhibit *44*, a photostat of the application for a passport made in 1927, and his attention directed to the address, the permanent address set down there for Erlanger, *106 Central Park West*, and he declared that Erlanger never said it to him, and that he never knew it (as his address); that he brought Lindgren, who was taking down these answers, to Erlanger's residence, where they were, No. 232 West End avenue; Lachman

confessed that he did not know whether Lindgren wrote the words " June, 1925, to July, 1925;" and that it looked like two different handwritings to him; said definitely that the words were not Mr. Erlanger's handwriting, and then said that he was not watching Lindgren and that he could not tell whether he did it or not, which statement he changed to another, that he was watching him write but did not see what he wrote; yet Lachman said that Lindgren was the only one who wrote at the time besides Erlanger and the contestant; that he could not tell which writing Lindgren did; could not tell which part Lindgren filled out; believed that Erlanger did sign his name, but did not see him, stating, " I was not interested in putting my face into what he was signing." He stated further that he did not hear Erlanger request that his passport should be sent to Abraham L. Erlanger, No. 106 Central Park West, New York; that he did not hear " Abraham L. Erlanger, 106 Central Park West, New York, New York;" nor did he hear Erlanger change it and say he wanted it sent somewhere else; did not know where the photographs came from, did not remember anybody asking for one, did not remember anybody going for one or bringing one; he did not know how the photographs got on the application; said he heard " Married, single, widowed, or divorced;" and he said that Miss Lesley happened to ask a question and that Erlanger said, " Do as you are told;" in other words, that before Miss Lesley would answer the question she asked Erlanger something and Erlanger said: " Do as you are told." This Lachman translated to mean that she would have to answer the questions that Lindgren was asking her. Questioned by the court (4981), he said as to these questions that they were put by Lindgren and that Lindgren put down the answers, and that he heard contestant say also when he asked her that question, " Single;" and that Erlanger said, " Single." When the examiner asked him why he had not told him that before, Lachman said that the examiner had not asked him anything about Erlanger; whereas, as a matter of fact, the examiner had previously in three different questions asked him (4978) to state everything that Erlanger had said; he sought to evade the situation this presented by trying to make an explanation that did not explain anything and finally was forced to admit that he had been asked to tell previously everything that he heard Erlanger say; said that Lindgren put that question to Erlanger and that Lindgren wrote the answer to it; *yet, when the proponents' Exhibit 44 was put in Lachman's hands and he was directed to look at every word of it and say where Lindgren wrote the answer to that question, Lachman answered, " It is not there."* Again he stated that he heard Lindgren ask Erlanger where he was born, how old he was, and all that, and

that Lindgren was writing the answers; *and the examiner, after asking him if he knew what it was to take an oath to tell the truth, put to him the question whether Lindgren asked Erlanger where he resided and he answered,* " *Yes;*" to a question whether he saw him (Lindgren) write after he heard the answer, he answered affirmatively; and that he knew that Erlanger gave his address and that Lindgren asked the question, and that Lindgren was doing something, whether he was writing or not, he could not say; that Erlanger said something which he did not remember, that he saw Lindgren write, and likewise as to Lindgren's asking Erlanger where he was born, and seeing Lindgren write; witness said, " Yes, sir," to these several questions; he even told the court that he heard these questions put upon these topics; he reiterated this (4986); the examiner took him all over the several questions in the application and the answers set down, calling his attention to the varied handwritings, and then he put the bald question to him as to whether it was Lindgren's handwriting (4988), and the witness admitted several times that he could not tell in whose handwriting the answers were, and he did not know whether any of these answers were in Lindgren's handwriting, and that he never saw his handwriting, that he did not know who did the handwriting other than Lindgren's signature. On inquiry by the court, Lachman said (4989) that only one person did the handwriting at that time, that he could remember only one, that his memory was clear, that outside of Erlanger signing his name, only one wrote there, that is, outside the signatures, only one wrote, and that his memory was clear on that; he could not say that there was a photograph on the application at the time; he did not know. *More confusion developed* when the examiner asked the question whether Lindgren had not asked Erlanger, " Married, single, widowed, or divorced," and that he said, " Single." Witness answered, " She said, ' Single,' " and he changed his answer as to Erlanger saying " single " and stated that he thought that the examiner meant Miss Lesley; he guessed that he " got that wrong;" that he did not think he, Lindgren, asked him that. Yet, in the next breath he said that he thought Erlanger said, " Single;" he said (4992) that the party went from Bremerhafen to Berlin on the trip and from there to Marienbad; he saw her sign " Mrs. Erlanger " on checks, the checks at the Hotel Bristol in Vienna; upon the boat going over, both for meals and for drinks, and at Marienbad; yet he allowed five or six weeks to go by without telling Mr. Erlanger; he stated that he knew right along that all of Mr. and Mrs. Erlanger's bills were being paid for, covering the rooms they occupied and the food they

ate, and that Miss Lesley paid the bills; did not see any bills made out to Miss Lesley; the contestant signed for all meals (5001); he saw her sign, and she signed " Mrs. Erlanger." The examiner called his attention to his testimony on the morning of this same day, 12/15/31, that at Marienbad he called Erlanger's attention to the fact that she signed those meal tickets " Mrs. Erlanger," and the witness said, " Yes," and he conceded also that he had said to Erlanger at Marienbad, " Do you know that Miss Lesley signed these checks as Mrs. Erlanger? She signed the meal tickets as Mrs. Erlanger?" And he said (5002) that Erlanger said to her, " You have a nerve to sign ' Mrs. Erlanger ' when you know you are not Mrs. Erlanger." He insisted that he told the truth in all of this testimony; that this all happened on the second day that they were in Marienbad, *and they remained in Marienbad five or six weeks, and she continued to sign the meal tickets every day;* and he did not act as secretary and he did not put up the meal tickets and compare them with the bill and see that they were not being overcharged; he did not even make out a check for Mr. Erlanger; he reiterated that they went from Bremerhafen to Berlin and from Berlin to Marienbad, after they had landed in Europe. The cross-examiner went into this matter thoroughly (5004) and Lachman insisted that they were in Berlin, at the Adlon Hotel. Then the examiner asked him if he did not know where he got that from, *" was because Peltier made the same mistake, and you repeat it, and is that not all you are doing? "* Yet, he still insisted that they went from Bremerhafen to Berlin (5005). The examiner tried to refresh his memory as to going directly from Bremerhafen to Marienbad and not going to Berlin by telling him that the contestant wrote a letter to Adlon Hotel fixing the date when they would arrive, the program having been changed, and that had they followed the original itinerary they would have been in Berlin on the sixth of June, and that they did not go to Berlin at all; that the letter was sent from Marienbad to the Adlon Hotel notifying them of the change; yet, Lachman said, " No," insisting that they went from Bremerhafen to Berlin. *Contestant's Exhibit C-11 did not change his opinion or his view of the matter.* (It was dated May 31, 1928, and addressed to Mrs. A. L. Erlanger, c/o Hotel de l'Esplanade. Marienbad.) He conceded that they were in Marienbad on May 31, 1928; again stated to the court that they went from Bremerhafen to Berlin and stopped there two or three nights; that this is definite in his memory. The matter was gone into minutely (5007–5009). He insisted that they were not in Berlin in July, and was positive that the trip was laid out by Mr. Gockinga. When shown the itinerary, Exhibit C-4, said he never talked to

Erlanger about it, though he got the itinerary a couple of weeks before he departed for Europe; Erlanger never spoke to him about it, nor he to Erlanger; he did not take it along with him; he did not see one while on the trip; from the time he left New York until the time they got back, he never saw the itinerary; he noticed how the itinerary was adjusted, but he never spoke to Mr. Erlanger about it; he admitted he knew the itinerary was " *made out for Mr. and Mrs. Erlanger party,*" that he received an itinerary " Attention of Mr. Murray," and that he read the letter when he got it, and that he read the part which read: " Assuring you that every little detail will be looked after from the beginning to the termination of this trip so that *Mr. and Mrs. Erlanger* will have a most comfortable and enjoyable journey, we are, with many thanks in advance for favoring our company, Yours very truly, Knickerbocker Tours." He admitted that he read this.  He said they were at the Hotel George V in September (5016) and sailed from Cherbourg on the twelfth or thirteenth of September.  Erlanger brought him over one day in Paris and showed him Napoleon's Tomb, and they took a little ride the next day, and he never had any cause for a newspaper; he repeated what he said as to the conversation with Erlanger on the *Columbus,* going over; he did not go back with them in the automobile (from the landing in New York to their home); he never mentioned matters spoken of in connection with his conversation with Erlanger in Europe; never mentioned it to Erlanger after the return from Europe; reference was made to Erlanger's having paid $900 for the wrist watch at Carlsbad in the Imperial Hotel. He stated Miss Lesley bought his wife a ring under the instructions of Erlanger.  *He never read the New York newspapers at about the time of the departure for Europe to see what they said about* the Erlangers; thought he was told about it, but he did not see it.  A lot of people that met him said, " I see you are going to Europe with Erlanger."

*From the time Lachman got back on that trip to the time when Erlanger died, he saw Erlanger probably about twice; the first maybe a week after the trip, and then the next time he does not remember how long it was, sometime after, and then he does not believe that he saw him; he believes that he went to the office and he was busy and he did not wait. Conceding (5025) that he saw him after that trip, he saw him once, that was probably a week after the arrival in New York.  He said he felt grateful to him, but he did not write to him, he never sent him a card; he never sent him any greetings; he did not send him any Christmas greetings.*  He admitted that he borrowed money from Erlanger; stated that Erlanger promised him $300, he gave him $300 over there, he bought his wife a ring, so that he really did not know

where he owed him money, " unless they are counting the $300 that he promised me, is a debt; I don't know."

In the redirect his counsel went into this matter again, and then he gave a version that Erlanger promised him $300 and said, " When you get over there, Murray, you can get your $300, and after we get to Monte Carlo I will give you a little money to bet on the races;" he said, " We never got there; in Vienna Miss Lesley said, ' The boss says to give you $300,' and she probably gave me fifty or a hundred dollars at a time until that was gone; then it came to the ring which Mr. Erlanger promised himself. So I do not know how I could have borrowed from him." In recross he admitted he got before they started *$2,250 for salary*, which was paid him *for eighteen weeks*, even before he left New York; then he said he was promised $300 besides for spending money.

*The deposition of Fernand Peltier*, the chauffeur-mechanic who drove the motor of Mr. and Mrs. Erlanger in 1928 and 1929 in the tour in Europe, had attached to it a certificate of John R. Wood, United States Vice-Consul at Paris, who took the deposition of Peltier, to the inspector, among other things stating, " That the said witness, *having stated to me that he was not sufficiently familiar with the English language to give his testimony therein, I did appoint Winifred Harle, known to me to be competent and disinterested person, as sworn interpreter, and did duly swear her truly and faithfully to translate the oath and interrogatories, and cross-interrogatories to be administered and propounded,*" etc. He said he knew Mr. Erlanger and the lady who accompanied him, met them at Bremerhafen; met them on the *21st or 20th of May, 1928*, at Bremerhafen, went to the Hotel Adlon, Berlin, stayed one day and two nights, left for Marienbad, remained six weeks at Hotel de l'Esplanade, going frequently to lunch at Carlsbad and Marienbad; went to Vienna, to the Hotel Bristol, remained there two months, went for a day to Pistiani; from Vienna returned via Munich, remaining there one day at the Bayerischer Hof Hotel, then to Strasburg, to the Hotel de la Maison Rouge, and from there to Paris, to the Hotel George V, remained three or four days in Paris at that hotel and left for Cherbourg, where they took the boat; did not remember the name of the boat; it was 1928. Left them at Cherbourg about September 12, 1928; said he addressed Mrs. Erlanger thus: " As Mrs. Erlanger, by courtesy;" said he took his orders from Mr. Erlanger; sometimes they rode together, sometimes separately; he described the itinerary after meeting them at Naples, January 14, 1929, viz., in *1929* he met them at Naples, Italy, on the fourteenth of January, went to Palermo, back by boat to Naples; they came back by railroad; thence to Genoa, from Genoa to Monte Carlo;

then came back to Paris, stopping at Marseilles, and at Lyons, staying one night at each of these places; remained a few days at Paris, then drove to Cherbourg, where they took the boat, the *Berengaria,* " that must have been the 27th of February, 1929."

Dr. Paul drove with them part of the time; said he never heard Mr. Erlanger introduce the lady who accompanied him to other people; did not introduce her in his presence; asked, *" Did you drive the man and woman known as Mr. and Mrs. Erlanger to theatres and various places of amusement,"* he answered, " Yes, I did;" asked about the demeanor of Mr. Erlanger toward the woman, he answered, *" It is difficult to explain exactly,* because Mr. Erlanger never walked with this lady, being that he was paralyzed, and under these circumstances I cannot tell you exactly what was his demeanor toward this lady. *Of course, he was courteous as a gentleman is with a lady;"* said her attitude toward him was the same, they were reciprocally courteous. Witness' wife met Mr. and Mrs. Erlanger; he introduced his wife to Mr. Erlanger and the lady who accompanied him; he did not remember what was said; " I just said, ' This is my wife,' or something like that;" when shown the two photographs, he said he recognized one as Mr. Erlanger, and that of the lady he recognized as the lady who accompanied him, " Whom by courtesy we called Mrs. Erlanger." It was conceded that Mr. duVivier (a lawyer) represented the *proponents at the examination of this witness.* Being asked, was the nature of the evidence to be given by him discussed, and if so, to state all that he recalled that was said, and what was said by each participant in the discussion, he answered, *" Yes, I spoke of it vaguely with Mr. duVivier, I cannot recall word for word what was said, but we were talking, he asked me if I really was Mr. Erlanger's chauffeur, if I could testify as a witness in the case which has now arisen." " No, I was neither furnished with nor did I see a copy or extract of the questions now being asked of me."* (*This deposition does not give the questions and answers in French.*) Said he received no instructions or advice either from a woman calling herself Mrs. Erlanger or from anybody representing her. Then when asked whether he received any letter from Mrs. Erlanger since March seventh, he said, " I received a letter from the lady calling herself Mrs. Erlanger," and he produced it. This letter is attached to the deposition; it was read into the record (3947) in detail; signature " Mrs. A. L. Erlanger " was conceded to be contestant's signature; he received no letter from her attorneys or representatives; never received anything or been promised anything by either the contestant or any of her attorneys or representatives; said, " The lady who said she was Mrs. Erlanger introduced herself to me as being Mrs. Erlanger." *Asked whether she was referred to as*

*Miss Lesley, if so, how and when,* he said, " *At the Hotel de l' Esplanade, at Marienbad, Mr. Lachman, who showed me her passport, but I do not remember the name of Lesley, I know it was not Mrs. Erlanger.*" and he further testified, " Yes, I did learn that she was not Mr. Erlanger's wife; it is difficult for me to say the exact date, but it was in Carlsbad for the first time, at the Hotel Imperial, from Mr. Erlanger himself, and confirmed in the neighborhood of Vienna during a drive. *The first time was after lunch at the Hotel Imperial, after Mr. Lachman had called me. Mr. Erlanger came out of the hotel apparently very annoyed.* At that moment he was *talking to his secretary, Mr. Lachman, in a somewhat harsh way of the lady who accompanied him, Mrs. Erlanger, as we were calling her, and seeing this excitement, I approached Mr. Erlanger.*" (Note that right here the words on the deposition " by courtesy " are stricken out and the signature Fernand Peltier, the initials of F. P., W. H. for the interpreter and stenographer, and J. R. W. for the commissioner, are signed opposite the scratching out.) " *Then he told me of this lady's attitude inside the hotel, which was to talk to the staff serving at table, giving herself out to be Mrs. Erlanger; not admitting this, he said in English ' She has never been and never will be Mrs. Erlanger.' That was in 1928. The second incident took place in the Wiener Wald. We had stopped the car and Mr. Lachman, Mr. Erlanger and I were talking about a forthcoming trip, and we spoke of this lady's intervention in the plans for the itinerary.* Then it was that Mr. Erlanger said to me, ' *What does she think she is. She is nobody. She is a god-damned fool, that is all she is.*' I said to him, ' Anyway, she is your wife,' and then it was that he said to me, ' She has never been, Fernand, she never will be.' " He said he had several reasons to believe she was not Mr. Erlanger's wife; " In the first place, because she was not introduced to me by Mr. Erlanger as Mrs. Erlanger; in the second place, Mr. Erlanger's attitude during the trip did not appear to be, towards this lady, as it should have been towards his wife; thirdly, because I saw this lady's passport, which was in Mr. Lachman's hands, and he showed it to me; and fourthly, because Mr. Erlanger expressed himself towards me as I have just stated." He declared that he had never written she was not Mr. Erlanger's wife, but he stated, " I have certainly said so. So far as I can remember, I told Mr. duVivier in Paris, about four or five months ago, I do not remember exactly when. I told my wife when I returned to Paris, in 1928. I did not even expect to see this lady again in 1929. In each case I mentioned it in the course of conversation." Asked the names and addresses of other people who spoke to the woman in Mr. Erlanger's presence, he mentioned Dr. Paul, Mr. Fischer, Mr. Gockinga, Mr. Lachman, Tomassello. " By courtesy I called her

Mrs. Erlanger. * * * I have stated that Mr. Erlanger did not introduce this lady to any one as Mrs. Erlanger in my presence." Asked if Erlanger ever told him that Mrs. Erlanger was not Mrs. Erlanger, was not Mr. Erlanger's wife, or that she was Miss Lesley, he answered, " Yes, I have already stated that he told me she was not Mrs. Erlanger, on two occasions, once at Carlsbad and once in the Wiener Wald near Vienna, but he did not tell me what her real name was." Asked if he received similar information from other sources, he said, " Yes, Mr. Lachman told me, showing me the lady's passport, as I have already said. * * * I could not swear to the name being Lesley, and I do not remember whether she was indicated as being unmarried; but the passport had her photograph on it and did not have the name Mrs. Erlanger." At this point there was read into the record (pp. 3965, 3966) a letter written by this witness, Peltier, on December 27, 1929, to Mr. Erlanger. Proponents made no objection. It was written from LeBonhomme, December 27, 1929. He began the letter by hoping the year had been a good year for " you and Mrs. Erlanger." Near the end of the long letter he said, " At last, dear sir, I should ask you to be kind enough to tell Mrs. Erlanger that I wrote to you and with my best wishes give her my most courteous regards. In hope that my letter is going to reach you in good condition, and expecting to hear about you and Mrs. Erlanger very good, I present you the expression of my very deep respect. Yours faithfully, Peltier." Peltier's testimony is open to much suspicion. It is difficult to believe that he did not know, for instance, that the itinerary had been arranged for " Mr. and Mrs. Abraham L. Erlanger," that he did not witness Mrs. Erlanger signing the checks and paying the bills in restaurants and hotels, that the hotel managers all along the route were receiving them as Mr. and Mrs. Erlanger pursuant to the directions of Knickerbocker Tours, Inc. Moreover, all the other depositions from Europe present a contrary picture, also the testimony of Tomassello. His story of the colloquies with decedent at Carlsbad and at Wiener Wald is in its familiarity strangely unlike French chauffeurs in their relations with their employer, and again it is so identical with Lachman's insistence that the party went to Berlin, so similar with Lachman's description of the Carlsbad ebullition as to lose much of the weight it might have otherwise. Finally, Peltier's own letter (in evidence) weakens any probative force of the statements in the deposition.

Walter J. Wall, of the White Star Line, said that there was a sailing of the Olympic from the other side on September 12, 1928; pointed out in a volume entitled " First Class, 1928, Southampton Service, White Star Line," the passenger list for the sailing of the

*Olympic* from Europe on September twenty-eighth; the last page of the passenger list under the heading " Additional " was offered in evidence, shows the following names; " Erlanger, Mr. A. L.; Lesley, Mrs. C.;" the witness stated that Mr. and Mrs. Erlanger occupied rooms B-40, 42, 44; the rooms corresponding to the ticket originally were 37, 39, 41; they were exchanged afterward for the rooms first above named.

*Emil Lieper*, of North German Lloyd, produced documents in reference to the Erlanger trip, steamship *Columbus*, sailing May 12, 1928; had not a printed passenger list; explained that the North German Lloyd did not have available a passenger list of the steamship *Columbus* sailing May 12, 1928, from New York, the original contract ticket stamped at the pier was marked in evidence (Exhibit V-5); that there had been a passenger list and that decedent and contestant were listed as Abraham L. Erlanger and *Mrs. Charlotte Lesley*.

*George D. Pennington*, of Navagazione Generale Italiana, and steamship *Augustus*, sailing on the 3d of January, 1929, to Naples, produced passenger list (Proponents' Exhibit 41), which is the only public record. A. L. Erlanger, who sailed on *Augustus* that day was not on the list; witness produced a ticket (Contestant's Exhibit H-4) for Mr. A. L. Erlanger; he found *Mrs. Erlanger* listed as a passenger on the passenger lists, on the records, not on the printed passenger list. Meyer Keen had requested that the names be not printed in the passenger list. He pointed out the reservation made for Mr. and Mrs. A. L. Erlanger, suite G (Exhibit U-4); explained the location, etc., of the rooms, their layout and said the records of the ship show *Mr. and Mrs. Erlanger in bedroom suite G, one bedroom with two beds, one bathroom* immediately next to the bedroom.

*William F. Majory*, of the Bethlehem Steel Corporation, produced the original account of Charlotte Lesley, 175 Riverside drive, relating to fifty shares of Bethlehem Steel in the name of Charlotte Lesley; the new certificate, November 15, 1929, for fifty shares of common stock was made out to Charlotte Lesley; he gave records of dividends, checks for dividends, etc., down to November, 1931. (See testimony of Walter S. Thompson, teller [6450–6452], and M. Tucci, assistant secretary of Union Dime Saving Bank [4264, 4259, 4254].)

*Harry J. Baczensky*, of Union Fields Cemetery, Brooklyn, produced an order blank for a plot known as the Fixel plot; it was an order to do some work on the plot, and it was conceded that it was in the handwriting of the contestant, dated February 29, 1928, and with typewritten name at the top, " Miss Charlotte Lesley;" the plot is a family plot belonging to the father and mother of the contestant. (The signature in handwriting of contestant

*does not include " Miss "* on either order blank. It is " Charlotte Lesley, care of Kalisher, 106 Central Park West, corner 71st St." on each paper [Proponents' Exhibit 248 and Exhibit 249].)

*William F. Smart*, certified shorthand reporter, testified that he took shorthand notes of the statement of certain witnesses, taken on Friday, March 14, 1930, in the New Amsterdam Theatre Building, at two o'clock; there were present Mr. Kresel, Mr. Hershkopf, Charles L. Craig and Saul J. Baron; he took down the statement of Dillon and dictated the notes into a phonograph and a Miss Carrington, typist, transcribed the notes.

*Marcus Heiman* recalled seeing contestant in Monte Carlo in 1929, latter part of January or early part of February; stated that between the occasion when he saw her in Chicago (1924 or 1925) and at this time in 1929, when he met her in Monte Carlo, he did not speak to Erlanger in connection with the contestant, but in a conversation, in October or November, 1928, he mentioned the contestant; Erlanger speaking about the radio remarked the night before up at the house he had it on; he quoted Erlanger as saying: " It did not work properly and *I was telling the little lady about it up at the house; you remember that little lady that you met at Chicago." He saw the contestant in decedent's room at Monte Carlo, he saw them later in the George V Hotel in Paris. He was in Paris about three days while they were there.* He described the California trip in January, 1930; he was one of the party in the private car; he said that at Chicago Erlanger did not feel very well and did not leave the hotel, and the weather was not quite so good. He suggested that they could have *Mr. Austrian come to the hotel to see them, and Erlanger said, no, he would not have* Mr. Austrian come to the hotel and see him in the atmosphere of the woman. He took motor rides in Los Angeles with Erlanger; recalled Erlanger saying that the trip would not be in vain if out of it he could get John Witherspoon (the Pullman porter) to live with him in New York and take care of him, and then he would not have to have the lady with him (meaning the contestant); questioned about other talks with Erlanger at Los Angeles, he said " We called on *Mr. Hepner, the wig man,* and he was out, and *I suggested to Mr. Erlanger that we have Mr. Hepner call at the hotel and he objected, he said he did not want Mr. Hepner to see him in the atmosphere of this woman."* At Phœnix, Ariz. (4595), witness declared Erlanger said, " Charlotte Lesley has no legal claim on me;" and further, " I desire to get out of the clutches of this woman" (4601); in talking with Heiman (4609) about the contents of the telegrams to be sent to Dillon, he said that he was going to have John Dillon tell the contestant that he was going to the Ambassador alone. In Los Angeles he said,

*speaking about the contestant, that he had been awfully good to her, that she would buy an automobile as you would buy cigarettes; that all that she wanted was what she could get out of him.* In directing Heiman about sending telegrams to Dillon asking him to make reservation at the hotel, he told Heiman, " When I am at the hotel, I can have my brother and sisters dine with me, not that I cannot have them dine with me where I am, but I do not want them to see their brother embarrassed," or some such words. He quoted Erlanger as saying at Phœnix that if he had to write a brief of how he became involved with her, he would not know where to start, in connection with his statement that Charlotte Lesley had no legal claim on him; he said that he had told contestant that she had robbed him of his most priceless possession, his pride, which was next to life itself; that if he had to write a brief, he would not know where to start; he desired to get out of the clutches of this woman — " The woman that was with us in Phœnix;" that he did not see anybody do the registering at Los Angeles; at the Arizona Biltmore in Phœnix. (Yet the contestant did the registering. She registered Mr. and Mrs. Erlanger or Mr. A. L. Erlanger; Heiman registered right under that name.) On cross-examination he saw very little of him from 1908 until 1922. From 1922 on he saw a good deal of him, three or four times, he thinks, in 1922; probably three times in 1923; and possibly three or four times in 1924; and in 1925 he was negotiating with him in connection with a theatre in Chicago. At Nice he saw in either the Paris edition of the Chicago *Tribune* or of the *Herald* that *Mr. Erlanger,* or *Mr. and Mrs. Erlanger, were at* hotel in Monte Carlo; it was either *Mr. and Mrs. Erlanger or Erlanger* himself. Then he said he did not see the name, Mr. and Mrs. Erlanger, in one of the papers; did not know whether it was in connection with Monte Carlo or with a hotel in Paris; on California trip *en route* to Albany he lunched on the train. Mr. and Mrs. Dillon, Mr. Erlanger, contestant and Mr. Stanton and himself lunched together. Stanton addressed the contestant as Mrs. Erlanger, if he addressed her at all; in Mr. Erlanger's presence, Witherspoon, the porter, addressed her as Mrs. Erlanger; McMitchell, the valet, addressed her as Mrs. Erlanger all the time on the trip (4630) out to California; contestant was in the same suite with Mr. Erlanger at the Blackstone Hotel in Chicago. At the table on the train (Albany) she was addressed as Mrs. Erlanger; *after their departure, at the table, contestant helped Mr. Erlanger in every way she could; if it was necessary to cut his meat she would do it, anything else that was necessary for her to do, she did;* after several days John Witherspoon seemed to act as nurse. He and contestant played cards two or three hours at a time; that was every day;

Joe Toplitzky met the train at Los Angeles; *witness said that Erlanger could speak emphatically.* None of the conversations that he narrated as having taken place in Paris or Los Angeles or Phœnix took place in the presence of the contestant. Contestant said to him, " You are to go as our guest," and that when she said " our " he understood " our " to mean Mr. Erlanger and herself; he figured that he was a guest so far as the food went, on the train; she had said to him, " We want you to be our guest on this trip;" she called him either Mr. Heiman or she might have casually called him Markie; she told him to address her by her first name, which he did occasionally, very seldom. He repeated that the registration made by her at the Arizona Biltmore Hotel in Phœnix was " Mr. and Mrs. Erlanger;" he sat with the contestant riding from Los Angeles to Phœnix, Mr. Erlanger, contestant and himself took their meals together, played cards with the contestant just as he did before; addressed her the same way he did before; just as friendly to her as before; in every respect the witness' attitude and demeanor were the same; he did not mention any of the conversations to her, and while she was present Mr. Erlanger did not refer to them in any way; he said Erlanger's demeanor did not change on the ride between Los Angeles and Phœnix towards anybody. He said that Erlanger was very antagonistic to the contestant part of the trip, Los Angeles to Phœnix. The antagonism referred to related to the whole trip, started a little after the trip began; he said Erlanger was irritable, a little antagonistic toward the lady; he admitted it was hard for a man in his position to travel; that anybody traveling in a train from New York to Los Angeles gets a little worried; he said, " I would say so," and he admitted that he himself did. He said, " He was, as I say, a sick man, and that was a long trip, and it was hard on him, very hard on him; " at Phœnix they rode in the automobile in the mornings and afternoon, and at night he would go in the lobby; the contestant was either in her room or was with Erlanger; that contestant was trying to pay attention to Erlanger; she was endeavoring; she was doing all in her power. The witness quoted Erlanger as saying in Europe that she was never going to accompany him on another trip. (Note. Yet she made another trip.)

*Francis E. Reid, No. 2 West Sixty-seventh street;* press agent; entered the newspaper business in *1889* had been with Erlanger since 1907; last time he saw Erlanger was in January, 1928, just after he returned from Los Angeles — at his office. He had sent for him; nobody else was present. ·He said that a reporter had been there the day before and had tried to get into his office; that he wanted to see him about a divorce case; and that Erlanger said,

" *That is a silly story because I am not married;* " that " Mr. Dillon should have told him that at once; " that he wanted him to go down to the newspaper office and see Mr. B., saying he knew he was not married; and Erlanger said *that he would rather not have any such story printed, even as a rumor.* Reid told of his securing an introduction to and of his interview with the managing editor, " Mr. Currey," of a certain newspaper with respect to the reporter. He insisted on calling him " Mr. Currey," though his name known far and wide in the newspaper world is " Mr. Curley." Reid said he did not know contestant; in his association with Erlanger he never spoke to him about a Mrs. Erlanger; that in giving him directions as to publicity at the time of his California trip Erlanger, did not say he was going to be accompanied on the trip by Mrs. Erlanger. He was interrogated as to whether in July, 1927, the heads of the departments were called together by Dillon and a notice read to them to the effect that all business which the heads had to take up with Erlanger should be taken up with Mr. Dillon or through Dillon; Reid replied that he did not remember being at any meeting of that kind; he remembered being told by Mr. Dillon that such was the case. He remembered one occasion several years before January, 1930, Erlanger had been ill at the time and was away from the office for several days; *he imagined a couple of years before the stroke he had been away from the office for some time and he had a nurse; said Erlanger told him,* "*As he put it, he says, that woman up at the house was jealous of the nurse. He said he told her that she ought not to feel that way about it because the nurse was only there ' to wait on me and empty slops.' He told me he did not suppose she would want to do that. That was the way he referred to her, simply as ' that woman.' *" Reid said he read the newspapers and that he kept a scrapbook of matters that pertained to Erlanger; they were pasted; he had an assistant and a stenographer. who were faithful, he was positive about it, and the work was properly done; people under him were to read the newspapers and cut out anything that related to Erlanger; the New York *Times* was one of the papers from which clippings were made. He regarded the New York *Times* as an important matter; etc.; Reid said that he never heard that there was a Mrs. Erlanger in years 1926, 1927, 1928. He remembered when Erlanger went to Europe in 1928, about the sailing, etc. He was shown a photostat of *a sheet of the New York Times of May 11, 1928,* the day before Erlanger sailed, for he sailed at midnight May 11, 1928; he said he saw the article about the sailing on the steamship *Columbus. He was shown the article in the Times and* the names " Mr. and Mrs. A. L. Erlanger " (Contestant's Exhibit R-12). He was asked,

" You see who sailed on the *Columbus* on the 11th of May, 1928? A. Yes. Q. Who was it? A. Mr. and Mrs. A. L. Erlanger." *The talk about " that woman," Reid said, was long before May 11, 1928; must have been a couple of years before;* did not think it was as many as eight; *fixed it as two years before the stroke;* it might have been three; asked if Mr. Erlanger told him to go up and tell the *Times* that there was not a Mrs. Erlanger, witness said, having read it, he did not see any reason for going to Mr. Erlanger and calling his attention to the fact Mrs. Erlanger was sailing with him; said he received no Christmas gift from Erlanger in 1928, nor at Easter time; he thinks he got a week's salary; in Easter, 1929, he got nothing; Easter, 1928, nothing; Christmas, 1929, he thought he got a week's salary. *Reid never dined with Erlanger, that is, never dined at his house, but dined with him in Boston; never at his house; never at the apartment, 175 Riverside drive; never at 232 West End avenue;* asked if he remembered where Erlanger was living in 1928, he said, " Yes, 232 West End avenue; " he was corrected on that. *Reid said that Erlanger never talked to him about a wife at all;* he could not recall Erlanger's having talked to him at any other time about a woman. He did not think it was a male nurse that the woman was jealous of; thought it was a woman nurse. (See *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; *Matter of Comly*, 185 Penn. St. 211; *Stevens* v. *Stevens*, 56 N. J. Eq. 491; *Tracy* v. *Frey*, 95 App. Div. 593.) In weighing Reid's testimony, which has been carefully considered, his age, the condition of his memory, the physical condition of Erlanger at this time, almost within a month of his death, are important factors. It is not surprising that the mere mention of " divorce " to a man in his weak condition, who had since 1912 paid approximately $324,000 in alimony, should greatly disturb, and that the thought of unpleasant publicity would equally upset him.

*Hazel M. Schade, a witness for proponents*, testified that she knew Mrs. Dillon for nine years, having first met her at Sag Harbor, that thereafter she saw her on an average of once a week, sometimes twice over the week-ends; she remembered meeting her two years after her marriage; that she had not seen her for two years when she first met her after she was married; that she met Dillon after their marriage in Mrs. Dillon's office in the New Amsterdam Building; that thereafter witness moved to Flushing and there between April and July, 1928, had conversation with the Dillons concerning Erlanger and contestant; that in the conversation with the Dillons, Dillon said he wanted to put Charlotte, the lady who was living with Mr. Erlanger, before the public, and that they must get Mr. Erlanger to take Charlotte out often and enable her to

show herself off in Mr. Erlanger's company; that Dillon said that " that would fix us for life;" that Dillon said he had told Mr. Erlanger that Mr. Erlanger, being king•pin of the theatrical business, ought to travel and go through Europe and ought to take a trip around the country and see all his theatres; that would give Charlotte a chance to show herself off with Mr. Erlanger and establish herself as connected with him; that Dillon said in words or in substance, " We will establish her around as Mrs. Erlanger;" and that Charlotte and the Dillons were going to be fixed for life; that Dillon and herself talked about managing the theatres, and that Dillon said in substance, " I am going to manage the business for her * * * and run all the theatres she will get from Mr. Erlanger;" that he spoke about taking a trip around the world with Charlotte and his wife *and that he thought they would be able to do this in 1932* (this alleged conversation was in April–July, 1928); that he spoke of Erlanger's bad health and stated that Erlanger could not possibly live very much longer; that he was paralyzed and full of uremic poisoning and liable to drop off any time; that he spoke about his ability to handle the contestant; that she was putty in his hands and that he could do as he wanted to; that Dillon spoke about making reservations at hotels for Mr. Erlanger and Charlotte, the finest suite at the Ambassador; that prior to Mrs. Dillon's marriage she had spoken to her about contestant quite often. (The substance of all these answers as to what Mr. Dillon said is embodied in each instance in the question — 6842, 6843, 6844, 6845, 6846 — the witness merely answering " yes, sir.") When asked when the conversation was when Mrs. Dillon first mentioned the contestant to her, she replied, " Not very long after I came home, when we got well acquainted she was telling me about Mr. Erlanger and this lady;" she fixed the time as July, 1923, at a summer hotel in Sag Harbor; she afterwards fixed the time as being not a year after becoming acquainted with her. She further testified (6858) the Dillons said to her that it was to their interest to work with the contestant; that Dillon said in words or substance, " *We will all be sitting pretty in 1932* if we put Charlotte over." (It will be recalled here that all of these conversations were stated by the witness to have taken place — page 6842 — between April and July, 1928.) She said the Dillons did not like Baron because he was a watch dog. In redirect she stated the last time she saw Dillon was July 17, 1928, and that was the last time she saw Mrs. Dillon; it was at Flushing; she had no conversation with either of them after that time, nor did she talk with them since that time over the telephone; *she had never met Erlanger, never spoke to him, never wrote to him, nor he to her, never communi-*

*cated with him in any form, and everything that the Dillons are supposed to have said to her took place either on July 17, 1928, or before that time;* that she knew that Erlanger was alive in 1928 and 1929; that she learned of his death in the papers; that at no time in 1928, 1929 or 1930, or at any time, did she ever communicate anything to Erlanger that Mr. or Mrs. Dillon was supposed to have said to her. In answer to questions put by the court, she said that in the conversations with Dillon, testified to by her, there were just Mrs. Dillon and the witness and Dillon present; it was in their apartment in Flushing; that what Dillon said was not all said at one time, but " leading up to the picture. There was a picture. Madeleine had told me before about the woman." Further, she stated that she was just a housewife, married, husband living, was married at the time she lived in Flushing; her husband was not living with her then; they were separated at that time; she was born in 1876 in Texas; has lived in New York since 1912. Correcting this statement, she said, " No, not the City of New York; " she traveled with her husband to Boston and lived there for a while, two or three years; she said at the time of the conversations with Dillon she was living in the same house with them in Flushing; that she ran the house for Dillon; that they came home every night; that she was running a tearoom for him under her name because Mr. Erlanger did not want him to have two businesses. On further cross-examination she said (6865) that the conversations took place in the Dillons' apartment, the suite upstairs; that she just had a room to sleep in there; that her daughter was there; that her daughter slept with her; that she was in the Dillons' apartment every night, they talked business; that she was there all the time together; that her husband was not living in the apartment where the witness was being examined; that she and her husband had not lived together since four and a half years ago. On redirect, when she was asked whether she was separated from her husband, she changed her previous answers and said, " No, he takes care of me; we do not live together; he lives by somebody — " He contributes to her support.

Upon representations that this woman was ill and could not attend at court her testimony was taken (6319) in her apartment in West Ninety-ninth street; she was lying in bed or in a couch during the whole of the examination, in a small room not large enough to admit all those present at the hearing. As a forerunner of her testimony, proponents' counsel in the cross-examination of Mrs. Dillon and Mr. Dillon interrogated each of them as to their knowing Mrs. Schade (this witness) and as to various statements made by them or either of them in conversation with her. The examina-

tion of Dillon, who went upon the witness stand after Mrs. Dillon, was ended on November twenty-fifth. Proponents' counsel may be presumed to have known from that time whether or not he intended to complete the inquiry made of the Dillons in cross-examination by calling this witness. Contestant rested on December fourth, and in the late afternoon of that day proponents' case was opened. At any time thereafter, so far as the routine of the trial was concerned, this witness could have been called. However, she was not put on the witness stand. No further reference was made to her until near the close of the session of January fifth, when proponents' counsel stated to the court: " I have stated to Mr. Steuer that there is a witness, Mrs. Schade, whom I desire to call, but who is, unfortunately, ill, she had some operation on Saturday, and I am in hope she will be able to be out in a couple of days. In case she is not out by that time I shall have to ask your honor for some method of taking her testimony. So I would like to reserve the right to introduce that testimony before the close of the case." He further stated that his adversary was agreeable if it was agreeable to the court. After a further discussion and a statement by the court the trial proceeded. The witness had not been produced in court or examined elsewhere up to Friday, at which time it was arranged with the court to take the testimony at the witness' home on Saturday afternoon, January ninth. The trial was ended on Monday, January eleventh at two P. M. *The detail of these facts leading up to her examination is set forth because the time and the place and the conditions under which the testimony of this witness was taken did not permit of an adequate examination of the witness. Counsel who called her made no attempt to explain her not having been called at some time after the Dillons were on the stand. Whenever counsel for either side requested it during the trial, witnesses were permitted to testify out of the usual order.* Near the end of her examination the court inquired of her how long she had been ill (6857), she answered, " I had pneumonia, I first came down — " The question was repeated in part, and she answered, " I do not know, I cannot remember how long." The court asked counsel why was not she produced in court; the witness interjected, " I was." The court asked, "At a time when she was on her feet? " Counsel replied she was in court; and the court queried: " Why wasn't she called as a witness? " and the witness replied, " Because there were other witnesses on the stand." Counsel then stated that she was in court on two different occasions. When later asked by the court (6863) whether on the two days when counsel said she was in court, whether she was there all day on each of the two days, she replied

that she was there one day all day and that on the other day they said it would be too long, that she could go home because she felt very bad; that she had got up from a spell of sickness, from a spell of pneumonia. She did not know the days when she was in court. When asked if she could not remember back two or three or four weeks, she answered, " Just before I got sick again; really, I do not — " When asked if she could not say how long she had been sick, she answered, " I think it was just about — last, first or last week. You know, when you are sick, you cannot remember very good." Again she stated she was there the whole of one day, that she was there part of another day, the latter time in the morning up to recess. Her testimony, of course, must be *considered in connection with the emphatic denials made by Mr. and Mrs. Dillon during their cross-examination.*

*Benno Dudenhauser,* a teller of the Bowery Savings Bank, produced records of the account of Charlotte Fixel, among which was the signature card opening the account (Exhibit 181), the signature " Charlotte Fixel " being in contestant's handwriting. He could not state in whose handwriting the balance of the handwriting was. Account was opened *January 8, 1925.* Opposite the words " Name of wife or husband " (on the signature card), the space was blank. The reverse side bore the name Charlotte Lesley. Four deposit slips produced bore the name of Charlotte Lesley, 175 Riverside drive, in her handwriting dated 3–12–1928, 3–2–28, 2–29–28, 1–10–28 (Exhibit 182) and two withdrawal slips (Exhibit 184) dated 3–18–31 and 9–18–30 bore the name *Charlotte Lesley* and a ledger sheet manuscript bore the name Charlotte Lesley (Exhibit 185), and three withdrawal slips dated 11–20–29, 3–14–29 and 3–22–27 bore the name Charlotte Lesley, addresses 232 West End avenue, 175 Riverside drive, respectively, and were in contestant's handwriting.

*August Kruenauer,* assistant secretary Franklin Savings Bank, explained the procedure for opening accounts, produced records of the bank, including signature card (Exhibit 234) conceded to have been signed by contestant with the signature Charlotte M. Lesley. The account was opened July 15, 1929. The rest of the handwriting on the signature card counsel contended was not in her handwriting. However, it has been received and considered. It included the address 175 Riverside drive, names of parents and opposite the words husband or wife the word " single." The woman employee who wrote the card was at the time of the trial still employed by the bank, available as a witness, but not produced. Two withdrawal slips (Exhibits 239 and 240) dated August 14,

1929, and November 20, 1929, with the signature of contestant Charlotte M. Lesley on the front bear data on the back, penned opposite printed words, address, parents' names, etc., and below the printed words " husband or wife " the word " single " in pencil writing. Four deposits slips dated 7–15–1929, 9–11–29, 9–23–29, 10–1–29 were produced (Exhibits 235, 236, 237, 238) and a ledger sheet manuscript showing account in the name of Charlotte M. Lesley (Exhibit 243).

In addition to the foregoing parol proofs, proponents introduced in evidence many exhibits, of which the following are the more important for this period:

(1) Itinerary for the European trip (Proponents' Exhibit 34), prepared by the Knickerbocker Tours, entitled: " Suggestion of route for Mr. and Mrs. Abraham Erlanger, party," and record of four pages also, marked contestant's Exhibit C-4. (2) Passenger list *Olympic, 9–12–28* (Proponents' Exhibit 40), bears the names *Mr. A. L. Erlanger and Mrs. C. Lesley.* (3) Bill 9–6–28 (Proponents' Exhibit 287) and bill 10–28–29 (Proponents' Exhibit 288), all of these bills made out to *Charlotte Lesley* from Betts & Co., and *O. K.'d by Mrs. E., and paid out of Erlanger's personal account.* (4) Telegram, A. L. Erlanger to Dillon, *1–19–30,* from Phœnix, Ariz., directing him to reserve the same suite of rooms at the Ambassador Hotel as he had first time there, or as similar as possible, to be occupied on his arrival (Proponents' Exhibit 106). (5) Telegram from Dillon to Heiman, Phœnix, Ariz., stating that he had delivered message to Mr. Tyler, reservation, Ambassador Hotel, and O. K., signed " Jack " (Proponents' Exhibit 106). (6) Telegram from Heiman in Phœnix, Ariz., to Dillon, dated 1–20, in regard to arrival in New York of Erlanger, and stating that latter wanted Dillon and his wife to meet them at Albany (Proponents' Exhibit 107). (7) Credit slip showing list of dividends on Equitable Office Building Corporation common stock, the slip being entitled " *Charlotte Fixel, 4–6–31, care of Mrs. A. L. Erlanger,* 37 West 72d Street," the date opposite the certificate numbers is *10–22–28,* and the certificate numbers are T6458 to T6465, inclusive; dividend checks on Equitable Office Building Corporation dated *1–2–29, 4–1–29, 7–1–29, 10–1–29 and 1–2–30,* all payable to the order of *Charlotte Fixel, care of A. L. Erlanger,* 175 Riverside drive, apartment O-12-E, New York, New York (Proponents' Exhibits 208, 209, 210, 211, 212); four of these exhibits are indorsed, " *Charlotte Fixel, Charlotte Lesley,*" and one of the five is indorsed " *Charlotte Fixel.*" (8) Bank of America Association certificate of stock, thirty-six shares, issued to *Charlotte Fixel,* certificate dated *11–15–28,* certificate transfer on the back of which — dated

3–16–29 — is signed by *Charlotte Fixel* and witnessed by Edward Fitzgerald (Proponents' Exhibit 224). (9) Certificate of stock Bowery and East River National Bank, dated *3–13–28*, made out to *A. L. Erlanger* for five shares, the back of which has the notation: " Transfer name of Charlotte Lesley " (see testimony of Pratt); blank form of transfer, also on the back of this certificate is not filled out, but is signed at the bottom in ink, " *3–21–28, Charlotte Lesley*, A. L. Erlanger, in presence of Madeleine C. Donnelly " (Proponents' Exhibit 221). (10) Letter, Bank of America, addressed to Mr. A. L. Erlanger, 214 West Forty-second street, dated 11–28, in regard to his recent deposit of five shares of Bowery and East River National Bank and inclosing " Ctf. thirty-six shares N.-O. *Charlotte Fixel*," and three certificates for five, five and eleven shares respectively, to A. L. Erlanger, together with a reference to certain dividend checks, three to the order of A. L. Erlanger and two to the order of *Charlotte Fixel* (Proponents' Exhibit 225). (11) Three checks, Bank of America to A. L. Erlanger, dated 7–2–28, 10–1–28, 11–17–28 (Exhibits 228, 229, 230), covering dividends on bank stock. (12) Four checks, Bank of America to *Charlotte Fixel*, care of A. L. Erlanger, 175 Riverside drive, New York, N. Y., for $40.50 each, being dividends on stock, dated 7–2–28, 10–1–28, 1–2–29 and 4–1–29, indorsed respectively " Charlotte Fixel, Charlotte Lesley; Charlotte Lesley, Charlotte Fixel; Charlotte Fixel, Charlotte Lesley; Charlotte Fixel, Charlotte Lesley " (Exhibits 226, 227, 231, 232). (13) Check, Bank of America to Charlotte Fixel, for $8,675.48, indorsed Charlotte Fixel, Charlotte Lesley, dated March 18, 1929 (Exhibit 233). (14) Agreement of Charlotte M. Fixel, dated 11–14–28, whereby she certifies that the mortgage is still a lien on the Garden City property (it may be noted here that this property passed by deed Erlanger to *Charlotte Fixel*) (Contestant's Exhibit H-7) (Proponents' Exhibit 55). (15) Check, 4–26–29, Bank of America, *Charlotte Leslie, $750, drawn on the A. L. Erlanger personal account* and signed by *A. L. Erlanger personally* (indorsed Charlotte Leslie and Charlotte Lesley) (Proponents' Exhibit 299). (16) Check, Bank of America, *10–14–29*, $3,990, to the order of *Charlotte Fixel*, drawn on the *A. L. Erlanger personal account*, signed by *A. L. Erlanger personally, indorsed Charlotte Fixel, Charlotte Erlanger* (Proponents' Exhibit 300). (17) Check, 12–5–29, to the order of *Charlotte Fixel*, $500, drawn on the A. L. Erlanger personal account, signed by A. L. Erlanger personally; indorsed " *Charlotte Fixel, Charlotte Lesley* " (Proponents' Exhibit 301). (18) Two applications for money orders for taxes, Garden City property, both made out to E. R. Courtney, town clerk, both dated *7–9–29*, sent

by *Charlotte Fixel*, 214 West Forty-second street (Proponents' Exhibit 180). (Note. These taxes were paid upon the property which passed by the deed Erlanger to Fixel.) (19) Letter, *7–9–29*, to E. R. Courtney, inclosing money order, signed " *Charlotte Fixel*, 214 West 42d Street " (Proponents' Exhibit 179). (20) Renewal of operator's license *1929–1930*, signed " *Charlotte Lesley*, 175 Riv. Drive," attested by " Madeleine C. Donnelly " (Proponents' Exhibit 396). (21) Application for renewal of operator's license, *1928–1929*, signed " *Charlotte Lesley*, 175 Riv. Drive " (Proponents' Exhibit 395). (22) Certificate of stock, ten shares, Otis Steel Company, certificate dated 10–10–28, transfer signed by the certificate holder on the back thereof to Lucian Denni, 175 Riverside drive, three shares, and to *Miss Charlotte Lesley*, 175 Riverside drive, seven shares; these names being typed into the transfer, which is dated *10–30–28* (Proponents' Exhibit 216). (23) Certificate for twenty-seven shares, Otis Steel Company stock, dated *12–5–28*, made out in the name of Miss Charlotte Lesley (Proponents' Exhibit 217). (24) Record, Chase National Bank, concerning the issue of twenty-seven shares of stock, Otis Steel Company, *12–5–28*, bearing the name " *Miss Charlotte Lesley* " (Proponents' Exhibit 214). (25) Certificate for twenty-seven shares stock, Otis Steel Company, dated *11–28–28*, with the name *Miss Charlotte Lesley*, 175 Riverside drive, typed into the transfer on back of said certificate (Proponents' Exhibit 215). (26) Letter, Bowery and East River National Bank to Dillon advising the charging of the account of Erlanger for $4,520, payment for five shares Bowery and East River National Bank stock, and asking advice as soon as possible as to whose name and address the stock certificate is to be transferred, dated *3–7–28* (Proponents' Exhibit 222). (Note. Proponents' Exhibit 223 is for id.) (27) Certificate for fifty shares of Bethlehem Steel Corporation, dated 11–1–29; in the transfer the name of " Miss Charlotte Lesley, 175 Riv. Drive, Apt. O–12–E, New York City " is typed in (Proponents' Exhibit 201). (28) Check Bethlehem Steel Corporation, made out to Miss *Charlotte Lesley*, 175 Riverside drive, for a dividend of 2–15–30, indorsed *Charlotte Lesley* (without the word " Miss ") (Proponents' Exhibit 205). (29) Signature card opening an account in the American Savings Bank, 11–17–28, in the name of *Charlotte Lesley*, 175 Riverside drive, Apt. O–12–E; on the card there is no check opposite the word " husband " or the word " wife " (Proponents' Exhibit 174). (30) Signature card, Excelsior Savings Bank, dated *4–2–29*, bearing the signature *Charlotte Lesley*, 175 Riverside drive, Apt. O–12–E (Proponents'

Exhibit 244). (31) Withdrawal slip, Franklin Savings Bank, *8–14–29*, bearing the signature *Charlotte Lesley, and Charlotte M. Lesley*, 175 Riverside drive (Proponents' Exhibit 239). (32) Passenger list, steamship *Olympic*, sailing from Europe, *9–12–28*, showing among additional names, "*Mr. A. L. Erlanger, Mrs. C. Lesley*" (Proponents' Exhibit 40). (33) Registration, Flint car, *1929*, signed "*Charlotte Lesley*" (Proponents' Exhibit 58). (34) Registration of a Packard car, *10–21–29*, made out to *Charlotte Lesley*, 175 Riverside drive, and signed "Charlotte Lesley" (Proponents' Exhibit 59). (35) In Franklin Savings Bank (Proponents' Exhibit 239) the word "*single*" *is not in her handwriting.* (36) Check, Bank of America, dated *2–20–30*, drawn on A. L. Erlanger special for $700, signed by Baron and Pratt; indorsed E. Fitzgerald (Proponents' Exhibit 291). (See Pratt's testimony in regard to cash sent to 175 Riverside drive at request of contestant.) (37) Bill of Betts & Co., insurance, 6–1–28, addressed to *Miss Charlotte Lesley*, covering the Flint coupe, bearing the *O. K. of Pratt* and the stamp of the financial department (Proponents' Exhibit 286). (38) Bill, same company, *9–6–28*, made out to *Miss Charlotte Lesley*, insurance Flint coupe, stamped paid, bearing the O. K. of Pratt and stamped by the financial department (Proponents' Exhibit 287). (39) Bill, same company *10–28–29*, in regard to Packard coupe, made out to *Miss* Charlotte Lesley, O. K.'d by Pratt and stamped by the financial department; marked "Paid" (Proponents' Exhibit 288). (See Pratt's testimony [5379–5381] and cross-examination [5426, 5623, 5711].) (40) Letter written by contestant to Pironti, in Italy, dated *6–24–30*, in which she referred to Erlanger: "We were very happy for twenty-eight and one-half years" (Proponents' Exhibit 241). (41) Telegram addressed to A. L. Erlanger, 175 Riverside drive, *Christmas Day 1928*, signed "Captain Jack" (Proponents' Exhibit 102). (42) Letter, *3–6–30*, from contestant to Joe Toplitsky, sent from 175 Riverside drive, and reading as follows: "*My dear Joe, Just a wee note to tell you how sad my home is. A. L. E. will most likely be gone to rest by the time you get this, but I want you to get this from me in case you wish to be here: it is just a question of hours now. He has cancer of the liver, and is in a coma now. I have named you honorable pallbearer. Hope you are well. With love from us both, in haste, Charlotte*" (Proponents' Exhibit 399). (43) Power of attorney executed 5–10–28, by decedent to his brother Mitchell and Saul J. Baron (Proponents' Exhibit 82). (44) Letter from Nathan Straus, dated *6–6–29*, to "Dear Abe," signed "Very cordially, your friend," and copy of letter sent in reply by Erlanger, *6–8–29;*

a second letter from Straus to Erlanger, dated 6–13–29 (Proponents' Exhibits 378, 379, 380). These were offered by proponents to show the absence of any reference to Mrs. Erlanger or wife in said letters. (45) Federal income tax return for 1928, showing the answer " No " to question about marriage and " None " to question about dependents living in his household. (Note. This is significant since in certain prevous years he took an exemption for his sister.) (46) Signed order blank covering work directed to be done upon the plot in Unionfield Cemetery, in the name of " *Miss Charlotte Lesley*," dated " 2–29–28," order in the name of *Miss Charlotte Lesley*, c/o C. O. Kalischer, 106 Central Park West (Proponents' Exhibit 248). (47) Similar order of *2–26–29*, in the name of *Miss Charlotte Lesley*, c/o Kalischer, 106 Central Park West, directing the fixing of two adult graves, " Fixel, with ivy; also the small child's grave the same " (Proponents' Exhibit 249). (48) Order blank, dated *2–26–29*, in the name of *Miss Charlotte Lesley*, c/o Kalischer, 106 Central Park West, " Two graves of Fixel, cover with ivy, also plant small plot of flowers on small child's grave " (Proponents' Exhibit 249). (Similar orders ran back to 1920 from which time they were sent to *Miss Charlotte Lesley*.) (49) Two applications for dog licenses, March 4, 1929, and October 15, 1929, in name of Charlotte Lesley.

After an analysis of the proofs submitted for the earlier period the conclusion was reached that the relationship of the parties from 1920 to November, 1927, while illicit was matrimonial and that the parties desired matrimony; after a consideration of the proofs covering the period extending from the date May 4, 1927, when Erlanger suffered a stroke, to December, 1927, the conclusion was arrived at that Erlanger's declaration on the boardwalk and the acquiescence of contestant, under all the surrounding circumstances, constituted an agreement *per verba de præsenti*. The question now arises, what is the effect of the proofs submitted by proponents and contestant for the period running from November, 1927, to March 7, 1930, when Erlanger died? All of these proofs must be considered in the light of the events of 1927, culminating in the boardwalk episode. Strictly speaking, the establishing of the consent and agreement of the parties placed the burden of proof upon proponents, in attacking said agreement. (*Matter of Smith*, 136 Misc. 863, an exhaustive opinion by Surrogate WINGATE; *Matter of Briggs*, 138 id. 146; affd., 232 App. Div. 666; *Chancey v. Whinnery*, 147 Pac. 1036.) But in view of all the proofs submitted and the conclusions hereinafter stated, there is no necessity of considering this question of burden of proof so far as it concerns this

later period and proponents; it may in fact be disregarded. So far as parol proof is involved, proponents presented very few witnesses; they in the main were Pratt, Heiman, Lachman, Shade, Mooney, Reid, Richardson and, by deposition, Peltier, the French chauffeur. Observations have already been made upon the testimony of most of them. Heiman's testimony in part was contradicted by other witnesses. The accuracy of his memory, and maladies under which Erlanger was suffering at the time, must be considered in connection with the explosive remarks quoted by Heiman. In any event any statement by Erlanger disclaiming his being married would not disturb or nullify the consent and agreement already proven, for, as Surrogate HART observed: " But a marriage once entered into with intent to assume its obligations cannot be taken off like a coat and discarded." (*Matter of Spector*, 129 Misc. 835. See, also, *Matter of Comly*, 185 Penn. St. 208, 212; *Bissell* v. *Bissell*, 55 Barb. 327; *Davidson* v. *Ream*, 97 Misc. 108.) Richardson and Pratt, called by proponents, provided much support for contestant's contentions. Stern never met contestant; Bickerton, so far as the record shows, did not see contestant during the period from 1927 to Erlanger's death; he had ceased to be his attorney in 1925; Lederer did not see her in the later period at all, so far as his testimony discloses; Lachman saw Erlanger only twice after they returned from Europe in 1928 and it is apparent that he did not see contestant at all after that return; Tyler was never introduced to contestant and his testimony was confined to 1925 and previous years; Pratt never visited the parties either at West End avenue or Riverside drive, and never met contestant; it does not appear that Dillingham met her after 1928; he made it clear and definite on the witness stand that his relations with Erlanger were of a business character and not social; John Emerson, former president of Actors Equity Association, an organization of theatrical people, apparently had no social contact with Erlanger; he never had met contestant. " *In a question affecting the fact of his marriage, the opinion of the few neighbors who make up his social circle will outweigh the negative testimony of a thousand citizens who know nothing and care nothing about the matter.*" (*Matter of Comly, supra.*) At this point it should be noted that three employees, Hemmer and Aguolia in the finance department and Tommy Farrell, telegrapher and telephone operator, were not called, though at the time of the trial they were still connected with the Erlanger offices. From the typewritten inscription at the top of the first page of Exhibit 105 it would seem that Farrell had been examined by the inquisitors who interrogated Dillon. Yet he who by reason of his work and station in the offices

would naturally be an important witness was not called nor was his statement produced. Proponents apparently lay the greater stress upon their documentary proof which in their brief they array particularly against contestant's parol proofs overlooking the voluminous documentary evidence of contestant. All of the exhibits of both sides have been considered and studied in connection with the whole record. Proponents have emphasized the importance of Erlanger's transfer to " *Charlotte Fixel* " of the certificates of stock of the Equitable Building Corporation stock (Exhibit 92) and of the recital of the same name in the certificates issued in the split up (Exhibit 255); the certificates of thirty-six shares of Bank of America stock in the name of *Charlotte Fixel* which Pratt said was at Erlanger's direction (Exhibit 224); the dividend checks on said stock (Exhibits 226 and 227); the dividend checks on the Equitable Building Company stock (Exhibit 208), and dividend checks on Bank of America stock (Exhibit 231); cashier's check to order of *Charlotte Fixel* (Exhibit 283) for proceeds of sale of the Bank of America stock; dividend check on Bank of America stock to order of Charlotte Fixel (Exhibit 232) and other dividend checks in same name (Exhibits 205, 210, 211, 212, 218, 219). They also stress the checks (Exhibits 300 and 301) drawn at Erlanger's request, according to Pratt, to order of *Charlotte Fixel*. In connection with these two checks it should be noted that one was indorsed " Charlotte Fixel," " Charlotte Lesley " (Exhibit 301, dated 12/5/29), and the other, dated 10/14/29 (Exhibit 300), was indorsed Charlotte Fixel, Charlotte Erlanger. In appraising the weight to be given to the use of the name *Charlotte Fixel* on the face and in the transfer indorsement on the back of Exhibit 224, the certificate for thirty-six shares Bank of America stock, the testimony of Pratt in the direct and cross-examination must be considered as well as the indorsements upon the original of this stock, viz., the five shares in the Bowery and East River National Bank (Exhibit 221) which indorsements were (1) at the top " *Transfer name of Charlotte Lesley* " in the handwriting of Pratt, and (2) at the foot of the blank transfer in the handwriting of Erlanger the following " *March 21, 1928*, Charlotte Lesley A. L. Erlanger." Reference at this point should be made to the discussion concerning the use of names fictitious, professional, maiden, etc., in connection with the exhibits of the earlier period. The testimony does not disclose Erlanger's purpose in using or directing to be used the name of Charlotte Fixel upon the stock certificates and checks above referred to. Covering this later period contestant presented the strong array of witnesses whose testimony has been outlined above. They include Dr. Marshall, Dr. McConnell, Dr.

Grausman, Benjamin C. Riley, the Dillons, Charlotte Donnelly, Amy Ashmore Clark, Dorothy McCulloch, Meyer Keen, Walter Gockinga, the tourist agent, Miss Baker and the photographers, Greenhut and Hudson, Henri Newell, the interior decorator, Upton, the architect, Misses Byrne and Matthieu, of the French Hospital, Witherspoon, the Pullman porter, and Grant, the Pullman waiter, Seiffert, of Sloane Company, Schofield, the Packard Car salesman, Inskip, the Rolls Royce agent, the superintendent, hallman and elevator operators at 175 Riverside drive, Jennie Fielis, the housekeeper, McMitchell, the valet, Kroell, the manager of Hotel Ambassador, and three of his employees, Woywood, the tailor, Reath, the trained nurse, Revett, the chauffeur, real estate agents, managers, head waiters and waiters of restaurants, agents of steamship lines, and bank representatives, Stanton, representative of New York Central railroad, Tomassello, an attendant who accompanied the parties on their European trip in 1929, and depositions of Louise Maier, Villa Igiea, Palermo, Italy, Sodo, the jeweler of Naples, Pironti, the tourist agent, Naples, Fischer, hotel manager, Hotel Bristol, Vienna. This parol proof was supported by documentary evidence, some of which has been listed above. As against the relatively few instances where Erlanger was connected with documents in which contestant's maiden name was used, there was presented by contestant a long line of varied exhibits, with a great many of which he was shown to be fully acquainted and with many of which he must have had full knowledge, reciting the name " Mrs. Abraham L. Erlanger." Beginning in the year 1927, the period during which a definite change took place in their relationship, bill after bill bearing the name " *Mrs. A. L. Erlanger* " was received at his offices — some of which even were indorsed " O. K. Mrs. E.," were audited, recorded in his accounts, paid by checks signed by Erlanger or by checks signed by Pratt and Baron or Bergman and Baron. Many letters, hotel records, steamship lists, itineraries, telegrams, bank checks, bank records, plans and blueprints, press notices and other documents were produced and became as it were living witnesses upon the questions of acknowledgment, habit and repute. Contestant's proofs, parol and documentary, are not only of greater weight than those of proponents, they are overwhelming upon the issues of cohabitation, acknowledgment, habit and repute. The lives of the parties during this period were inseparable excepting only the few days spent in his sister's home in February, 1930; there was scarcely a moment when they were not together, excluding, of course, the hours when he was at his offices. The cohabitation was continuous, unbroken and exclusive. Moreover,

cohabitation in New Jersey followed the agreement *per verba de præsenti* in November, 1927, and on subsequent occasions. The cohabitation was marked by the same fidelity toward each other that marked the earlier period. Not the faintest semblance of a blemish was brought out to effectively mar, taint or tarnish the relationship of the parties. Many witnesses attested the devotion, love, solicitude, kindliness and constancy of each to the other.

Proponents would draw from their translation of the proofs in this case a sordid picture of continued breaching of the moral law, persistent and unrelenting flaunting of the decree of the Supreme Court of New York, repeated violation of the Federal statute against transporting of a woman into another State for immoral purposes, the carrying out of a base and debasing secret understanding to effectuate all of the above, the constant quest of social contact and companionship with decent respectable people — the continued commingling at home and abroad with self-respecting persons by a man and a woman with hearts defiled and minds obsessed by lust. *But the real picture shown by convincing proofs presents a union of two sympathetic persons for a time illicit but because of the barrier in the divorce decree and not because of a lack of matrimonial intent, a decade of mutual fidelity unstained by even a suggestion of indifference or inconstancy, a blending of two lives which both in the seclusion of the domestic circle and in all their external and public aspects were such as are lived by the average husband and wife faithfully devoted to each other. After the trial of the issue herein and careful consideration of the proofs presented and study of the briefs of counsel for contestant and proponents I hold that from 1920 up to a time within the first week of November, 1927, the relationship of the parties was matrimonial; that on some day within the first week in November, 1927, upon the boardwalk in Atlantic City, New Jersey, Abraham L. Erlanger and contestant by their consent, and under all the surrounding circumstances by their agreement per verba de præsenti became husband and wife; that this relationship of husband and wife was consummated and confirmed by their subsequent cohabitation, acknowledgment, habit and repute. I hold that contestant has fully established her status as the widow of the decedent.* (*Hynes* v. *McDermott*, 91 N. Y. 451; *Chamberlain* v. *Chamberlain*, 68 N. J. Eq. 415; affd., Id. 737; *Badger* v. *Badger*, 88 N. Y. 522; *Boyd* v. *Boyd*, 252 id. 426; *Travers* v. *Reinhardt*, 205 U. S. 423; *Matter of Briggs*, supra; *Jackson* v. *Jackson*, 94 N. J. Eq. 233; 113 Atl. 495; *People, etc.*, v. *Pizzura*, 211 Mich. 71.) These conclusions are adequately justified by the facts and the law above outlined. Were additional support necessary for these conclusions, the presumptions that are

recognized throughout the whole domain of common-law marriage law are most appropriate to the proofs presented, the presumption in favor of innocence as against the commission of crime and immorality (which is especially applicable to the situation in which Erlanger found himself in the relationship of the earlier period and the events of November, 1927); the presumption in favor of marriage as against concubinage, of honor against dishonor, of decency as against indecency. (*O'Gara* v. *Eisenlohr*, 38 N. Y. 301; *Matter of Biersack*, 96 Misc. 166; *Barnum* v. *Barnum*, 42 Md. 251; *Keller* v. *Linsenmyer*, 101 N. J. Eq. 664, 677; *Richardson* v. *Smith*, 80 Md. 89, 93; *Redgrave* v. *Redgrave*, 38 id. 93, 97; *Jackson* v. *Jackson*, 80 id. 176; 30 Atl. 752, 753; *Matter of Lando*, 127 N. W. 1125; *Wilcox* v. *Wilcox*, 46 Hun, 40; *Hynes* v. *McDermott*, 91 N. Y. 451; *Matter of Wells*, 123 App. Div. 696; affd., 194 N. Y. 548; *Applegate* v. *Applegate*, 118 Misc. 359; *Leeds* v. *Joyce*, 202 App. Div. 696; affd., 235 N. Y. 620; *Fagin* v. *Fagin*, 88 Misc. 306.) Proponents in their replying memorandum assert that the theory underlying contestant's brief is that there can be a marriage declared against the decedent by estoppel. In view of all of the facts and authorities herein set forth it is unnecessary to discuss the principle of estoppel as applicable to the issue in this case. However, were further support of our conclusions necessary, it is available in such authorities as *Chamberlain* v. *Chamberlain* (68 N. J. Eq. 415, 422); *Jackson* v. *Jackson* (94 id. 233; 113 Atl. 495); *Johnson* v. *Johnson* (41 Tenn. 626); *State* v. *Murphy* (6 Ala. 765, 772); *Matter of Imboden* (111 Mo. App. 220; 86 S. W. 263, 268, where, while a different result followed a new trial and appeal, the principle laid down is important). In closing the above review of the facts and the authorities germane to the issue raised herein, no more appropriate observation may be recorded than this excerpt from the closing paragraphs of the opinion of the Supreme Court of Georgia in *Askew* v. *Dupree* (30 Ga. 173, 190): "*I have never known of a self-solemnized marriage. But suppose such should occur; better, far, for the parties, especially the female, that the law should be as it is. Her honor is saved, and this is worth more than everything, even life itself. All other contracts may be rescinded and the parties restored to their former condition; marriage cannot be undone.*" Proceed accordingly.